**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| DON HOLLAND, individually and on behalf of all others similarly situated, | § § § | |
| *Plaintiff*, | § § § | Civil Action No. 1:23-cv-110 |
| vs. | § § | JURY TRIAL DEMANDED |
| CRYPTOZOO INC., a Delaware Corporation, LOGAN PAUL, DANIELLE STROBEL, JEFFREY LEVIN, EDUARDO IBANEZ, JAKE GREENBAUM a/k/a CRYPTO KING, and OPHIR BENTOV a/k/a BEN ROTH, | § § § § § § § | |
| *Defendants*. | § § | |

COMES NOW, Plaintiff Don Holland ("Plaintiff"), on behalf of himself and all other similarly situated individuals, and alleges on personal knowledge, investigation of his counsel, and on information and belief, the following claims against Defendants CryptoZoo Inc., Logan Paul, Danielle Strobel, Jeffrey Levin, Eddie Ibanez, Jake Greenbaum a/k/a Crypto King, and Ophir Bentov a/k/a Ben Roth (collectively, "Defendants"):

## I.     NATURE OF ACTION

1.     Plaintiff Don Holland is a police officer residing in Round Rock, Texas who purchased digital currency products from Defendants.

2.     CryptoZoo Inc. is a Delaware corporation that created and/or sells digital currency products in the form of a digital currency called Zoo Tokens, which could be used to purchase Defendants' other products, CryptoZoo Non-Fungible Tokens ("CZ NFTs"), for use in its online game CryptoZoo. Non-Fungible Tokens ("NFTs"), as discussed below, are a form of digital assets that can be purchased, sold, and transferred on the Binance blockchain.

3.      Logan Paul is an entertainer with a sizeable online audience. Based on his own statements, information, and belief, he is a founder and majority owner of CryptoZoo Inc.

4.      Danielle Strobel is Logan Paul's assistant and one of the founders of CryptoZoo Inc.

5.      Jeffrey Levin is Logan Paul's manager and one of the founders of CryptoZoo Inc.

6.      Eduardo Ibanez is the lead developer of CryptoZoo and one of the founders of CryptoZoo Inc.

7.      Jake Greenbaum a/k/a Crypto King is one of the founders of CryptoZoo Inc.

8.      Ophir Bentov a/k/a Ben Roth is the manager of the CryptoZoo community.

9.      Defendants promoted CryptoZoo Inc.'s products using Mr. Paul's online platforms to consumers unfamiliar with digital currency products, leading to tens of thousands of people purchasing said products. Unbeknownst to the customers, the game did not work or never existed, and Defendants manipulated the digital currency market for Zoo Tokens to their advantage.

10.     The Defendants executed a "rug pull," which is a colloquial term used to describe a scheme in which an NFT developer solicits funds from prospective NFT purchasers promising them certain benefits. Once the purchasers' funds are used to purchase the NFTs, the developers abruptly abandon the project and fail to deliver the promised benefits all while fraudulently retaining the purchasers' funds.

11.     As part of Defendants' NFT scheme, Defendants marketed CZ NFTs to purchasers by falsely claiming that, in exchange for transferring cryptocurrency to purchase the CZ NFT, purchasers would later receive benefits, including, among other things, rewards, exclusive access to other cryptocurrency assets, and the support of an online ecosystem to use and market CZ NFTs. In reality, soon after completing the sale of all their CZ NFTs, Defendants, together with others,

transferred millions of dollars' worth of purchasers' cryptocurrency to, among other places, wallets controlled by Defendants.

12.     Acknowledging CryptoZoo's failings on January 13, 2023, Mr. Paul released a video promising to (1) "burn" his and Mr. Levin's Zoo Tokens, (2) create a "rewards program for disappointed Base Egg and Base Animals holders," and (3) to finish and deliver the game. The rewards program involves "burn[ing] your Base Egg or Base Animal for the mint price (0.1 Eth/equivalent in BNB)"—only two of three sets of CZ NFTs in CryptoZoo. The program does not include Defendants' profitable Zoo Tokens used to participate in the failed CryptoZoo or the third set of CZ NFTs, Hybrid Animals.

13.     Around the same time, Mr. Paul—or someone acting on his behalf—posted messages to the CryptoZoo community confirming the exclusion of consumers who had already sold CZ NFTs from the "rewards program."



14.    Paul also posted that no one in the CryptoZoo community should put any more money into CryptoZoo, framing it as an investment, before saying CryptoZoo was "not intended as an investment vehicle."



15.     Mr. Paul stated he "would no longer be the scapegoat for anyone's financial decisions" in denying responsibility for Plaintiff and the CryptoZoo community's losses.



16.     This action seeks redress from Defendants for their fraudulently promoting and selling products that did not function as advertised, failing to support the CryptoZoo project, and manipulating the digital currency. Defendants operated this fraudulent venture to exploit and steal from Plaintiff and other customers who trusted Mr. Paul's false representations. As a result, Defendants defrauded Plaintiff and thousands of other consumers, and unjustly enriched themselves by profiting off Plaintiff and others without delivering on their promises.

17.     Plaintiff is one of numerous consumers who purchased Zoo Tokens from Defendants and who was damaged by Defendants' manipulation of the Zoo Token market. Plaintiff seeks past and future compensation for Defendants' fraudulent actions and other damages available under his causes of action.

## II.        SUBJECT MATTER JURISDICTION AND VENUE

18.     This Court has original jurisdiction of this action under 28 U.S.C. § 1332.  This controversy is between citizens of different states, and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

19.     Venue in this Court is proper under 28 U.S.C. § 1391(b). The claims asserted in this action arose in this district; a substantial part of the activities, conduct, and/or damages giving rise

to the claims occurred in this district; and Defendants have substantial contacts with this district.

### III.   PARTIES AND PERSONAL JURISDICTION

20.    CryptoZoo Inc. is a Delaware corporation with a listed address of 20 Greene Street #4, New York, NY 10013, and its registered agent, United States Corporation Agents, Inc., located at 221 N. Broad St., Suite 3, Middletown, DE 19709-1070.

21.    Logan Paul is a United States citizen who may be located at 118 Dorado, Beach E, Dorado, PR 00646-2093.

22.    Danielle Strobel is a United States citizen who resides at 5107 Williams Fork Trail, Apt 211, Boulder, CO 80301-3477.

23.    Jeffrey Levin is a United States citizen who resides at 953 Glenhaven Drive, Pacific Palisades, CA 90272-2202.

24.    Eduardo Ibanez is a United States citizen who resides at 53 Kings Highway N., Westport, CT 06880-3004.

25.    Jake Greenbaum a/k/a Crypto King is a United States citizen who resides at 7311 Avalon Blvd, Alpharetta, GA 30009-2503.

26.    Ophir Bentov a/k/a Ben Roth is a United States citizen who resides at 21221 Oxnard St., Apt 457, Woodland Hills, CA 91367.

### IV.   BACKGROUND ON DIGITAL ASSETS, CRYPTOCURRENCY, AND NFTS

27.    A "cryptocurrency" is a digital or "virtual" currency circulated over the Internet as a form of value. Cryptocurrencies are created, and their transaction records are verified and maintained, by a decentralized system using cryptography, rather than through a centralized authority like a bank or government. Like traditional fiat currency, there are multiple types of cryptocurrencies—e.g., Bitcoin, Ether, and Binance Token ("BNB"). Due to its decentralized

nature and limited regulation, cryptocurrency users can transfer funds over the blockchain more anonymously compared to traditional banking and credit systems.

28.     Cryptocurrency owners typically store their cryptocurrency in digital "wallets," which are identified by unique electronic "addresses." Wallets allow cryptocurrency users to store and retrieve their digital assets, and can hold multiple cryptocurrencies. Each digital wallet has a unique cryptographic address, which is used to facilitate transfers of cryptocurrency between wallet addresses.

29.     These types of cryptocurrency transactions are completed using (1) a "public key," which is akin to a bank account number or public-facing email address, and (2) a corresponding "private key," which is akin to a bank 4-digit PIN or email password that allows a user the ability to access and transfer value or information stored at the public address. Users may transfer cryptocurrency to the public address represented as a case-sensitive string of letters and numbers, 26 to 36 characters long. Each public address is controlled and/or accessed using a unique corresponding private key. Only the holder of an address's private key can authorize transfers of cryptocurrency from that address to another cryptocurrency address. A user may control multiple public blockchain addresses simultaneously.

30.     Each cryptocurrency transaction, regardless of the cryptocurrency denomination, is recorded on a "blockchain," which acts as a public accounting ledger. Unlike a traditional bank's ledger, the transactions reflected in a blockchain are distributed across numerous participants that, together, form a network. For each cryptocurrency transaction occurring on a blockchain, the blockchain public ledger records, among other things, the following transaction details: the date and time; the unique cryptocurrency addresses involved in the transaction, including the addresses of the sending and receiving parties; and the amount of cryptocurrency transferred.

31.     The blockchain does not identify the parties who control the cryptocurrency addresses involved in each transaction. However, because each cryptocurrency address is unique, anyone can review other transactions recorded on the blockchain related to the transfer and trace the flow of cryptocurrency. Tracing cryptocurrency to a particular user can be complicated, however, by a user's reliance on multiple cryptocurrency addresses to transfer funds or the use of "mixers," which, in practice, can be used to obscure the link between the sender and receiver of transferred cryptocurrency by commingling cryptocurrencies from multiple transferring parties into a pool before sending specific amounts on to an intended recipient.

32.     An NFT is a unique digital item that is recorded on a blockchain and cannot be copied, substituted, or subdivided. In other words, each NFT is a one-of-a-kind digital item. NFTs can also be transferred on the blockchain. Many NFTs exist as part of the Ethereum blockchain. Like cryptocurrencies, NFTs are uniquely identifiable on the blockchain. Once minted, an NFT can no longer be edited, modified, or deleted.

33.     NFTs can be created in multiple forms, but one of the most common types of NFTs is an image data file similar to a .jpeg image file. However, unlike a .jpeg image file, the NFT provides the owner with an electronic image and corresponding certificate of ownership. NFTs can also act as a "utility" token, allowing an NFT owner to access reward programs, giveaways, and access to other digital assets by virtue of their NFT ownership.

34.     NFTs are created through a process referred to as "minting" and relies on the use of a "smart contract." A smart contract is a piece of computer code that runs on a blockchain. In simple terms, a smart contract is a program that automatically executes defined tasks when and if certain conditions are met. A smart contract system often follows "if . . . , then . . ." statements. For example, a smart contract might be coded to release electronic currency to a party

automatically upon the occurrence of an agreed-upon event without the need for further action by either party to the contract. The minting of NFTs relies on smart contracts to govern the creation, sale, and any subsequent transfers of the NFTs after minting. NFT smart contract code is publicly viewable on the blockchain.

## V.        MISNOMER / ALTER EGO

35.     In the event any parties are misnamed or are not included here, it is Plaintiff's contention that such was a "misidentification," "misnomer," and/or such parties are/were "alter egos" of parties named here. Alternatively, Plaintiff contends that such "corporate veils" should be pierced to hold such parties properly included in the interest of justice.

## VI.        PRINCIPAL-AGENT LIABILITY

36.     All allegations here of acts or omissions by Defendants include, but are not limited to, acts and omissions of such Defendants' officers, directors, operators, managers, supervisors, employees, affiliates, subsidiaries, vice-principals, partners, agents, servants, and owners. Plaintiff alleges that such acts and omissions were committed or made with express and/or implied authority of the Defendants, or were ratified or otherwise approved by the same Defendants; or otherwise that such acts or omissions were made in the routine, normal course of the actor's employment or agency, and within the scope of the agency or employment, as the case may be.

## VII.        FACTUAL ALLEGATIONS AS TO PLAINTIFF

37.     Plaintiff began investing in cryptocurrency in 2016. In 2021, Plaintiff was told by his son about a new NFT project with Logan Paul. CryptoZoo was promoted by Mr. Paul as a "game that makes you money" with a "massive team" supporting it, funded by "like a million" dollars Mr. Paul claimed to have invested. In August of 2021, Defendants released the Zoo Tokens, CZ NFTs, and CryptoZoo's terms stating "[Defendants] will strive to do the best for the project

and the community." *See* Exhibit 1. Shortly thereafter Plaintiff invested an initial $1,000 to purchase Zoo Tokens, which he used to purchase an CZ NFT.

38.     After the launch date came and went, the investment initially went down in price before going up and then back down which is when a lot of individuals began to fear the project due to lack of positive developments. Like others, Plaintiff thought there was long term merit in the project due to the false affirmations by the development team, including from Ben Roth. It was a steady drip of information on positive developments—which were untrue—that led him to believe the project was legitimate. Accordingly, Plaintiff spent an additional approximately $2,000 after his initial investment for a total of $3,000.

39.     Once he saw Logan Paul announce another NFT project and started ignoring ZOO, he realized his money was likely lost. CryptoZoo was never released as advertised and the value of the Zoo Tokens and CZ NFTs plummeted.

40.     The value continued to drop because Defendants manipulated the market for Zoo Tokens by buying and selling them in bulk. Defendants caused Plaintiff to effectively lose the vast majority of the value of the assets (~$3,000) he used to purchase the Zoo Tokens.

41.     Defendants' scheme caused damages to Plaintiff and other consumers. Defendants knew consumers like Plaintiff would be convinced to purchase their products by Defendants' false representations of profit and a functional game.

42.     On information and belief, Defendants made the business decision to forego an expensive and time-consuming process to create a functional CryptoZoo game or support it, and instead deliberately undertook a scheme to defraud Plaintiff and other consumers.

43.     On information and belief, June 11, 2021, was considered internally by Defendants as "Zoo Day," the day upon which they released—without any public notice—their digital

products for purchase on the Binance blockchain. On Zoo Day, and until the release was publicly announced, Logan Paul, Danielle Strobel, Jeffrey Levin, Eddie Ibanez, and Jake Greenbaum a/k/a Crypto King purchased these digital products at an artificially low value. Soon after the project was publicly announced, Eddie Ibanez, Jake Greenbaum, and potentially other Defendants, sold large amounts of the digital products for an immediate and large profit, effectively stealing the money of consumers who had invested. Defendants knew they were supposed to hold onto any early purchased digital products until months after the public release because they knew that selling before then constitutes a "rug pull" and is fraudulent. Due to the unconscionability of Defendants' fraudulent scheme, Defendants should disgorge the revenue, profit, and any other gains made therefrom to Plaintiff.

44.     On information and belief, Defendants manipulated the Zoo Token market. Their standard operating procedure has been to promise products they failed to deliver on only to abandon the project and community they promised to support. Due to these unconscionable practices, Defendants should disgorge any revenue, profits, or any other gains from their scheme to Plaintiff.

45.     Logan Paul and Defendants knew or should have known that they were falsely advertising a non-functional product and that consumers would be deceived by their false representations. Defendants acted with reckless disregard when they made such false representations and are responsible for Plaintiff's damages.

### VIII.     CLASS ACTION ALLEGATIONS

46.     Plaintiff brings this action under Rule 23(b)(2) and (3) of the Federal Rules of Civil Procedure on behalf of a class tentatively defined as:

**CRYPTOZOO CLASS:**

All persons who purchased Zoo tokens and/or CryptoZoo NFTs while in Texas prior to the filing of this action.

47.     Excluded from the class definition are any employees, officers, directors of Defendants, and attorneys appearing in this case, and any judge assigned to hear this action. Plaintiff reserves the right to modify this class definition as he obtains relevant information.

48.     The proposed class can be identified through Defendants' records and Binance block chain records containing, amongst other information, the relevant digital currency transactions.

49.     Such data indicates there is approximately 20,000 victims and on information and belief there are thousands in Texas. Accordingly, the number of Putative CryptoZoo Class Members is believed to be in the thousands, rendering the class so numerous that individual joinder of all class members is impracticable.

50.     Plaintiff is a member of the proposed class.

**<u>Commonality</u>**

51.     There are questions of fact common to the Putative CryptoZoo Class, and those questions predominate over questions affecting any individual Putative CryptoZoo Class Member. Common questions of fact include but are not limited to:

      a.   Whether Defendants fraudulently promoted products or services, that did not exist as promoted, causing consumers like those in the Putative CryptoZoo Class to purchase said products or services;

      b.   Whether Defendants violated their agreement to deliver a functional product and breached their agreement;

      c.   Whether Defendants knew CryptoZoo would not be functional when they

claimed it would be and made false representations despite that knowledge;

    d.   Whether Defendants had a duty to provide functional product to their consumers, and if Defendants violated that duty;

    e.   Whether Defendants failed to deliver on its promises to consumers to provide a functional product;

    f.   Whether Defendant made any false representations to their consumers, and whether Defendants knew those representations to be false, or whether those assertions were made recklessly and without adequate investigation of their truth or falsity;

    g.   Whether Defendants received revenues from their fraudulent venture, and the amount of those revenues;

    h.   Whether Defendant manipulated the market for Zoo tokens and their NFTs; and

    i.   Whether Defendants had a duty to not manipulate the market for Zoo, and whether Defendants violated that duty.

52.    There are questions of law common to the Putative CryptoZoo Class, and those questions predominate over questions affecting any individual Putative CryptoZoo Class Member. Common questions of law include but are not limited to:

    a.   Whether Defendant's conduct in (1) making false representations about CryptoZoo, (2) failing to provide a functional CryptoZoo product, and (3) manipulating the Zoo token market, constitute acts of fraud;

    b.   Whether Defendant's conduct common to the Putative CryptoZoo Class has resulted or will result in Defendant being enriched at the expense of Putative CryptoZoo Class Members, or in Defendant retaining a benefit to the detriment

and loss of Putative CryptoZoo Class Members, in frustration of the fundamental principles of justice, equity, and good conscience, and thus constitutes unjust enrichment;

c.   Whether Defendant's conduct common to the Putative CryptoZoo Class demonstrates willfulness, malice, or recklessness, or whether Defendant proceeded with conscious disregard for the rights of others, therefore entitling Putative CryptoZoo Class Members to punitive damages.

**Typicality**

53.     Typicality. *Fed. R. Civ. P. 23(a)(3).*  Plaintiff's claims are typical of the claims of the Putative CryptoZoo Class Members.  Plaintiff would only seek individual or actual damages if class certification is denied.  In addition, Plaintiff is entitled to relief under the same causes of action and upon the same facts as the other Members of the Putative CryptoZoo Class.

**Adequacy**

54.     Adequacy. *Fed. R. Civ. P. 23(a)(4).*  Plaintiff is an adequate representative of the proposed Putative CryptoZoo Class because his interests coincide with and are not antagonistic to, the interests of the Members of the Putative CryptoZoo Class he seeks to represent; he has retained counsel competent and experienced in such litigation; and he intends to prosecute this action vigorously.  Plaintiff and his Counsel will fairly and adequately protect the interests of the Members of the Putative CryptoZoo Class.

**Superiority**

55.     Superiority. *Fed. R. Civ. P. 23(b)(3).*  Questions of law and fact common to the Putative CryptoZoo Class Members predominate over questions affecting only individual Members, and a class action is superior to other available methods for fair and efficient

14

adjudication of the controversy.  Liability will be determined based on a common set of facts and legal theories.  Willfulness will be determined based on Defendants' conduct and knowledge, not upon the effect of Defendants' conduct on the Putative CryptoZoo Class Members.  The damages sought by each Member are such that individual prosecution would prove burdensome and expensive given the complex and extensive litigation necessitated by Defendants' conduct.  It would be virtually impossible for Members of the Putative CryptoZoo Class individually to redress effectively the wrongs done to them.  Even if the Members of the Putative CryptoZoo Class themselves could afford such individual litigation, it would be an unnecessary burden on the courts.  Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the complex legal and factual issues raised by Defendants' conduct.  By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in one case.

### IX.        CAUSES OF ACTION

### A.  <u>COUNT ONE: FRAUD</u>

56.     Plaintiff incorporates by reference the foregoing paragraphs of this Demand as if fully set forth here.

57.     Defendants failed to disclose that CryptoZoo was non-functional as promoted and that they would not be supporting the project.

58.     Defendants have no practice of providing promised products/projects and supporting said projects/products.

59.     This is a signal attribute of fraud because Defendants represented to provide the promoted products/projects and to do what was best for the Plaintiff and other consumers.

Moreover, in related context and as previously alleged, Defendants had a duty to provide the promoted products/projects and to do what was best for the Plaintiff, investors, and other consumers, but chose to proceed in violation of this duty.

60.     Rather than make candid, straightforward disclosure of their material failures, Defendants ignored them.

61.     Plaintiff and other consumers were ignorant of these material failures and did not stand in equal opportunity with Defendants to know they existed. They had no way of knowing what sort of products/projects would be implemented or what contractual terms Defendants injected to immunize their scheme. In this context these purported contractual terms have the additional effect of intentionally misleading Plaintiff and other consumers concerning Defendants' practices. These customers cannot reasonably expect that Defendants would take their assets and fail to provide a functional CryptoZoo, fail to support the community, or manipulate the Zoo Token market. But this is reflected repeatedly in Plaintiff's statements as presented in this Demand.

### B.  COUNT TWO: EXPRESS BREACH OF CONTRACT

62.     Plaintiff incorporates by reference the foregoing paragraphs of this Demand as if fully set forth here.

63.     Plaintiff alleges that he entered into valid and enforceable express contracts, or was a third party beneficiary of valid and enforceable express contracts, with Defendants.

64.     The valid and enforceable express contracts that Plaintiff entered with Defendants include Defendants' representations that they would provide a functional version of CryptoZoo at the time the Zoo Tokens and CZ NFTs were publicly noticed and/or released as for sale. The express contracts also include violations of Defendants' then-current terms of service.

65.     Under these express contracts, Defendants and/or their affiliated contractors or

associates, promised and were obligated to: (a) provide a functional version of CryptoZoo, upon which the value of Zoo Tokens and CZ NFTs were at least partially dependent; and (b) provide the agreed terms in exchange for Plaintiff's and other consumers investments in Defendants' products/services. In exchange, Plaintiff and other consumers agreed to pay money for these products/services.

66.     Both the (a) provision of a functioning CryptoZoo and (b) the obligation that Defendants "will strive to do the best for the project and the community" of participants in CryptoZoo—amongst other obligations—were material aspects of these agreements.

67.     At all relevant times, Defendants expressly represented in their promotions that CryptoZoo would be functional by September 1, 2021, and they "will strive to do the best for the project and the community [of participants in CryptoZoo]." Defendants had a duty to provide a functional CryptoZoo product, especially if they were taking assets from Plaintiff and other consumers in exchange for access to it. Instead, Defendants pocketed Plaintiff's and other consumers' money and mostly forgot, according to the publicly available information, about the "failed endeavor" until receiving negative media attention.

68.     Defendants' express representations—including, but not limited to, express representations found in their advertising and promotion—formed an express verbal contract/offer requiring Defendants to provide a functional CryptoZoo and to "strive to do the best for the project and the community [of participants in CryptoZoo]."

69.     Plaintiff trusted Defendants' representations and proposed agreements related to their products. Yet Defendants failed to provide the promoted product and do what was best for their consumers, even lying about the underlying investment in the project. The CryptoZoo Tokens and CZ NFTs are essentially worthless, in part because CryptoZoo was never released. Plaintiff

would not have entered into these agreements with Defendants without believing CryptoZoo would function and be supported by Defendants.

70.     A meeting of the minds occurred, as Plaintiff and other consumers invested in Defendants digital products in exchange for, amongst other things, a functioning CryptoZoo and Defendants' support of it.

71.     Plaintiff performed his obligations under the contract when he paid for Defendants' digital products.

72.     Defendants materially breached their contractual obligations to provide a functional CryptoZoo and support the project.

73.     Defendants materially breached the terms of these express contracts, including, but not limited to, the terms stated in their promotions and then-current terms of service.

74.     The ensuing damages were a reasonably foreseeable consequence of Defendants' actions in breach of these contracts.

75.     As a result of Defendants' failure to fulfill obligations promised in these contracts, Plaintiff and other consumers did not receive the full benefit of the bargain, and instead received products that were of a diminished value to that described in the agreements. Defendants therefore damaged Plaintiff in an amount at least equal to the difference in the value of the Zoo Tokens he paid for, and the value he was left with.

76.     Had Defendants disclosed that CryptoZoo was nonfunctional, or that they were not going to support the project, neither the Plaintiff nor any reasonable person would have purchased/invested in Defendants' products/services.

77.     As a direct and proximate result of these breaches, Plaintiff has been harmed and has suffered, and will continue to suffer, actual damages and injuries, including without limitation

the loss of assets and loss of use of those assets, out-of-pocket expenses, and the loss of the benefit of the bargain he had struck with Defendants.

78.     Plaintiff is entitled to compensatory and consequential damages suffered as a result of these breaches.

### C. COUNT THREE: IMPLIED BREACH OF CONTRACT

79.     Plaintiff incorporates by reference the foregoing paragraphs of this Demand as if fully set forth here.

80.     When Plaintiff and other consumers provided their investments/monies to Defendants in exchange for Defendants' services and products required to participate in CryptoZoo, they entered into implied contracts with Defendants under which Defendants agreed to reasonably provide a functional CryptoZoo and support it.

81.     Defendants solicited and invited Plaintiff and other consumers to invest/pay for its digital products as part of Defendants' regular business practices. Plaintiff accepted Defendants' offers and provided assets to Defendants.

82.     In entering into such implied contracts, Plaintiff reasonably believed and expected that Defendants would provide a functional CryptoZoo and support the project.

83.     Plaintiff provided assets to Defendants reasonably believing and expecting that Defendants would provide a functional CryptoZoo and support the project.

84.     Plaintiff would not have provided his assets to Defendants in the absence of the implied contract between him and Defendants to provide a functional CryptoZoo and support the project.

85.     Plaintiff would not have entrusted his assets to Defendants in the absence of their implied promise provide a functional CryptoZoo and support the project.

86.     Plaintiff fully and adequately performed his obligations under the implied contracts with Defendants.

87.     Defendants breached their implied contracts with Plaintiff by failing to provide a functional CryptoZoo and support the project.

88.     As a direct and proximate result of Defendants' breaches of the implied contracts, Plaintiff sustained damages as alleged here.

89.     Plaintiff is entitled to compensatory and consequential damages suffered as a result of these breaches.

**D.  <u>COUNT FOUR: UNJUST ENRICHMENT</u>**

90.     Plaintiff incorporates by reference the foregoing paragraphs of this Demand as if fully set forth herein.

91.     As a direct and proximate result of Defendants' intentional and unlawful taking of Plaintiff's assets without providing the promised product/services, Plaintiff has been deprived of the profits and other benefits of purchasing/investing in Defendants' products. Defendants have been unjustly enriched by its wrongful receipt and retention of profits and other benefits it deprived Plaintiff and, in equity, Defendants should not be allowed to retain their revenues and benefits.

92.     Plaintiff is entitled to a judgment requiring Defendants to disgorge all sums they have received as revenue and other benefits arising from its unconscionable and unlawful failure to provide a functional CryptoZoo, failure to support the project, and manipulation of the Zoo Token market.

**E.  <u>COUNT FIVE: VIOLATION OF TEXAS'S DECEPTIVE TRADE PRACTICES ACT ("DTPA")</u>**

93.     Plaintiff incorporates by reference the foregoing paragraphs of this Demand as if fully set forth here.

94.    Plaintiff is a consumer under the DTPA.

95.    Defendants' conduct concerning their false advertising, failure to provide the promised products/services, manipulation of the Zoo Token market, failure to disclose information concerning the progress of CryptoZoo, and failure to support Plaintiff and the CryptoZoo community, as enumerated in this Demand, constitute false, unfair, misleading, unconscionable, and/or deceptive acts under the DTPA These facts were known to Defendants at all times and done with the intent to induce Plaintiff and consumers to provide assets to Defendants, remain in the program after it initially failed, or engage in transactions that they would not otherwise have engaged had the information withheld been known to them.

96.    Defendants conduct concerning their misrepresentations and failures as enumerated in this Demand was unfair, misleading, and unconscionable under the DTPA.

97.    Defendants should not be allowed to rely on their terms of service to escape liability for their accused practices and profit from their own wrong.

98.    As a direct and proximate result of Defendants' intentional, unconscionable, misleading, unfair, and unlawful conduct, Plaintiff has been deprived of the profits and other benefits of purchasing/investing in Defendants' products/services.

99.    Plaintiff has been damaged by Defendants' willful violation of the DTPA and is entitled to relief in the form of treble damages, attorneys' fees, and costs.

### F.  COUNT SIX: NEGLIGENCE

100.    Plaintiff incorporates by reference the foregoing paragraphs of this Demand as if fully set forth herein.

101.    By representing to the public that CryptoZoo would be functional, was seeded with around a million dollars, and that the CryptoZoo community would be supported, Defendants had

a duty of care to use reasonable means to provide the promised products/services, not manipulate the Zoo Token market, and support Plaintiff and the other members of the CryptoZoo community.

102. Defendants' duty of care to provide the promised products/services, not manipulate the Zoo Token market, and support Plaintiff and the other members of the CryptoZoo community arose from the special relationship that existed between Plaintiff and Defendants. Defendants were positioned to ensure that the promised products/services would be delivered, that the Zoo Token market was not manipulated, and to support Plaintiff and the other members of the CryptoZoo community.

103. Defendants breached their duties, and thus were negligent, by failing to provide the promised products/services, not manipulating the Zoo Token market, and failing to support Plaintiff and the other members of the CryptoZoo community. The specific negligent acts and omissions committed by Defendants include, but are not limited to:

   a. Promoting products or services, that did not exist as promoted, causing Plaintiff to purchase said products or services under false pretenses;

   b. Representing that CryptoZoo would be functional and making false representations despite that knowledge;

   c. Willfully failing to provide functional products and services to their consumer, even after receiving revenues from their fraudulent venture;

   d. Willfully manipulating the market for Zoo Tokens and CZ NFTs; and

   e. Willfully failing to support Plaintiff and the CryptoZoo community.

104. It was foreseeable that Defendants' failures to provide the promised products/services, not manipulate the Zoo Token market, and support Plaintiff and the other members of the CryptoZoo community would result in one or more types of injuries to Plaintiff.

105. Plaintiff is entitled to compensatory and consequential damages suffered as a result of Defendants' negligent failures.

### G. <u>COUNT SEVEN: FRAUDULENT MISREPRESENTION</u>

106.    Plaintiff incorporates by reference the foregoing paragraphs of this Demand as if fully set forth here.

107.    Defendants fraudulently represented to the public that CryptoZoo would be functional and that they would be supporting the project and the CryptoZoo community.

108.    Upon information and belief, Defendants knew that CryptoZoo would never be functional and that they had no intention of supporting the project or the CryptoZoo community, including Plaintiff.

109.    Defendants had a duty to tell its consumers, including Plaintiff, that CryptoZoo would never be functional and that they had no intention of supporting the project or the CryptoZoo community.

110.    Rather than make candid, straightforward disclosures to their consumers, including Plaintiff, Defendants willfully concealed that CryptoZoo would never be functional and that they had no intention of supporting the project or the CryptoZoo community.

111.    Plaintiff would not have purchased Defendants' products but for his reliance on Defendants' material statements that CryptoZoo would be functional and that they would be supporting the project and the CryptoZoo community.

112.    As a result, Plaintiff is entitled to compensatory and consequential damages suffered as a result of Defendants' fraudulent representations.

### H. <u>COUNT EIGHT: CONSPIRACY TO COMMIT FRAUD</u>

113.    Plaintiff incorporates by reference the foregoing paragraphs of this Demand as if fully set forth here.

114.    Defendants conspired with one another and potentially others as yet unknown to

commit the acts set forth in this Demand.

115.    Said conspiracy constitutes a conspiracy to defraud Plaintiff and other consumers.

116.    Plaintiff, unaware of the falsity of statements made by Defendants, and in reliance on their accuracy, paid money to Defendants based on such fraudulent statements. Plaintiff has been damaged as a result of Defendants' conspiracy to commit fraud.

## X.    DAMAGES

117.    Plaintiff hereby adopts by reference each and every foregoing paragraph of the stated in this Demand as if fully and completely set forth here.

118.    Defendants' conduct and actions discussed above proximately caused injury to Plaintiff, which resulted in:

    i.    Loss of use damages for assets diminished by Defendants' actions;

    ii.    Actual damages and treble damages under the DTPA;

    iii.    Exemplary damages under the DTPA and Common Law Fraud;

    iv.    Actual damages, including economic damages under all causes of action;

    v.    As a direct and proximate result of Defendants' breaches of contracts, Plaintiff sustained damages as alleged here;

    vi.    Plaintiff is entitled to compensatory and consequential damages suffered as a result of Defendants' fraud and actions.

    vii.    Mental anguish;

    viii.    Civil penalties;

    ix.    Prejudgment interest;

    x.    Attorney's fees; and

    xi.    Costs of action.

119.    Plaintiff further seeks unliquidated damages within the jurisdictional limits of this Court.

## XI.        PUNITIVE DAMAGES

120.    Plaintiff incorporates the foregoing paragraphs of this Demand as if fully set forth here.

121.    The wrong done to Plaintiff by Defendants was attended by fraudulent, malicious, intentional, willful, wanton, or reckless conduct that evidenced a conscious disregard for Plaintiff's rights. Therefore, Plaintiff seeks punitive damages in an amount to be proven at trial.

## XII.        ATTORNEY'S FEES

122.    Each and every allegation contained in the foregoing paragraphs is realleged as if fully rewritten here.

123.    Plaintiff is entitled to recover reasonable attorney fees and request the attorney's fees be awarded under his breach of contract claims.

## XIII.        INCORPORATION OF PARAGRAPHS

124.    Every paragraph in this Demand is hereby incorporated into every other paragraph.

## XIV.        PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants, awarding relief as follows:

a.     For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendants' wrongful conduct;

b.     Holding that the doctrine of unjust enrichment applies and ordering Defendants to pay Plaintiff all sums received by Defendants flowing from their illegal and unconscionable activities;

c.     For an award of actual damages, compensatory damages, statutory damages, exemplary damages, and statutory penalties, in an amount to be determined, as allowable by law;

d.     For an award of punitive damages, as allowable by law;

e.      For an award of attorneys' fees and costs, and any other expenses, including expert witness fees;

f.      Pre-and post-judgment interest on any amounts awarded; and

g.      Such other and further relief as this court may deem just and proper.

Respectfully submitted,

*/s/ Jarrett L. Ellzey*

**ELLZEY & ASSOCIATES, PLLC**
Jarrett L. Ellzey
Texas Bar No. 24040864
jarrett@ellzeylaw.com
Leigh S. Montgomery
Texas Bar No. 24052214
leigh@ellzeylaw.com
Alexander G. Kykta
Texas Bar No. 24107841
alex@ellzeylaw.com
1105 Milford Street
Houston, Texas 77006
Phone: (888) 350-3931
Fax: (888) 276-3455

**ATTORNEY TOM & ASSOCIATES**
Tom Kherkher (*pro hac vice* forthcoming)
Texas Bar No. 24113389
tom@attorneytom.com
5909 West Loop South Suite 525
Houston, Texas 77401
Phone: (855) 866-9467