# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS

## AUSTIN DIVISION

DON HOLLAND, individually and on behalf of all
others similarly situated,

Plaintiff,

vs.

CRYPTOZOO INC., a Delaware Corporation,
LOGAN PAUL, DANIELLE STROBEL, JEFFREY
LEVIN, EDUARDO IBANEZ, JAKE
GREENBAUM a/k/a CRYPTO KING, and OPHIR
BENTOV a/k/a BEN ROTH,

Defendants.

_____/

LOGAN PAUL,

Cross-Plaintiff,

vs.

EDUARDO IBANEZ and
JAKE GREENBAUM a/k/a CRYPTO KING

Cross-Defendants.

_____/

Civil Action No. 1:23-cv-110

## LOGAN PAUL'S ANSWER, AFFIRMATIVE DEFENSES, AND CROSSCLAIM
## AGAINST EDUARDO IBANEZ AND JAKE GREENBAUM a/k/a CRYPTO KING

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................. i

**ANSWER** ...................................................................................................................................... 1

    I.      NATURE OF THE ACTION ................................................................................... 1

    II.     SUBJECT-MATTER JURISDICTION AND VENUE ............................................ 2

    III.   PARTIES AND PERSONAL JURISDICTION .................................................... 3

    IV.   BACKGROUND ON DIGITAL ASSETS, CRYPTOCURRENCY, AND NFTS .......... 3

    V.    MISNOMER/ALTER EGO ................................................................................... 4

    VI.   PRINCIPAL-AGENT LIABILITY ...................................................................... 4

    VII.  FACTUAL ALLEGATIONS AS TO PLAINTIFF ............................................ 5

    VIII.  CLASS ALLEGATIONS ...................................................................................... 6

       Commonality ...................................................................................................... 6

       Typicality ............................................................................................................ 6

       Adequacy ............................................................................................................ 6

       Superiority .......................................................................................................... 7

    IX.   CAUSES OF ACTION ........................................................................................ 7

     A.   COUNT ONE: FRAUD ................................................................................... 7

     B.   COUNT TWO: EXPRESS BREACH OF CONTRACT ................................... 7

     C.   COUNT THREE: IMPLIED BREACH OF CONTRACT .............................. 8

     D.   COUNT FOUR: UNJUST ENRICHMENT ................................................... 9

     E.   COUNT FIVE: VIOLATION OF TEXAS'S DECEPTIVE TRADE PRACTICES ACT ("DTPA") ....................................................................................................... 9

     F.   COUNT SIX: NEGLIGENCE ....................................................................... 10

     G.  COUNT SEVEN: FRAUDULENT MISREPRESENTATION ..................... 10

     H.  COUNT EIGHT: CONSPIRACY TO COMMIT FRAUD ............................ 11

    X.    DAMAGES ......................................................................................................... 11

    XI.   PUNITIVE DAMAGES ..................................................................................... 11

    XII.  ATTORNEY'S FEES ......................................................................................... 11

    XIII. INCORPORATION OF PARAGRAPHS ......................................................... 11

    XIV. PRAYER FOR RELIEF ..................................................................................... 12

**DEMAND FOR JURY TRIAL** ................................................................................................ 12

**AFFIRMATIVE DEFENSES** ................................................................................................. 12

First Affirmative Defense (Intervening and Superseding Cause) ............................................ 12

Second Affirmative Defense (Good Faith)............................................................................... 12

Third Affirmative Defense (Assumption of Risk).................................................................... 12

Fourth Affirmative Defense (Economic Loss Rule) ................................................................ 13

Fifth Affirmative Defense (Adequate Remedy at Law) ........................................................... 13

Sixth Affirmative Defense (No Capacity to Defraud).............................................................. 13

Seventh Affirmative Defense (Contributory Negligence)........................................................ 13

Eighth Affirmative Defense (Failure to Mitigate).................................................................... 13

Ninth Affirmative Defense (No Fraudulent, Malicious, Intentionally Harmful, Willful, Wanton, or Reckless Conduct) .................................................................................................... 13

Tenth Affirmative Defense (Overbroad Class Definition - Standing)....................................... 14

Eleventh Affirmative Defense (Overbroad Class Definition - Failure to State a Claim).......... 14

Twelfth Affirmative Defense (Inadequate Class Representative/No Standing)........................ 14

Thirteenth Affirmative Defense (Case not Appropriate for Class Certification) ...................... 14

Fourteenth Affirmative Defense (Texas Constitutional and Statutory Cap on Punitive Damages)................................................................................................................................... 14

Defenses Reserved .................................................................................................................. 14

**PRAYER FOR RELIEF** ..................................................................................................... 15

## CROSSCLAIM TABLE OF CONTENTS

**CROSSCLAIM** .......................................................................................................... 15

**INTRODUCTION** .................................................................................................... 15

**PARTIES, JURISDICTION, AND VENUE** ............................................................ 17

**BACKGROUND** ...................................................................................................... 17

Background on Cryptocurrency and NFTs ................................................................ 17

CryptoZoo is Conceived as a Blockchain Game where Players Breed Animals Using NFTs.. 19

Mr. Paul Assembles a Team to Successfully Deliver the CryptoZoo Game. .......................... 19

Mr. Greenbaum and Mr. Ibanez Assume Roles with CryptoZoo. ............................................ 21

Mr. Greenbaum Creates and Launches the Token Liquidity Pool. ........................................... 23

Suspicious Trading Activity Occurs in the Liquidity Pool Immediately After Launch. ........... 25

Mr. Paul Publicly Announces the CryptoZoo Project After Receiving Assurances of Progress from the CryptoZoo Team. ...................................................................................... 27

Mr. Paul Uncovers Mr. Greenbaum's Deceit and Ousts Him from CryptoZoo. ..................... 30

The Egg Sale Does Not Proceed as Planned and Mr. Paul Continues to Receive False Promises from Mr. Ibanez about the Progress of the Game's Development ........................... 32

Mr. Paul Discovers that Mr. Ibanez is a Complete Fraud. .......................................... 35

Mr. Paul Is Repeatedly Assured CryptoZoo is Still in Development. ...................................... 36

Mr. Paul Pledges to Buyback all of the CryptoZoo Egg NFTs. ............................................... 37

**CLAIMS FOR RELIEF** .......................................................................................... 38

COUNT I FRAUDULENT INDUCEMENT ............................................................... 38

COUNT II FRAUDULENT MISREPRESENTATION .............................................. 39

**PRAYER FOR RELIEF** ......................................................................................... 40

**DEMAND FOR JURY TRIAL** .............................................................................. 40

Defendant Logan Paul hereby answers the Complaint brought by Plaintiff Don Holland, brings a crossclaim against Defendant Eduardo Ibanez and Defendant Jake Greenbaum a/k/a Crypto King, and states as follows:

## ANSWER

All allegations not expressly admitted are denied. The Complaint includes a number of headings. Mr. Paul denies all headings to the extent they contain factual allegations or characterizations against Mr. Paul. Mr. Paul responds to the corresponding numbered allegations of the Complaint as set forth below.

### I.    NATURE OF THE ACTION

1.      Mr. Paul lacks knowledge or information sufficient to admit or deny the allegations set forth in paragraph 1 of the Complaint, and therefore denies paragraph 1.

2.      Admitted to the extent that CryptoZoo, Inc. ("CryptoZoo"), was incorporated in the state of Delaware and that Non-Fungible Tokens ("NFTs") are a form of digital assets that can be bought, sold, and transferred on blockchains. In all other respects, Mr. Paul denies the allegations set forth in paragraph 2 of the Complaint.

3.      Admitted.

4.      Admitted that Mr. Paul considered Ms. Strobel as one of the founders of CryptoZoo. Denied that Ms. Strobel is still his assistant.

5.      Admitted.

6.      Admitted that Mr. Ibanez was the lead developer of CryptoZoo. Denied that Mr. Ibanez is still the lead developer of CryptoZoo.

7.      Admitted.

8.      Admitted that Mr. Bentov was the manager of the CryptoZoo community. Denied

that Mr. Bentov is still the manager of the CryptoZoo community.

9.      Denied.

10.     Denied.

11.     Denied.

12.     Mr. Paul admits that he released a video on January 13, 2023, but denies that he "promised" to take any action in that video. Mr. Paul denies the remaining allegations set forth in paragraph 12.

13.     The image set forth in paragraph 13 speaks for itself, and Mr. Paul denies any allegations inconsistent with the image set forth in paragraph 13.

14.     The image set forth in paragraph 14 speaks for itself, and Mr. Paul denies any allegations inconsistent with the image set forth in paragraph 14, including, but not limited to, the allegation that Mr. Paul "fram[ed] CryptoZoo as an investment."

15.     The image set forth in paragraph 15 speaks for itself, and Mr. Paul denies any allegations inconsistent with the image set forth in paragraph 15.

16.     Mr. Paul lacks knowledge or information sufficient to admit or deny allegations of Plaintiff's intentions in bringing this action, and therefore denies the same. Mr. Paul otherwise denies the allegations set forth in paragraph 16.

17.     Mr. Paul lacks knowledge or information sufficient to admit or deny allegations about Plaintiff's relationship to CryptoZoo, and therefore denies Plaintiff's allegation that he purchased CryptoZoo tokens. Mr. Paul otherwise denies the allegations set forth in paragraph 17.

## II.     SUBJECT-MATTER JURISDICTION AND VENUE

18.     The allegations in paragraph 18 are legal conclusions to which no response is required. To the extent a response is required, Mr. Paul lacks knowledge or information sufficient

to admit or deny the allegations set forth in paragraph 18, and therefore denies them.

19.     The allegations in paragraph 19 are legal conclusions to which no response is required. To the extent a response is required, Mr. Paul lacks knowledge or information sufficient to admit or deny the allegations set forth in paragraph 19, and therefore denies them.

### III.     PARTIES AND PERSONAL JURISDICTION

20.     Admitted.

21.     Admitted.

22.     Mr. Paul lacks knowledge or information sufficient to admit or deny the allegations set forth in paragraph 22, and therefore denies them.

23.     Mr. Paul lacks knowledge or information sufficient to admit or deny the allegations set forth in paragraph 23, and therefore denies them.

24.     Mr. Paul lacks knowledge or information sufficient to admit or deny the allegations set forth in paragraph 24, and therefore denies them.

25.     Mr. Paul lacks knowledge or information sufficient to admit or deny the allegations set forth in paragraph 25, and therefore denies them.

26.     Mr. Paul lacks knowledge or information sufficient to admit or deny the allegations set forth in paragraph 26, and therefore denies them.

### IV.     BACKGROUND ON DIGITAL ASSETS, CRYPTOCURRENCY, AND NFTS

27.     Admitted only to the extent that Plaintiff alleges that "cryptocurrencies" are digital assets in which transactions are verified, and records maintained, by a decentralized system using cryptography. Mr. Paul denies the remaining allegations set forth in paragraph 27.

28.     Admitted.

29.     Admitted only to the extent that Plaintiff alleges that cryptocurrency wallets have

public and private keys. Mr. Paul lacks knowledge or information sufficient to admit or deny the remaining allegations set forth in paragraph 29, and therefore denies them.

30.     Admitted.

31.     Admitted only to the extent that Plaintiff alleges that each cryptocurrency wallet address is unique, and all transactions are recorded on a blockchain, which acts as a digital ledger, and are viewable by the public. Mr. Paul denies the remaining allegations set forth in paragraph 31.

32.     Admitted only to the extent that Plaintiff alleges that NFTs are digital assets that exist in the form of tokens that are viewable and can be transferred on blockchains. Mr. Paul lacks knowledge or information sufficient to admit or deny the remaining allegations set forth in paragraph 32, and therefore denies them.

33.     Mr. Paul lacks knowledge or information sufficient to admit or deny the allegations set forth in paragraph 33, and therefore denies them.

34.     Admitted only to the extent that Plaintiff alleges that NFTs are created through a process called "minting" out of a "smart contract." Mr. Paul lacks knowledge or information sufficient to admit or deny the remaining allegations set forth in paragraph 34, and therefore denies them.

**V.     MISNOMER/ALTER EGO**

35.     The allegations set forth in paragraph 35 of the Complaint are legal conclusions to which no response is required. Mr. Paul denies the allegations set forth in paragraph 35 to the extent that a response is required.

**VI.     PRINCIPAL-AGENT LIABILITY**

36.     The allegations set forth in paragraph 36 of the Complaint are legal conclusions to

which no response is required. Mr. Paul denies the allegations set forth in paragraph 36 to the extent that a response is required.

## VII.    FACTUAL ALLEGATIONS AS TO PLAINTIFF

37.    The Terms of Service attached to the Complaint as Exhibit 1 speak for themselves, and Mr. Paul denies any allegations inconsistent with the Terms of Service. Mr. Paul also denies that he is the source of any statement set forth in the Terms of Service and denies such statements to the extent Plaintiff intends to attribute them to him. To the extent paragraph 37 contains allegations that rely on statements made by Mr. Paul, Mr. Paul admits that the statements are his, but denies that their meaning or his intentions are reflected accurately where, as here, those statements are taken out of context. Mr. Paul lacks knowledge or information sufficient to admit or deny the remaining allegations set forth in paragraph 37, and therefore denies them.

38.    Mr. Paul lacks knowledge or information sufficient to admit or deny the allegations set forth in paragraph 38, and therefore denies them.

39.    Mr. Paul lacks knowledge or information sufficient to admit or deny allegations about Plaintiff's beliefs or state of mind, and therefore denies any such allegation set forth in paragraph 39. Mr. Paul denies the remaining allegations set forth in paragraph 39.

40.    Denied.

41.    Denied.

42.    Denied.

43.    Denied.

44.    Denied.

45.    Denied.

## VIII.   CLASS ALLEGATIONS

46.      Denied. Mr. Paul denies the claims asserted against him and that a class should be certified.

47.      Denied. Mr. Paul denies the claims asserted against him and that a class should be certified.

48.      Denied. Mr. Paul denies the claims asserted against him and that a class should be certified.

49.      Denied. Mr. Paul denies the claims asserted against him and that a class should be certified.

50.      Denied. Mr. Paul denies the claims asserted against him and that a class should be certified.

**<u>Commonality</u>**

51.      Denied. Mr. Paul denies the claims asserted against him and that a class should be certified.

52.      Denied. Mr. Paul denies the claims asserted against him and that a class should be certified.

**<u>Typicality</u>**

53.      Denied. Mr. Paul denies the claims asserted against him and that a class should be certified.

**<u>Adequacy</u>**

54.      Denied. Mr. Paul denies the claims asserted against him and that a class should be certified.

**Superiority**

55.     Denied. Mr. Paul denies the claims asserted against him and that a class should be certified.

## IX.     CAUSES OF ACTION

### A. **COUNT ONE: FRAUD**

56.     Mr. Paul repeats and realleges each and every response contained in the foregoing paragraphs as if set forth fully herein.

57.     Denied.

58.     Denied.

59.     Denied.

60.     Denied.

61.     Denied.

### B. **COUNT TWO: EXPRESS BREACH OF CONTRACT**

62.     Mr. Paul repeats and realleges each and every response contained in the foregoing paragraphs of the Complaint as if set forth fully herein.

63.     Denied.

64.     Denied.

65.     Denied.

66.     Denied.

67.     Mr. Paul admits that the Terms of Service attached to the Complaint [D.E. 1-2] represent that CryptoZoo, Inc. would "strive to do the best for the project and the community," but denies that he is the author of that statement, that it can be attributed to him as an individual, and that it can serve as the basis for any contract between Mr. Paul and Plaintiff or any other consumer.

Mr. Paul denies the remaining allegations set forth in paragraph 67 of the Complaint.

68.     Denied.

69.     Denied.

70.     Denied.

71.     Denied.

72.     Denied.

73.     Denied.

74.     Denied.

75.     Denied.

76.     Denied.

77.     Denied.

78.     Denied

**C.   COUNT THREE: IMPLIED BREACH OF CONTRACT**

79.     Mr. Paul repeats and realleges each and every response contained in the foregoing paragraphs of the Complaint as if set forth fully herein.

80.     Denied.

81.     Mr. Paul admits that Defendants invited consumers to purchase CryptoZoo digital products but denies that he promoted them as an investment. Mr. Paul denies the remaining allegations set forth in paragraph 81 of the Complaint.

82.     Mr. Paul lacks knowledge or information sufficient to admit or deny allegations set forth in paragraph 82 regarding Plaintiff's expectations or state of mind, and therefore denies such allegations. Mr. Paul also denies that he is, or ever was, party to an implied contract with Plaintiff.

83.     Mr. Paul lacks knowledge or information sufficient to admit or deny allegations set

forth in paragraph 83 regarding Plaintiff's expectations or state of mind, and therefore denies such allegations. Mr. Paul denies the remaining allegations set forth in paragraph 83 of the Complaint.

84.     Mr. Paul lacks knowledge or information sufficient to admit or deny allegations set forth in paragraph 84 regarding Plaintiff's state of mind, or what Plaintiff would have done under any set of circumstances, and therefore denies such allegations. Mr. Paul denies the remaining allegations set forth in paragraph 84 of the Complaint.

85.     Mr. Paul lacks knowledge or information sufficient to admit or deny allegations set forth in paragraph 85 regarding Plaintiff's expectations or state of mind, and therefore denies such allegations. Mr. Paul denies the remaining allegations set forth in paragraph 85 of the Complaint.

86.     Denied.

87.     Denied.

88.     Denied.

89.     Denied.

**D.   COUNT FOUR: UNJUST ENRICHMENT**

90.     Mr. Paul repeats and realleges each and every response contained in the foregoing paragraphs of the Complaint as if set forth fully herein.

91.     Denied.

92.     Denied.

**E.   COUNT FIVE: VIOLATION OF TEXAS'S DECEPTIVE TRADE PRACTICES ACT ("DTPA")**

93.     Mr. Paul repeats and realleges each and every response contained in the foregoing paragraphs of the Complaint as if set forth fully herein.

94.     Denied.

95.     Denied.

96.    Denied.

97.    Denied.

98.    Denied.

99.    Denied.

**F.  COUNT SIX: NEGLIGENCE**

100.   Mr. Paul repeats and realleges each and every response contained in the foregoing paragraphs of the Complaint as if set forth fully herein.

101.   Denied.

102.   Denied.

103.   Denied.

104.   Denied.

105.   Denied.

**G.  COUNT SEVEN: FRAUDULENT MISREPRESENTATION**

106.   Mr. Paul repeats and realleges each and every response contained in the foregoing paragraphs of the Complaint as if set forth fully herein.

107.   Denied.

108.   Denied.

109.   Denied.

110.   Denied.

111.   Mr. Paul lacks knowledge or information sufficient to admit or deny allegations set forth in paragraph 111 about Plaintiff's state of mind, and therefore denies any such allegations set forth in paragraph 111 of the Complaint. Mr. Paul denies the remainder of paragraph 111.

112.   Denied.

**H.  COUNT EIGHT: CONSPIRACY TO COMMIT FRAUD**

113.    Mr. Paul repeats and realleges each and every response contained in the foregoing paragraphs of the Complaint as if set forth fully herein.

114.    Denied.

115.    Denied.

116.    Denied.

**X.      DAMAGES**

117.    Mr. Paul repeats and realleges each and every response contained in the foregoing paragraphs of the Complaint as if set forth fully herein.

118.    Denied.

119.    To the extent that paragraph 119 requires a response, Mr. Paul denies the allegations set forth therein.

**XI.     PUNITIVE DAMAGES**

120.    Mr. Paul repeats and realleges each and every response contained in the foregoing paragraphs of the Complaint as if set forth fully herein.

121.    Denied.

**XII.    ATTORNEY'S FEES**

122.    Mr. Paul repeats and realleges each and every response contained in the foregoing paragraphs of the Complaint as if set forth fully herein.

123.    Denied.

**XIII.   INCORPORATION OF PARAGRAPHS**

124.    Mr. Paul repeats and realleges each and every response contained in the foregoing paragraphs of the Complaint as if set forth fully herein.

## XIV.   PRAYER FOR RELIEF

Plaintiff's Prayer for Relief sets forth no allegations of fact, and as such, does not require an admission or denial. Mr. Paul denies that Plaintiffs are entitled to any relief, as requested in his Prayer for Relief or otherwise.

### DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Mr. Paul demands a trial by jury in this action on all the issues triable by a jury.

### AFFIRMATIVE DEFENSES

Mr. Paul alleges the following defenses without assuming any burden of proof he would not otherwise bear.

### First Affirmative Defense
### (Intervening and Superseding Cause)

Any injuries Plaintiff suffered, to the extent they exist, were caused by Jake Greenbaum a/k/a Crypto King and Eduardo Ibanez, and not by Mr. Paul, including, without limitation, the prior, intervening or superseding conduct of Messrs. Greenbaum and Ibanez.

### Second Affirmative Defense
### (Good Faith)

Mr. Paul's statements and actions were undertaken in good faith, and constitute lawful, proper, and justified conduct, consistent with reasonable consumer expectations and applicable laws and regulations.

### Third Affirmative Defense
### (Assumption of Risk)

Plaintiff, a seasoned cryptocurrency investor, was aware of the risks associated with investing in digital assets and assumed all risk for any potential losses.

### Fourth Affirmative Defense
### (Economic Loss Rule)

To the extent that a valid contract exists, Plaintiff's tort claims are barred by the economic loss rule.

### Fifth Affirmative Defense
### (Adequate Remedy at Law)

To the extent that a valid contract exists, Plaintiff's unjust enrichment claim is barred because he has an adequate remedy at law.

### Sixth Affirmative Defense
### (No Capacity to Defraud)

Mr. Paul did not knowingly make any false or misleading statements regarding CryptoZoo, and therefore he did not have the capacity to defraud Plaintiff or any other CryptoZoo consumer.

### Seventh Affirmative Defense
### (Contributory Negligence)

Mr. Paul did not cause Plaintiff to incur any damages, proximately or otherwise. Moreover, if Plaintiff suffered any damages, Plaintiff contributed, in whole or in part, to those damages.

### Eighth Affirmative Defense
### (Failure to Mitigate)

Plaintiff failed and neglected to take reasonable steps to reduce or minimize damages he experienced, and thus cannot recover to the extent he failed to mitigate his damages.

### Ninth Affirmative Defense
### (No Fraudulent, Malicious, Intentionally Harmful, Willful, Wanton, or Reckless Conduct)

Mr. Paul's actions with regard to CryptoZoo were not fraudulent, malicious, intentionally harmful, willful, wanton, or reckless, and he therefore cannot be liable for punitive damages. Mr. Paul further asserts that Plaintiff is barred from recovering punitive damages because any imposition of punitive damages against him, under the facts and circumstances of this case, would

violate his constitutional rights under applicable law.

### Tenth Affirmative Defense
**(Overbroad Class Definition - Standing)**

Plaintiff's class definition is overbroad because it includes putative class members who suffered no damages, and therefore lack standing to pursue claims against Mr. Paul or any Defendant.

### Eleventh Affirmative Defense
**(Overbroad Class Definition - Failure to State a Claim)**

Plaintiff's class definition is overbroad because putative class members suffered no damages, and therefore cannot state any claim against Mr. Paul or any Defendant.

### Twelfth Affirmative Defense
**(Inadequate Class Representative/No Standing)**

Mr. Paul asserts that Plaintiff does not qualify as a class representative and lacks standing to assert any claim on behalf of others.

### Thirteenth Affirmative Defense
**(Case not Appropriate for Class Certification)**

This case is not appropriate for certification as a class action, and thus all class allegations should be dismissed or stricken.

### Fourteenth Affirmative Defense
**(Texas Constitutional and Statutory Cap on Punitive Damages)**

Plaintiff's claims for punitive damages against Mr. Paul are limited to the caps on non-economic damages established by the Texas Constitution and Tex. Civ. Prac. & Rem. Code § 41.008.

### Defenses Reserved

The foregoing defenses are raised by Mr. Paul without waiver of any other defenses that may come to light during the discovery proceeding in this case, or otherwise. Mr. Paul hereby reserves the right to amend or supplement this answer to assert any other related defenses as they

14

become available.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Defendant Logan Paul demands that this action be dismissed with prejudice as to Logan Paul, that the Court enter final judgment in Mr. Paul's favor and against Plaintiff, that the Court grant Mr. Paul attorneys' fees and costs as authorized by law, and that the Court grant such other relief as the Court deems appropriate.

## **CROSSCLAIMS**

Pursuant to Federal Rule of Civil Procedure 13, Logan Paul brings crossclaims against Eduardo Ibanez and Jake Greenbaum a/k/a Crypto King and alleges as follows:

## **INTRODUCTION**

1.      Logan Paul is a globally recognized entertainer, athlete, and entrepreneur, known for creating YouTube videos, boxing, hosting podcasts, wrestling professionally with the WWE, and co-founding a popular line of sports and energy drinks known as PRIME. Mr. Paul has found enormous success due to his dedication and drive—he is the reigning United States Champion in WWE, his YouTube channel has more than 23 million subscribers, and his *Impaulsive* podcast attracts more than 4.5 million subscribers.

2.      In February 2021, Mr. Paul identified an opportunity to become one of the first public figures to develop and launch a Non-Fungible Token ("NFT") project in the burgeoning digital asset market. In keeping with his deep love of both collectibles and video games, Mr. Paul conceptualized a digital game that would allow players to hatch and breed virtual hybrid animals from NFTs. The project eventually became known as CryptoZoo.

3.      Mr. Paul considered CryptoZoo a passion project. Although he hoped and anticipated that the project would eventually be profitable, he also knew that the success of the

15

project would define his reputation in the crypto space and more generally bear on his hard-earned reputation as a successful content creator and influencer.  But he believed strongly in his vision for what he believed was a cutting-edge project with the potential to expose a greater audience to the world of blockchain technology and NFTs. To realize that vision, though, Mr. Paul needed help.

4.       Recognizing that he lacked the technical skill to build and launch CryptoZoo himself, Mr. Paul assembled a team of purported specialists to execute the vision. Or at least he thought he did. In the spring of 2021, Defendants Eduardo Ibanez and Jake Greenbaum a/k/a Crypto King joined CryptoZoo as founding team members. Mr. Greenbaum and Mr. Ibanez promoted themselves to Mr. Paul as experts who possessed the specialized knowledge and expertise necessary to develop and launch the game. Mr. Greenbaum touted himself as a "crypto/NFT expert," who could oversee and consult on all blockchain-related aspects of the project. Mr. Ibanez had previously founded a (now defunct) marketing and data analytics company and purported to be an MIT-educated developer who had substantial cryptocurrency knowledge and experience.

5.       Mr. Greenbaum and Mr. Ibanez were con artists. Unbeknownst to Mr. Paul, both men lied about their resumes, knowledge, experience, and intentions.  Through fraud and deceit, Mr. Greenbaum and Mr. Ibanez sabotaged the CryptoZoo project and prevented it from ever realizing Mr. Paul's vision.

6.       While Mr. Paul has not sold a single ZOO Token or CryptoZoo NFT, has not made any profit off the game, and has actually lost hundreds of thousands of dollars due to the duplicity and deceit of those he trusted, Mr. Greenbaum and Mr. Ibanez have pocketed millions of dollars as a result of their fraud.

7.       This action seeks redress from Mr. Greenbaum and Mr. Ibanez for defrauding Mr.

Paul and exploiting CryptoZoo for their own financial gain.

## PARTIES, JURISDICTION, AND VENUE

8.     Logan Paul is a United States citizen who resides in Dorado, Puerto Rico.

9.     Eduardo Ibanez is a United States citizen who resides at 53 Kings Highway N., Westport, Connecticut 06880.

10.     Jake Greenbaum a/k/a Crypto King is a United States citizen who resides at 7311 Avalon Blvd., Alpharetta, Georgia 30009.

11.     This Court has subject-matter jurisdiction over this crossclaim pursuant to 28 U.S.C. §1367(a) because it is so related to Plaintiff's claims it forms part of the same case or controversy under Article III of the United States Constitution.

12.     Venue is appropriate in the United States District Court for Western District of Texas, Austin Division, because this Court is the appropriate venue for the main action.

## BACKGROUND
### Background on Cryptocurrency and NFTs

13.     Cryptocurrencies are digital currencies in which transactions are verified and records are maintained by a decentralized system using cryptography.

14.     Cryptography is the study and practice of sending secured, encrypted messages or data between two or more parties. In cryptography, the sender "encrypts" the message, which obscures its content to a third party, and the receiver "decrypts" the message, making it legible again. Cryptocurrencies use cryptography to create transactions that are anonymous, secure, and "trustless," meaning that third parties like banks and credit-card companies do not need to process cryptocurrency transactions.

15.     The decentralized system that verifies cryptocurrency transactions and maintains a record of those transactions is known as a "blockchain." The blockchain acts as a public ledger

where transactions are processed and recorded across a decentralized network formed by numerous market participants. The details of each transaction that are recorded on the blockchain include the date and time of the transaction, the sender and recipient of the transaction, and the amount of cryptocurrency transferred.

16.     There are different types of cryptocurrencies, such as Bitcoin, Ether, and Binance Coin ("BNB"). Each unique cryptocurrency has its own blockchain.

17.     Cryptocurrency is stored in "wallets" identified by unique addresses. Each cryptocurrency wallet has a public address or "key," which functions like a bank account number to publicly identify the wallet. Each cryptocurrency wallet also has a "private key" or "seed phrase," which functions like a password to a cryptocurrency wallet. Only the holder of a wallet's private key can authorize transfers from that wallet.

18.     NFTs are digital assets that can be created and transferred on blockchains. NFTs are "non-fungible," meaning they cannot be copied, substituted, or subdivided. Each NFT is a one-of-a-kind digital item that exists in the form of a token on a blockchain. NFTs are created through a process known as "minting" out of a "smart contract." A smart contract is simply lines of computer code written on a blockchain that are programmed to automatically execute defined tasks if certain conditions are met. To "mint" an NFT, a smart contract is coded to release NFTs to cryptocurrency wallets that transfer the pre-defined amount of digital payment to the smart contract. The code of an NFT smart contract can specify which type of payment is required to release NFTs to wallets.

19.     NFTs can exist in numerous forms, but most commonly exist in the form of an image file similar to a .jpeg. However, unlike other digital images, ownership of NFT serves as digital verification of ownership of the corresponding image.

20.     In addition to NFTs, other fungible tokens can be created and launched on

blockchains.

**CryptoZoo Is Conceived as a Blockchain Game Where Players Breed Animals Using NFTs.**

21.     In early 2021, Mr. Paul conceived of a blockchain game from an animal fusion concept. As Mr. Paul envisioned it, the novelty of his idea was that in this game, players would be able to collect digital assets that would have utility rather than merely sitting in a digital wallet. Specifically, players would be able to acquire egg NFTs that would then "hatch" and yield base animal NFTs, and players with multiple base animals would then be able to "breed" those animals to create hybrid animal NFTs. Players (*i.e.*, "Zookeepers") would be able to collect, maintain, breed, trade, and ultimately even play mini arcade games with their animal NFTs within an autonomous virtual ecosystem. This concept became known as CryptoZoo ("CryptoZoo" or the "Game").

22.     Mr. Paul had seen the animal fusion concept go viral in other contexts, but he also was inspired by Pokémon, a Japanese media franchise comprising video games, trading cards, animated series and films, and other media. The primary characters in Pokémon are animal-like creatures endowed with special powers, which the player can train and "evolve" into stronger forms. Mr. Paul was motivated by his belief in the potential for a digital game with similar concepts to introduce younger generations to NFTs, cryptocurrency, and blockchain technology.

**Mr. Paul Assembles a Team to Successfully Deliver the CryptoZoo Game.**

23.     Mr. Paul understood, however, that he possessed neither the technical expertise nor the time to single-handedly bring CryptoZoo to life. Indeed, Mr. Paul had only recently been introduced to blockchain technology and NFTs, himself. And in addition to the demands of hosting a popular weekly podcast, among many other commitments, it was announced in December 2020 that Mr. Paul would be fighting boxing legend Floyd Mayweather Jr. in a high-profile match

scheduled for June 2021. Mr. Paul therefore assembled a team of what he believed were experts to help turn his vision for CryptoZoo into a reality while he continued to build his brand and train to fight one of the greatest boxers of all time.

24.     Mr. Paul's management team quickly identified Defendants Jake Greenbaum and Eduardo ("Eddie") Ibanez as potentially qualified candidates from within his social and pseudo-professional network. Based on what Mr. Paul understood to be their respective backgrounds and skillsets, he invited them to join the project.

25.     Mr. Paul met Mr. Greenbaum in 2020 when he reached out to Mr. Greenbaum through Instagram about buying Pokémon cards. Mr. Greenbaum was known in the high-end collectibles industry as the "Collectibles Guru." As Mr. Paul became acquainted with Mr. Greenbaum, however, he informed Mr. Paul that dealing collectibles was merely a side project, and his actual passion was in cryptocurrency and blockchain technology—areas that Mr. Paul knew little about. Mr. Paul learned that because of his supposed expertise in these areas, Mr. Greenbaum was known in other circles not as the Collectibles Guru, but as the "Crypto King."

26.     Mr. Greenbaum had proposed and helped Mr. Paul carry out a business idea whereby Mr. Paul would conduct and livestream "box breaks" of first edition Pokémon cards.  Mr. Paul's first exposure to NFTs was in relation to these box breaks. Mr. Greenbaum had helped Mr. Paul create and sell NFTs of himself, and the box break participants (*i.e.*, those who would receive the cards in the packs Mr. Paul opened during the breaks) were chosen in a raffle from amongst those who had purchased the NFTs.

27.     Mr. Paul met Mr. Ibanez through his *Impaulsive* co-host Mike Majlak, as Mr. Ibanez had worked for Mr. Majlak's former boss. Mr. Ibanez was introduced to Mr. Paul as a young, MIT-educated tech genius who had previously worked for the CIA and NFL teams, including the

Philadelphia Eagles, which he had supposedly helped win a Super Bowl. Moreover, several successful businessmen and entrepreneurs, including J. Christopher Burch, knew Mr. Ibanez personally and vouched for him.

28.     On or about February 19, 2021, Mr. Paul hosted an in-person kick-off meeting in Los Angeles to brainstorm and flesh out the CryptoZoo concept. The meeting included Mr. Greenbaum, Mr. Ibanez, and several members of Mr. Paul's inner circle, including his manager Jeffrey Levin, and his personal assistant Danielle Strobel. Because of this group's involvement in the project from the outset, they sometimes referred to themselves thereafter as the "founders" of the project.

29.     Ophir Bentov was not a founder in this respect, but he started working on the project in the summer of 2021, primarily by managing the online community and by helping Mr. Paul investigate Mr. Greenbaum's suspected misdeeds. More on that below.

**Mr. Greenbaum and Mr. Ibanez Assume Roles with CryptoZoo.**

30.     At the brainstorming meeting in February 2021, Mr. Greenbaum and Mr. Ibanez recommended creating and incorporating a token into the Game. Under this token concept, animal NFTs would yield "ZOO Tokens" to players in amounts that varied depending on the rarity of the animal they owned, and players would then be able spend those Tokens in a virtual marketplace and on a variety of in-game features and enhancements.

31.     Unaware of the logistical and other potential implications of the decision to incorporate a token, Mr. Paul was initially enthusiastic about the idea because he saw the potential for a token to increase the Game's virality and create a more dynamic and immersive player experience. Unfortunately, the token concept set the stage for Mr. Greenbaum and Mr. Ibanez to each undermine and sabotage the project for their own financial benefit.

32.     Consistent with what Mr. Paul understood to be their respective skillsets, following the February 2021 meeting, Mr. Greenbaum and Mr. Ibanez proceeded to take ownership of and advise on various aspects of the project. Mr. Greenbaum advised on all blockchain and cryptocurrency-related aspects of the project, including the advantages and disadvantages of selling NFTs on the Ethereum network versus the Binance Smart Chain ("BSC") network.

33.     Mr. Greenbaum also was responsible for the "economics" of the Zoo Tokens and NFTs—*i.e.*, the amounts that would be created, how they would be allocated, pricing, in-game fees, and so forth—and he prepared the initial draft of CryptoZoo's "whitepaper."

34.     Mr. Ibanez was responsible for the development of the Game, including the gameplay, user interface, and website design. As with Mr. Greenbaum, Mr. Ibanez claimed to have significant knowledge of cryptocurrency, blockchain technology, and the attributes of successful projects in this space, and he acted as another advisor in these respects.

35.     For his part, Mr. Paul was eventually to be responsible for marketing and promoting the Game at the appropriate time. Between February and August 2021, however, Mr. Paul contributed primarily by creating the rules of the Game; assigning names and rarities to the animals that would be featured in the Game; providing high-level input on in-game features, design, and functionality; and assisting to hire and oversee artists to work on graphics and animation.

36.     During this time, Mr. Paul incurred approximately $220,000 in out-of-pocket expenses for the project, most of which was spent on paying artists.

37.     Mr. Ibanez, who represented himself as wealthy, told Mr. Paul he would come out of pocket to pay for development costs, which would include paying a team of developers working under his direction. Mr. Paul's expenses were eventually reimbursed from the proceeds of the NFT sales, and his understanding was that Mr. Ibanez's development expenses would be similarly

22

reimbursed.

38.     In the weeks and months after the February 2021 brainstorming meeting, Mr. Paul would regularly follow up with Mr. Ibanez about the status of development and related deliverables. At every step of the way, Mr. Ibanez provided glowing updates about his progress and solicited further input on Mr. Paul's preferences to be incorporated into the Game.

**Mr. Greenbaum Creates and Launches the Token Liquidity Pool.**

39.     In May 2021, as Mr. Paul was increasingly consumed with preparation for his upcoming boxing match with Floyd Mayweather Jr., Mr. Greenbaum started planning for the creation of a liquidity pool for the ZOO Token. Liquidity pools are markets created on a blockchain for specific tokens; creating a liquidity pool essentially creates the first market where users are able to transact with that token on the blockchain.  It was in connection with the liquidity pool that Mr. Paul started to suspect Mr. Greenbaum did not have CryptoZoo's best interests at heart.

40.     As Mr. Greenbaum explained to Mr. Paul and the other founders, it was appropriate to create a liquidity pool for the ZOO Token at that stage, even though the project was still in development, and the pool's purposes were to (1) create a market for the ZOO Token, and stabilize that market through trading activity, (2) lock a portion of the total ZOO Tokens in the pool to be distributed later as in-game rewards for players, and (3) preserve another portion of Tokens for distribution to the founders.

41.     As Mr. Greenbaum further explained, the creation of a liquidity pool for the ZOO Token would not be announced publicly, and nobody would know about it other than the founders. From Mr. Paul's standpoint, there was nothing nefarious about that secrecy; it was entirely consistent with the purposes as set forth by Mr. Greenbaum, which both Mr. Greenbaum and Mr. Ibanez told Mr. Paul were not only legitimate, but indeed standard.

42.     Thus, on June 11, 2021, without an official announcement, Mr. Greenbaum created a liquidity pool for the ZOO Token on the Binance blockchain, thereby creating a market wherein ZOO Tokens could be swapped for BNB Coin.

43.     On that day, which the founders referred to as "Zoo Day," the founders other than Mr. Paul met in person in Los Angeles in order to take turns acquiring Zoo Tokens and adding to the liquidity pool. Having just finished his Mayweather match days earlier (on June 6, 2021), Mr. Paul participated in this process remotely from Puerto Rico.

44.     Mr. Paul relied on Mr. Greenbaum with respect to all aspects of the liquidity pool. This is evident from the founders' communications on Zoo Day and the weeks leading up to it. On May 16, 2023, Mr. Paul asked the founders, "who's in charge of the liquidity/token pool blah blah blah like idk how any of that shit works." Mr. Greenbaum wrote that he was taking responsibility for it "as part of [his] role for tokenomics and daily monitoring of the pool/funds."

45.     Mr. Greenbaum and Mr. Ibanez assured Mr. Paul and the other co-founders that creating and trading in the liquidity pool did not present regulatory issues, and in that way was distinguishable from selling the Tokens in a presale.

46.     Based on Mr. Greenbaum's claimed experience and expertise, as Mr. Paul was buying ZOO Tokens and adding to the liquidity pool on Zoo Day, he sought directions primarily from Mr. Greenbaum on when and how to buy, when and how to add to the liquidity pool, and in what quantities. In one illustrative communication to his co-founders that day, Mr. Paul wrote, "idk how this liquidity thing works or what the return looks like so explain it to me tomorrow sometime."

**Suspicious Trading Activity Occurs in the Liquidity Pool Immediately After Launch.**

47.     Zoo Day would soon take a dark turn. Around the time that the founders finished acquiring ZOO Tokens, Mr. Paul learned that dozens of unique and unattributed cryptocurrency wallets had been trading Tokens in the liquidity pool alongside the founders. In other words, it became clear that the existence of the new market for ZOO Tokens had somehow become known to dozens of project outsiders. And over the course of several hours on Zoo Day, the trading activity of those outsiders had caused the market capitalization of ZOO Tokens to drop precipitously from approximately $130 million to approximately $26 million.

48.     Of course, the trading activity of these outsiders never should have been possible; neither the creation of the liquidity pool — nor, for that matter, the Game from which these Tokens were to eventually derive their utility — had been announced publicly.

49.     Mr. Greenbaum blamed the activity on trading robots or "bots," and unknown cryptocurrency traders that had managed to find the Token early. Trading robots are computer programs that automatically execute trades based on information provided to the bot.

50.     Mr. Paul was alarmed. Even though he knew little about liquidity pools, he was immediately suspicious of Mr. Greenbaum's explanation and how casually it had been delivered, particularly when Mr. Greenbaum had not notified him or the other co-founders of any outside activity in real-time as the transactions were happening.

51.     He shared his suspicions in a text message in which he questioned "how a person could've magically known about the minting today, been on the lookout for $ZOO, got in AT THE SAME RANDOM TIME we got in, multiplied their money then dipped at the peak and knew the timing of all of it." He expressed his belief that all of this was "incredibly too convenient . . . like someone was tipped off."

52.     Mr. Paul also confronted Mr. Greenbaum directly about the fact that these outside

buyers—who allegedly were unaffiliated—also happened to be transacting in a coin called Bully that Mr. Greenbaum had recently told Mr. Paul about.  Still, Mr. Greenbaum maintained that he was not responsible, directly or indirectly, for the trading activity.

53.     The next day Mr. Ibanez informed Mr. Paul that he and other founders would be developing a "full trading strategy (buy and sell) that way we don't peak the price (we buy gradually) & we don't let some punk or bot sell while we're riding the price up." Mr. Paul immediately rejected any suggestion of even potential market manipulation via Mr. Ibanez's proposed trading strategy, asking in relevant part, "Why are we manipulating it like that?  Why would we want to drive it up?  shouldn't it just 'be'?"

54.     Even before the suspicious trading activity on Zoo Day, however, Mr. Paul had repeatedly inquired of Mr. Greenbaum about the appropriate amount of ZOO Tokens for the founders to acquire—and indeed, had expressed his belief that there should be a "max, even for us"—precisely because of his instincts about the fragility of the market and his belief that no one should be in a position to "control[] too much of it."

55.     Now, having seen that fragility first-hand, and having started to question Mr. Greenbaum's motives, Mr. Paul believed trading rules were necessary to protect the integrity of the Game—not to manipulate the market, but to *prevent* any potential manipulation by bad actors. Mr. Paul and his co-founders therefore agreed to "rules" whereby they would only sell Tokens in certain amounts, and only under certain, limited market-specific conditions. The purpose was to effectively "lock up" the founders' tokens and limit the founders' ability to turn an immediate profit from the Game.

56.     At the time, Mr. Paul expressed his frustrations and concerns about Mr. Greenbaum to the other founders, explaining he was considering re-minting the ZOO Token and removing Mr.

Greenbaum from the project altogether.  It was another several months, however, before Mr. Paul was able to validate his suspicions about Mr. Greenbaum.

### Mr. Paul Publicly Announces the CryptoZoo Project After Receiving Assurances of Progress from the CryptoZoo Team.

57.     CryptoZoo was Mr. Paul's passion project. Because of his drive to build a successful project, Mr. Paul would constantly challenge and reevaluate the key decisions and assumptions underlying the project.  That is why, even after the liquidity pool was created and Mr. Paul and his co-founders had spent hundreds of thousands of dollars acquiring ZOO Tokens, he still continued to question whether the Game should incorporate a token at all.

58.     On August 7, 2021, Mr. Paul asked Mr. Greenbaum and Mr. Ibanez whether there were other successful NFT projects that utilized a token. Mr. Paul wondered whether the Token made the game "gimmicky," and whether "the strength of our NFTs and the art can speak for itself / And it becomes solely collectible based / Like the banger projects [right now]." Mr. Greenbaum and Mr. Ibanez responded by offering examples of other NFT games that utilized tokens. Together, they convinced Mr. Paul that the ZOO Token was intertwined with the CryptoZoo concept and integral to the success of the Game.

59.     From the time of the founders' brainstorming meeting in February 2021, Mr. Paul had repeatedly expressed that he would not be marketing or promoting CryptoZoo until development was complete.

60.     To that end, between February and August 2021, Mr. Paul often rejected efforts by Mr. Greenbaum and Mr. Ibanez to fast-track development in order to take advantage of what they perceived as a thriving but mercurial NFT market—a market that Mr. Greenbaum at one point described as a "house of cards."

61.     On Zoo Day, for example, Mr. Paul asked about next steps following the creation of the liquidity pool. Mr. Greenbaum and Mr. Ibanez responded with a list of tasks, including setting up a website and social media accounts, setting up an online community on both Discord and Telegram, conducting an egg NFT sale, and finishing development and launching the Game. Mr. Greenbaum insisted that these tasks were "[a]ll short term as in 1-2 days."  Mr. Paul responded, "no rush boys please / until development is done and checked THOROUGHLY I don't want to start doing other shit super publicly / Gotta make sure platform is FLAWLESSSSS."

62.     On August 7, 2021, Mr. Greenbaum followed up to ask about the timing of the project's announcement, noting, "Bullish momentum right now with NFTs and coins couldn't be more perfect." Mr. Paul told Mr. Greenbaum to "chill," responding, "Project needs to be perfect before we launch / Market is hot but more important we get this right."

63.     Within the next few days, Mr. Ibanez started providing Mr. Paul with explicit, unequivocal assurances that CryptoZoo's development had progressed to its final stages and that Mr. Paul therefore could confidently announce the Game and at the same time provide the public with a specific launch date for the sale of egg NFTs (the "Egg Sale").

64.     For example, on August 9, 2021, Mr. Ibanez informed Mr. Paul that the NFTs were ready to be sold to the public, saying "Eggs are good to go." When Mr. Ibanez proposed September 1, 2021 as the date for the Egg Sale, Mr. Paul asked for confirmation that everything would be ready by then, reiterating that it "Needs to be perfect." Mr. Ibanez provided this confirmation, responding, "For Egg pre-sale 1000%." "For game also," he added.

65.     The following week, on August 15, 2021, Mr. Paul sought confirmation that nothing had changed, asking Mr. Ibanez, "[S]till feeling good about September 1?" To which Mr. Ibanez responded, "On Dev [*i.e.*, development] yes. Marketing I'm trusting you."

66.     Mr. Ibanez substantiated his assurances to Mr. Paul through a series of text messages, phone calls, and videoconferences, during which he detailed the items that were outstanding and provided timeframes for their completion.

67.     Mr. Ibanez further validated his assurances to Mr. Paul by representing that he (Mr. Ibanez) had been consulting with lawyers about the rollout of the project.  Mr. Ibanez had told Mr. Paul and the other founders, for example, that steps had been taken to obtain a CryptoZoo trademark and that he had received the "go ahead from legal that we can launch." Mr. Paul had also instructed Mr. Levin, as his manager, to ensure that "[a]ll paperwork and legalities" were completed, and Mr. Levin confirmed that he had been discussing these matters with Mr. Ibanez.

68.     Having no reason at that time to question the information he was receiving from Mr. Ibanez, whom he trusted, Mr. Paul proceeded to publicly announce CryptoZoo on his *Impaulsive* podcast on August 17, 2021.

69.     The plan was for the project to be released in phases: The Egg Sale would take place several weeks later, on September 1, but the gameplay components—which included the ability to actually hatch the eggs and breed animals, and the ability of those animals to yield ZOO Tokens—would take place at dates to be determined and announced thereafter.

70.     In the days following Mr. Paul's announcement, Mr. Ibanez continued to represent that development of all phases was on track, at one point informing Mr. Paul that the entire Game— not just the components needed for the Egg Sale—would be completed by August 20, 2021.

71.     Mr. Paul was ecstatic for the world to finally be introduced to CryptoZoo. He hoped for the project to be successful and profitable, but his overarching focus was on seeing his vision for the Game fulfilled. When Mr. Ibanez reached out to inform Mr. Paul on the day of the announcement that the market capitalization had reached $100 million, Mr. Paul responded, "Bro

who cares / Honestly fuck all that / I hope people find the stupid satisfaction we find with hatching their hybrids / That's what I want / Fuck the token / Fuck everything / I want someone to laugh out loud about this:"—and he then sent a picture of a "Pandacat," one of the hybrid animals that would be featured in the Game.

72.     Around the same time, Mr. Paul wrote to his co-founders, "When this shit goes crazy. Everyone stay calm.  I swear to god just breathe & don't make it a big deal. We just came to make people live out their wildest imaginary dreams / Everything else is a bonus."

### Mr. Paul Uncovers Mr. Greenbaum's Deceit and Ousts Him from CryptoZoo.

73.     As anticipated, after Mr. Paul publicly announced CryptoZoo, the price of ZOO Tokens skyrocketed. Troublingly, as that happened, ZOO Tokens were being sold from wallets that had held volumes so significant they could only have been held by one of the founders, in violation of the trading rules the founders had previously agreed to amongst themselves.

74.     Mr. Paul was incensed by this and told his co-founders, "Your tokens do not leave your wallet / this is a game / not a shitcoin / and as of now / the coin went up / because I said something about it / so when someone else is capitalizing on it and jeopardizing the integrity of a very honest and legitimate project, who do you think takes the blame publicly?"

75.     At Mr. Paul's direction, between August 18 and August 24, 2021, Mr. Bentov helped investigate the source of the trading activity and determined that dozens of wallets selling ZOO Tokens were either controlled by, or had received their Tokens from, Mr. Greenbaum.

76.     In or around this timeframe, Mr. Paul also learned, as he had suspected, that third parties had learned about ZOO Tokens from Mr. Greenbaum or had purchased their Tokens directly from him. Mr. Paul confirmed that Mr. Greenbaum had in fact been selling ZOO Tokens behind the scenes and making them available to third parties since Zoo Day—including through under-

the-table cash deals.

77.     When confronted, Mr. Greenbaum denied that he personally had been selling Tokens. Although he admitted to distributing Tokens to third parties, he claimed to have believed that the founders had authorized such distributions, and he attempted to defend the reasonableness of the third parties' respective decisions to sell in the current market environment. He told Mr. Paul that he was overreacting in light of public enthusiasm for the project, which he attributed to NFT influencers promoting the project at his (*i.e.*, Mr. Greenbaum's) request.

78.     Outraged, and having lost all trust and confidence in Mr. Greenbaum, Mr. Paul agreed with a plan conceived by several of the co-founders to remove him from the project. A new version of the ZOO Token was launched, and wallets that held the original version of the Token were credited 1:1, replacing each original ZOO Token with the new version of the Token. In doing so, the wallets that were traceable to Mr. Greenbaum were effectively "blacklisted."

79.     When Mr. Greenbaum realized what was happening, he called Mr. Paul a scam artist and accused him of betraying his community and orchestrating a rug pull.

80.     By that point, however, Mr. Paul knew that CryptoZoo—which had yet to even launch—would never be able to realize its potential with someone like Mr. Greenbaum sabotaging the project from the inside for his own financial gain. Mr. Paul told the other founders: "The game is beyond him.  Wait until we successfully launch our eggs and I explain this fucking surgical maneuver we pulled off to remove the snake from the grass it is fucking legendary / That's the thing about honesty and authenticity boys / Can't lose when you're true to yourself and others."

81.     Mr. Greenbaum would later admit that he had made millions of dollars through his surreptitious sale of ZOO Tokens. But unbeknownst to Mr. Paul until much later, Mr. Greenbaum was not the only founder engaging in this type of deception.

82.     Once Mr. Paul informed the co-founders that he would be publicly announcing CryptoZoo on his podcast, Mr. Ibanez started trading in the ZOO Token liquidity pool in order to profit from the forthcoming announcement. Starting on August 16, 2021, the day before the announcement, he started adding liquidity to the liquidity pool. Then, on August 20, 2021, several days *after* the announcement, Mr. Ibanez closed his liquidity pool position and cashed out after the price of ZOO Tokens spiked. The timing of this maneuver alone netted Mr. Ibanez approximately 85 BNB (approximately $38,000.00).

83.     Moreover, contrary to what he had been representing to the founders at the time, Mr. Ibanez had also been divesting himself of the ZOO Tokens he had acquired on Zoo Day. Between Zoo Day and Mr. Paul's *Impaulsive* announcement, Mr. Ibanez transferred more than 36 billion ZOO Tokens to unattributed wallets. Over the nine days following the announcement, he transferred his remaining balance of Tokens—totaling more than 71 billion Tokens—to additional unattributed wallets. The 23 unattributed wallets to which Mr. Ibanez had sent Tokens proceeded to transfer those Tokens to dozens more unattributed wallets, many of which then started selling.

84.     Based on public reports, Mr. Ibanez made approximately $1.7 million from selling ZOO Tokens, an amount Mr. Paul has not independently substantiated but has no reason to refute. At the time, Mr. Paul did not know of Mr. Ibanez's trading activity. He was, however, about to learn the hard way that Mr. Ibanez was not who he had claimed to be, and that he had been deceived all along about Mr. Ibanez's ability to deliver the Game.

### The Egg Sale Does Not Proceed as Planned and Mr. Paul Continues to Receive False Promises from Mr. Ibanez about the Progress of the Game's Development

85.     Despite Mr. Ibanez's repeated assurances to Mr. Paul that the Egg Sale would be ready by September 1, 2021, it was not. Because of Mr. Ibanez's lack of preparedness, the Egg Sale was delayed from September 1 until September 3. Frustrated, Mr. Paul told Mr. Ibanez at the

time that "If we give a release date, we have to hit it." But, unfortunately, the issues were only beginning.

86.     On launch day, the rollout of the Egg Sale experienced significant technical difficulties, causing general confusion and frustration in the online community. For example, the plan as advertised to the community had been for 5,000 egg NFTs to be sold on OpenSea and made available for purchase using Ethereum, and for another 5,000 egg NFTs to be sold on CryptoZoo.co and made available for purchase using BNB. But the OpenSea component experienced delays, glitches, and suspected bots that made the NFTs difficult to acquire, eventually leading to the majority of the NFTs having to be sold for BNB.

87.     These technical issues and delays were compounded by the presence of scammers selling fake egg NFTs that were unaffiliated with the project, the fact that some non-blacklisted holders of the original ZOO Token had failed to receive the 1:1 airdrop of the new version of the Token, and a general inability of Mr. Ibanez and his development team to resolve issues as they arose and ensure the community was being kept informed.

88.     Although the egg NFTs sold out, Mr. Paul was horrified by how the Egg Sale had transpired. On September 5, 2021, Mr. Paul wrote to Mr. Ibanez and the rest of the team to address their deceit about their level of preparedness: "The problem is that we are extremely understaffed, underequipped, under-experienced and bit off more than we can chew and none of it was relayed to me / Manage my expectations / If something can't be done I need to know / And so far nothing has been done on time or as it was told to me. . . ."

89.     Mr. Paul instructed Mr. Ibanez to "hire more devs [*i.e.*, developers]" immediately to ensure the Game was completed properly. He instructed him to hire four or five more developers and "bring them on tomorrow," saying, "I don't care how much it costs."

90.     Mr. Levin traveled to New York City to oversee Mr. Ibanez and his team of developers and to try and gain comfort that development was on track and that they had adequate support. But in the weeks that followed, the project only continued to spiral further out of control.

91.     As Mr. Paul was shown aspects of the Game that supposedly were far-along in their development, he grew increasingly concerned. As one example, on September 8, 2021, Mr. Paul was shown a test of CryptoZoo's virtual marketplace. Mr. Paul's impression was that it was confusing and felt like an "incomplete product." He told Mr. Ibanez that they only had one shot at a first impression, and that his own first impression was "Wtf is this." Mr. Paul told his management team that he regretted using Mr. Ibanez, but by then it was too late.

92.     On September 29, 2021, Mr. Paul learned that Mr. Ibanez's lead developer had apparently stolen the code to the Game and was holding it hostage, trying to extort Mr. Paul and the other founders for $1 million.  Mr. Ibanez relayed that his developer "went rouge [sic], I had to launch a new token to kill him as he was talking shit and trying to extort us. . . . I've never had this happen—I am very pissed and I take full responsibility for this. We are focusing on game and getting it out and KO'ing and making it rock."

93.     Mr. Ibanez had, inexplicably, hired as his lead developer a rumored former felon who previously had been incarcerated for armed robbery and who, even before stealing the code, had been badmouthing Mr. Paul and the very project he was tasked with building in online forums.

94.     Mr. Paul was beside himself with frustration. On September 30, 2021, he messaged Mr. Ibanez and the rest of the team and said: "Absolutely fucking ridiculous. All of this. I'm baffled. Everyone will be publicly held accountable for any errors, blunders, or missteps or betrayals that took place for this project—I'm not sure there's a worse feeling than putting your trust in a team that continually fails in the biggest way possible. I've done all I can & for the first

time in my life I'm completely powerless—but I will not go down here, because I'm not responsible, and I WILL execute this game properly with the right people."

### **Mr. Paul Discovers that Mr. Ibanez is a Complete Fraud.**

95.     In late October 2021, Mr. Paul learned for the first time that Mr. Ibanez may have misrepresented his credentials. Mr. Bentov messaged Mr. Paul and said Mr. Ibanez is a "con artist the biggest I've ever met." Mr. Paul asked, "IS he a con?  Or is he just a pathetic miserable loser," to which Mr. Bentov insisted, "Nah he is a con."

96.     Mr. Bentov relayed an unconfirmed rumor that Mr. Ibanez had never attended MIT, to which Mr. Paul responded, "fuckkk . . . I'm gonna kill Mike [Majlak] for introducing me to this fucking guy under the guise of genius development."

97.     In that conversation with Mr. Bentov, Mr. Paul wondered what possible reason there could be for Mr. Ibanez to have misled him for the preceding eight months about his ability to develop the Game. The answer to that question came a few months later in February 2022, when a local Philadelphia news outlet ran an article about Mr. Ibanez that detailed a lifetime of deception.[1]

98.     It turned out that Mr. Ibanez's *entire backstory* was a fabrication, including the credentials that had caused Mr. Paul to entrust the project to him in the first place. Not only had Mr. Ibanez never attended MIT or worked for NFL teams, but he also had misrepresented a variety of other accomplishments and skillsets. He previously had been accused by an LDS church of attempting to access and misappropriate sensitive information of its members, his defunct data

---

[1] *See* Adam Robb, "Philly-born tech founder who falsely claimed he had an Eagles Super Bowl Ring and helped the CIA hunt terrorists got $1.5 million in PPP loans as his company went up in flames," Billy Penn at WHYY (Feb. 14, 2022), https://billypenn.com/2022/02/14/eddie-ibanez-zenabi-eagles-dolphins-logan-paul/.

analytics firm was under federal investigation for suspected PPP fraud, he was currently being sued by a landlord for more than $100,000 in back rent and property damage, and judgments against him from other creditors had already started to accumulate. None of this had been known by Mr. Paul (or the various other businesspeople who Mr. Ibanez had conned over the years).

**Mr. Paul Is Repeatedly Assured CryptoZoo Is Still in Development.**

99.     Following the Egg Sale and the development issues that became apparent in the days and weeks that followed, Mr. Paul became less involved in the day-to-day of CryptoZoo.

100.     From September 2021 through 2022, Mr. Levin attempted to get the project back on track, including by working with new development teams to take over Mr. Ibanez's responsibilities. During that time, as Mr. Paul waited for the go-ahead from his manager to reengage with the project, Mr. Paul would periodically receive updates from Mr. Levin and Mr. Bentov who made clear that the project was progressing—albeit slowly.

101.     On January 4, 2022, Mr. Levin informed Mr. Paul that a recently hired developer, Vatom, was building out the project and was "doing great." Mr. Levin said, "Unfortunately slower than we expected but we now have a very capable and excited team building." That same day, Mr. Bentov told Mr. Paul that the project was "starting to look up" and that the new developers were "A+."

102.     Because Mr. Paul understood the project was not a matter of *if*, but *when*, in late January 2022 he purchased the cryptozoo.com domain name that he had long coveted.

103.     In the months that followed, he continued receiving positive and reassuring updates about the status of the slow-moving development of CryptoZoo.

104.     In June 2022, with development still underway, Mr. Paul asked Mr. Levin and Mr. Bentov whether he should publicly discuss what had caused the unexpected and ongoing delays. Mr. Levin responded that, "The solve is being worked out.  We are working on an updated roadmap

and timeline. Upon that we will explain past and future." Mr. Paul asked how the project could be successfully revived at that point, to which Mr. Levin responded, "By building. Which we are working on."

105.    In the same conversation, Mr. Paul begged Mr. Levin, "don't let me down or the CryptoZoo heads. PLS MAKE SOMETHING DOPE." Given that Mr. Paul did not control the CryptoZoo game wallets that held proceeds from NFT sales, and did not know what had become of them, he also suggested that "someone should explain [to the public] what's going on. And be transparent about funds. Cuz I'm curious too."

**Mr. Paul Pledges to Buyback all of the CryptoZoo Egg NFTs.**

106.    In January 2023, Mr. Paul announced that he was personally committing 1,000 Ethereum to a buyback program, whereby disappointed holders of egg NFTs and base animal NFTs would be able to return those NFTs for the mint price of .1 Ethereum. Contemporaneously with the filing of the crossclaims asserted herein, Mr. Paul is announcing the launch of the promised buyback.

107.    Mr. Paul spent hundreds of thousands of dollars trying to continue to develop CryptoZoo. But he eventually learned that the Game, as he envisioned it, was not feasible because of regulatory issues of which he had never previously been apprised.

108.    Throughout the history of CryptoZoo, Mr. Paul has only ever desired the creation of a fun, blockchain-based digital collectibles game. Unlike Mr. Ibanez or Mr. Greenbaum, he has not sold a single ZOO Token or NFT and has not made any profit off the game; to the contrary, Mr. Paul has lost hundreds of thousands of dollars due to the duplicity and deceit of those he trusted.

109.    Mr. Paul brings these crossclaims to hold Defendants Jake Greenbaum and Eddie

Ibanez responsible for the harm he has been caused by their misconduct, which includes significant reputational harm and out-of-pocket expenses relating to the project.

## CLAIMS FOR RELIEF

### COUNT I
### FRAUDULENT INDUCEMENT
### against Mr. Ibanez and Mr. Greenbaum

110.    Mr. Paul incorporates by reference paragraphs 1 through 114 as though set forth herein.

111.    Mr. Ibanez and Mr. Greenbaum held themselves out to Mr. Paul as subject-matter experts qualified to successfully launch CryptoZoo. Mr. Ibanez represented that he was an MIT-educated computer developer capable of developing the computer game at the center of the NFT project. Mr. Greenbaum represented he was a cryptocurrency and blockchain expert that could handle all token and blockchain related aspects of the CryptoZoo project.

112.    Mr. Ibanez did not attend MIT and was not an expert computer developer.

113.    Mr. Greenbaum was not a blockchain or cryptocurrency expert. Mr. Greenbaum did not possess the deep technical knowledge he claimed, but. knew just enough to loot CryptoZoo for his personal gain.

114.    Mr. Paul relied on Mr. Ibanez's and Mr. Greenbaum's representations about their skills, experience, and expertise in deciding to bring them on to the CryptoZoo team.

115.    Mr. Paul relied on Mr. Greenbaum and Mr. Ibanez to execute his vision and oversee CryptoZoo in good faith and would not have retained them had he known that they would exploit the CryptoZoo project for personal gain.

116.    As a result of Mr. Ibanez and Mr. Greenbaum's misrepresentations to Mr. Paul, Mr. Paul has suffered significant monetary damages as well as reputational harm.

**WHEREFORE,** Mr. Paul demands judgment against Eduardo Ibanez and Jake Greenbaum a/k/a Crypto King, for fraudulent misrepresentation, awarding damages, attorneys' fees, costs, pre- and post-judgment interest, and any other relief this Court finds just.

## COUNT II
## FRAUDULENT MISREPRESENTATION
### against Mr. Ibanez and Mr. Greenbaum

117.     Mr. Paul incorporates by reference paragraphs 1 through 114 as though set forth herein.

118.     Mr. Ibanez and Mr. Greenbaum misrepresented to Mr. Paul team that they would not sell ZOO Tokens for their own financial gain and/or that they would not purchase ZOO Tokens from the liquidity pool from unknown cryptocurrency wallets.

119.     Both Mr. Greenbaum and Mr. Ibanez also failed to disclose material facts about the CryptoZoo project to Mr. Paul. Both men, for example, failed to disclose that they started trading out of the liquidity pool as early as June 11, 2021, for their own financial gain.

120.     Mr. Ibanez and Mr. Greenbaum knew these representations and omissions were false and sought to conceal the truth from Mr. Paul so they could financially benefit by selling ZOO Tokens without Mr. Paul's knowledge, which they did.

121.     Mr. Ibanez and Mr. Greenbaum intended for Mr. Paul to rely on these misrepresentations, so they would continue as part of the CryptoZoo project, and thereby line their own pockets at Mr. Paul's expense.

122.     Mr. Paul did in fact rely on Mr. Ibanez's and Mr. Greenbaum's misrepresentations about the ZOO Tokens and allowed Mr. Ibanez and Mr. Greenbaum to remain members of the CryptoZoo team, even after they surreptitiously traded ZOO Tokens for their own benefit

without Mr. Paul's knowledge. team and further enrich themselves.

123.    As a result of Mr. Ibanez's and Mr. Greenbaum's fraud, Mr. Paul has suffered

significant monetary damages as well as reputational harm.

**WHEREFORE,** Mr. Paul demands judgment against Eduardo Ibanez, and Jake Greenbaum

a/k/a Crypto King, for fraud, awarding damages, attorneys' fees, costs, pre- and post-judgment

interest, and any other relief this Court finds just.

**PRAYER FOR RELIEF**

Mr. Paul requests that the Court award him relief against Mr. Ibanez and Mr. Greenbaum

as follows:

(1)    Actual and compensatory damages, including interest, his reasonable attorneys'

fees, and costs, as allowed by law;

(2)    Punitive damages, as allowed by law;

(3)    Pre-judgment and post-judgment interest as provided by law;

(4)    Any further and different relief as this case may require or as determined by this

Court to be just, equitable, and proper under the circumstances.

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil procedure 38(b), Mr. Paul demands a jury trial for any

and all issues triable by a jury.

| | |
|---|---|
| /s/ Benjamin J. Widlanski___<br>Benjamin J. Widlanski, Esq.<br>Email: bwidlanski@kttlaw.com<br>Tal Lifshitz, Esq.<br>Email: tjl@kttlaw.com<br>Rachel Sullivan, Esq.<br>Email: rs@kttlaw.com<br>Jeffrey Leavitt, Esq.<br>jleavitt@kttlaw.com<br>**KOZYAK TROPIN & THROCKMORTON LLP**<br>2525 Ponce de Leon Blvd., 9th Floor<br>Miami, Florida 33134<br>Telephone: (305) 372-1800<br>Facsimile: (305) 372-3508<br>Jeffrey A. Neiman<br>Email: jneiman@mnrlawfirm.com<br>Jason L. Mays<br>Email: jmays@mnrlawfirm.com<br>**Marcus Neiman Rashbaum & Pineiro**<br>2 S. Biscayne Boulevard, Ste 2530<br>Miami, Florida 33131<br>Telephone: (954) 462-1200<br><br>*Counsel for Defendant Logan Paul* (admitted<br>*pro hac vice*) | /s/ Jeffrey Neiman__<br>Jeffrey Neiman<br>jneiman@mnrlawfirm.com<br>Jason L. Mays<br>jmays@mnrlawfirm.com<br>**MARCUS, NEIMAN, RASHBAUM & PINEIRO LLP**<br>One Biscayne Tower<br>2 South Biscayne Boulevard, Suite 2530<br>Miami, Florida 33131<br>Telephone: (305) 400-4260<br><br>*Counsel for Defendants Paul* (admitted *pro hac vice*) |
| /s/ Shelby O'Brien___<br>Shelby O'Brien<br>**ENOCH KEVER PLLC**<br>7600 N. Capital of Texas Highway<br>Building B, Suite 200<br>Austin, Texas 78731<br>Telephone: (512) 615-1223<br>Facsimile: (512) 615-1198<br>sobrien@enochkever.com<br>*Counsel for Defendants Paul,*<br>*Levin, and Bentov*<br>(admitted to Western District of Texas) | |

## **CERTIFICATE OF SERVICE**

I hereby certify a copy of the above and foregoing has been served upon all counsel of

record by using the Court's electronic filing system on the 4th day of January 2024.

*/s/ Shelby O'Brien*
Shelby O'Brien