**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS**

**AUSTIN DIVISION**

DON HOLLAND, individually and on behalf of all
others similarly situated,

Plaintiff,

vs.

CRYPTOZOO INC., a Delaware Corporation,
LOGAN PAUL, DANIELLE STROBEL, JEFFREY
LEVIN, EDUARDO IBANEZ, JAKE
GREENBAUM a/k/a CRYPTO KING, and OPHIR
BENTOV a/k/a BEN ROTH,

Defendants.

_____/

LOGAN PAUL,

Cross-Plaintiff,

vs.

EDUARDO IBANEZ and
JAKE GREENBAUM a/k/a CRYPTO KING,

Cross-Defendants.

_____/

Civil Action No. 1:23-cv-110

**DEFENDANT/CROSS-PLAINTIFF LOGAN PAUL'S MOTION TO DISMISS
<u>PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT</u>**

Defendant/Cross-Plaintiff Logan Paul moves to dismiss Plaintiffs' First Amended Class Action Complaint (the "First Amended Complaint" or "FAC," ECF No. 81), with prejudice and in its entirety under Federal Rule of Civil Procedure 12(b)(6). The First Amended Complaint fails to state any claim upon which relief may be granted.

## SUMMARY OF THE ARGUMENT

The First Amended Complaint presents a picture of two alternate realities: one plausible, the other not. In one, the CryptoZoo project is presented as a scam from start to finish, with all Defendants seeking only to fleece unsuspecting investors. In the other, CryptoZoo was broken by internal divisions, an overly ambitious project goal, and unanticipated difficulties. One of those explanations is well-supported by the facts, a plausible reading of the allegations, and, in fact, what occurred. The other is wishful thinking.

In the First Amended Complaint, 137 individual plaintiffs, three putative class representatives, and the class they purport to represent fail to present any cognizable claim for relief, instead presenting a complaint so riddled with pleading deficiencies and long on conclusory statements that Mr. Paul cannot discern which allegations Plaintiffs intend to support the claims against him. The First Amended Complaint is also a deficient "shotgun pleading" because it improperly incorporates each claim for relief into the subsequent claim for relief and each paragraph into every other paragraph, rendering it indecipherable. The First Amended Complaint doubles down on this by failing to identify which allegations apply to which Defendants, improperly grouping them together throughout. To make matters worse, Plaintiffs have not pled any facts from which Defendants can discern whether this Court has jurisdiction over the claims against any Defendant.

Plaintiffs also fail to plead the basic elements of each claim set forth in the First Amended Complaint's twenty-seven counts. These pleading failures are more acute in some instances—

1

Plaintiffs' attempts to plead RICO, securities fraud, common-law fraud, and statutory fraud claims, for example, are not only unsupported by ultimate facts, but also run afoul of Federal Rule of Civil Procedure 9(b). Regardless, each and every count in the First Amended Complaint is deficient for failure to plead key elements like reliance, causation, or any duty running from Mr. Paul to Plaintiffs or absent class members.

In short, Plaintiffs' claims for relief are wholly without merit. They fail to meet basic federal pleading standards. They fail to provide any factual support for their conclusory allegations that Mr. Paul intended to defraud the users of CryptoZoo, which was conceived as a passion project, not an investment opportunity or a scheme to defraud consumers. Plaintiffs gambled and lost. They should not now be allowed to maintain implausible, deficient claims against Mr. Paul based on their decisions to "invest" in a project that was not an investment vehicle in the first instance. The Court should dismiss the First Amended Complaint with prejudice and in its entirety.

### BACKGROUND

Plaintiffs are three putative class representatives and 137 individual litigants who purchased CryptoZoo ZOO Tokens and NFTs and allege that the CryptoZoo project was a "rug pull" investment scam orchestrated by Defendants Logan Paul, Jeffrey Levin, Danielle Strobel, Jake Greenbaum, Eduardo Ibanez, and Ophir Bentov, all employees of Defendant CryptoZoo, Inc. (FAC ¶¶ 45-221.) Plaintiffs bring claims for fraud, fraudulent misrepresentation, negligence, unjust enrichment, civil conspiracy to defraud, aiding and abetting fraud, breach of express and implied contract, and violations of the federal RICO statute, Rules 10b-5 and Section 20(a) of the Securities Exchange Act, the Commodities Exchange Act, and the Texas, New York, Iowa, North Carolina, California, Pennsylvania, New Jersey, Arizona, Florida, Colorado, Massachusetts, Illinois, and Nevada consumer protection statutes. (*Id.* ¶¶ 235-523.)

Plaintiffs hail from at least thirty-two countries and fourteen U.S. states, with most residing abroad. (*Id.* ¶¶ 45-184.) Each Plaintiff alleges where he resides and purchased CryptoZoo products, when he purchased CryptoZoo products, how much he spent, and how much he lost. *See id.* Only two of the three "Co-Lead" Plaintiffs plead anything more: Don Holland alleges that he was an experienced cryptocurrency investor when he purchased CryptoZoo and that he purchased on the recommendation of his son, and Alex Heikali alleges that he was an experienced cryptocurrency investor when he purchased CryptoZoo and that he purchased on the recommendation of a friend. (*Id.* ¶¶ 193, 194, 202, 203.) All Plaintiffs purchased CryptoZoo products between May 8, 2021, and January 14, 2023 (the "Purchase Period"), and seek to recover the investment losses they allegedly incurred from purchasing CryptoZoo. (*Id.* ¶¶ 45-184.)

Every CryptoZoo consumer—including every Plaintiff—agreed to CryptoZoo's Terms and Conditions ("T&C"), which provide in part:

> 9. CryptoZoo are NOT Investment Vehicles
>
> CryptoZoo are collectible digital art pieces that also function as fun, Non-Fungible Tokens for you to collect. They were created as art pieces intended for people to enjoy by collecting, *not as a financial instrument*. CryptoZoo makes *absolutely no promises or guarantees regarding the value of CryptoZoo NFTs* aside from the one that we will strive to do the best for the project and the community.

(CryptoZoo T&C at 2-3, ECF No. 1-2 (emphasis added)).

Beyond the representations and conditions in the T&C, Plaintiffs attribute three, public-facing affirmative representations to Defendant Logan Paul during the Purchase Period:

- On a YouTube show on August 18, 2021, Mr. Paul promoted CryptoZoo as a "really fun game that makes you money" with a "massive team" supporting it, funded by "like a million dollars." (FAC ¶ 200).

- On a YouTube show on October 11, 2021, Mr. Paul stated:

> I think [CryptoZoo is] the most important thing we're doing. Kids are going to care about the blockchain because of my project. Imagine if your first experience on the blockchain is with CryptoZoo. We're coming up with really, really fun plans for six months, a year down the line, two years down the line. Like this could be the one of the biggest things I do. (*Id.* ¶ 206).

- On May 14, 2022, after all but one of the Plaintiffs had purchased CryptoZoo, Mr. Paul stated that he had "[n]ever given up, [and was] working on [CryptoZoo] daily"; had "[a]rtists working around the clock"; was "[r]etroactively working to make these projects right and [it] just takes times time bro"; and he was "working backwards" to try to "fix it." (*Id.* ¶ 210).

No Plaintiff alleges that he received, reviewed, or relied on any of these representations. (*Id.* ¶¶ 45-187, 193, 194, 202, 203.)

Also conspicuously missing from the First Amended Complaint are detailed factual allegations regarding Logan Paul's state of mind. Plaintiffs assert conclusively that Mr. Paul and the other founders "made the business decision to forego an expensive and time-consuming process to create a functional CryptoZoo game and support it, and instead deliberately undertook a scheme to defraud Plaintiffs", (*id.* ¶ 216), but never back these claims with supporting facts. In fact, in the very same paragraph, Plaintiffs acknowledge Mr. Paul's public statement that the CryptoZoo game was built but could not be released due to previously unforeseen hurdles, such as regulatory issues. (*Id.*; *see also id.* ¶ 4 (incorporating Mr. Paul's public statement that "the game will never be released, allegedly because 'there are too many regulatory hurdles that would need to be cleared.'").) Plaintiffs never plead any factual allegations showing that Mr. Paul, or the other Defendants, intended not to produce CryptoZoo—they simply state, in conclusory fashion, that their version of events must be so.

In early 2024, after the CryptoZoo project had failed, Paul initiated a "buyback" program designed to restore CryptoZoo consumers to the position they were in before they purchased CryptoZoo.[1]  (*Id.* ¶¶ 5-7.) The buyback terms provided:

> Upon requesting a buy-back and accepting these Terms, PAUL agrees to pay you .1 Ethereum, and in exchange you agree to return, the CryptoZoo NFT [] that is the subject of your buy-back request (the "Buy-Back"). Pursuant to this Buy-Back, .1 Ethereum will be deposited into the crypto wallet from which the NFT was returned, and at that time you will no longer own or have any possessory interest in the NFT that was returned.

(*Id.* ¶ 6.)

The buyback program was open to all consumers, including every Plaintiff to this action. (*See* CryptoZoo Buyback Terms & Conditions (the "Buyback T&C"), attached as **Exhibit A**.)

Plaintiff Don Holland filed his original class action complaint on February 2, 2023, against CryptoZoo, Inc., Logan Paul, and other individual defendants. (*See* Compl., ECF No. 1.) After other Defendants moved to dismiss the original complaint (ECF Nos. 22, 23), on January 4, 2024, Defendant Paul filed an answer, affirmative defenses, and a cross-claim against Defendants/Cross-Defendants Eduardo Ibanez and Jake Greenbaum, denying the core allegations of the original complaint and bringing claims for fraudulent inducement and fraudulent misrepresentation against Ibanez and Greenbaum for hijacking and looting the CryptoZoo project. (Answer, Affirmative Defenses, & Crossclaim, ECF No. 55). Clerk's defaults were entered against Ibanez and Greenbaum on April 17 and May 16, 2024, respectively, based on their respective failure to plead, respond, or otherwise defend against the Crossclaim. (ECF Nos. 70, 74.) Paul has since filed a

---

[1] The market value of Ethereum fluctuates like the U.S. dollar, but no one could credibly argue that the return of a buyer's purchase price in dollars for physical goods purchased in dollars was unfair, even if the value of the U.S. dollar was lower at the time of the refund. The CryptoZoo products were purchased using Ethereum, and Mr. Paul is offering to return the same amount of Ethereum with which they were purchased originally. (Compl. ¶¶ 5-6.) This is the very definition of a fair refund.

Motion for Default Judgment against Ibanez and Greenbaum, which is pending. (ECF No. 75.)

On January 15, 2024, Plaintiffs moved for leave to file the proposed First Amended Class Action Complaint. (ECF No. 60.) The Court granted Plaintiffs' motion on August 19, 2024, and the Clerk separately filed the First Amended Complaint brought by Plaintiff Holland, together with two new co-lead plaintiffs and 137 individual plaintiffs. (ECF Nos. 80, 81.)

Defendant Logan Paul now moves to dismiss all claims against him with prejudice and in their entirety.

**LEGAL STANDARD**

A motion to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief may be granted "tests the sufficiency of the complaint under Federal Rule of Civil Procedure 8." *Kan v. OneWest Bank, FSB*, 823 F. Supp. 2d 464, 468 (W.D. Tex. 2011). "For a complaint to meet the pleading requirements of Rule 8(a)(2) and to survive a Rule 12(b)(6) motion to dismiss, the following conditions must be met: (1) every element of each cause of action must be supported by specific factual allegations; and (2) the complaint must state a plausible claim for relief." *Id.* While courts generally accept "as true all factual allegations contained within the complaint," courts are "not bound to accept legal conclusions couched as factual allegations." *Id.* (citations omitted). Finally, the "Plaintiffs must plead specific facts, not mere conclusory allegations." *Id.* (quoting *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1067 (5th Cir. 1994)).

**ARGUMENT**

I.    **THE FIRST AMENDED COMPLAINT FAILS TO SATISFY FEDERAL RULE OF CIVIL PROCEDURE 8.**

    A.    <u>The First Amended Complaint fails to plead ultimate facts supporting any claim as to a single Plaintiff.</u>

The First Amended Complaint fails to plead the bare minimum of supporting facts, as required by Federal Rule of Civil Procedure 8(a)(2), to support claims under which **any** of the

6

named "Plaintiffs" would be entitled to relief. The First Amended Complaint lists *dozens* of individual "Plaintiffs" (137, to be precise) and three "Co-Lead Class Plaintiffs" without pleading **a single ultimate fact** about *any* of their purchases to support their claims. (FAC ¶¶ 45-184.) The most specific allegations about any Plaintiff's purchases are that Plaintiff Holland purchased ZOO Tokens and Zoo NFTs because his son told him to, and Plaintiff Heikali purchased Zoo Tokens because his friend told him to. (*Id.* ¶¶ 202-03.)

The spare facts the First Amended Complaint *does* plead demonstrate that no Plaintiff relied on any statement by Logan Paul or any other Defendant. And, throughout a 531-paragraph complaint, only three paragraphs include allegations addressing the circumstances of any Plaintiff's' purchases, omitting details as to reliance, whether any Plaintiff was actually deceived, whether any Plaintiff would have purchased CryptoZoo products had they known they would fail as an investment, and whether any Plaintiff purchased CryptoZoo products as an investment at all. (FAC ¶¶ 200, 206, 210.) Instead, the First Amended Complaint pleads only that a mass of individual Plaintiffs purchased CryptoZoo products. (*Id.* ¶¶ 48-184.) Plaintiffs repeat the same, basic, insufficient allegations for every Plaintiff, alleging only the amount of money each spent and each Plaintiff's place of residence. (*Id.*)

The First Amended Complaint's pleading deficiencies extend to Defendants, as well. Plaintiffs fail to allege any facts demonstrating why the Court has jurisdiction over the Defendants, such as where Defendants reside or do business. (*Id.* ¶¶ 185-92.) Plaintiffs further fail to specify which state's law applies to the common law claims in this proceeding. (*See generally id.*) This is particularly egregious given that *most* of the individual Plaintiffs reside abroad in as many as thirty-two countries, including England, Kuwait, Australia, Lebanon, Russia, Argentina, Denmark, Croatia, and Brazil. (*Id.* ¶¶ 48-184). Three plaintiffs are alleged only to reside "in the United

States" or "the United Kingdom."[2] (*Id.* ¶¶ 57, 134, 175.) The First Amended Complaint wholly fails to comply with Rule 8.

The First Amended Complaint also fails to name all but one of the purported Plaintiffs in its caption, in direct violation of Federal Rule of Civil Procedure 10. Rule 10 clearly establishes the requirements for the names of parties to a case, mandating that "[t]he title of the complaint **must** name all of the parties." Fed. R. Civ. P. 10(a) (emphasis added). The First Amended Complaint's caption names one Plaintiff and one Plaintiff only: Don Holland. (FAC at 1.) This pleading deficiency compounds the confusing nature of the First Amended Complaint.

The First Amended Complaint's failure to plead these most basic and essential supporting facts—where most of its claims require some demonstration of reliance or, at a barest minimum, that Plaintiffs actually purchased some item **from the Defendants**—renders it entirely deficient under Rule 8.

B.  The First Amended Complaint is an indecipherable shotgun pleading.

The First Amended Complaint is an improper "shotgun pleading" because it fails to comply with Federal Rule of Civil Procedure 8(a)(2)'s requirement that a pleading be "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Shotgun pleading is disfavored in the Fifth Circuit. *Noble Cap. Tex. Real Est. Income Fund LP v. Newman*, 2023 WL 3035411, at *3 (W.D. Tex. Jan. 13, 2023) ("Group pleading or 'shotgun pleading' is disfavored—a 'sin'—in the Fifth Circuit.") (citations omitted), *report and recommendation approved*, 2023 WL 3035399 (W.D. Tex. Feb. 22, 2023); *see also S. Leasing Partners, Ltd. v. McMullan*, 801 F.2d 783, 788 (5th Cir. 1986) ("[The] 'shotgun approach' to pleadings, where the

---

[2] In their haste to get their amended pleading on file, (*see* Resp. Opp'n Pl.'s Mot. Leave to Amend, ECF No. 62), Plaintiffs either (at best) failed to fully grapple with the complex but critical choice-of-law issues presented by the litigation of foreign individuals' claims or (at worst) may not have even considered the issues at all.

pleader heedlessly throws a little bit of everything into his complaint in the hopes that something will stick, is to be discouraged.") (cleaned up).

The First Amended Complaint fails to comply with Rule 8(a)(2) for two reasons. First, it commits the most common "sin" of shotgun pleading—it improperly incorporates each count into the next, leaving the resulting jumble of incorporated allegations ambiguous at best and incomprehensible at worst. (FAC ¶¶ 235, 258, 269, 272, 278, 285, 293, 493, 504, 510, 518.) Then, in the final paragraph, Plaintiffs plead that "[e]very paragraph in this Complaint is hereby incorporated into every other paragraph." (*Id.* ¶ 531.) Any chance that the First Amended Complaint could be salvaged is extinguished at this point. Every paragraph of the First Amended Complaint **is** the First Amended Complaint, according to Paragraph 531. This is an abject absurdity, and it is the very opposite of a "short and plain" statement of the facts. The Court should not countenance such scattershot pleading. The Court should dismiss the First Amended Complaint on this ground alone. *See, e.g.*, *Valadez v. City of San Antonio*, 2022 WL 1608016, at *7 (W.D. Tex. May 20, 2022) ("[D]ismissal under Rules 8(a)(2) and 10(b) is appropriate where 'it is *virtually impossible* to know which allegations of fact are intended to support which claim(s) for relief.'") (quoting *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1325 (11th Cir. 2015)).

Second, the First Amended Complaint improperly groups Defendants together, leaving Mr. Paul unable to discern which allegations are meant to support Plaintiffs' claims against him. The Fifth Circuit prohibits "group pleading"—identifying defendants generally and pleading counts against all defendants without providing factual allegations against each defendant. *Noble Cap.*, 2023 WL 3035411, at *3. Courts in this District routinely dismiss complaints that fail to appropriately distinguish among defendants. *See, e.g., id.* (dismissing complaint as shotgun

9

pleading for grouping defendants); *see also United States v. Lakeway Reg'l Med. Ctr., LLC*, 2020 WL 6146571, at \*2 (W.D. Tex. Feb. 13, 2020) (same).

The First Amended Complaint repeatedly commits this "sin." In most counts, Plaintiffs refer only to "Defendants," never identifying a specific Defendant by name or separating them into groups. (FAC ¶¶ 235-483, 518-23.) Only in the Exchange Act counts do Plaintiffs even attempt to distinguish among the Defendants, alleging conduct undertaken by the "Founder Defendants" and "Manager Defendants." (*Id.* ¶¶ 484-509.)[3] This distinction, which still groups Defendants, is insufficient to save the Exchange Act counts. *See, e.g.*, *Noble Cap.*, 2023 WL 3035411, at \*3 ("The Fund's attempt to put Defendants into two camps is appreciated. However, its effort at simplification does not cure the deficiency in its pleading.").

This deficiency is even more severe where, as here, most of the plaintiff's claims must comply with Rule 9(b)'s heightened pleading requirements. *See Lakeway Reg'l Med.*, 2020 WL 6146571, at \*2 ("The Defendants cannot and should not be required to parse through a complaint totaling 54 pages and 184 paragraphs of factual allegations and guess who among them is allegedly responsible for making each material misrepresentation, material omission, or false statement to the Government. This type of confusion is exactly what Rule 9(b)'s heightened standard is designed to prevent."). Plaintiffs' 531-paragraph, 115-page First Amended Complaint fails to adequately distinguish among Defendants at every turn. Mr. Paul should not have to parse through the complaint and attempt to infer which claim may or may not be directed at him, and on what grounds. *Id.*

The Court should dismiss the First Amended Complaint as an improper shotgun pleading.

---

[3] Plaintiffs do make specific reference to Defendants Paul and Levin in the lone RICO count, but fail to otherwise distinguish between the other Defendants, and the RICO count is otherwise woefully inadequate in its allegations, as addressed further in this motion. (*Id.* ¶¶ 510-17.)

## II. PLAINTIFFS DO NOT PLEAD FRAUD-BASED CLAIMS WITH PARTICULARITY SUFFICIENT TO SATISFY RULE 9(b).

As Plaintiffs have not satisfied Rule 8, they cannot satisfy Rule 9(b). Most of the First Amended Complaint is based on alleged fraudulent conduct, including Plaintiffs' claims for fraud, fraudulent misrepresentation, conspiracy to commit fraud, aiding and abetting fraud, statutory consumer fraud,[4] and in some states, unjust enrichment.[5] These claims are subject to the heightened

---

[4] *See, e.g.*, *Mulder v. Kohl's Dep't Stores, Inc.*, 865 F.3d 17, 21 (1st Cir. 2017) (Rule 9(b) applies to claims under [Mass. Gen. Law] chapter 93A that involve fraud); *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009) ("Rule 9(b)'s heightened pleading standards apply to claims for violations of the CLRA and UCL."); *Coyle v. JSL Mech., Inc.*, 2023 WL 5985273, at *4 (E.D. Pa. Sept. 14, 2023) ("Coyle's UTPCPL claim . . . lacks the required particularity under Rule 9(b)."); *Urban Outfitters, Inc. v. Dermody Operating Co., LLC*, 2022 WL 4134127, at *3 (D. Nev. Sept. 12, 2022) ("[C]ourts within the District of Nevada and the Nevada Supreme Court have applied Rule 9(b)[] . . . to consumer fraud/deceptive trade practices claims under Nevada law."); *Sasso v. Tesla, Inc.*, 584 F. Supp. 3d 60, 80 (E.D.N.C. 2022) ("Rule 9(b) applies to unfair and [North Carolina] deceptive trade practices claims based on alleged misrepresentations."); *Moeller v. Samsung Elecs. Am., Inc.*, 623 F. Supp. 3d 978, 986 (S.D. Iowa 2022) (Rule 9(b) applies to statutory Iowa Consumer Fraud claims); *Katz v. Ambit Ne., LLC*, 2021 WL 2680184, at *6 (D.N.J. June 29, 2021) ("NJCFA claim did not satisfy Rule 9(b)); *Sanchez v. Allstate Vehicle & Prop. Ins. Co.*, 2021 WL 5636695, at *4 (S.D. Tex. Dec. 1, 2021) (Rule 9(b) applies to the Texas Deceptive Trade Practices Act (TDPTA)); *Murtagh v. Bed Bath & Beyond Inc.*, 2020 WL 4195126, at *5 (D. Colo. July 3, 2020), *report and recommendation adopted*, 2020 WL 4193553 (D. Colo. July 21, 2020) ("[C]ourts in this District apply the heightened pleading standards of Rule 9(b) . . . to CCPA claims."); *Hadley v. Kellogg Sales Co.*, 243 F. Supp. 3d 1074, 1094–95 (N.D. Cal. 2017) ("Plaintiff has inadequately alleged a violation of [California's] FAL and CLRA under the requirements of Rule 9(b)"); *USA Nutraceuticals Grp., Inc. v. BPI Sports, LLC*, 2016 WL 4254257, at *3 (S.D. Fla. Feb. 16, 2016) ("[C]ourts regularly apply Rule 9(b) to FDUTPA claims[.]"); *Aliano v. Louisville Distilling Co., LLC*, 115 F. Supp. 3d 921, 930 (N.D. Ill. 2015) ("Claims brought under the [Illinois Consumer Fraud Act] must meet the heightened pleading standard of Rule 9(b)."); *Kramer v. Ocwen Loan Servicing LLC*, 2014 WL 1827158, at *3 (D. Ariz. May 8, 2014) (Arizona Consumer Fraud Act claims "must be pled with particularity as required by Rule 9(b)").

[5] *See, e.g.*, *In re Arris Cable Modem Consumer Litig.*, 2018 WL 288085, at *10 (N.D. Cal. Jan. 4, 2018) ("[B]ecause the unjust enrichment/quasi-contract claim is based on the same allegedly misleading advertisements upon which Plaintiffs' UCL, FAL, and CLRA claims are based, . . . the

pleading requirements set forth in Federal Rule of Civil Procedure 9(b), which requires that "a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The Fifth Circuit has "held that pleading fraud with particularity requires that at a minimum . . . a plaintiff must set forth the who, what, when, where, and how of the alleged fraud." *U.S. ex rel. Nunnally v. West Calcasieu Cameron Hosp.*, 519 F. App'x 890, 892 (5th Cir. 2013) (cleaned up) (quoting *U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997)); *Thomas v. Abebe*, 833 F. App'x. 551, 554 (5th Cir. 2020) (affirming dismissal of a claim for conspiracy to commit fraud where the underlying fraud claim was not pled with specificity as required by Rule 9(b).).

No Plaintiff pleads the circumstances of his fraud-based claims with particularity. The individual plaintiffs and "Co-Lead" Plaintiff Mourad Kechichian allege only their date and location of purchase, the amounts spent, and the amounts allegedly lost on "CryptoZoo Products." (FAC ¶¶ 47-145.) They do not specify which "CryptoZoo Products" they purchased, how they lost money, what caused their losses, on what representations or omissions (if any) they relied, when they relied, or why they purchased CryptoZoo. *See id.* Faring only slightly better, the remaining "Co-Lead Plaintiffs," Mr. Holland and Mr. Heikali, plead similar facts, adding only that they purchased CryptoZoo products on the recommendation of friends or family and naming the CryptoZoo products purchased. (*Id.* ¶¶ 45, 46, 193, 194, 202, 203, 208.)  These allegations fall far short of Rule 9(b)'s heightened standard.

---

unjust enrichment/quasi-contract claim also sounds in fraud and is subject to Rule 9(b)'s heightened pleading requirements."); *In re Ford Fusion & C-Max Fuel Econ. Litig.*, 2015 WL 7018369, at *19 (S.D.N.Y. Nov. 12, 2015) ("Plaintiffs' claim for unjust enrichment . . . *is* subject to Rule 9(b) because, as discussed above, that claim involves averments of fraud.*"); Berry v. Indianapolis Life Ins. Co.*, 2011 WL 3555869, at *9 (N.D. Tex. Aug. 11, 2011) (dismissing unjust enrichment claim pursuant to Rule 9(b)).

The Court should dismiss Plaintiffs' fraud-based claims with prejudice.

### III.   PLAINTIFFS HAVE NOT STATED ANY CLAIM THAT REQUIRES RELIANCE OR PROXIMATE CAUSATION.

Reliance is a critical element of most of Plaintiffs' claims. Specifically, a plaintiff must plead and prove that he relied on a material misrepresentation or omission to state a claim for securities fraud, fraud and fraudulent misrepresentation, negligent misrepresentation, and violations of most of the state consumer protection statutes at issue. *See, e.g.*, *Stewart v. Kodiak Cakes, LLC*, 537 F. Supp. 3d 1103, 1135 (S.D. Cal. 2021) ("A plaintiff alleging claims under the CLRA, FAL, or UCL, must allege actual reliance."); *Miller v. Cadence Bancorporation*, 2020 WL 4581736, at *2 (S.D. Tex. Aug. 7, 2020) (reliance is an element of a Rule 10b-5 claim); *Naiman v. Alle Processing Corp.*, 2020 WL 6869412, at *7 (D. Ariz. Nov. 23, 2020) ("Actual reliance is an element of an ACFA claim[.]"); *Gordon v. Sig Sauer, Inc.*, 2019 WL 4572799, at *21 (S.D. Tex. Sept. 20, 2019) ("The Texas Deceptive Trade Practices Act requires a plaintiff to prove detrimental reliance on the alleged false or misleading statement."); *Rosales v. Sentry Ins. a Mut. Co.*, 2017 WL 5303474, at *2 (W.D. Tex. May 30, 2017) (reciting elements of common law fraud claim); *Muhammad v. Ocwen Loan Servicing, Inc.*, 2016 WL 2857509, at *4 (N.D. Tex. Apr. 14, 2016) (reciting elements fraudulent misrepresentation); *Williams v. Wells Fargo Bank, N.A.*, 2012 WL 5510747, at *2 (N.D. Tex. Nov. 14, 2012) (reciting elements of negligent misrepresentation); *Williams v. United Cmty. Bank*, 724 S.E.2d 543, 549 (2012) ("Where a plaintiff cannot forecast evidence of actual reliance, summary judgment for the defendants [on a claim for violation of N.C. Gen. Stat. § 75–1.1] is proper."); *Toy v. Metro. Life Ins. Co.*, 928 A.2d 186, 203 (2007) (justifiable reliance is an element of the UTPCPL).

And, because conspiracy to defraud and aiding and abetting fraud are derivative claims and not independent torts, Plaintiffs cannot sustain these claims without pleading an underlying fraud

claim. *See* p. 48, *infra*; *see, e.g.*, *Berry v. Bryan Cave LLP*, 2010 WL 1946264, at *10 (N.D. Tex. May 11, 2010) ("In pleading a claim for aiding and abetting, Plaintiffs must also plead the underlying tort allegedly committed by the primary tortfeasors."); *In re Ryan*, 2008 WL 4829947, at *3 (Bankr. N.D. Cal. Oct. 29, 2008) ("[W]ithout the existence of an underlying tort, a claim for conspiracy or aiding and abetting cannot stand.").

Finally, although a plaintiff need not plead first-party reliance as an element of a federal RICO claim, RICO claims will generally fail for lack of causation without a showing of at least third-party reliance. *See Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 658 (2008) ("[N]one of this is to say that a RICO plaintiff who alleges injury "by reason of" a pattern of mail fraud can prevail without showing that *someone* relied on the defendant's misrepresentations."); *see also, e.g.*, *Poe v. Bock*, 2018 WL 4677901, at *2 (W.D. Tex. June 11, 2018), *report and recommendation adopted,* 2018 WL 4275839 (W.D. Tex. Sept. 7, 2018) ("In general, then, a RICO plaintiff alleging injury by reason of a pattern of mail fraud must establish at least third-party reliance in order to prove causation.") (cleaned up); *Allstate Ins. Co. v. Michael Kent Plambeck, D.C.*, 2014 WL 1303000, at *4 (N.D. Tex. Mar. 31, 2014), *aff'd sub nom. Allstate Ins. Co. v. Plambeck*, 802 F.3d 665 (5th Cir. 2015) ("Plaintiffs cannot demonstrate causation for a RICO violation without demonstrating some type of reliance."); *Bridgewater v. Double Diamond-Del., Inc.*, 2011 WL 1671021, at *11 (N.D. Tex. Apr. 29, 2011 (discussing *Bridge* and dismissing RICO claim because "[h]ere, Plaintiffs do not claim third-party reliance and it is not clear how they may show causation without first-party reliance.").

Plaintiffs have not alleged that they—or anyone—relied on misrepresentations by Mr. Paul. No Plaintiff alleges that he received or reviewed any representation by Mr. Paul relating to CryptoZoo, (FAC ¶¶ 45-184; 202, 203.)  Even were that not the case, for the same reasons set forth

below with respect to Plaintiffs' contractual claims, no Plaintiff's reliance on Mr. Paul's statements as alleged in the FAC would be reasonable or justified. *See* pp. 35-40, *infra*.

To the extent that any Plaintiff bases any claim on alleged omissions, they cannot prevail without pleading, and then proving, that Mr. Paul owed them a duty to disclose. *See, e.g.*, *Basic Inc. v. Levinson,* 485 U.S. 224, 239 (1988) ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5."); *Taya Agric. Feed Mill Co. v. Byishimo*, 2022 WL 17716383, at *2 (5th Cir. Dec. 14, 2022) (affirming dismissal of fraud-by-omission claim because bank had no duty to disclose); *Oddo v. United Techs. Corp.*, 2022 WL 577663, at *9 (C.D. Cal. Jan. 3, 2022) ("Where a fraud-based claim is based on an alleged omission, plaintiff must establish a duty to disclose."); *LBBW Luxemburg S.A. v. Wells Fargo Sec. LLC*, 10 F. Supp. 3d 504, 515 (S.D.N.Y. 2014) ("[W]here fraud is allegedly perpetrated by omission, Defendant must have had a duty to disclose the relevant fact."). Plaintiffs have pled neither the existence of a duty to disclose, nor facts from which the Court can infer one.[6]

---

[6] Though there are distinctions among the various states' laws, a duty to disclose generally arises when there is a direct transactional or fiduciary relationship between the plaintiff and defendant, or when a defendant states a half-truth that is misleading because material facts were omitted. *See, e.g.*, *Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 791 (S.D.N.Y. 2020) (for securities fraud, "[a]n omission of information not affirmatively required to be disclosed is, instead, actionable only when disclosure of such information is necessary 'to make statements made, in the light of the circumstances under which they were made, not misleading.") (cleaned up); *Byishimo*, 2022 WL 17716383, at *2 (dismissing claim for fraud based on omissions because plaintiff and defendant "did not have a confidential or fiduciary relationship," and defendant "did not make a partial disclosure or convey a false impression") (cleaned up); *Disher v. Tamko Bldg. Prod., Inc.*, 2018 WL 905360, at *3 (S.D. Ill. Feb. 15, 2018)("Not every nondisclosure constitutes fraud by omission. Rather, a duty to disclose arises in four circumstances: "(1) where there is a confidential or fiduciary relationship between the parties; (2) where the duty is provided by statute; (3) where a defendant has partially disclosed material facts to the plaintiff but created the impression of full disclosure; and (4) where one party to a contract has superior knowledge and is relied upon to disclose the same."). Mr. Paul did not contract with any Plaintiff, nor did any Plaintiff justifiably rely on a misleading statement by Mr. Paul, as no Plaintiff has alleged as much and the statements attributed to Mr. Paul are puffery. *See* pp. 38-40, *supra*.

15

The same claims also fail because the First Amended Complaint lacks allegations of proximate causation. This is true first and foremost because for Plaintiffs' misrepresentation claims, finding that Mr. Paul's conduct caused Plaintiffs' losses will depend on proof of Plaintiffs' reliance. *See, e.g.*, *Oncology Tech, LLC v. Elekta, Inc.*, 2013 WL 12171814, at *2 (W.D. Tex. Apr. 26, 2013) (fraud plaintiff required to show that its "reliance caused injury"); *Petrosyan v. AMCO Ins. Co.*, 2012 WL 12884920, at *3 (C.D. Cal. Oct. 9, 2012) (fraud claim requires losses caused by reliance). At the very least, including under circumstances where reliance is not required, Plaintiffs must allege that they would not have purchased CryptoZoo had they known the truth. *See, e.g.*, *Warner v. Ford Motor Co.*, 2008 WL 4452338, at *17 (D. Colo. Sept. 30, 2008) (showing that Plaintiff would not have purchased vehicle if he had known about defect sufficient theory of causation on omission-based claim under CCPA); *In re Dynegy, Inc. Sec. Litig.*, 339 F. Supp. 2d 804, 884 (S.D. Tex. 2004) (Third Fourth, Fifth, Sixth, Seventh, and Eleventh Circuits, adhere to two-part transaction/loss causation requirement "under which plaintiffs must plead and prove facts establishing both that they would not have purchased the securities had they known the truth (reliance or 'transaction causation'), and that the defendants' misrepresentations caused them to suffer an economic loss (proximate cause or ('loss causation')"); *Ibrahim v. Old Kent Bank* 2000 WL 263987, at *5 (N.D. Ill. Feb. 25, 2000) ("We note the Illinois Supreme Court has held that proximate cause is a requirement under the ICFA, resulting in actual damages being limited to situations where the misrepresentation proximately caused plaintiffs to pay a fee they would not have paid had they known the truth.") (cleaned up). Plaintiffs' allegations, however, demonstrate that they purchased CryptoZoo as an investment *despite* Defendants' warnings not to do so. *See* pp. 37-38, *infra*.

16

The Court should dismiss Plaintiffs' claims for fraud, fraudulent misrepresentation, negligent misrepresentation, aiding and abetting fraud, conspiracy to defraud, and violations of Rule 10b-5, the federal RICO statute, and all state consumer protection statutes for failure to plead reliance or causation.

## IV.    PLAINTIFFS FAIL TO STATE A RICO CLAIM.

Section 1962(c) of the federal RICO statute provides that "it shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which effect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). "Claims under RICO, 18 U.S.C. § 1962, have three common elements: (1) a person who engages in (2) a pattern of racketeering activity, (3) connected to the acquisition, establishment, conduct, or control of an enterprise." *St. Germain v. Howard*, 556 F.3d 261, 263 (5th Cir. 2009) (quoting *Abraham v. Singh*, 480 F.3d 351, 355 (5th Cir. 2007)) (cleaned up). "Each concept is a term of art which carries its own inherent requirements of particularity." *Armendariz v. Chowaiki*, 2016 WL 8856919, at *6 (W.D. Tex. Mar. 31, 2016), *aff'd*, 683 F. App'x 338 (5th Cir. 2017) (cleaned up). Beyond the "inherent" particularity required to support a RICO claim, Rule 9(b) applies to RICO claims where the predicate acts alleged sound in fraud. *See Bonton v. Archer Chrysler Plymouth, Inc.*, 889 F. Supp. 995, 1004 (S.D. Tex. 1995) ("Rule 9(b)'s particularity requirement applies to pleading fraud as a predicate act in a RICO claim.") (citing *Tel–Phonic Servs., Inc. v. TBS Int'l, Inc.*, 975 F.2d 1134, 1138 (5th Cir. 1992)).

As with their other claims, Plaintiffs have failed to plead RICO claims with the specificity required by Rule 9(b), or to plead any causal link between Logan Paul's conduct and their alleged economic losses. *See* pp. 13-17, *supra*. Beyond these deficiencies, Plaintiffs have not pled—and cannot plead—the basic elements of a RICO claim, as they have not detailed (A) a pattern of

17

racketeering activity, as defined by 18 U.S.C. § 1961(1) or (B) a RICO enterprise. As such, the Court should dismiss Plaintiffs' RICO claim with prejudice.

    A.  <u>Plaintiffs have not pled a pattern of racketeering activity.</u>

"A pattern of racketeering activity consists of two or more predicate criminal acts that are (1) related and (2) amount to or pose a threat of continued criminal activity." *St. Germain*, 556 F.3d at 263. "Although two predicate acts are the minimum number of acts required to demonstrate a pattern of racketeering activity, two acts may not be sufficient." *Pan Am. Mar., Inc. v. Esco Marine, Inc.*, 2005 WL 1155149, at *6 (S.D. Tex. May 10, 2005) (citing *Sedima, S.P.R.L. v. Imrex Co, Inc.*, 473 U.S. 479, 496 n.14 (1985)).

The predicate criminal acts supporting a RICO claim may arise under state or federal law, but in either event are limited to the acts enumerated in 18 U.S.C. § 1961(1). *See, e.g., Armendariz*, 2016 WL 8856919, at *10–11 ("'Racketeering activity' is defined in RICO as 'any act or threat involving' certain enumerated state law crimes or any 'act' indictable under specified federal statutes and certain federal 'offenses.'" (quoting *Dennis v. Gen. Imaging, Inc.*, 918 F.2d 496, 511 (5th Cir. 1990)). "For state law predicate acts, 'only crimes prohibited in state statutes and listed in section 1961(1) can serve as predicate offenses for the purpose of a RICO claim.'" *Gordon v. Neugebauer*, 57 F. Supp. 3d 766, 777 (N.D. Tex. 2014) (quoting *Pan Am. Mar.*, 2005 WL 1155149, at *4) (emphasis in original). "Such state law crimes include murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance." *Id.* (quoting 18 U.S.C. § 1961(a); cleaned up). "For federal predicate acts, only those federal statutes specifically listed in section 1961(1) qualify as predicate acts for purposes of establishing a pattern of racketeering activity." *Id.* (citing, *inter alia*, *Bonton*, 889 F. Supp. at 1002 ("Any act that does not fall within the purview of RICO's definition of predicate offenses is not an act of 'racketeering activity.'") (cleaned up)).

Plaintiffs have not alleged a single criminal predicate act listed in Section 1961(1) in support of their civil RICO claim. See FAC ¶¶ 510-17. Their entire RICO claim comprises seven paragraphs of the First Amended Complaint, which, at best, suggest a simple—though poorly pled—fraudulent scheme. *See id.*; pp. 11-12, *supra*. Common law fraud, however, does not qualify as a RICO predicate act. In fact, Congress and the courts have made clear that the federal RICO statute is not a "'surrogate for garden-variety fraud actions properly brought under state law.'" *Crosswell v. Rodriguez*, 2023 WL 6206911, at *4 (S.D. Tex. Sept. 8, 2023), *report and recommendation adopted as modified sub nom. Crosswell v. Martinez*, 2023 WL 6207754 (S.D. Tex. Sept. 25, 2023) (noting "Congress's intention to 'prevent RICO from becoming a surrogate for garden-variety fraud actions properly brought under state law'") (quoting *Malvino v. Delluniversita*, 840 F.3d 223, 231 (5th Cir. 2016)). This failure alone warrants dismissal of Plaintiffs' RICO claim. *See, e.g.*, *Ocoro v. Montelongo*, 2018 WL 3040582, at *4-5 (W.D. Tex. June 19, 2018) (dismissing RICO claim for failure to sufficiently plead underlying predicate acts); *cf. Ausley v. Cross Cnty. Water Supply Corp.*, 2009 WL 5215401, at *5 (W.D. Tex. Dec. 28, 2009) ("[T]he [federal RICO] statute was never intended to allow plaintiffs to turn garden-variety state law fraud claims into federal RICO actions.") (quoting *Jennings v. Auto Meter Prods., Inc.*, 495 F.3d 466, 472 (7th Cir. 2007)).

Plaintiffs have not pled a pattern of racketeering activity.

B.  Plaintiffs have not satisfied RICO's enterprise requirement.

The federal RICO statute defines "enterprise" to include "any individual, partnership, corporation, association, or other alleged legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). An association-in-fact enterprise also "(1) must have an existence separate and apart from the pattern of racketeering, (2) must be an ongoing organization and (3) its members must function as a continuing unit as shown

19

by a hierarchical or consensual decision making structure." *Allstate Ins. Co. v. Plambeck*, 802 F.3d 665, 673 (5th Cir. 2015) (quoting *Calcasieu Marine Nat'l Bank v. Grant*, 943 F.2d 1453, 1461 (5th Cir. 1991)). Critically, "[a] pattern of racketeering activity does not, by itself, necessarily show that an enterprise exists." *Id.* (citing *United States v. Turkette*, 452 U.S. 576, 583 (1981); *Boyle v. United States*, 556 U.S. 938, 947 (2009)).

       1.  *Plaintiffs have not pled an enterprise with the requisite specificity.*

Plaintiffs asserting RICO claims must "plead specific facts, not mere conclusory allegations[,] which establish the enterprise." *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 738 (5th Cir. 2019) (citing *Manax v. McNamara*, 842 F.2d 808, 811 (5th Cir. 1988)). "Conclusory allegations of collaboration fail [to] support a plausible inference of the structural requirement necessary to support an association in fact enterprise under a RICO claim." *Murex, LLC v. GRC Fuels, Inc.*, 2016 WL 4207994, at *11 (N.D. Tex. Aug. 10, 2016) (citing *Boyle*, 556 U.S. at 946-47). Where a plaintiff does nothing more than allege a straightforward fraudulent scheme and conclude that all defendants involved are members of a RICO enterprise, the enterprise requirement has not been met. *See, e.g.*, *Armendariz*, 2016 WL 8856919, at *9 ("Indeed, the mere fact that individuals might have joined together to defraud Plaintiffs . . . is insufficient to establish a RICO enterprise.") (quoting *Elliott v. Foufas*, 867 F.2d 877, 881 (5th Cir. 1989)) (cleaned up); *Skidmore Energy, Inc. v. KPMG LLP*, 2004 WL 3019097, at *9 (N.D. Tex. Dec. 28, 2004) ("Plaintiffs merely state that '[t]o the best of Plaintiffs' information and belief, all named defendants are associated with the enterprise as set forth above[.]'").

Plaintiffs allege that Defendants participated in an "ongoing fraudulent enterprise" consisting of at least seven purported "pump and dump" schemes including the development and sale of CrytpoZoo tokens and NFTs. (*See* FAC ¶ 512.) Plaintiffs do not plead a single detail of any of the other fraudulent schemes—when they occurred, who was involved, the roles of the

participants, or the schemes' mechanics. *See id.* They simply list the supposed schemes, presumably for the purpose of alleging enterprise activity beyond the alleged CryptoZoo fraud.[7] *Cf. Clark v. Nat'l Equities Holdings, Inc.*, 561 F. Supp. 2d 632, 639 (E.D. Tex. 2006) (plaintiff must "show[] that the association exists for purposes other than simply to commit the predicate acts"). Plaintiffs' conclusory allegations do not meet the basic requirements of notice pleading, let alone RICO's more stringent particularity standard. *See, e.g.*, *Chyba v. EMC Mortg. Corp.*, 2011 WL 13205938, at *1 (N.D. Tex. Apr. 15, 2011), *aff'd*, 450 F. App'x 404 (5th Cir. 2011) ("The plaintiff must . . . plead specific facts, not mere conclusory allegations, to avoid dismissal.") (citing *Guidry v. Bank of LaPlace*, 954 F.2d 278, 281 (5th Cir. 1992)). Plaintiffs have not pled a RICO enterprise beyond the alleged CryptoZoo fraud. *See, e.g.*, *Clark*, 561 F. Supp 2d at 639 (dismissing RICO claim where plaintiff alleged that singular goal of enterprise was defrauding those engaged in oil and gas industry).

2.    *CryptoZoo cannot form an enterprise with its officers and employees.*

"[T]o establish liability under § 1962(c) one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *ISystems v. Spark Networks, Ltd.*, 2012 WL 3101672, at *4 (5th Cir. Mar. 21, 2012) (quoting *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001)):

---

[7] Because Plaintiffs' allegations addressing the other purported schemes fail to satisfy the most basic pleading requirements, the Court must discount them as part of the alleged enterprise's activity. Plaintiffs have accordingly also failed to plead an enterprise that is distinct from its alleged pattern of racketeering activity. At best, they describe an enterprise of CryptoZoo and its members that was formed to execute the alleged CryptoZoo scheme. (*See* FAC ¶¶ 195-220; 510-17.) These allegations cannot support a RICO claim. *See, e.g.*, *Express Working Cap., LLC v. One World Cuisine Grp., LLC*, 2018 WL 4214349, at *11 n.8 (N.D. Tex. Aug. 16, 2018), *report and recommendation adopted*, 2018 WL 4210142 (N.D. Tex. Sept. 4, 2018) ("For purposes of § 1962(c), which prohibits the conduct of an enterprise's affairs through a pattern of racketeering activity, the enterprise must . . . be distinct from the series of predicate acts constituting racketeering activity.") (cleaned up). This provides an additional basis for dismissal.

21

In making a distinction between a RICO 'person' and a RICO 'enterprise,' it is not enough to establish that a defendant corporation through its agents committed the predicate acts in the conduct of its own business. That officers or employees of a corporation, in the course of their employment, associate to commit predicate acts does not establish an association-in-fact enterprise distinct from the corporation.

*Id.* (quoting *Whelan v. Winchester Prod. Co.*, 319 F.3d 225, 229 (5th Cir. 2003)) (cleaned up).

Accordingly, "[a] corporation whose corporate officers and employees are engaged in a corporation's activities cannot constitute a RICO enterprise based upon the activities of its employees," *Mauer v. Heritage Auctions, Inc.*, 2010 WL 11575504, at *1 (N.D. Tex. July 16, 2010) (citing *Whelan*, 219 F.3d at 230), and "[w]here a plaintiff alleges that a RICO enterprise consists merely of a corporation associating with its own employees, the claim fails." *Yadav v. Frost Bank*, 2020 WL 7385842, at *5 (W.D. Tex. Dec. 16, 2020), *aff'd sub nom.* 851 F. App'x 509 (5th Cir. 2021); *see also, e.g., ISystems*, 2012 WL 3101672, at *5 ("ISystems cannot avoid the distinctiveness requirement by alleging a RICO enterprise that consists merely of a corporation defendant associated with its own employees or agents carrying on the regular affairs of the defendants.") (cleaned up); *Senthilnathan v. AT&T, Inc.*, 2018 WL 472925, at *1 (N.D. Tex. Jan. 3, 2018), *report and recommendation adopted*, 2018 WL 461123 (N.D. Tex. Jan. 18, 2018) ("Employees who, in the course of their employment, associate to commit RICO predicate acts do not form a distinct RICO 'enterprise.'").

Plaintiffs here fail to plead the existence of an "enterprise" because the enterprise alleged consists only of CryptoZoo, its officers, and its employees. Plaintiffs identify seven "enterprise" members: CryptoZoo; its "Founder Defendants," Logan Paul, Jeffrey Levin, Jake Greenbaum, Danielle Strobel, and Eduardo Ibanez, whom Plaintiffs also identify as CryptoZoo's lead developer; and its "Manager Defendant," Ophir Bentov, named as "the manager of the CryptoZoo community." (FAC ¶¶ 185-92, 512, 514-16.) Plaintiffs' only discernable charge is that CryptoZoo

22

schemed with its own employees to deceive Plaintiffs in connection with their CryptoZoo purchases. (*See, e.g., id.* ¶¶ 12-31, 195-220.) Allegations of CryptoZoo's collusion with its members cannot support a RICO claim. *See, e.g., Mauer*, *Yadav*, *supra*.

The Court should dismiss Plaintiffs' RICO claim with prejudice.

**V.     PLAINTIFFS' EXCHANGE ACT CLAIMS FAIL BECAUSE THE ZOO TOKENS AND NFTS ARE NOT SECURITIES AND PLAINTIFFS FAIL TO MEET THE PSLRA'S HEIGHTENED PLEADING STANDARDS FOR SCIENTER.**

Plaintiffs assert two claims for relief under the Securities Exchange Act of 1934 (the "Exchange Act")—one in Count Twenty-Four for securities fraud under Section 10(b) (codified at 15 U.S.C. § 78j(b)) and Rule 10b-5 (codified at 17 C.F.R. § 240.10b-5), and one in Count Twenty-Five for control person liability under Section 20(a) (codified at 15 U.S.C. § 78t). Both counts fail to state a claim for two reasons. First, ZOO Tokens and NFTs are not securities, and Plaintiffs fail to allege sufficient facts to show that either could be a security. Second, Plaintiffs fail to plead either count with the particularity required under the Private Securities Litigation Reform Act of 1995 (the "PSLRA") or Federal Rule of Civil Procedure 9(b).

    A.     <u>ZOO Tokens and NFTs are not securities because they do not qualify as "investment contracts."</u>

Plaintiffs allege that the ZOO Tokens and Zoo NFTs are "unregistered securities," (FAC ¶¶ 22, 491, 495), but never explain how or why they should be considered securities at all. (*Id.* ¶¶ 480-509.) Generally, courts apply the "investment contract" analysis established by the Supreme Court in *S.E.C. v. J. Howey Co.* to determine whether cryptocurrencies or NFTs should be considered securities. 328 U.S. 293, 298-99 (1946); *Sec. & Exch. Comm'n v. Ripple Labs, Inc.*, 682 F. Supp. 3d 308, 321 (S.D.N.Y. 2023) (applying the *Howey* test to sales of Ripple Labs' XRP cryptocurrency), *motion to certify appeal denied,* 2023 WL 6445969 (S.D.N.Y. Oct. 3, 2023).

*Howey* defines an "investment contract" as:

> [A] contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise.

328 U.S. at 298–99.

The Fifth Circuit Court of Appeals has adopted a specific test to determine whether activity fits the third element of the *Howey* test and can be considered to "expect profits solely from the efforts of the promoter or a third party." The "proper standard" is "whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *Martin v. T. V. Tempo, Inc.*, 628 F.2d 887, 889 (5th Cir. 1980) (citation omitted).

Plaintiffs' allegations fail to show that the ZOO Tokens or NFTs qualify as securities. First, cryptocurrencies should not generally be considered securities. *Ripple*, 682 F. Supp. 3d at 324 ("XRP, as a digital token, is not in and of itself a 'contract, transaction[,] or scheme' that embodies the *Howey* requirements of an investment contract"); Amicus Curiae Brief of Paradigm Operations LP, *Ripple*, No. 20-CIV-10832, at 3-6, n.18, ECF No. 707-1 (S.D.N.Y. Nov. 15, 2022) (observing that commentators "have generally recognized that most crypto assets do not fall within one of the enumerated categories of the term 'security' in . . . the Securities Exchange Act of 1934," that those commentators instead "have trained their focus" on "the statutory catch-all" of the "investment contract," and that even then "most crypto assets are *not* properly characterized as securities.") (emphasis in original).

Second, the purchase of cryptocurrencies must be evaluated based on the circumstances at hand to determine if such a purchase qualifies as an "investment contract" under *Howey*. *See Martin*, 628 F.2d at 889; *Ripple*, 682 F. Supp. 3d at 323-31. Here, as Plaintiffs acknowledge,

CryptoZoo's T&C expressly disclaim that CryptoZoo is an investment vehicle. The T&C are clear that "CryptoZoo are NOT [i]nvestment [v]ehicles," or "financial instrument[s]," but instead "digital art pieces intended for people to enjoy by collecting." (T&C at 2-3 (emphasis added).) Accordingly, under *Howey*, no consumer who agreed to the T&C can claim that Mr. Paul "led [them] to expect profits solely from [Mr. Paul's] efforts." 328 U.S. at 298–99. To the contrary, CryptoZoo expressly advised Plaintiffs *not* to expect profits. *See* T&C, *supra*; FAC ¶¶ 8, 20.

Regardless, a plaintiff cannot have a reasonable expectation in profits based on the "undeniably significant" efforts of a promoter where he does not directly purchase the item at issue from the promoter. *See Ripple*, 682 F. Supp. 3d at 327-31. *Ripple* plainly observes that where third-party purchasers of a cryptocurrency token—called the "Programmatic Buyers" of the "XRP Token" in that case—cannot assert securities claims against a defendant that did not sell directly to them. *Id.* at 328. This distinction is crucial.

In *Ripple*, the Programmatic Buyers purchased the XRP Token as "public buyers . . . on digital asset exchanges." *Id.* Due to their status as public purchasers, the "Programmatic Buyers could not reasonably expect that Ripple would use the capital it received from its sales to improve the XRP ecosystem and thereby increase the price of XRP." *Id.* Further, the court observed that arguments that "Ripple 'explicitly targeted speculators' or that 'Ripple understood people were speculating on XRP as an investment'" were insufficient to maintain a securities claim as well, "because a speculative motive 'on the part of the purchaser or seller does not evidence the existence of an 'investment contract' within the meaning of the Securities Act.'" *Id.* at 329 (cleaned up).

Crucially, like the Programmatic Buyers in *Ripple*, Plaintiffs do not allege that they purchased ZOO Tokens directly from CryptoZoo. (FAC ¶¶ 10, 45, 480-503.) Plaintiff Holland, for example, alleges only that he "invested one-thousand dollars ($1,000) purchasing CryptoZoo

25

Products on September 4, 2021, and an additional two-thousand dollars ($2,000) in November of 2021. (*Id.* ¶ 45.) While Plaintiffs allege generally that the purported *class* includes direct purchasers, (*id.* ¶ 10), it is telling that no individual Plaintiff alleges that he or she purchased ZOO Tokens or Zoo NFTs directly from CryptoZoo. (*Id.* ¶ 45.)[8]

The remainder of Plaintiffs' allegations demonstrate the real likelihood that they—and many other purchasers of ZOO Tokens and Zoo NFTs—purchased those items through secondary markets rather than directly through CryptoZoo. (*See, e.g., id.* ¶¶ 203 (alleging that "a friend told Plaintiff Heikali about CryptoZoo, and on September 11, [sic] invested an initial $40,000 to purchase ZOO Tokens.").) Additionally, if Plaintiffs' inconsistent allegations demonstrate anything at all, they show that the volatility of the general cryptocurrency market, rather than any particular effort by Defendants, drove any expectation of profits in ZOO Tokens or Zoo NFTs. *Compare id.* ¶ 205 (alleging rises and falls in price of ZOO Token at various dates starting in November of 2021 and claiming tangential connection to actions by the Defendants drove those price rises and falls) *with id.* ¶ 206 (incongruously alleging that "[i]nitially during **September**, ZOO Tokens lost almost all of their value for the first time," with no connection made to any activity by the Defendants relating to the price fall) (emphasis added).)

Plaintiffs' claims that the ZOO Tokens and Zoo NFTs are securities therefore fail for the same reasons as the Programmatic Buyers' claims in *Ripple*. Plaintiffs fail to plead that they purchased ZOO Tokens or Zoo NFTs directly from CryptoZoo. And allegations that Defendants

---

[8] The First Amended Complaint does allege that some individuals purchased ZOO Tokens or Zoo NFTs "from Defendants." (*See, e.g., id.* ¶ 46 ("Alex Heikali . . . purchased CryptoZoo Products **from Defendants**.").) But it nowhere alleges that any of those purchases were **from CryptoZoo** directly. The First Amended Complaint's myriad pleading failures make it difficult to sort through Plaintiffs' claims and, at times, work to hide pleading deficiencies by burying those deficiencies in a mound of irrelevant allegations (like as here). This is just one more reason why the Court should dismiss the First Amended Complaint for failure to state a claim.

were aware that he, or other purchasers, were speculatively purchasing ZOO Tokens or Zoo NFTs are not sufficient to demonstrate that ZOO Tokens or NFTs qualify as investment contracts. *Ripple*, 682 F. Supp. 3d at 328-30. Rather, Plaintiffs' allegations demonstrate, at best, that they did not have expectations of profit based on the "essential managerial efforts" of Defendants but rather on speculative market forces. *Martin*, 628 F.2d at 889.

The Court should dismiss Plaintiffs' Exchange Act claims in Counts Twenty-Four and Twenty-Five with prejudice because Plaintiffs fail to support their securities claims with sufficient allegations and the ZOO Tokens and Zoo NFTs do not qualify as securities under the *Howey* test.

B.  <u>Plaintiffs fail to plead facts demonstrating any intent to defraud or mislead with respect to any of Logan Paul's public statements.</u>

Plaintiffs fail to state a claim for securities fraud against Logan Paul under Section 10(b) of the Exchange Act and Rule 10b-5 because the First Amended Complaint fails to meet the heightened pleading standards set forth in the PSLRA and Rule 9(b). "To state a securities-fraud claim under section 10(b), and Rule 10b–5, plaintiffs must plead (1) a misstatement or omission; (2) of a material fact; (3) made with scienter; (4) on which the plaintiffs relied; and (5) that proximately caused the plaintiffs' injuries." *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 362 (5th Cir. 2004). To satisfy Rule 9(b), "plaintiffs must 'specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent.'" *Id.* (citation omitted).

Under the PSLRA, Plaintiffs must go one step further: "The PSLRA reinforces the particularity requirements of Rule 9(b), requiring the plaintiffs to state not only the time, place, the identity of the speaker, and the content of the alleged misrepresentation, but also to explain why the challenged statement or omission is false or misleading." *Id.* "The PSLRA *also* requires that the complaint 'with respect to *each* act or omission alleged' to be false or misleading 'state with

*particularity facts* giving rise to a *strong* inference that *the defendant* acted with the required state of mind.'" *Id.* at 363 (emphasis in original; quoting 15 U.S.C. § 78u–4(b)(2)). To meet this requirement and avoid dismissal under Rule 9(b) and the PSLRA, plaintiffs must "(1) specify each statement alleged to have been misleading, i.e., contended to be fraudulent; (2) identify the speaker; (3) state when and where the statement was made; (4) plead with particularity the contents of the false representations; (5) plead with particularity what the person making the misrepresentation obtained thereby; and (6) explain the reason or reasons why the statement is misleading, i.e., why the statement is fraudulent." *Neiman v. Bulmahn*, 854 F.3d 741, 746 (5th Cir. 2017) (cleaned up).

Plaintiffs' scienter and causation allegations are woefully inadequate under the PSLRA and Rule 9(b). The entirety of Plaintiffs' allegations supporting scienter are set forth in only three paragraphs. (FAC ¶¶ 481-83.) Without identifying specific statements that Plaintiffs allege to be false, the First Amended Complaint states only that "Plaintiffs allege that the above-described material misrepresentations and omissions were made by Defendants either intentionally and/or with reckless disregard to the accuracy." (*Id.* ¶ 481.) The First Amended Complaint never identifies which "above-described" statements it means to reference here. Plaintiffs further allege that "Defendants were aware of the false claims as set forth above," (*id.* ¶ 482), and that "the Manager Defendant knew or were [sic] grossly reckless in not knowing the fabricated, non-existent base security that Plaintiffs and the Class were investing in." (*Id.* ¶ 483.)

Plaintiffs do not allege with particularity any facts supporting Defendants' alleged state of mind. Plaintiffs fails to plead particular facts, as required by the PSLRA, identifying **each** act or omission alleged, when or where those acts or omissions allegedly occurred, and how those acts

or omissions were allegedly false.[9] *See, e.g.*, *Southland Sec.*, 365 F.3d at 377 (stating that "the plaintiffs fail to plead at least one of the following elements with particularity: when the statements were made, where they were made, and sufficient allegations for charging any individual defendant with them."). Nor do Plaintiffs identify **how** each Defendant allegedly knew these unspecified statements were false. *Id.* (observing that "the plaintiffs do not explain in connection with or closely following the allegations concerning the making or issuance of the statements alleged in this section how the statement was false or misleading, or how and when any identified individual defendants knew, or was severely reckless in not knowing, the inaccuracy of the statement."). Plaintiffs further fail to direct allegations at each individual Defendant's state of mind, as required, instead wrongly grouping Defendants together. *Id.* (noting that the plaintiffs' "allegations fail to plead with particularity facts giving rise to a strong inference of scienter because they rely on 'group pleading' insofar as they fail to identify which of the individual defendants knew that the forecasted earnings growth was false."). Plaintiffs' scienter allegations are therefore insufficient to support securities fraud claims under the PSLRA and Rule 9(b). *Id.*

Plaintiffs' causation allegations fail on similar grounds. The PSLRA requires plaintiffs to plead "loss causation, i.e., a causal connection between the material misrepresentation and the loss." *Heck v. Orion Grp. Holdings, Inc.*, 468 F. Supp. 3d 828, 860 (S.D. Tex. 2020) (quoting *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005)). A 10b-5 plaintiff must also plead transaction causation—that the defendant's misrepresentation induced the plaintiff to engage in the at-issue transaction. *See O'Connor v. Cory*, 382 F. Supp. 3d 534, 550 (N.D. Tex. 2019) ("Transaction

---

[9] Even assuming that Mr. Paul, and the Court, should have to sift through the prior 480 paragraphs of the First Amended Complaint to identify what "material misrepresentations and omissions" Plaintiffs mean to reference in the securities claims (and they should not be so required), those allegations are similarly inadequate under Rule 9(b) and the PSLRA. *See* pp. 11-13, *supra*.

causation is often equated to reliance, and typically involves proof of "but-for" causation—*i.e,* a plaintiff proves transaction causation by showing that, but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction.") (cleaned up).

Plaintiffs here conclude without support that Defendants' collective conduct caused their investment losses, without alleging that they relied on any statement by Mr. Paul (or any other Defendant) or that they would not have purchased CryptoZoo Tokens or NFTs had Mr. Paul or his co-Defendants done anything differently. (FAC ¶¶ 480-509.) These allegations cannot support a claim for violation of Rule 10b-5. *See, e.g.*, *Heck*, 468 F. Supp. 3d at 861 ("Simply alleging that plaintiffs purchased Orion's common stock at inflated prices and that the stock price fell after negative news of the Company's finances and operations came out is not sufficient to plead loss causation."); *Porter v. Shearson Lehman Bros. Inc.*, 802 F. Supp. 41, 60 (S.D. Tex. 1992) ("This [10b-5] causation requirement is satisfied only if the misrepresentation touches upon the reason or reasons for plaintiff's pecuniary loss.").

Plaintiffs have not stated claims for violations of Section 10(b) and Rule 10b-5.

C. <u>Plaintiffs fail to state a claim for control person liability against Mr. Paul because they do not plead facts demonstrating intent to defraud or mislead in any of the other Defendants' public statements.</u>

Similarly, Plaintiffs fail to state a claim for control person liability against Logan Paul because Plaintiffs fail to plead with specificity any violation of Section 10(b) and Rule 10b-5 by any person supposedly controlled by Mr. Paul. A plaintiff cannot maintain a Section 20(a) claim unless he has adequately pled an underlying Section 10(b) and Rule 10b-5 claim. *See ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 362 n.123 (5th Cir. 2002) (observing that plaintiffs' "section 20(a) control-person liability claims . . . were also properly dismissed based on [p]laintiffs' failure to plead predicate securities fraud claims under section 10(b) and Rule 10b–

30

5."); *In re El Paso Elec. Co. Sec. Litig.*, 2004 WL 377555, at *7 (W.D. Tex. Feb. 23, 2004) ("In order to state a claim under Section 20, a plaintiff must allege a predicate securities fraud offense under Section 10(b)."). Because Plaintiffs have not pled an underlying Section 10(a) and Rule 10b-5 claim, they cannot maintain a Section 20(a) claim against Mr. Paul.

Additionally, Plaintiffs cannot maintain a Section 20(a) claim against Mr. Paul because they have asserted a Section 10(a) claim against him. The assertion of a Section 10(a) claim against a defendant bars a plaintiff from asserting a Section 20(a) claim against that defendant. *See Lemmer v. Nu-Kote Holding, Inc.*, 2001 WL 1112577, at *12 (N.D. Tex. Sept. 6, 2001) ("Because Lemmer asserts a claim against Brigante under § 10(b) and Rule 10b-5, this would preclude a § 20(a) claim against him."), *aff'd,* 71 F. App'x 356 (5th Cir. 2003).

The Court should dismiss Plaintiffs' claim under Section 20(a) for control person liability with prejudice.

## VI.    PLAINTIFFS FAIL TO STATE A CLAIM FOR RELIEF UNDER THE COMMODITY EXCHANGE ACT BECAUSE THEIR ALLEGATIONS SUPPORT ONLY THE EXISTENCE OF SPOT SALES.

Almost as an afterthought, Plaintiffs bring a claim for relief under the Commodity Exchange Act (codified at 7 U.S.C. §§ 1-25). (FAC ¶¶ 518-23.) But Plaintiffs fail to plead that their purchases of the ZOO Tokens and NFTs were futures contracts, rather than spot sales—a prerequisite to relief under the Commodities Exchange Act's private right of action. *Id.* § 25(a)(1).

That private right of action, detailed in Section 25(a)(1), requires a private plaintiff to have made a "contract of sale of any commodity for future delivery" to be able to recover under the Act. 7 U.S.C. § 25(a)(1)(B), (D); *BDI Cap., LLC v. Bulbul Invs. LLC*, 446 F. Supp. 3d 1127, 1135 (N.D.

Ga. 2020) (noting that "courts have held that a 'condition precedent' to a Subparagraph (D) claim is that 'the plaintiff purchased or sold a contract for future delivery.'").[10]

Federal courts that have analyzed cryptocurrency-related Commodities Exchange Act claims have found Section 25 requires those claims to be related to futures contracts, and those courts have granted summary judgment against the plaintiffs or dismissed the plaintiffs' claims because the claims have instead related to "spot sales." *BDI Cap.*, 446 F. Supp. 3d at 1135-36; *Berk v. Coinbase, Inc.*, 2018 WL 5292244, at *2 (N.D. Cal. Oct. 23, 2018) ("Because Berk used Coinbase to purchase Bitcoin Cash, rather than to make a contract to purchase Bitcoin Cash at a specific date in the future, he cannot maintain a claim under the CEA.").

*BDI Capital*'s analysis is particularly on-point. In *BDI*, the plaintiff held bitcoin in an account with the defendants. 446 F. Supp. 3d at 1132. The plaintiff attempted to withdraw the bitcoin from its account but claimed to receive error messages. *Id.* at 1133. The defendants, in the meantime, closed down the company that maintained the plaintiff's account. *Id.* Due to extenuating circumstances, the plaintiff and defendants were not able to settle the plaintiff's account before the managing company shut down. *Id.* After the plaintiff sued, the defendants returned the bitcoin and dollars associated with the plaintiff's account, but the plaintiff maintained his claims under the Commodity Exchange Act against the defendants. *Id.* at 1134.

The court found that the plaintiff could not maintain a claim relating to the bitcoin under the Commodity Exchange Act because the plaintiff's purchases of bitcoin were not for future

---

[10] The Commodity Exchange Act also allows private recovery for claims by plaintiffs "who received trading advice for a fee," 7 U.S.C. § 25(a)(1)(A), and for a "contract subject to section 23 of this title." *Id.* § 25(a)(1)(C). Section 23 of the Commodity Exchange Act addresses "unregulated margin accounts and leverage contracts for [] gold, silver, and platinum." *Id.* § 23(b)(1); *BDI Cap.*, 446 F. Supp. 3d at 1136. Plaintiffs plead no allegations that Defendants provided trading advice for a fee, and clearly the ZOO Tokens and Zoo NFTs are not gold, silver, or platinum.

delivery. *Id.* at 1135-36. Applying longstanding federal precedent, the court acknowledged that private plaintiffs can only maintain claims for relief under the Commodity Exchange Act for purchases involving futures contracts, trading advice given for a fee, or for "unregulated margin accounts and leverage contracts for commodities (specifically gold, silver, and platinum)." *Id.* (footnotes omitted). Because the evidence the plaintiff submitted showed that the bitcoin arose "from the spot sale of a commodity," the plaintiff failed to meet one of the conditions precedent to maintaining a private claim, and the court granted summary judgment for the defendants. *Id.*

The First Amended Complaint's allegations demonstrate that the purchasers of Zoo Tokens and NFTs engaged in spot sales rather than purchases of futures contracts, much like the plaintiff in *BDI Capital*. (FAC ¶¶ 518-23); 446 F. Supp. 3d at 1135-36. Specifically, Plaintiffs plead that they (and others) purchased the "CryptoZoo Products," which Plaintiffs define as the ZOO Tokens and NFTs. (FAC ¶¶ 2, 522.) Plaintiffs plainly allege that their claims all seek to cover "persons and entities who purchased ZOO Tokens or CZ NFTs." (*Id.* ¶ 10 (emphasis added).) Plaintiffs repeat these allegations throughout the First Amended Complaint. (*Id.* ¶¶ 2, 10, 22, 23, 29, 31, 45-184.)

At no point do Plaintiffs allege that they purchased ZOO Tokens or Zoo NFTs for future delivery. (*See generally id.*) And, lest Plaintiffs attempt to argue otherwise, nowhere does the First Amended Complaint allege that any individual entered into a futures contract for the delivery of the CryptoZoo game (or that a game could be considered a commodity, in any case). Rather, Plaintiffs pin their claim to relief squarely on spot purchases of Zoo Tokens and NFTs. This deficiency is fatal to Plaintiffs' Commodity Exchange Act claim. *BDI Cap.*, 446 F. Supp. 3d at 1135-36; *Berk*, 2018 WL 5292244, at *2.

The Court should dismiss Count Twenty-Seven with prejudice.

33

## VII.   PLAINTIFFS FAIL TO PLEAD FACTS SUPPORTING CRITICAL ELEMENTS OF THEIR COMMON-LAW CAUSES OF ACTION.

Federal district courts in Texas apply the "most significant relationship" test to conflicts of law in tort and contract cases. *See J&J Sports Prods., Inc. v. Kirkpatrick*, 2020 WL 5504469, at *6 (E.D. Tex. Sept. 11, 2020) ("Texas courts use the 'most significant relationship' test when resolving choice-of-law questions in contract cases."). "In tort cases, the applicable law will usually be the local law of the state where the injury occurred," or the state where Plaintiffs incurred their losses. *See, e.g.*, *Tobin*, 637 F. Supp. 2d at 412. In contract cases, "the place of negotiation and performance are the most significant[,]" and "[i]f both of those contacts occur in the same state, that state's law will usually apply." *J&J Sports Prods., Inc. v. Kirkpatrick*, 2020 WL 5504469, at *6 (E.D. Tex. Sept. 11, 2020).

Plaintiffs do not allege where any Defendant resides or where the parties negotiated or performed the alleged contracts. Defendants presume, therefore, that the state where each Plaintiff was injured—the state where each Plaintiff purchased CryptoZoo—will govern all claims. For purposes of this motion, however, Mr. Paul has not delved into the laws of the thirty-one foreign countries where most Plaintiffs reside. Rather than bloat this motion with articulations of the local laws of every state and country at issue, Mr. Paul will focus primarily on Texas and California, where the Co-Lead Plaintiffs reside, and highlight other states' laws where significant distinctions exist or for additional support. Regardless, Plaintiffs fail to plead sufficient facts to support any of their common-law claims under any state's substantive law.

A.   Plaintiffs fail to state claims for breaches of express and implied contracts.

Plaintiffs plead claims for breaches of express and implied oral contracts based on alleged representations by unspecified Defendants and CryptoZoo's T&C. "The elements of written and oral contracts are the same and must be present for a contract to be binding." *Wal-Mart Stores,*

34

*Inc. v. Lopez*, 93 S.W.3d 548, 555 (Tex. App.—Houston [14th Dist.] 2002, no pet.). "The following elements are required for the formation of a[ny] binding contract: (1) an offer, (2) acceptance in strict compliance with the terms of the offer, (3) a meeting of the minds, (4) each party's consent to the terms, and (5) execution and delivery of the contract with the intent that it be mutual and binding." *Foster v. Strike, LLC*, 2023 WL 6466217, at *2 (S.D. Tex. Mar. 18, 2023) (quoting *Wal-Mart*, 93 S.W.3d 555-56). Additionally, "[a]n implied-in-fact contract arises from the acts and conduct of the parties, it being implied from the facts and circumstances that there was a mutual intention to contract." *Wal-Mart*, 93 S.W.3d at 557 (cleaned up; citation omitted). "[I]n determining mutual assent, the court considers the communications between the parties and the acts and circumstances surrounding those communications." *Id.* at 556. Finally, "[p]laintiffs must allege the specific contract terms and how they were violated in order to state a claim for breach of contract." *Franco v. U.S. Bank Nat'l Ass'n*, 2014 WL 4441224, at *4 (W.D. Tex. Sept. 8, 2014).

Plaintiffs focus their claims on both alleged oral representations by "Defendants" to "provide a functional CryptoZoo and support it" and CryptoZoo's T&C, including that agreement's representation that Defendants would "strive to do the best for the project and the community." (FAC ¶¶ 241-68). None of these representations is attributed to Logan Paul. Individually, therefore, he cannot be found to have breached these "terms." *See, e.g.*, *Kelly v. Worth Holdings, LLC*, 2017 WL 4156186, at *8 (N.D. Cal. Sept. 18, 2017) ("[U]nder California law, a plaintiff may not maintain a breach of contract claim against a person who is not a party to the contract."); *Silvas v. Ohio Cas. Ins. Co.*, 2005 WL 2645015, at *2 (W.D. Tex. Aug. 24, 2005) ("Texas law does not provide a cause of action for breach of contract . . . against a defendant who is not a party to the underlying contract." (citing *Natividad v. Alexsis, Inc.,* 875 S.W.2d 695, 698 (Tex. 1994)).

Plaintiffs attribute only three representations during the Purchase Period to Mr. Paul: (1) statements on August 18, 2021, characterizing CryptoZoo as a "game that makes you money" with a "massive team" supporting it, funded by "like a million" dollars, FAC ¶ 200; (2) statements in October 2021, after Zoo Tokens had "lost almost all of their value for the first time" that CryptoZoo was "the most important thing we're doing," "we're coming up with really, really fun plans," and "like, this could be one of the most important things I do," *id.* ¶ 206; and statements on May 14, 2022—long *after* all but one of the Plaintiffs had purchased CryptoZoo—that Paul and Levin had not "given up," "development takes time," and artists were "working around the clock," *id.* ¶ 210. None of these statements can form the basis of a valid contract with Plaintiffs.

The first set of representations—characterizing CryptoZoo as a "game that makes you money" with a "massive team" supporting it, funded by "like a million" dollars—cannot be construed as binding promises as a matter of law. The first representation—that CryptoZoo is a "game that makes you money" is not a binding promise for at least two reasons. First, both Mr. Holland and Mr. Heikali are, by their own admission, experienced cryptocurrency investors with knowledge of the asset's volatility. (FAC ¶¶ 193, 194). Because they were experienced investors, any reliance they might allege on these representations—and they have alleged none—would be unreasonable as a matter of law. *See, e.g.*, *Nunn, Yoest, Principals & Assocs., Inc. v. Union Pac. Corp.*, 69 F. App'x 658 (5th Cir. 2003) (as a "sophisticated, long-time participant" in subject industry plaintiff could not "demonstrate that its reliance on [Defendant]'s optimistic projections was justifiable"); *Clardy Mfg. Co. v. Marine Midland Bus. Loans Inc.*, 88 F.3d 347, 358 (5th Cir. 1996) (observing that "[t]he justifiableness of the reliance is judged in light of the plaintiff's intelligence and experience," and holding, "viewed against all of the surrounding circumstances and the plaintiff's business experience" that's plaintiff's reliance "was, as a matter of law,

36

unjustified").

Second, CryptoZoo's T&C expressly disclaim CryptoZoo products as investment vehicles. The T&C are clear:

> 9.  CryptoZoo are NOT Investment Vehicles
>
> CryptoZoo are collectible digital art pieces that also function as fun, Non-Fungible Tokens for you to collect. They were created as art pieces intended for people to enjoy by collecting, *not as a financial instrument*. CryptoZoo makes *absolutely no promises or guarantees regarding the value of CryptoZoo NFTs* aside from the one that we will strive to do the best for the project and the community.

(CryptoZoo T&C at 2-3, ECF No. 1-2 (emphasis added).)

Accordingly, were any Plaintiff to plead reliance on Mr. Paul's offhand representation that CryptoZoo would "make them money," their purported reliance would be unjustified based on their acceptance of the T&C. *See, e.g.*, *WC 3rd & Trinity, LP v. STK Rebel Austin, LLC*, 2019 WL 433620, at *6 (W.D. Tex. Feb. 2, 2019), *report and recommendation adopted sub nom.*, 2019 WL 2572537 (W.D. Tex. Mar. 21, 2019) ("[R]eliance on a misrepresentation that is directly contradicted by the express, unambiguous terms of a written agreement . . . is not justified as a matter of law.").

Regardless, no Plaintiff alleges that he relied on these "terms," let alone heard them, so as to reach a "meeting of the minds" with Mr. Paul. The latter two representations—that CryptoZoo had "a massive team" behind it and was funded by "like a million dollars" constitute puffery because they are too vague to be actionable. *See, e.g.*, *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1053 (9th Cir. 2008) ("A statement is considered puffery if the claim is extremely unlikely to induce consumer reliance. Ultimately, the difference between a statement of fact and mere puffery rests in the specificity or generality of the claim."); *JT Brother Constr., LLC v. Texas Pride Trailers, LLC*, 2022 WL 800183, at *5 (S.D. Tex. Mar. 16, 2022) ("general positive descriptions" of product and its capabilities amounted to puffery); *Barnett v. Mentor H/S, Inc.*, 133

37

F. Supp. 2d 507, 513 (N.D. Tex.), *aff'd*, 31 F. App'x 156 (5th Cir. 2001) (oral statements that product was "defect-free" constituted "mere puffing" and could not support breach of contract claim.) A plaintiff cannot state a breach of contract claim without identifying *specific*, *material* terms the defendant allegedly breached. *See, e.g.*, *Franco*, 2014 WL 4441224, at *4 ("Plaintiffs must allege the specific contract terms and how they were violated in order to state a claim for breach of contract."); *cf. Via v. Blanchard*, 2021 WL 4902391, at *10 (N.D. Tex. July 30, 2021) ("Without an enforceable contract, there can be no breach of contract."). Generalized allegations of "false affirmations" do not fit the bill. *See, e.g.*, *Thomas Mushroom & Specialty, IV, Inc. v. Am. Int'l Grp., Inc.*, 2023 WL 5945856, at *6 (N.D. Tex. Sept. 11, 2023) ("[A] plaintiff must identify a specific contractual provision that the defendant allegedly breached[.]").

Mr. Paul's remaining public representations also constitute puffery. No consumer would reasonably construe any of these statements as a contractual term—representations that a project is "important" or that plans are "really fun" are not promises that one can breach. And, finally, Mr. Paul's alleged May 2022 statements that he and Mr. Levin had not "given up," that "development takes time," and that artists were "working around the clock," succeeded 139 of the 140 Plaintiffs' purchases.[11] These Plaintiffs could not have relied on these statements as a basis for their purchase decisions.

Finally, to the extent that Plaintiff alleges breaches of CryptoZoo's T&C, Mr. Paul is not a party to that agreement; Plaintiff and other consumers accepted its terms as presented by CryptoZoo, Inc. (*See* T&C at 1, ECF No. 1-2.) Even were that not the case, Plaintiff once again

---

[11] The remaining plaintiff, Jaime Ruiz Martinez, a resident of Spain, alleges that he purchased $190 in CryptoZoo products on January 14, 2023. (FAC ¶ 158.) According to the First Amended Complaint, this was at least a month after public pronouncements that CryptoZoo had "failed." (*Id.* ¶ 119.) Mr. Martinez cannot claim that he reasonably relied on any statement promoting CryptoZoo.

fails to identify a material, violated term. *See Franco*, *supra*. Moreover, as explained above, the T&C also expressly preclude any claim of mutual assent between CryptoZoo and class members, like Plaintiff, who purchased CryptoZoo products as an investment because they clearly state that "CryptoZoo are NOT investment vehicles." *See* p. 25, *supra*.

Finally, the "promise" in CryptoZoo's T&C (which are governed by Delaware law) to "strive to do the best for the project and the community" is aspirational in nature and cannot provide the basis for *any* breach of contract claim. *See, e.g.*, *Vurimindi v. Fuqua Sch. of Bus.*, 435 F. App'x 129, 133 (3d Cir. 2011) (school's expression of "its desire to provide the highest quality education" was aspirational and could not serve as basis for valid, binding contract); *Baker v. Beird*, 2019 WL 1211465, at *3 (Mich. Ct. App. Mar. 14, 2019) (no mutual assent or meeting of the minds where, "[a]side from defendant's general promise to try to make breast reconstruction a positive experience for the patient, there was nothing on the form that identified any specific act to be performed by defendant"); *Lucero v. Curators of Univ. of Missouri*, 400 S.W.3d 1, 6 (Mo. Ct. App. 2013) (promises that are "aspirational in nature" cannot serve as basis for breach of contract claim); *Yocca v. Pittsburgh Steelers Sports, Inc.*, 854 A.2d 425, 429 (2004) (promise to season ticketholders to "try to assign seats as close to your current seat location" did not represent a promise to sell particular seats in new football stadium). Plaintiffs concede as much in the FAC, characterizing this "promise" as a "non-binding browserwrap[] term[]." (FAC ¶ 201.).

Plaintiffs cannot state claims for breach of contract.

B. <u>Plaintiffs fail to plead facts supporting a claim against Logan Paul for unjust enrichment.</u>

Plaintiffs' unjust enrichment claim fails for three reasons. First, the transactions at issue are governed by a contract—the T&C—so Plaintiffs have an adequate remedy at law. Second, Plaintiffs fail to plead that they directly conferred a benefit on Mr. Paul, rather than on CryptoZoo.

Third, Plaintiffs fail to adequately plead a claim under Texas law based on fraud, duress, or undue advantage.

Claims for unjust enrichment are typically barred where plaintiffs have an adequate remedy at law under a contract or another legal right. *See, e.g.*, *King v. Baylor Univ.*, 46 F.4th 344, 368 (5th Cir. 2022) (affirming district court's dismissal of unjust enrichment claim where "the parties' contract governs the services at issue" because Texas law holds claims for unjust enrichment to be "inapplicable when parties have an express contract covering the subject matter of the parties' dispute.") (cleaned up) (citing *BMG Direct Mktg., Inc. v. Peake*, 178 S.W.3d 763, 770 (Tex. 2005)). Other states' laws generally accord with this principle. *See, e.g., Yang v. Dar Al-Handash Consultants*, 250 F. App'x 771, 773 (9th Cir. 2007) (affirming district court's dismissal of unjust enrichment claim under California law because "such a claim 'cannot lie where there exists between the parties a valid express contract covering the same subject matter.'") (citation omitted).[12]

Unjust enrichment claims also typically require plaintiffs to demonstrate that they conferred a benefit directly on the defendant against whom they seek recovery. *See, e.g., Greathouse v. Cap. Plus Fin. LLC*, 2023 WL 5759250, at *16 (N.D. Tex. Sept. 6, 2023) (for an unjust enrichment claim, "the benefit received by a defendant must come directly from a

---

[12] *See also, e.g.*, *SiteLock LLC v. GoDaddy.com LLC*, 562 F. Supp. 3d 283, 310 (D. Ariz. 2022) ("If there is a remedy provided by law for the breach of contract claim, the unjust enrichment claim fails and the claim must be dismissed."); *In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*, 996 F. Supp. 2d 942, 984 (S.D. Cal. 2014), (S.D. Cal. Feb. 10, 2014) ("Under Florida, Massachusetts, . . . New York, . . . and Texas law a plaintiff may not recover for unjust enrichment where a 'valid, express contract governing the subject matter of the dispute exists.'") (citation omitted); *Pulte Home Corp., Inc. v. Countryside Cmty. Ass'n, Inc.*, 382 P.3d 821, 833 (Colo. 2016) (observing that a "party cannot recover for unjust enrichment by asserting a quasi-contract when an express contract covers the same subject matter because the express contract precludes any implied-in-law contract.").

plaintiff"); *Chiquita Fresh N. Am., L.L.C. v. Port Everglades Terminal, LLC*, 372 So. 3d 277, 280 (Fla. 4th DCA 2023) ("It is well-established that to support an unjust enrichment claim, a plaintiff must have *directly* conferred a benefit on the defendant.") (emphasis in original).[13] Plaintiffs fail to plead that they conferred any benefit—let alone a direct benefit—on Mr. Paul. (FAC ¶¶ 270-71.) Rather, Plaintiffs plead generally that Defendants committed an "intentional and unlawful taking of Plaintiffs' assets." (*Id.* ¶ 270.) Such allegations cannot support a claim for unjust enrichment in the first place and are not directed specifically against Mr. Paul in any case, as Plaintiffs fail to ever support that Mr. Paul was given or retained any personal benefit from Plaintiffs' alleged purchases. (*Id.*)

Finally, in every state at issue, the defendant's retention of the benefit conferred must be inequitable or unjust. *See, e.g.*, *In re KP Eng'g, L.P.*, 63 F.4th 452, 457 (5th Cir. 2023) (Texas law

---

[13] The plaintiff's direct conferral of a benefit on a defendant is a typical feature of most of the relevant states' unjust enrichment law. *See, e.g.*, *Pulte Home*, 382 P.3d at 833 ("To prevail on an unjust enrichment claim, a party 'must prove that (1) the defendant received a benefit (2) at the plaintiff's expense (3) under circumstances that would make it unjust for the defendant to retain the benefit without commensurate compensation.'") (citation omitted); *accord Guy v. Neb. Furniture Mart, Inc.*, 2019 WL 12043671, at *4 (S.D. Iowa Apr. 17, 2019) ("The elements of unjust enrichment are (1) enrichment of the defendant, (2) at the expense of the plaintiff, (3) under circumstances that make it unjust for the defendant to retain the benefit."); *Infinity Fluids Corp. v. Gen. Dynamics Land Sys., Inc.*, 210 F. Supp. 3d 294, 309 (D. Mass. 2016) ("To succeed on a claim for unjust enrichment, a plaintiff must show (1) a benefit conferred upon defendant by plaintiff, (2) an appreciation or knowledge by defendant of the benefit, and (3) that acceptance or retention of the benefit under the circumstances would be inequitable without payment for its value.") (citation omitted); *Schmidt v. Ford Motor Co.*, 972 F. Supp. 2d 712, 721 (E.D. Pa. 2013) (under Pennsylvania and New Jersey law, "[t]he "benefit" must be conferred by the plaintiff directly—indirect benefits bestowed by third parties will not support a claim for unjust enrichment."); *Great Am. Emu*, 509 F. Supp. 3d at 538 ("In order to establish a claim for unjust enrichment, a party must have conferred a benefit on the other party, and the benefit must not be gratuitous and it must be measurable."); *Unionamerica Mortg. & Equity Tr. v. McDonald*, 626 P.2d 1272, 1273 (Nev. 1981) (stating that the elements of a claim for unjust enrichment are "a benefit conferred on the defendant by the plaintiff, appreciation by the defendant of such benefit, and acceptance and retention by the defendant of such benefit under circumstances such that it would be inequitable for him to retain the benefit without payment of the value thereof.") (citation omitted).

41

recognizes two types of unjust enrichment claims: "one for passive receipt of a benefit that would be unconscionable to retain, and another for wrongfully securing a benefit."); *Todd v. Tempur-Sealy Int'l, Inc.*, 2016 WL 344479, at *7 (N.D. Cal. Jan. 28, 2016) (citing Massachusetts law, *inter alia*: "For a claim of unjust enrichment, the last event necessary for liability appears to be acceptance of a benefit that is inequitable to retain."); *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 990 (C.D. Cal. 2015) (under Colorado law, plaintiff must show that "(1) the defendant received a benefit (2) at the plaintiff's expense (3) under circumstances that would make it unjust for the defendant to retain the benefit without commensurate compensation"); *Osness v. Lasko Prod., Inc.*, 868 F. Supp. 2d 402, 414 (E.D. Pa. 2012) ("When considering the validity of a claim for unjust enrichment, [a court] must focus on whether the enrichment of the defendant is *unjust*.") (emphasis in original).

Plaintiffs allege that they bought ZOO Tokens and NFTs as an investment opportunity. (FAC ¶ 45 ("Plaintiff Don Holland . . . **invested** one-thousand dollars ($1,000) purchasing CryptoZoo Products . . . .") (emphasis added).) Plaintiffs also plead that they received the products he purchased. (*See, e.g., id.* ¶ 23 (referencing "the ZOO Tokens and CZ NFTs received . . . ." (emphasis added).) The gravamen of their unjust enrichment claim, therefore, is not that they did not receive the product that they paid for—they did—it is that they did not receive the investment returns that they unreasonably expected from a product that Defendants had marketed as something else and *expressly disclaimed as an investment*. (*Compare id.* ¶ 45 *with id.* ¶ 20 (citing Logan Paul's public statements and CryptoZoo's white paper, both expressly stating that ZOO Tokens were "not intended to be an investment vehicle.").).

Plaintiffs compound this problem by conceding that Logan Paul has offered to reimburse holders of Zoo NFTs by paying holders 0.1 Ethereum—the original purchase price **and medium**

of those NFTs—in exchange for return of the NFTs. (FAC ¶¶ 4-8.) Plaintiffs complain about the nature of Mr. Paul's buyback, speciously claiming that it contains "misrepresentations" because Ethereum was worth less at the time Plaintiffs drafted the First Amended Complaint, but their allegations in fact demonstrate that Mr. Paul is not retaining any benefit from the Zoo NFTs—he is returning purchasers' original payments to them if they participate in the buyback. (*Id.* ¶ 4).

Simply put, Plaintiffs plead themselves out of an unjust enrichment claim. The Court should dismiss Plaintiffs' unjust enrichment claims.

C. <u>Plaintiffs cannot establish that Mr. Paul owed them any legal duty that he breached through negligence.</u>

To state a claim for negligence, a plaintiff must plead three elements: "the existence of a duty; a breach of that duty; and damages proximately caused by that breach." *Phoneternet, LLC v. LexisNexis Risk Sols., Inc.*, 2019 WL 4748271, at *5 (N.D. Tex. Sept. 30, 2019) (citing *Kroger Co. v. Elwood*, 197 S.W.3d 793, 794 (Tex. 2006)). "The threshold issue in any negligence case is whether the defendant owed a duty to the plaintiff." *Id.* (citing *Pagayon v. Exxon Mobil Corp.*, 536 S.W.3d 499, 503 (Tex. 2017)). The determination of whether a duty exists is a legal question for the court to resolve. *Id.* "The nonexistence of a duty ends the inquiry into whether negligence liability may be imposed." *Prime Prod., Inc. v. S.S.I. Plastics, Inc.*, 97 S.W.3d 631, 635 (Tex. App.—Houston [1st Dist.] 2002, pet. denied).

Logan Paul did not owe a duty of care to any Plaintiff because he does not stand in privity of contract with any Plaintiff, nor has any Plaintiff alleged a "special relationship" of trust and confidence with Mr. Paul. *See, e.g.*, *Leahy v. U.S. Nat. Bank Ass'n*, 155 A.D.3d 512 (N.Y. 2017) ("The complaint fails to state causes of action for negligence and negligent misrepresentation, given the absence of allegations that would establish a duty owed to plaintiff by defendant or a special relationship of trust or confidence between the parties."); *Pollman v. Am. Safety Indem.*

43

*Co.*, 2004 WL 904119, at *1 (N.D. Tex. Apr. 27, 2004) (defendant had no duty where no contractual or special relationship with plaintiff). To be sure, no Plaintiff purchased CryptoZoo products directly from Mr. Paul, nor does any Plaintiff allege that he relied on any representation by Mr. Paul. (FAC ¶¶ 45-187; 193, 194, 202, 203); *see, e.g.*, *JTRE Manhattan Ave. LLC v. Cap. One, N.A.*, 585 F. Supp. 3d 474, 479 (S.D.N.Y. 2022) ("The 'duty' or 'special relationship' element of negligent misrepresentation limits such claims to 'situations involving actual privity of contract between the parties or a relationship so close as to approach that of privity.'" (quoting *Anschutz Corp. v. Merrill Lynch & Co., Inc.*, 690 F.3d 98, 114 (2d Cir. 2012)) (cleaned up).

Even were that not the case, Plaintiffs cannot state claims for negligence because the duties they allege—duties to refrain from manipulating the market, to "support Plaintiffs and other members of the CryptoZoo community," and to provide the promised products and services—are precluded by CryptoZoo's T&C. The first duty—to refrain from market manipulation—is barred by CryptoZoo's disclaimer of its tokens and NFTs as vehicles for investment. *See* p. 25, *supra*. A defendant cannot owe a duty to a plaintiff where it has expressly disclaimed the duty alleged. *See, e.g.*, *Malick v. JP Morgan Chase Bank, N.A.*, 797 F. App'x 563, 566 (2d Cir. 2019) (mortgagor could not state negligence claim against lender for theft or property damage where "the Mortgage Deed explicitly disclaim[ed] any duty of [the lender] to act to protect, secure, or repair the Property"); *In re Int'l Payment Grp., Inc.*, 733 F. App'x 98, 103 (4th Cir. 2018) ("[T]he Rules and Regulations, to which IPG agreed, disclaim the creation of any duty of care or any "special relationship." . . . [T]hese provisions unambiguously prevent IPG from saddling SunTrust with any non-contractual duty of care."); *Damner v. Facebook Inc.*, 2020 WL 7862706, at *6 (N.D. Cal. Dec. 31, 2020) ("Plaintiff's allegation that Facebook owed him a duty of care to keep his personal information safe is contradicted by the terms of the SRR, which expressly disclaim such

a duty."); *Andrade v. Carrington Mortg. Servs., LLC*, 2015 WL 7108119, at *4 (W.D. Mich. Nov. 13, 2015) (servicer had no duty to provide loan modification for purposes of negligence claim where statute "specifically disclaim[ed] any duty for a loan servicer to provide a loan modification").

Defendants' purported promise to "support Plaintiffs and other members of the CryptoZoo community" also arises from the T&C; it represents Plaintiffs' attempt to bind Defendants to the *contractual* representation that they would "strive to do the best for the project and the community." *See* p. 3, *supra*. Not only is this statement aspirational and therefore not a promise to "support the community" at all, but it is also too vague to support a claim for negligence *or* breach of contract.[14] *See* pp. 35-40, *supra*; *See, e.g.*, *Jones v. City of Vallejo*, 2024 WL 2153646, at *3 (E.D. Cal. May 14, 2024) (negligence claim failed because the complaint's vague reference to defendants' supposed duty to comply with "the Municipal Code and other quality of life and [sic] codes" did not "sufficiently allege the circumstances giving rise to a  duty . . . let alone what defendants had a duty to do[.]"); *In re Johnson & Johnson Talcum Powder Prod. Mktg., Sales Pracs., & Prod. Liab. Litig.*, 553 F. Supp. 3d 211, 229–30 (D.N.J. 2021) ("As a number of courts have explained, public statements espousing aspirational goals, statements of generic intent, or statements vowing or acknowledging that it has a duty do not constitute promises that would create

---

[14] No defendant could plausibly understand how to avoid breaching such an open-ended "duty." Endorsing such a vaguely defined duty would provide plaintiffs carte blanche to initiate negligence lawsuits, which the Court should not countenance. *See, e.g.*, *Phoneternet, LLC v. LexisNexis Risk Sols., Inc.*, 2019 WL 4748271, at *8-9 (N.D. Tex. Sept. 30, 2019) (declining to impose Plaintiffs' proffered legal duty on defendant business that would have expanded defendant company's duties beyond maintaining its own records correctly to attempting to correct records of other corporations); *In re Luminant Generation Co.*, 2023 WL 8630982, at *7-10 (Tex. App.—Houston [1st Dist.] Dec. 14, 2023, orig. proceeding) (declining to impose duty to "continuously generate electricity for retail customers" on utility company due, in part, to concerns of expanding liability of utility company to be "statewide" and "to every retail customer").

a legal duty based on a voluntary undertaking.") (quoting *McCants v. Nat'l Collegiate Athletic Ass'n*, 201 F. Supp. 3d 732, 741–42 (M.D.N.C. 2016); citing, *inter alia*, *Doe 30's Mother v. Bradley*, 58 A.3d 429, 455 (Del. Super. Ct. 2012) ("[A] statement of aspirational goals that an organization's members will strive to uphold does not meet the prerequisites for even the most minimal of recognized undertakings—a mere promise.... No legal duty arises from these statements that would be owing to anyone."); *Texas v. Am. Tobacco Co.*, 14 F. Supp. 2d 956, 973 (E.D. Tex. 1997) (observing that Texas law does not recognize any legal "duty based upon corporate statements or advertising.").

Even were that not the case, the economic loss rule precludes a plaintiff from recovering in tort damages arising from an alleged breach of contract. *See Memorial Hermann Healthcare Sys. Inc. v. Eurocopter Deutschland, GMBH*, 524 F.3d 676, 678 (5th Cir. 2008) (Texas law precludes plaintiffs "from seeking relief in tort . . . when the injury is only the economic loss to the subject of a contract itself.") (quoting *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex.1986)) (cleaned up); *Apollo Grp., Inc. v. Avnet, Inc.*, 58 F.3d 477, 479 (9th Cir. 1995) (applying Arizona law and observing that "[g]enerally, under the 'economic loss' rule, a plaintiff who suffers only pecuniary injury as a result of the conduct of another cannot recover those losses in tort. Instead, the claimant is limited to recovery under the law of contract."); *United Guar. Mortg. Indem. Co. v. Countrywide Fin. Corp.*, 660 F. Supp. 2d 1163, 1180 (C.D. Cal. 2009) ("The economic loss rule generally bars tort claims for contract breaches, thereby limiting contracting parties to contract damages.").[15]

---

[15] *See also, e.g.*, *Legacy Data Access, Inc. v. Cadrillion, LLC*, 889 F.3d 158, 164 (4th Cir. 2018) ("North Carolina's economic loss rule provides that ordinarily, a breach of contract does not give rise to a tort action by the promisee against the promisor.") (cleaned up); *Perdue v. Hy-Vee, Inc.*, 455 F. Supp. 3d 749, 761 (C.D. Ill. 2020) ("The economic loss doctrine bars a plaintiff from recovering for purely economic losses under a tort theory of negligence."); *Power v. Erie Fam.*

The economic loss rule also precludes any negligence claim for purely economic losses arising from Defendants' "promise" to provide contracted-for goods and services. *See, e.g.,* p. 39, *supra*. Beyond that, Plaintiffs cannot claim to have suffered any injury from these "breaches," since, as they concede, Mr. Paul instituted a buyback program designed to return the full, original value of every CryptoZoo consumer's CryptoZoo purchase. (FAC ¶¶ 5-8.)

Plaintiffs cannot state claims for negligence.

D.  Plaintiffs cannot sustain claims for civil conspiracy or aiding and abetting.

To maintain a claim for civil conspiracy or aiding and abetting, a plaintiff must first plead an underlying intentional tort. *Berry v. Bryan Cave LLP*, 2010 WL 1946264, at \*10 (N.D. Tex. May 11, 2010) ("In pleading a claim for aiding and abetting, Plaintiffs must also plead the underlying tort allegedly committed by the primary tortfeasors."). Plaintiffs allege a conspiracy to commit fraud and aiding and abetting fraud. (FAC ¶¶ 285-88, 289-92.) Because they cannot state

---

*Life Ins. Co.*, 392 F. Supp. 3d 587, 593 (E.D. Pa. 2019), *aff'd,* 813 F. App'x 751 (3d Cir. 2020) (Under Pennsylvania law, the economic loss rule bars recovery if the allegedly breached duty arises under a contract between the parties."); *Aprigliano v. Am. Honda Motor Co.*, 979 F. Supp. 2d 1331, 1335 (S.D. Fla. 2013) ("The economic loss rule is a judicially created doctrine that sets forth the circumstances under which a tort action is prohibited if the only damages suffered are economic losses.") (cleaned up); *Dill v. Am. Home Mortg. Servicing, Inc.*, 935 F. Supp. 2d 299, 303 (D. Mass. 2013) ("Under Massachusetts law, the economic loss doctrine bars recovery for ordinary negligence claims in the absence of personal injury or property damage."); *Peri & Sons Farms, Inc. v. Jain Irr., Inc.*, 933 F. Supp. 2d 1279, 1283 (D. Nev. 2013) ("In Nevada, the economic loss doctrine bars unintentional tort claims when a plaintiff seeks to recover 'purely economic losses.'"); *Arcand v. Brother Int'l Corp.*, 673 F. Supp. 2d 282, 307–08 (D.N.J. 2009) ("The economic loss rule defines the boundary between the overlapping theories of tort law and contract law by barring the recovery of purely economic loss in tort, particularly in strict liability and negligence cases.") (quotations omitted); *Annett Holdings, Inc. v. Kum & Go, L.C.*, 801 N.W.2d 499, 503 (Iowa 2011) ("When two parties have a contractual relationship, the economic loss rule prevents one party from bringing a negligence action against the other over the first party's defeated expectations[.]"); *Town of Alma v. AZCO Constr., Inc.*, 10 P.3d 1256, 1264 (Colo. 2000) ("We hold that a party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such a breach absent an independent duty of care under tort law."); *Clark-Fitzpatrick, Inc. v. Long Island R. Co.*, 516 N.E.2d 190, 193 (N.Y. 1987) ("It is a well-established principle that a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated.").

underlying fraud claims, their conspiracy and aiding and abetting claims cannot stand. *See, e.g.*, '*W. Fork Advisors, LLC v. SunGard Consulting Servs., LLC*, 437 S.W.3d 917, 921 (Tex. App.— Dallas 2014, pet. denied) (civil conspiracy claim will be subject to dismissal where plaintiff cannot sate claim for underlying tort); *Berry*, *supra.*. This alone warrants dismissal of Plaintiffs' civil conspiracy and aiding and abetting claims.

Plaintiffs' conspiracy claim is also barred by the intracorporate conspiracy doctrine, which provides that a corporation cannot conspire with its own employees or agents. *See Hilliard v. Ferguson*, 30 F.3d 649, 653 (5th Cir. 1994) ("It is a long-standing rule in this circuit that a 'corporation cannot conspire with itself any more than a private individual can, and it is the general rule that the acts of the agent are the acts of the corporation.'") (citation omitted).

Defendants Paul, Levin, Ibanez, Strobel, Greenbaum, and Bentov were employees or agents of Defendant CryptoZoo, Inc. (FAC ¶¶ 185-92.) Accordingly, Plaintiffs cannot prevail on a claim for an alleged conspiracy among them as a matter of law. *See, e.g.*, *Hilliard*, *supra.*

The Court should dismiss Counts Seven and Eight.

## VIII. PLAINTIFFS' COLORADO AND TEXAS STATUTORY CLAIMS ARE OTHERWISE INSUFFICIENTLY PLED.

### A. Plaintiffs do not plead that CryptoZoo significantly impacted the public as required by Colorado law.

Plaintiffs' claim for violation of the Colorado Consumer Protection Act ("CCPA") fails because Plaintiffs do not allege facts that Mr. Paul's conduct significantly impacted the public. The CCPA requires a plaintiff to show that the deceptive conduct alleged had a significant public impact. *See Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 146-47 (Colo. 2003) (CCPA claim requires plaintiff to show, *inter alia*, that challenged practice "significantly impacts the public as actual or potential consumers of the defendant's goods, services, or property"). The First Amended Complaint does not attribute any conduct to Mr. Paul

48

that significantly impacted the public as consumers of CryptoZoo's goods and services. *Id.* As established above, the representations on which Plaintiffs base their claims were puffery and could not compel any consumer's justified reliance. *See* pp. 37-39, *supra*. And no significant public impact can be claimed where, as here, full reimbursement has been made available to all consumers and the products and services at issue were disclaimed as investments. *See* p. 5, *supra.* Accordingly, the Court should dismiss Count Thirteen of the First Amended Complaint for failure to state a claim.

    B.   <u>Plaintiffs fail to plead that Mr. Paul took advantage of their lack of knowledge as required under the Texas Deceptive Trade Practices Act.</u>

Plaintiffs also fail to state a claim under the Texas Deceptive Trade Practices Act because they do not allege that Mr. Paul took advantage of their lack of knowledge. To sustain a claim under the Deceptive Trade Practices Act, the following elements must be satisfied: "(1) the plaintiff is a consumer, (2) the defendant engaged in false, misleading, or deceptive acts, and (3) these acts constituted a producing cause of the consumer's damages." *Doe*, 907 S.W.2d at 478. Additionally, the Texas Supreme Court has held that "[t]o prove an unconscionable action or course of action, a plaintiff must show that the defendant's act took advantage of [a] lack of knowledge and 'that the resulting unfairness was glaringly noticeable, flagrant, complete and unmitigated.'" *Huynh v. Walmart Inc.*, 30 F.4th 448, 453 (5th Cir. 2022) (citing *Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 677 (Tex. 1998)).

Plaintiffs do not allege that Mr. Paul took advantage of any lack of knowledge. In fact, the only allegations any Plaintiff makes regarding knowledge of cryptocurrency suggests the opposite: that Plaintiffs Heikali and Holland, at least, had knowledge of the market because they had been investing in cryptocurrency for years before CryptoZoo became public. (*See, e.g.,* FAC ¶¶ 193, 194 (alleging that Holland "began investing in cryptocurrency in 2016 at his son's urging" and

49

Heikali purchased on recommendation of friend)). Plaintiffs also concede that CryptoZoo's T&C informed all consumers that "CryptoZoo [we]re NOT investment vehicles," but "art pieces intended for people to enjoy by collecting, *not as a financial instrument*." (T&C at 2-3, ECF No. 1-2 (emphasis added).)

Because Plaintiffs fail to allege facts demonstrating that Mr. Paul's conduct took advantage of any Plaintiff's lack of knowledge, the Court should dismiss Count Twenty-Three of the First Amended Complaint.

## CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiffs' First Amended Complaint with prejudice.

Dated: August 29, 2024.

Respectfully submitted,

| | |
|---|---|
| /s/ *Benjamin J. Widlanski* <br> Benjamin J. Widlanski, Esq. <br> Email: bwidlanski@kttlaw.com <br> Tal Lifshitz, Esq. <br> Email: tjl@kttlaw.com <br> Rachel Sullivan, Esq. <br> Email: rs@kttlaw.com <br> Clayton J. Schmitt, Esq. <br> Email: cschmitt@kttlaw.com <br> **KOZYAK TROPIN & THROCKMORTON LLP** <br> 2525 Ponce de Leon Blvd., 9th Floor <br> Miami, Florida 33134 <br> Telephone: (305) 372-1800 <br> Facsimile: (305) 372-3508 <br> *Counsel for Defendant Logan Paul* (admitted *pro hac vice*) | /s/ *Jeffrey Neiman* <br> Jeffrey Neiman, Esq. <br> jneiman@mnrlawfirm.com <br> Jason L. Mays, Esq. <br> jmays@ mnrlawfirm.com <br> **MARCUS, NEIMAN, RASHBAUM & PINEIRO LLP** <br> One Biscayne Tower <br> 2 South Biscayne Boulevard, Suite 2530 <br> Miami, Florida 33131 <br> Telephone: (305) 400-4260 <br><br> *Counsel for Defendant Logan Paul* (admitted *pro hac vice*) |
| /s/ *Shelby O'Brien* <br> Shelby O'Brien <br> **ENOCH KEVER PLLC** <br> 7600 N. Capital of Texas Highway | |

| Building B, Suite 200<br>Austin, Texas 78731<br>Telephone: (512) 615-1223<br>Facsimile: (512) 615-1198<br>sobrien@enochkever.com<br>*Counsel for Defendants Paul,*<br>*Levin, and Bentov*<br>(admitted to Western District of Texas) | |

## CERTIFICATE OF SERVICE

I hereby certify a copy of the above and foregoing has been served upon all counsel of record by using the Court's electronic filing system on the 29th day of August, 2024.

/s/ *Benjamin J. Widlanski*
Benjamin J. Widlanski, Esq.

14W579710

51

EXHIBIT A

**Terms and Conditions**

These Terms and Conditions (the "Terms") shall apply to the buy-back opportunity being offered by LOGAN PAUL ("PAUL"). Please read these Terms carefully, as they affect your rights.

Upon requesting a buy-back and accepting these Terms, PAUL agrees to pay you .1 Ethereum, and in exchange you agree to return, the CryptoZoo NFT ("NFT") that is the subject of your buy-back request (the "Buy-Back"). Pursuant to this Buy-Back, .1 Ethereum will be deposited into the crypto wallet from which the NFT was returned, and at that time you will no longer own or have any possessory interest in the NFT that was returned.

**Eligibility**

The CryptoZoo NFTs eligible for the Buy-Back will be base egg NFTs and base animal NFTs. Hybrid animal NFTs will not be eligible for the Buy-Back. Any NFTs submitted for the Buy-Back that PAUL in his sole discretion deems ineligible pursuant to this provision will not be returned. The Buy-Back will be available to eligible participants for a limited window beginning January 4, 2024 and it will expire on February 8, 2024. Once the Buy-Back period expires, no claims will be considered.

**Waiver of Claims and Release**

By accepting these Terms, you acknowledge and agree that you are waiving any actual or anticipated claims against PAUL, as well as against any related personnel, affiliates, agents, partners, employees, service providers, or representatives, for monetary or equitable relief arising out of or in connection with CryptoZoo, including but not limited to this Buy-Back, your purchase of any $ZOO tokens, or your purchase of any CryptoZoo NFT. You further acknowledge that the Buy-Back does not constitute an admission by PAUL of your legal entitlement to any amount, nor does it constitute an admission of any responsibility in connection with any actual or anticipated claims relating to CryptoZoo.

**Severability**

If a particular provision of these Terms is held to be invalid, the provision shall be deemed severed from these Terms and shall not affect the validity of the remainder of the Terms, which shall remain in full force and affect.