## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| DON HOLLAND, individually and on behalf of all others similarly situated, [1] *Plaintiff,* | § § § | |
| v. | § § | 1:23-CV-00110-ADA-RCG |
| CRYPTOZOO INC., a Delaware Corporation; LOGAN PAUL; DANIELLE STROBEL; JEFFREY LEVIN; EDUARDO IBANEZ; JAKE GREENBAUM a/k/a CRYPTO KING; and OPHIR BENTOV a/k/a BEN ROTH; *Defendants.* | § § § § § § § § § | |

## REPORT AND RECOMMENDATION OF THE U.S. MAGISTRATE JUDGE

BEFORE THE COURT is Defendant Danielle Strobel's ("Defendant Strobel")[2] Rule 12(b)(2) Motion to Dismiss. (Doc. 86).[3] This case is before the undersigned through a Standing Order pursuant to 28 U.S.C. § 636 and Appendix C of the Local Court Rules for the Assignment of Duties to United States Magistrate Judges. After due consideration of the Parties' briefs and case law, the Court **RECOMMENDS** that Defendant Strobel's Motion to Dismiss be **GRANTED** and Plaintiffs' claims against Defendant Strobel be **DISMISSED WITHOUT PREJUDICE**. *Id.*

---

1. Plaintiffs' First Amended Complaint (the "Complaint") lists Don Holland, Alex Heikali, and Mourad Kechichian as "Co-Lead Plaintiffs." (Doc. 81 at 5). However, both parties list only Don Holland in their case styles. (Docs. 81 at 1; 86 at 1). Out of caution, the Court's style reflects that of the parties.

2. Plaintiffs' Complaint consistently refers to Defendant Strobel as "Danielle Strobel" or "Strobel," and once incorrectly as "Stroebel." (Doc. 81). However, in her Motion to Dismiss, Defendant Strobel notes her legal name changed to "Danielle Jonas" during the course of this lawsuit. (Doc. 86 at 1 n.1). For clarity, Defendant nevertheless refers to herself as "Ms. Strobel." *See id.* For the sake of consistency, the Court here refers to her as "Defendant Strobel."

3. All citations are to CM/ECF generated pagination, unless otherwise noted.

## I.    BACKGROUND

This case involves an alleged cryptocurrency scam. (Doc. 81 at 6). Don Holland, Alex Heikali, and Mourad Kechichian, individually and on behalf of a 140-person class (collectively, "Plaintiffs"), allege they fell victim to a fraudulent investment scheme, "masquerading as an ever-pending online children's game company," concocted by the founders of CryptoZoo, Inc. ("CryptoZoo"). *Id*. This dispute incepted when Logan Paul ("Defendant Paul"), Defendant Strobel, Jeffrey Levin ("Defendant Levin"), Eddie Ibanez ("Defendant Ibanez"), and Jake Greenbaum ("Defendant Greenbaum") formed CryptoZoo in 2021 with the intent it be managed by Ophir Bentov ("Defendant Bentov") (collectively, "Defendants"). *Id*. at 6–7. Defendants formed CryptoZoo "to sell digital assets ostensibly for use in the digital CryptoZoo game: first, in the form of a digital currency called Zoo Tokens, which could then be used to purchase Defendants' other products," such as CryptoZoo's Non-Fungible Tokens ("CZ NFTs"). *Id*. at 7. Plaintiffs aver that although Defendants advertised CryptoZoo as a game and investment opportunity, in reality it "was created to serve as a fraudulent vehicle for the sole purpose of selling patently worthless, unregistered Zoo Tokens and CZ NFTs to enrich CryptoZoo's founders, promoter/manager, and affiliates." *Id*. at 10–11.

In addition to spearheading CryptoZoo's formation, "Defendants also created an online CryptoZoo community to discuss the game." *Id*. at 7. For instance, through his vast social media platform, Defendant Paul touted CryptoZoo as "so fun" and "a really fun game that makes you money." *Id*. Plaintiffs claim Defendants' marketing efforts induced them into transferring cryptocurrency to purchase CZ NFTs, which in turn would—at least, in theory—afford Plaintiffs certain benefits, such as "exclusive access to other cryptocurrency assets, and the support of an online ecosystem to use and market CZ NFTs." *Id*. at 11. According to Plaintiffs, Defendants

publicly stated the game, which Defendants claimed they themselves had played, was tested and completed in 2023. *Id*. at 7. Unbeknownst to Plaintiffs, CryptoZoo would never come to fruition. *Id*. It was through these grandiose promises Defendants allegedly lured so many into purchasing Zoo Tokens, which could be used to buy what Plaintiffs assumed would be lucrative digital assets and exclusive benefits. *Id*.

Plaintiffs also complain Defendants knowingly manipulated the digital currency market by executing a "rug pull," wherein "an NFT developer solicits funds from prospective NFT purchasers promising them benefits[,]" but "[o]nce the purchasers' funds are used to purchase the NFTs, the developers abruptly abandon the project and fail to deliver the promised benefits all the while fraudulently retaining the purchasers' funds." *Id*. at 11. Defendants' venture culminated in what Plaintiffs refer to as "Zoo Day" on June 11, 2021. *Id*. at 50. Allegedly, Defendants surreptitiously released digital products for purchase without notifying the public on that day. *Id*. This afforded Defendants Paul, Strobel, Levin, Ibanez, and Greenbaum the opportunity to "purchase[] these digital products at an artificially low value." *Id*. Thereafter, once the availability of the products was publicly announced, "[Defendant] Ibanez, [Defendant] Greenbaum, and potentially other Defendants, sold large amounts of the digital products for an immediate and large profit, effectively stealing the money of consumers who had invested." *Id*.

Each Plaintiff purchased CryptoZoo products and eventually lost anywhere from $100 to $350,000. *Id*. at 22–41. According to Plaintiffs, Defendants continuously reassured Plaintiffs of CryptoZoo's impending release—that is, until January 4, 2024, when Defendant Paul publicly announced the game would never be released because "there [were] too many regulatory hurdles that would need to be cleared." *Id*. at 7. As recompense for CryptoZoo's failure to launch, Defendant Paul initiated a sort of buy-back program, wherein he allegedly promised to buy back

CZ NFTs "for their 'original purchase price'" as "'a way for [Defendant Paul] to make whole those who intended to play CryptoZoo." *Id*. at 8. However, Plaintiffs complain even the reality of the buy-back program did not mirror Defendants' representations. *Id*. For example, rather than the original purchase price, Defendant Paul instead offered on a discretionary basis "a flat exchange of 0.1 Ethereum for each CZ NFT returned—conveniently omitting the economic reality that Ethereum's dollar-value has gone down nearly 50% since the initial sale of CryptoZoo products over two years ago." *Id*. Additionally, only those with "base egg NFTs and base animal NFTs" were eligible for the program; those with "hybrid animal NTFs" or Zoo Tokens were ineligible. *Id*.[4]

In sum, Plaintiffs believe "Defendants misrepresented the status of the CryptoZoo game to entice [Defendant] Paul's loyal online fans and the public into investing in CryptoZoo and then failed to ever provide a functional CryptoZoo game to use said CryptoZoo products, failed to support the CryptoZoo community as promised, and manipulated the initial and resale markets for Zoo Tokens and CZ NFTs." *Id*. at 9.

On August 19, 2024, Plaintiffs filed their Complaint alleging twenty-seven separate causes of action. (Doc. 81). On September 3, 2024, Defendant Strobel filed her Rule 12(b)(2) Motion to Dismiss (the "Motion"), challenging this Court's jurisdiction over her. (Doc. 86). Plaintiffs filed their Response on October 16, 2024. (Doc. 91). Defendant Strobel replied on November 8, 2024. (Doc. 99). Consequently, the instant matter is ripe for disposition.

---

4. For purposes of disposing of this Motion, it is not necessary to delve too deeply into the various types of CryptoZoo products and which were eligible for the buy-back program. Suffice it to say, Plaintiffs argue Defendant Paul represented to Plaintiffs that his buy-back program's purpose was to make whole all those who invested in CryptoZoo and lost, regardless of the type of cryptocurrency they possessed at the time Defendant Paul initiated the program. (Doc. 81 at 8–9). In reality, however, only possessors of certain kinds of products were eligible, and even those eligible were not made whole. *Id*.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(2) allows for dismissal of an action when a court lacks personal jurisdiction over the defendant. In resolving a Rule 12(b)(2) motion, the Court may consider "affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery." *Stuart v. Spademan*, 772 F.2d 1185, 1192 (5th Cir. 1985). "Where a defendant challenges personal jurisdiction, the party seeking to invoke the power of the court bears the burden of proving that jurisdiction exists." *Luv N' care Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465, 496 (5th Cir. 2006) (citing *Wyatt v. Kaplan*, 686 F.2d 276, 280 (5th Cir. 1982)). To carry that burden the plaintiff must plead a *prima facie* showing of personal jurisdiction. *Palmer v. Idalia Llorens Collection Agency, Inc.*, 434 F. Supp. 3d 462, 467 (E.D. Tex. 2020) (citing *Alpine View Co. v. Atlas Copco AB*, 205 F.3d 208, 215 (5th Cir. 2000)). Additionally, "allegations in the plaintiff's complaint are taken as true, except to the extent that they are contradicted by the defendant" and "[a]ny material and genuine, conflicting facts are resolved in favor of the plaintiff for the purpose of determining whether a *prima facie* case exists." *Id.*

There are two requirements for a court to exercise personal jurisdiction over a non-resident defendant: "(1) the long-arm statute of the forum state creates personal jurisdiction over the defendant; and (2) the exercise of personal jurisdiction is consistent with the due process guarantees of the United States Constitution." *Revell v. Lidov*, 317 F.3d 467, 469 (5th Cir. 2002). "Because Texas' long-arm statute has been held to extend to the limits of due process, only the second jurisdictional precondition must be examined." *Allstate Inc. v. Interline Brands, Inc.*, 997 F. Supp. 2d 501, 506 (N.D. Tex. 2014) (citing *Jones v. Petty–Ray Geophysical Geosource, Inc.*, 954 F.2d 1061, 1067 (5th Cir. 1992)).

For personal jurisdiction to comport with due process, the plaintiff must show that: (1) "the defendant purposefully availed itself of the benefits and protections of the forum state by establishing 'minimum contacts' with that state such that it would reasonably anticipate being haled into court there"; and (2) "exercising jurisdiction over the defendant would not offend traditional notions of fair play and substantial justice." *Id.* (citing *Jones*, 954 F.2d at 1068). "The 'minimum contacts' prong of the due process analysis can be met through contacts giving rise to either specific or general jurisdiction." *Id.* (citing *Gundle Lining Constr. Corp. v. Adams Cnty. Asphalt, Inc.*, 85 F.3d 201, 205 (5th Cir. 1996)). General jurisdiction arises "when the nonresident defendant's contacts with the forum state, even if unrelated to the cause of action, are continuous, systematic, and substantial"; whereas specific jurisdiction "is established through the defendant's contacts with the forum state arising from, or related to, the cause of action." *Id.* (citations and quotation marks omitted).

### III.    DISCUSSION

Plaintiffs' general assertion of personal jurisdiction in their Complaint is as follows: "The Court has personal jurisdiction over each of the Defendants because each either conducts business in and maintains operations in this District, is an individual who either is present in the district for jurisdictional purposes, or has sufficient minimum contacts with the District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice." (Doc. 81 at 18). The issue presented is whether, based on the facts in the record, the Court has personal jurisdiction over Defendant Strobel, a Colorado resident. (Doc. 86 at 2). As far as the Court can tell, Defendant Strobel's Motion raises five primary and distinct bases for dismissal: (1) the out-of-state Plaintiffs cannot establish personal jurisdiction as a matter of law, (2) CryptoZoo and other Defendants' contacts with Texas cannot be imputed to

6

Defendant Strobel for purposes of jurisdiction, (3) Defendant Strobel lacks sufficient contacts with Texas for the Court to exercise general[5] or specific jurisdiction over her, (4) Plaintiffs cannot manufacture jurisdiction by pleading federal statutory claims, and (5) Plaintiffs' federal statutory claims necessarily fail as to the international plaintiffs. (Doc. 86). The Court assesses each in turn.

### 1. Out-Of-State Plaintiffs' Assertion of Personal Jurisdiction

Defendant Strobel first argues all 137 members of the class do not reside in Texas and therefore cannot plead facts establishing specific jurisdiction over Defendant Strobel. (Doc. 86 at 8). "In other words, jurisdiction over [Defendant] Strobel cannot be premised on claims made by out-of-state Plaintiffs against an out-of-state Defendant for conduct that allegedly occurred in a forum other than Texas." *Id*. In support of this assertion, Defendant Strobel cites to *Defense Distributed v. Grewal*, 971 F.3d 485 (5th Cir. 2020). *Id*. In essence, Defendant Strobel seems to assert the non-Texas-resident Plaintiffs have little to no ties to Texas; therefore, they are precluded from arguing this Court has personal jurisdiction over Defendant Strobel—presumably due to the limited nature of their own contacts with Texas. *Id*.

This argument has no merit. The issue of whether a court can exercise specific jurisdiction over a defendant turns on the defendant's contacts with the forum, not the plaintiff's. *See Tekmart Integrated Mfg. Servs. Ltd. v. Power-Sonic Corp.*, No. 23-CV-00081, 2023 WL 4307158, at *5 (W.D. Tex. June 30, 2023) ("The personal jurisdiction analysis is defendant-focused."). Moreover, the portion of *Defense Distributed* Defendant Strobel cites to does not support the proposition she asserts. Although unclear, Defendant Strobel's Motion seems to

---

5. Defendant Strobel contends the Court lacks general jurisdiction over her. (Doc. 86 at 7). The Court quickly disposes of this basis for dismissal because Plaintiffs concede as much: "Plaintiffs do not claim to have general jurisdiction over Defendant [Strobel] . . . ." (Doc. 91 at 1). Furthermore, the Court agrees Defendant Strobel lacks sufficient contacts with Texas to confer general jurisdiction over her.

reference the following: "Put another way, the nexus to Texas was 'based entirely on the unilateral actions and decisions of [the plaintiff], not the [defendant].' And 'in general, the unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State.'" *Defense Distributed*, 971 F.3d at 491 (citing *Stroman Realty, Inc. v. Wercinski*, 513 F.3d 476 (5th Cir. 2008)). It is true, a plaintiff's contacts alone cannot serve as the predicate for asserting personal jurisdiction over a defendant; however, Defendant Strobel here argues just the opposite: 137 members of the class have insufficient contacts with the forum. (Doc. 86 at 8).  Assuming Defendant Strobel does indeed reference the above portion of *Defense Distributed*, her citation is inapposite, as she seems to argue 137 members of the class have limited contacts with Texas. Regardless of what part of *Defense Distributed* Defendant Strobel intended to highlight, her argument here nevertheless fails because, as mentioned, the issue in this personal jurisdiction analysis does not turn on the class members' contacts with Texas, but rather with hers.

## 2. Imputing Contacts of Other Defendants to Defendant Strobel for Purposes of Establishing Specific Jurisdiction

For the bulk of the Complaint, Plaintiffs refer to the various defendants in the collective, rather than to Defendant Strobel, specifically. (*See generally* Doc. 81). At times, Plaintiffs use "Defendants" to refer to all the named defendants, while in other instances they use "Founder Defendants" to include Defendant Strobel, as well as Defendants Paul, Levin, Ibanez, and Greenbaum. *Id*. Defendant Strobel argues—and the Court agrees—lumping all the defendants together and attributing the actions of some defendants to others is problematic. (Doc. 86 at 3–4). In essence, Defendant Strobel believes CryptoZoo and the other defendants' contacts with the forum cannot be imputed to Defendant Strobel, and even if they could, her conduct is protected

by the fiduciary-shield doctrine. *Id*. at 10–11. In response, Plaintiffs argue their allegations, as were raised in their Complaint, of liability based on alter ego, corporate veil-piercing, and agency render imputation proper in this case. (Doc. 91 at 3). Thus, the threshold issue before the Court is whether Plaintiffs' use of "Defendants" and "Founder Defendants" presents adequate bases for contacts imputation, or if only those allegations referencing Defendant Strobel, specifically, are subject to consideration.

The Court first takes up the fiduciary-shield doctrine. "Because the doctrine originates from judicial interpretations of long-arm statutes—not the federal due process clause—the shield exists only to the extent state law recognizes it." *Savoie v. Pritchard*, 122 F.4th 185, 191 (5th Cir. 2024) (internal quotation marks omitted). Based on Fifth Circuit precedent, Texas law seems to recognize the fiduciary-shield doctrine. *See Stuart*, 772 F.2d 1185 (declining to impute contacts to the defendant because the plaintiff failed to satisfy an exception to the fiduciary-shield doctrine). Thus, if applicable, the Court will apply the fiduciary-shield doctrine. Under this doctrine, "an individual's transaction of business within the state solely as a corporate officer does not create personal jurisdiction over that individual though the state has in personam jurisdiction over the corporation." *Stuart*, 772 F.2d at 1197. However, "[t]here are two exceptions to the fiduciary-shield doctrine: (1) it does not shield an individual from personal jurisdiction arising out of his or her allegedly tortious actions while working for a corporate entity, and (2) does not apply when the individual or subsidiary is the alter ego of the corporation or parent." *Conveyor Aggregate Prods. Corp. v. Benitez*, No. 18-CV-20, 2019 WL 1921613, at *5 (W.D. Tex. Mar. 4, 2019) (internal citations and quotation marks omitted). The Court addresses each exception—the tort exception and the alter ego exception—in turn.

As for the tort exception, Plaintiffs allege Defendants committed a variety of torts, including fraud, conspiracy to commit fraud, fraudulent misrepresentation, etc. (Doc. 81 at 56–64). At first glance, it would seem the fiduciary-shield doctrine cannot insulate Defendant Strobel from Plaintiffs' claims sounding in tort. But Plaintiffs' allegations suffer from one fatal flaw: they lump Defendants together. And the tort exception only holds that "the fiduciary-shield doctrine does not bar jurisdiction when a defendant is being sued for *his own tortious conduct*, which had reasonably foreseeable consequences in Texas." *Ragan & Massey, Inc. v. Voluntary Purchasing Grps, Inc.*, No. 09-CV-00039, 2009 WL 3157468, at *5 (E.D. Tex. Sept. 28, 2009) (emphasis added). In other words, "plaintiffs may not aggregate defendants' forum contacts and may not establish personal jurisdiction without specifying who did what." *Pearson v. Shriners Hosps. for Child., Inc.*, 133 F.4th 433, 442 (5th Cir. 2025); *see Gen. Retail Servs., Inc. v. Wireless Toyz Franchise, LLC*, 255 F. App'x 775, 793 (5th Cir. 2007) ("[I]t is not enough to simply rest on the use of the collective term, 'Defendants,' in the allegations"); *Rush v. Savchuk*, 444 U.S. 320, 332–33 (1980) (finding the aggregation of defendants does not comport with due process); *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417 (1984) (The "unilateral activity of another party or a third person is not an appropriate consideration when determining whether a defendant has sufficient contacts with a forum State to justify an assertion of jurisdiction."); *Fernandez-Lopez v. Hernandez*, No. 19-CV-46, 2020 WL 9396523, at *8 (W.D. Tex. Oct. 1, 2020), *R. & R. adopted*, 2020 WL 9396487 (W.D. Tex. Nov. 20, 2020) ("To establish jurisdiction, a plaintiff still must establish sufficient minimum contacts within the forum state for *each individual defendant* . . . ."). Therefore, to the extent Plaintiffs allege Defendant Strobel herself committed various torts in her capacity as a corporate officer, Defendant Strobel cannot avail herself of the safe haven of the fiduciary-shield doctrine.

However, in those instances where Plaintiffs allege "Defendants" or "Founder Defendants" committed various torts, the Court finds the tort exception inapposite and declines to attribute those actions to Defendant Strobel for purposes of jurisdiction.

As for the alter ego exception,[6] Plaintiffs contend CryptoZoo is the alter ego of Defendant Strobel, thereby justifying imputation of CryptoZoo's contacts to her. (Doc. 81 at 21). Under the alter ego exception, "courts attribute a corporation's contacts with the forum state to an individual defendant for jurisdictional purposes" when "the corporation is the alter ego of the defendant." *Stuart*, 772 F.2d at 1197. In determining whether a corporation is the alter ego of a defendant, courts are to consider whether: (1) the corporation is undercapitalized, (2) it is without separate books, (3) its finances are not kept separate from individual finances, (4) individual obligations are paid by the corporation, (5) the corporation is used to promote fraud or illegality, (6) corporate formalities are not followed, and (7) the corporation is merely a sham. *Id.* (citing *Lakota Girl Scout Council, Inc. v. Havey Fund-Raising Mgmt., Inc.*, 519 F.2d 634, 638 (8th Cir. 1975)). "Under Texas law, the primary factor for jurisdictional veil-piercing is the defendant's control of internal business operations and affairs of the corporation." *Savoie*, 122 F.4th at 192. The Court quickly disposes of Plaintiffs' veil-piercing argument, as their filings are devoid of any grounds to support all but two of these factors. Plaintiffs certainly meet the fifth factor: "The entity CryptoZoo Inc. was created to serve as a fraudulent vehicle for the sole purpose of selling patently worthless, unregistered Zoo Tokens and CZ NFTs to enrich CryptoZoo's founders, promoter/manager, and affiliates." (Doc. 81 at 10–11). Reading the filings generously, Plaintiffs

---

6. Plaintiffs' alter ego argument and corporate veil-piercing argument are indistinguishable, as Plaintiffs allege CryptoZoo is the alter ego of Defendant Strobel for purposes of piercing the corporate veil and imputing CryptoZoo's contacts (and liability) to her. (Doc. 91 at 3) ("Plaintiffs' allegations make clear Defendant [Strobel] was working jointly with the other Defendants to defraud consumers behind the veil of CryptoZoo. The actions taken on behalf of CryptoZoo can therefore be imputed on each individual Defendant.") (citations omitted). The Court therefore disposes of Plaintiffs' alter ego and corporate veil-piercing arguments in the same section.

hint at the seventh factor—namely, that CryptoZoo is a mere sham—by alleging Defendants repeatedly assured them the game was finalized but was never released. *Id*. at 46. However, Plaintiffs' filings lack any facts to support the other factors, or most importantly, that Defendant Strobel exercised any form of control over CryptoZoo. At most, Plaintiffs label Defendant Strobel as one of the founders of CryptoZoo and a 1% shareholder. (Doc. 81 at 43) "But an individual's status as an officer, director, or shareholder of an entity, standing alone, is not enough to support an alter ego finding." *See Savoie*, 122 F.4th at 193; *see also AT&T Co. v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 591 (9th Cir. 1996) ("[L]iability is not to be conflated with amenability to suit in a particular forum."). Thus, Plaintiffs have failed to convince the Court Defendant Strobel is the alter ego of CryptoZoo or vice versa. For these reasons, the Court declines to pierce the corporate veil for purposes of imputing CryptoZoo or any of the other defendants' contacts to Defendant Strobel for jurisdictional purposes.

The Court also notes Plaintiffs seek to impute CryptoZoo's contacts to Defendant Strobel based on a principal-agent liability theory. (Doc. 81 at 21). Although unclear, Plaintiffs seem to argue the actions of various agents working for CryptoZoo can serve to impute contacts on Defendant Strobel, as the principal. (Doc. 91 at 2) ("Defendant likewise did not attest that CryptoZoo employees, agents, contractors, or other entities related to CryptoZoo did not hire employees in Texas on its behalf. A 'principal is charged both with the acts of an agent committed within the scope of his duties and with knowledge of such acts.'") (quoting *Duffie v. Wichita County*, 990 F. Supp. 2d 695, 772 (N.D. Tex. 2013)). For the same reason Plaintiffs' alter ego argument fails, their agency argument similarly does not pass muster. "To impute the contacts of a third party to the defendant under an agency theory, the defendant must exercise control over the third party's activities in the forum by directing its agents or distributors to take

action there." *Fellowship Filtering Techs., LLC v. Alibaba.com, Inc.*, No. 15-CV-2049, 2016 WL 6917272, at *2 (E.D. Tex. Sept. 1, 2016). And as mentioned, Plaintiffs have given the Court no reason to find Defendant Strobel exercised control over CryptoZoo or its agents. In addition, Plaintiffs repeatedly and adamantly contend Defendant Strobel's Motion fails to controvert her agency argument. (*See* Doc. 91 at 3–4, 7). It is true, the Court "must accept as true [a plaintiff's] uncontroverted allegations, and resolve in its favor all conflicts between the facts contained in the parties' affidavits and other documentation." *Alpine View*, 205 F.3d at 215. However, Plaintiffs unduly hang their hats on this principle, as "the prima-facie-case requirement does not require the court to credit conclusory allegations, even if uncontroverted." *Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865, 869 (5th Cir. 2001). For these reasons, the Court declines to afford greater weight to Plaintiffs' bare-bones agency allegation or impute contacts on that basis.

That said, Plaintiffs' various attempts at contact-imputation—through the tort and alter ego exceptions to the fiduciary-shield doctrine and a principal-agent liability theory—fail. Having disposed of the portions of the Complaint wherein Plaintiffs refer to the defendants in the collective or seek to impute contacts, the Court below focuses on portions of the relevant filings that highlight Defendant Strobel's contacts, specifically.

### 3. Minimum Contacts Analysis

As a preliminary matter and relevant to the analysis in this section, the Court first identifies each of the five instances where the Complaint refers to Defendant Strobel by name:

> Founder Defendants Logan Paul, Danielle Strobel, Jeffrey Levin, Eddie Ibanez, and Jake Greenbaum a/k/a Crypto King created the company, CryptoZoo Inc., to sell digital assets ostensibly for use in the digital CryptoZoo game: first, in the form of a digital currency called Zoo Tokens, which could then be used to purchase Defendants' other products, CryptoZoo Non-Fungible Tokens [].

. . . .

Defendant Danielle Strobel was Logan Paul's assistant and is one of the founders of CryptoZoo Inc. and discusses helping administratively throughout Defendants' internal communications as their scheme developed.

The list of CryptoZoo founders is noted in Defendants' internal documents, where Paul, Strobel, Levin, Ibanez, and Greenbaum are listed as founders of CryptoZoo Inc., with each receiving 51%, 1%, 10%, 30%, and 5% of the founder shares respectively, with 3% leftover for expenses.

. . . .

On information and belief, June 11, 2021, was considered internally by Defendants as "Zoo Day," the day upon which they released—without any public notice—their digital products for purchase on the Binance blockchain. On Zoo Day, and until the release was publicly announced, Logan Paul, Danielle Strobel, Jeffrey Levin, Eddie Ibanez, and Jake Greenbaum a/k/a Crypto King purchased these digital products at an artificially low value. Soon after the project was publicly announced, Eddie Ibanez, Jake Greenbaum, and potentially other Defendants, sold large amounts of the digital products for an immediate and large profit, effectively stealing the money of consumers who had invested.

. . . .

Defendants each employed such criminal conduct as their regular way of doing business, as each Defendant lied about the progress of the game except for Defendant Stroebel [sic] who did not make public statements.

(Doc. 81 at 6–7, 43, 50, 109).

In her Motion, Defendant Strobel argues the Court lacks specific jurisdiction over her because she did not purposely avail herself of this forum. (Doc. 86 at 9). Perhaps more notably, Defendant Strobel's only contacts with Texas are limited and attenuated, and none of the twenty-seven causes of action arise out of those contacts. *Id.*  As for her non-business-related contacts, Defendant Strobel, a Colorado domiciliary, has only visited Texas twice, once for a canoe trip

and another time for a personal matter unrelated to this suit. *Id*. at 4–5. In regard to business matters:

> [Defendant] Strobel has never owned, leased, or held a security interest in any real estate or personal property in the State of Texas; opened or maintained a bank account in Texas; paid or owed taxes to the State of Texas or any of its political subdivisions; engaged in any business directed at Texas residents; opened or maintained an office or other business premises of any kind in Texas; hired employees, servants, or agents in Texas; maintained or been required to maintain a registered agent for service in Texas; maintained a telephone or facsimile number in Texas; or been a party to a lawsuit in Texas (with the exception of this case).
>
> [Defendant] Strobel's involvement in CryptoZoo was equally limited. She never drafted, revised, signed or filed any of CryptoZoo's organizational documents; drafted, revised, signed or published any CryptoZoo contract; drafted or revised CryptoZoo's Terms and Conditions or Terms of Service; or had access to any of CryptoZoo's bank, depository, or investment accounts.

*Id*. at 5 (citations omitted). Defendant Strobel attached an affidavit to her Motion certifying the truth to her abovementioned contacts, or the lack thereof. (Doc. 86-1). According to Defendant Strobel, many of Plaintiffs' claims are rooted in allegedly misleading statements Defendants made to Plaintiffs. (Doc. 86 at 9). However, Defendant Strobel points out—and indeed, the Complaint concedes—Defendant Strobel made no public statements, unlike the other Defendants. *Id*.; (Doc. 81 at 109) ("[E]ach Defendant lied about the progress of the game except for Defendant Stroebel [sic] who did not make public statements."). On the whole, Defendant Strobel believes Plaintiffs failed to identify any individualized conduct on her part that would render her amenable to suit in Texas. (Doc. 86 at 10).

Plaintiffs resist this conclusion, arguing Defendant Strobel's conduct justifies subjecting her to this Court's jurisdiction. (Doc. 91 at 1). More specifically, Plaintiffs aver, "Defendant [Strobel], through CryptoZoo, delivered products into the stream of commerce with the

expectation that they would be purchased by or used by consumers across the world, including Texas." *Id*. at 3. And Defendant Paul's conveyance of his concern as to the success of the cryptocurrency market in Texas to Defendant Strobel put her on notice of sales to Texas residents. *Id*. This knowledge, so the argument goes, made it foreseeable that Defendant Strobel would be haled into court in Texas. *Id*. Plaintiffs also argue "Defendant [Strobel] could have used other CryptoZoo founders, agents, or affiliates to hire Texas residents on her behalf." *Id*. at 3–4. In support, Plaintiffs point to purported discrepancies between the affidavit Defendant Strobel attached to her first motion to dismiss and the one pending before this Court to advance her assertion that Defendant Strobel did indeed hire Texas residents.[7] *Id*. at 2. The overarching theme of Plaintiffs' argument is "Defendant [Strobel] or agents or someone acting on her or CryptoZoo's behalf, sold CryptoZoo's products to consumers in Texas with the intent of selling to consumers in Texas—which is sufficient to confer specific jurisdiction over this case." *Id*. at 4–5.

In her Reply, Defendant Strobel reiterates her lack of contacts with Texas, particularly as it pertains to hiring Texas residents: "there is no allegation—much less 'obvious proof'—that [Defendant] Strobel hired anyone in Texas. (Doc. 99 at 2). Defendant Strobel further notes Plaintiffs, for the very first time in their Response, raise the stream-of-commerce theory. *Id*. at 3. Plaintiffs' failure to timely raise this argument aside, Defendant Strobel argues Plaintiffs have provided no facts indicating she placed anything into the stream of commerce. *Id*. All in all, Defendant Strobel finds the Complaint wholly devoid of any facts justifying this Court's exercise of jurisdiction over her. *Id*. at 1.

---

7. The Court assumes this argument was raised in error. Both affidavits contain the exact same sentence: "I have never hired employees, servants, or agents in Texas, nor have I maintained or been required to maintain a registered agent for service in Texas." (Docs. 22-1 at 2; 86-1 at 2). Because the affidavits are nearly identical—save a few spelling-error-corrections and organizational alterations—the Court disregards this argument.

In determining whether a court has specific jurisdiction over a defendant, the core inquiry is whether the defendant's contacts are such that she "could 'reasonably anticipate' being haled into the court of the plaintiff's chosen forum." *Shambaugh & Son, L.P. v. Steadfast Ins.*, 91 F.4th 364 (5th Cir. 2024) (citing *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351 (2021)). For specific jurisdiction to exist, a plaintiff must establish the affirmative of the first two prongs: (1) "whether the defendant has purposely directed its activities toward the forum state or purposely availed itself of the privileges of conducting activities there; (2) whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and (3) whether the exercise of personal jurisdiction is fair and reasonable." *Gadasalli v. Bulasa*, No. 22-CV-249, 2023 WL 3586424, at *7 (E.D. Tex. May 22, 2023) (quotation marks omitted). Once the plaintiff has met his charge as to the first two prongs, the burden thereafter shifts to the defendant to establish fairness and reasonableness. *See Savoie*, 122 F.4th at 191. Under certain circumstances, a single act by a defendant may be sufficient to confer personal jurisdiction over her. *See Lewis v. Fresne*, 252 F.3d 352, 358–59 (5th Cir. 2001). Importantly, the "minimum contacts prong for specific jurisdiction focuses on 'the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there.'" *Conveyor Aggregate*, 2019 WL 1921613, at *3 (quoting *Walden v. Fiore*, 571 U.S. 277, 285 (2014)). In other words, the "defendant's suit-related conduct must be such that it creates a substantial connection with the forum state." *Id.* at *3. Relevant here, because specific jurisdiction is a claim-specific inquiry, courts "must separately conduct a 'minimum contacts' analysis for each cause of action asserted." *Fairchild v. Barot*, 946 F. Supp. 2d 573, 577 (N.D. Tex. 2013). Beginning with Plaintiffs eight common law claims, then proceeding through their fifteen state statutory claims, the Court addresses each in turn.[8]

---

8. The pertinent analysis for Plaintiffs' federal statutory claims is completely distinct from those for their other

### i.    Counts 1 and 6: Fraud and Fraudulent Misrepresentation[9]

This district categorizes fraud claims into two similar but distinct classes:

> Under Texas law, there are two types of common-law fraud: (1) simple fraud, also known as fraudulent misrepresentation, and (2) fraudulent inducement, which is when someone allegedly induces another to enter into a contract by using false representations. These are separate causes of action, but they share the same elements, which are: (1) defendant made a material misrepresentation that (2) was false, (3) and was either known to be false when made or was asserted without knowledge of its truth, (4) the defendant intended the representation to be acted upon, (5) it was relied upon, and (6) it caused injury. However, to state a claim of fraudulent inducement, the plaintiff must also prove the existence of a contract.

*Bates Energy*, 361 F. Supp. 3d at 660 (internal citations and quotation marks omitted). The only distinction between the two claims is that, unlike fraudulent misrepresentation, "[f]raudulent inducement is a particular species of fraud that arises only in the context of a contract and requires the existence of a contract as part of its proof." *Bohnsack v. Varco, L.P.*, 668 F.3d 262, 277 (5th Cir. 2012) (quotation marks omitted). Regardless of this variance, inherent in a viable fraud claim is either an affirmative misrepresentation or a failure to disclose some material fact. *See In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 540 F. Supp. 2d 759, 770–71 (S.D. Tex. 2007) (clarifying the distinction between affirmative misrepresentation and failure to disclose a material fact); *see also Danziger & De Llano, L.L.P. v. Morgan Verkamp, L.L.C.*, 24 F.4th 491, 499 (5th Cir. 2022) (noting a Texas court does not automatically have personal jurisdiction over every foreign defendant who fails to disclose a material fact to a resident, but rather only in those cases where the defendant fails to disclose material facts

---

claims. As such, the Court analyzes the federal statutory claims in their own section.

9. For counts 1 and 6, Plaintiffs assert claims for "fraud" and "fraudulent misrepresentation." (Doc. 81 at 56–57, 62–63). Texas law recognizes two forms of fraud: fraud in the inducement and fraudulent misrepresentation. *See Bates Energy Oil & Gas v. Complete Oilfield Servs.*, 361 F. Supp. 3d 633, 660 (W.D. Tex. 2019). Although unclear, the Court assumes Plaintiffs intended to raise both claims and addresses them in this section.

through continuous communications). In the personal jurisdiction context, "[w]hen the actual content of communications with a forum gives rise to intentional tort causes of action, this alone constitutes purposeful availment." *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 213 (5th Cir. 1999). For instance, minimum contacts exist "where the nonresident defendant communicated via letters, telephone calls, and faxes with the plaintiff and the content of that communication included the alleged fraudulent statements." *Sutton v. Advanced Aquaculture Sys., Inc.*, 621 F. Supp. 2d 435, 441 (W.D. Tex. 2007) (citing *Wien Air Alaska*, 195 F.3d at 212). Regardless of the mode of communication, a fraud claim in the context of personal jurisdiction cannot survive without some form of material misrepresentation directed at a forum resident. This is where Plaintiffs' claims fall short.

Plaintiffs themselves concede Defendant Strobel made no misrepresentative statements: "Defendants each employed such criminal conduct as their regular way of doing business, as each Defendant lied about the progress of the game except for Defendant Stroebel [sic] who did not make public statements." (Doc. 81 at 109). Accepting Plaintiffs' uncontroverted allegations at face value—as this Court is required to do—Defendant Strobel directed no false communications at Texas residents sufficient to justify haling her into this Court under theories of fraudulent misrepresentation or fraudulent inducement. Nor do Plaintiffs allege facts to support an inference that Defendant Strobel concealed material information. What material fact did Defendant Strobel know but fail to disclose? The Complaint sheds no light on this issue. Instead, it merely identifies Defendant Strobel's Zoo Day purchase and somehow concludes she was obligated to inform Plaintiffs of her co-defendants' alleged pump-and-dump scheme. *Id*. at 50. Without more, the Court simply cannot find Defendant Strobel made fraudulent

misrepresentations or fraudulently induced Texas residents to support a finding of minimum contacts.

ii.    **Counts 2 and 3: Breach of Express Contract and Implied Contract**[10]

Plaintiffs' allegations pertaining to their breach of contract claims—both express and implied—are also insufficient to satisfy the minimum contacts requirement. "[W]ith respect to interstate contractual obligations, [the Supreme Court and the Fifth Circuit alike have] emphasized that parties who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to regulations and sanctions for the consequences of their activities." *Stuart*, 772 F.2d at 1191 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 479 (1985)). Notably, the mere existence of a contract alone is not determinative; rather, courts are to consider factors such as "prior negotiations, contemplated future consequences, terms of the contract, and the parties' actual course of dealing" in determining whether a contractual relationship gives rise to personal jurisdiction. *Id*. at 1193.

Plaintiffs' first breach-of-contract argument seems to rest on the fact that Defendant Strobel "promised and [was] obligated to: (a) provide a functional version of CryptoZoo, upon which the value of Zoo Tokens and CZ NFTs were at least primarily dependent; and (b) provide the agreed terms in exchange for Plaintiffs' and other consumers investments in Defendants' products/services." (Doc. 81 at 57). The issue with this contention is Plaintiffs themselves concede Defendant Strobel made no such promises. *See id*. at 109. The Court struggles to see how Defendant Strobel could have contracted with residents of this forum—and thereby

---

10. For purposes of disposing of this Motion, it is important to note the Court expresses no opinion as to whether Plaintiffs' claims have merit or if there was indeed a valid contract at issue here. Thus, because the facts relevant to Plaintiffs' second and third claims—breach of express contract and breach of implied contract, respectively—are the same, the Court analyzes them in conjunction. *See Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 850 (Tex. 2009) (noting the "difference between contracts formed through express promises and those formed through implied promises is the means by which they are formed").

purposely availed herself of it—if she never made any promises or representations to Texas residents. At most, Plaintiffs seem to argue Defendant Strobel may have participated in some capacity in employment contracts with Texas residents. (*See* Doc. 91 at 3–4). Because Defendant Strobel's affidavit verifies she "[has] never hired employees, servants, or agents in Texas[,]" Plaintiffs rely on the possibility "Defendant [Strobel] could have used other CryptoZoo founders, agents, or affiliates to hire Texas residents on her behalf." (Docs. 86-1 at 2; 91 at 3–4). Even so, the existence of an employment contract alone is insufficient; rather, "a contract may establish minimum contacts when considered against a backdrop of 'prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing.'" *Leonard v. Salinas Concrete, LP*, 470 S.W.3d 178, 190 (Tex. App.—Dallas 2015, no pet.) (quoting *Burger King*, 471 U.S. at 473)). But the record here is devoid of any uncontroverted evidence of negotiations or contractual dealings between Defendant Strobel and Texas residents. And this Circuit has found minimum contacts lacking in cases with far greater evidence of contractual dealings than the case at bar. *See, e.g.*, *Holt Oil & Gas Corp. v. Harvey*, 801 F.2d 773, 778 (5th Cir. 1986) (finding no specific jurisdiction where: "(1) [Defendant] entered into a contract with [Plaintiff], a Texas corporation; (2) [Defendant] sent a final revised joint operating agreement from Oklahoma to Texas; (3) [Defendant] sent three checks from Oklahoma to Texas in partial performance of its contractual obligations; and (4) [Defendant] engaged in extensive telephonic and written communication with [Plaintiff]"). Again, the Court sees no evidence of such dealings between Defendant Strobel and Texas residents.

### iii.    Count 4: Unjust Enrichment

Preliminarily, the Court notes "it is not clear that unjust enrichment actually functions as an independent cause of action." *Fairchild*, 946 F. Supp. 2d at 577–80. Out of an abundance of

caution, the Court nevertheless analyzes unjust enrichment as its own claim. However, based on the fraud analysis above and the very nature of this claim, Plaintiffs' unjust enrichment argument necessarily fails.

"Under Texas law an unjust enrichment claim requires a showing that one party has obtained a benefit from another by fraud, duress, or the taking of an undue advantage." *Digital Drilling Data Sys., L.L.C. v. Petrolink Servs., Inc.*, 965 F.3d 365, 379 (5th Cir. 2020) (internal citations and quotation marks omitted). As the Court already disposed of Plaintiffs' fraud claims, and Plaintiffs do not allege duress, that leaves them with one available avenue—unjust enrichment by taking of an undue advantage. Here, Plaintiffs argue "Defendants have been unjustly enriched by [their] wrongful receipt and retention of profits and other benefits they deprived Plaintiffs . . . ." (Doc. 81 at 61). The only conduct Plaintiffs attribute to Defendant Strobel is that which occurred on Zoo Day when various Defendants, including Defendant Strobel, surreptitiously purchased CryptoZoo digital products "at an artificially low value." *Id.* at 50. Thereafter, only once the project was publicly announced, "Eddie Ibanez, Jake Greenbaum, and *potentially other Defendants*, sold large amounts of the digital products for an immediate and large profit, effectively stealing the money of consumers who had invested." *Id.* (emphasis added). This is what Plaintiffs refer to as a "rug pull," presumably substantiating their unjust enrichment claim. *Id*. But a closer look at Plaintiffs' allegations reveals, although she may have purchased digital assets at an artificially low value, there is no mention of Defendant Strobel, specifically—only "potentially other Defendants"—participated in the alleged "rug pull" by selling off the assets at a higher value or absconding with any funds. *Id*. How can the Court conclude Defendant Strobel was unjustly enriched if Plaintiffs do not allege she sold off the assets for profit and gained some undue advantage? And, perhaps more importantly, what

connection does Defendant Strobel's purchase of digital assets have with this forum or its residents? Plaintiffs attempt to skip straight to the final destination, overlooking potholes and leaving no breadcrumbs to follow; the Court is not inclined to pave their path for them.

### iv.    Count 5: Negligence

In their Complaint, Plaintiffs allege various acts of negligence, most of which they do not directly attribute to Defendant Strobel, except perhaps two allegations—those being, (1) "Defendant [] Strobel was [Defendant] Paul's assistant and is one of the founders of CryptoZoo, Inc. and discusse[d] helping administratively throughout Defendants' internal communications as their scheme developed"; and (2) Defendant Strobel purchased CryptoZoo products on Zoo Day for an artificially low value. (Doc. 81 at 43, 50). Because Defendant Strobel, as Defendant Paul's assistant, was privy to internal communications, Plaintiffs believe the resulting injury in Texas was foreseeable. *Id*. at 62. Notably, Plaintiffs do not argue Defendant Strobel committed a tort in Texas, but rather her commission of a tort outside of Texas had foreseeable consequences for Texas residents. *Id*. Defendants, meanwhile, argue Plaintiffs are unable to point to any specific conduct on Defendant Strobel's part that had foreseeable consequences within Texas. (Doc. 86 at 11). In their Response, Plaintiffs highlight the portion of their Complaint wherein they alleged Defendant Paul "conveyed to *the other CryptoZoo founders* that he was specifically worried about access to cryptocurrency marketplaces being banned in Texas." (Doc. 91 at 3) (emphasis added). The exact language Plaintiffs use in the Complaint differs from that in their Response: "[Defendant] Paul exchanged text messages with [Defendant] Ibanez evincing concern that the Texas market may be in danger if cryptocurrency is banned there . . . ." (Doc. 81 at 49). Relatedly and in addition to their negligence argument, Plaintiffs raise—for the first time in their Response—a stream of

commerce theory: "Defendant [Strobel], through CryptoZoo, delivered products into the stream of commerce with the expectation that they would be purchased or used by consumers across the world, including Texas." (Doc. 91 at 3). Taking into account both her Motion and Reply, Defendant Strobel's arguments for dismissing Plaintiffs' negligence claim can be divided into three sections. They are as follows: (1) Plaintiffs fail to allege any tortious conduct—as opposed to indirect consequences—directed at the forum attributable to Defendant Strobel; (2) Plaintiffs alter the facts alleged in the Complaint to manufacture a stream-of-commerce argument, even though there exists "no allegation [in the Complaint] that [Defendant] Strobel placed anything into the 'stream of commerce'"; and (3) the case Plaintiffs rely on in support of their stream-of-commerce argument is inapposite. (Docs. 86 at 11; 99 at 3–4). The Court addresses each in turn.

Plaintiffs' negligence claim does not survive, as the Complaint does not identify specific conduct on Defendant Strobel's part directed at the forum. In the realm of personal jurisdiction as it pertains to a negligence claim, *Jobe v. ATR Marketing, Inc.* is instructive:

> A tort is complete when, and personal jurisdiction lies where, the actual injury occurs. In determining where the injury occurred for jurisdictional purposes, actual injury must be distinguished from its resultant consequences, such as pain and suffering, *economic effects*, *or other collateral consequences* that often stem from the actual injury. Recognizing that such collateral consequences may be far-reaching . . . our precedent holds that consequences stemming from the actual tort injury do not confer personal jurisdiction at the site or sites where such consequences happen to occur.

87 F.3d at 753 (citations omitted and emphasis added); *see Hoffman v. L & M Arts*, 774 F. Supp. 2d 826 (N.D. Tex. 2011) (applying the *Jobe* standard to a case arising under Texas law). In other words, "[a]lthough the foreseeable effects of a tort are to be assessed as part of the minimum contacts analysis, the Fifth Circuit has unequivocally expressed that 'foreseeable injury alone is not sufficient to confer specific jurisdiction, absent the direction of specific acts

toward the forum.'" *Smirch v. Allied Shipyard, Inc.*, 164 F. Supp. 2d 903, 908 (S.D. Tex. 2001) (quoting *Wien Air Alaska*, 195 F.3d at 212). For example, courts have found sufficient contacts where the "defendant directs intentional tortious conduct into a forum, or places a defective product into the stream of commerce with the knowledge it will be distributed in the forum state." *Id*.

Here, Plaintiffs' foreseeability argument suffers a self-inflicted blow at the hands of their clumsy attempt to distort the Complaint's facts in their Response. As mentioned, Plaintiffs' Complaint avers Defendant Paul apprised Defendant Ibanez—and Defendant Ibanez alone—of his concerns regarding the Texas cryptocurrency market. (Doc. 81 at 49). Only in their Response do Plaintiffs alter the allegation to encompass "the other CryptoZoo founders"—presumably, including Defendant Strobel. (Doc. 91 at 3). That Defendant Ibanez' receipt of a text message regarding Texas markets put Defendant Strobel on notice of potential harm to Texas residents is a stretch of logic to say the least. Even if Defendant Strobel was indeed on notice of her co-defendants' desire to target the Texas market, her passive possession of such knowledge hardly amounts to specific tortious conduct directed at the forum. Moreover, Defendant Strobel's purchase of CryptoZoo products on Zoo Day, albeit less passive than her other conduct, seems to have no connection with Texas. The economic effects, if any at all, of Defendant Strobel's purchase amounts to no more than collateral consequences, insufficient to demonstrate conduct directed at the forum.

As for their stream-of-commerce argument, Plaintiffs attempt—unsuccessfully—to utilize the same foreseeability logic applied in their negligence claim. Again, Plaintiffs reference the portion of their Complaint concerning Defendant Paul's communications with Defendant Ibanez about the Texas cryptocurrency market. (Doc. 91 at 3 (citing Doc. 81 at 49)). Defendant

Strobel's knowledge of CryptoZoo's products entrance into the stream of commerce and eventual arrival to the hands of Texas residents is sufficient to hale her into a Texas court, or so Plaintiffs' argument goes. Plaintiffs' self-controverted foreseeability argument aside, Defendant Strobel is correct in highlighting "there is no allegation that [Defendant] Strobel placed anything into the 'stream of commerce.'" (Doc. 99 at 3). A precondition to the stream-of-commerce standard espoused by Plaintiffs requires "that the defendant deliver[] the product into the stream of commerce." (Doc. 91 at 2) (quoting *Ainsworth v. Moffett Eng'g, Ltd.*, 716 F.3d 174, 177 (5th Cir. 2013)). In other words, with no allegation of delivery, a stream-of-commerce argument will not lie. And nowhere in the Complaint do Plaintiffs allege Defendant Strobel delivered a product into the stream of commerce. This brings the Court to Defendant Strobel's third and final argument in favor of dismissing Plaintiffs negligence claim: Plaintiffs' association of the instant case and *Ainsworth* is inapposite.

Even if the Court agreed with Plaintiffs' assertion that Defendant Strobel placed products into the stream of commerce—which, it does not—Plaintiffs' reliance on *Ainsworth* is nevertheless misplaced. *Ainsworth* involved a products liability dispute wherein a foreign manufacture placed a forklift into the stream of commerce with the knowledge that it would be purchased by consumers in Mississippi. *Ainsworth*, 716 F.3d at 177. The Fifth Circuit affirmed the district court's denial of the defendant's motion to dismiss for lack of personal jurisdiction because delivery, coupled with "mere foreseeability or awareness" that the products may be purchased by consumers in the forum is sufficient to subject a defendant to the jurisdiction of that forum. *Id*. However, what Plaintiffs here fail to acknowledge is "the defendant's contacts must be more than random, fortuitous, or attenuated, or the unilateral activity of another party or third person." *Id*. Moreover, the Fifth Circuit "has been reluctant to extend the stream-of-

commerce principle outside the context of products liability cases[.]" *Luv N' care*, 438 F.3d at 473. The Court is of the opinion the stream-of-commerce theory does not extend to Defendant Strobel, who neither placed a product into the stream of commerce, nor did she foresee—at least, not according to the Complaint—the potential for access to said products in Texas.

### v.    Counts 7 and 8: Conspiracy to Commit Fraud and Civil Aiding and Abetting Fraud

As mentioned in the negligence section, "mere allegations of a tort occurring outside the forum state is [sic] not sufficient to meet the purposeful availment requirement." *Hawkins v. Upjohn Co.*, 890 F. Supp. 601, 608 (E.D. Tex. 1994) (citing *Southmark Corp. v. Life Invs., Inc.*, 851 F.2d 763 (5th Cir. 1988)). Thus, where "[t]here is no allegation in the complaint that the alleged conspiracy was expressly aimed at Texas, nor an allegation that the alleged tortfeasor had knowledge that a particular Texas resident would suffer the brunt of the harm[,]" this Circuit's precedent "dictates this [C]ourt should not exercise personal jurisdiction." *Id*. The same showing is required in civil aiding and abetting claims. *See VeroBlue Farms USA, Inc. v. Wulf*, 465 F. Supp. 3d 633, 667 (N.D. Tex. 2020) (finding no *prima facie* showing of specific jurisdiction where the defendant neither aimed his tortious conduct at the forum, nor did he know "the brunt of the injury would be felt by the particular resident in the form").

Here, the same deficiencies that infect Plaintiffs' fraud and negligence claims similarly contaminate their conspiracy and aiding and abetting claims. Plaintiffs neither demonstrate Defendant Strobel directed a tort at the forum, nor had knowledge of her alleged co-conspirators tortious tendencies. At most, Plaintiffs allege Defendant Strobel may have been involved in the Zoo Day scheme by purchasing CryptoZoo products at an artificially low value. (Doc. 81 at 50). But even so, Plaintiffs can only identify effects experienced in Texas, and "the effects of an

alleged conspiracy in the forum state are insufficient to grant the court personal jurisdiction over the non-resident co-conspirators." *Hawkins*, 890 F. Supp. at 608.

### vi.    State Law Claims

Plaintiffs raise a total of fifteen state statutory violations in their Complaint. (Doc. 81 at 64–101). Every statute listed is some form of consumer protection act prohibiting unfair trade and advertisement practices. *See id*. Plaintiffs' fifteen statutory violations, along with excerpts relevant to this analysis, are listed below.

- Count 9: Arizona Consumer Fraud Act: "The act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice." Ariz. Rev. Stat. § 44-1522.

- Count 10: California False Advertising Law: "It is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services . . . which [are] untrue or misleading, and which [are] known, or which by the exercise of reasonable care should be known, to be untrue or misleading . . . ." Cal. Bus. & Prof. Code § 17500.

- Count 11: California Consumer Legal Remedies Act: "The unfair methods of competition and unfair or deceptive acts or practices listed in this subdivision undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or services to any consumer are unlawful: . . . Representing that goods or services have . . . characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have. Cal. Civ. Code § 1770(a).

- Count 12: California Unfair Competition Law: "[U]nfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by . . . the Business and Professions Code." Cal. Bus. & Prof. Code § 17200.

- Count 13: Colorado Consumer Protection Act: "A person engages in a deceptive trade practice when, in the course of the person's business, vocation, or occupation, the person: . . . Either knowingly or recklessly makes a false representation as to the characteristics, ingredients, uses, benefits, alterations, or quantities of goods, food, services, or property . . . ." Colo. Rev. Stat. § 6-1-105(1).

- Count 14: Florida Deceptive & Unfair Trade Practices Act: "Unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." (FLA. STAT. § 501.204(1).

- Count 15: Iowa Private Right of Action for Consumer Frauds Act: "A person shall not engage in a practice or act the person knows or reasonably should know is an unfair practice, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact, with the intent that others rely upon the unfair practice, deception, fraud, false pretense, false promise, misrepresentation, concealment, suppression, or omission in connection with the advertisement, sale, or lease of consumer merchandise . . . ." IOWA CODE § 714H.3.

- Count 16: Illinois Consumer Fraud and Deceptive Business Practices Act: "Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of any trade or commerce are hereby declared unlawful . . . ." 815 ILL. COMP. STAT. § 501/2.

- Count 17: Massachusetts Business Practices for Consumer Protection Law: "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." MASS. GEN. LAWS. ch. 93A, § 2.

- Count 18: North Carolina Unfair and Deceptive Trade Practices Act: "Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." N.C. GEN. STAT. § 75-1.1.[11]

- Count 19: New Jersey Consumer Fraud Act: The act, use or employment by any person of any commercial practice that is unconscionable or abusive, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise . . . is declared to be an unlawful practice . . . ." N.J. STAT. § 56:8-2.

- Count 20: Nevada Deceptive Trade Practices Act: "A person engages in a 'deceptive trade practice' if, in the course of his or her business or occupation, he or she: . . . Knowingly makes a false representation as to the characteristics, ingredients,

---

11. For Count 18, Plaintiffs cite to "North Carolina Code § 714H.1, *et seq*." (Doc. 81 at 88). Presumably, Plaintiffs inadvertently inserted a section of the Iowa Private Right of Action for Consumer Frauds Act—Iowa Code § 714H.1—because, to the Court's knowledge, no such section exists in the North Carolina Code. Based on the substance of the claim, it is clear Plaintiffs intended to cite to North Carolina General Statutes § 75-1.1. *See id*. The Court, therefore, cites to the relevant portion of this section of the North Carolina Code.

uses, benefits, alterations or quantities of goods or services for sale . . . ." NEV. REV. STAT. § 598.0915.

- Count 21: New York General Business Law: "Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful." N.Y. GEN. BUS. LAW § 349.

- Count 22: Pennsylvania Unfair Trade Practices and Consumer Protection Law: "'Unfair methods of competition' and 'unfair or deceptive acts or practices'" mean any one or more of the following: . . . Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have . . . ." 73 PA. STAT. § 201-2(4).

- Count 23: Texas Deceptive Trade Practices Act: "False, misleading, or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful and are subject to action by the consumer protection division . . . ." TEX. BUS. & COM. CODE § 17.46(a).

Examined collectively, these statutes convey the same fundamental message: a person violates state law when she knowingly misrepresents a product in a transaction with the intent that the consumer rely and act on her misrepresentations. Just as the various states' statutes mirror one another, so do Plaintiffs' claims under them. (*See* Doc. 81 at 64–101). In fact, each count, although sometimes phrased differently, contains the following allegation:

> In the course of their business, Defendants, themselves or through their agents, employees, and/or subsidiaries, violated the [state law] by knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts regarding the reliability, safety, and performance of investing in CryptoZoo or purchasing Zoo Tokens and CZ NFTs . . . .
>
> Specifically, by failing to disclose and actively concealing the failure to develop CryptoZoo, and misrepresenting its progress, affecting the value of Zoo Tokens and CZ NFTs, Defendants engaged in deceptive acts or practices . . . with intent that others rely upon such concealment, suppression, or omission, in connection with advertising CryptoZoo and selling Zoo tokens and CZ NFTs.
>
> Defendants' unfair or deceptive acts or practices . . . had a tendency or capacity to mislead and create a false impression in

30

> consumers, and were likely to and did in fact deceive reasonable
> consumers, including the [State] Plaintiffs . . . .

*Id*.

Seeing as both the law and the allegations are nearly identical for Plaintiffs' state law claims, the Court condenses the analysis for these claims. In determining whether a forum court may exercise personal jurisdiction over a non-resident defendant for violations of other states' statutes, the minimum-contacts analysis remains the same. *See, e.g.*, *Orton v. Pines*, No. G-15-25, 2015 WL 1637863 (S.D. Tex. Apr. 13, 2015) (conducting a minimum-contacts analysis over a foreign defendant for a violation of California state law). For purposes of the Motion at hand, the focus remains whether Defendant Strobel directed her unlawful conduct at Texas so as to purposely avail herself of this forum, even if the alleged statutory violations occurred in other states.

Disposing of these claims is rather simple, as the statutes closely mirror the common-law fraud claims already addressed. *Compare Bates Energy*, 361 F. Supp. 3d at 660 (listing the elements of common-law fraud: "(1) defendant made a material misrepresentation that (2) was false, (3) and was either known to be false when made or was asserted without knowledge of its truth, (4) the defendant intended the representation to be acted upon, (5) it was relied upon, and (6) it caused injury"), *with* ARIZ. REV. STAT. ANN. § 44-1522 ("The act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise . . . is declared to be an unlawful practice."). Thus, Plaintiffs' statutory claims invariably suffer the same unfortunate fate as their fraud claims. First, Plaintiffs cannot show Defendant Strobel deceived anyone or made misrepresentations because,

as Plaintiffs conceded, Defendant Strobel made no public statements—deceptive or otherwise. (Doc. 81 at 109). Second, Plaintiffs are unable to prove omission or suppression because they made no allegations Defendant Strobel had personal knowledge of the misrepresentations, let alone concealed them. Referencing a text chain in which Defendant Strobel was not included and labeling her a "founder" or "administrative assistant" hardly demonstrates Defendant Strobel "actively conceal[ed] the failure to develop CryptoZoo, and misrepresent[ed] its progress," as Plaintiffs so allege. *Id*. at 65. Where Plaintiffs see uncontroverted evidence of repeated purposeful availment, the Court sees mere fortuity. In sum, just as with their common law claims, Plaintiffs fail to make a *prima facie* showing of jurisdiction as to their state statutory claims.

### 4.  Whether Plaintiffs' Claims Arise Out of Defendant Strobel's Contacts

Although the Court is of the opinion Plaintiffs failed to satisfy the first prong of the specific jurisdiction analysis—that Defendant Strobel purposely availed herself of Texas by establishing minimum contacts with the state—the inquiry does not end there. The Court must nevertheless determine whether Defendant Strobel's Texas contacts, although insufficient, "arise from, or are directly related to, the cause[s] of action." *Gundle Lining*, 85 F.3d at 205; *see Morris v. B.C. Olympiakos, SFP*, 721 F. Supp. 2d 546, 567 (S.D. Tex. 2010) (addressing the second, "arise from" prong even though the plaintiff failed to demonstrate the defendant possessed the requisite contacts). "Or put just a bit differently, there must be an affiliation between the forum and the underlying controversy, principally, an activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Ford Motor*, 592 U.S. at 359. (citations and quotation marks omitted). For reasons outlined below, Plaintiffs failed to establish their claims arise from Defendant Strobel's purported contacts.

Construed charitably, Plaintiffs identify two potential (but attenuated) contacts between Defendant Strobel and Texas: (1) Defendant Strobel's title as assistant to Defendant Paul, and (2) Defendant Strobel's purchase of CryptoZoo products on Zoo Day. (Doc. 81 at 43, 50). According to Plaintiffs, Defendant Strobel performed "administrative" duties for CryptoZoo. *Id*. at 43. Assuming these duties were performed in or at least had some effect on Texas residents—which they did not—Plaintiffs fail to draw the link between Defendant Strobel's administrative duties and their various causes of action. For instance, most of Plaintiffs' claims are rooted in some form of misrepresentation, but nowhere do Plaintiffs explain how Defendant Strobel's duties led to or related to their defraudment. Defendant Strobel's second alleged contact—her Zoo Day purchase—albeit stronger than her other contact, is also deficient. Again, assuming Defendant Strobel's purchase affected or occurred in Texas, no ascertainable link exists between it and Plaintiffs' claims. *See Fernandez-Lopez*, 2020 WL 9396523, at *9 ("Jurisdiction can be based on acts done outside the state that have consequences or effects within the forum state, but only if the effects are seriously harmful and were intended or highly likely to follow from the nonresident defendant's conduct."). Perhaps if she, like some of her co-defendants, resold the products for a higher value to Texas residents, there may be some connection. But Plaintiffs do not allege as much. All allegations considered, Plaintiffs failed to present the requisite contacts, and even if they had, Defendant Strobel's ties to Texas are so attenuated as to be negligible.

**5. Whether the Exercise of Personal Jurisdiction Would be Fair and Reasonable**

The third and final prong of the personal jurisdiction analysis tasks courts with determining whether the exercise of personal jurisdiction is fair and reasonable. *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 271 (5th Cir. 2006). If the plaintiff is able to satisfy

the first two prongs, the burden thereafter shifts to the defendant to prove the obverse—that the exercise of jurisdiction would be unfair and unreasonable. *See id*. However, "[i]f the plaintiff fails to satisfy either of [the first two prongs], personal jurisdiction is not established in the forum state," and the analysis concludes after the second prong. *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004). Having concluded Defendant Strobel's random and fortuitous contacts with Texas did not give rise to Plaintiffs' claims, the Court concludes the specific jurisdiction analysis and proceeds to an entirely different mode of obtaining personal jurisdiction—via federal statute.

### 6. Federal Statutory Claims

As a prefatory matter, the Court addresses how exactly the analysis changes when jurisdiction is premised on a federal statute authorizing nationwide service of process, as opposed to jurisdiction invoked under Texas' long-arm statute. Already discussed at length, a "federal court sitting in diversity in Texas may exercise jurisdiction over a foreign defendant if permitted by (1) the Texas long-arm statute, and (2) the due process clause of the Fourteenth Amendment." *Diece-Lisa Indus., Inc. v. Disney Enters., Inc.*, 943 F.3d 239, 249 (5th Cir. 2019). Simply put, these requirements boil down to what courts commonly refer to as the "minimum contacts" analysis, as was performed above. *Id*. at 249–50. This analysis, however, differs slightly in federal question cases where personal jurisdiction is premised on a federal statute that authorizes nationwide service of process:

> Under Rule 4(k)(1)(D) of the Federal Rules of Civil Procedure, service of a summons or filing a waiver of service is effective to establish jurisdiction over the person of a defendant when authorized by a statute of the United States. Where service is authorized by federal statute, the more expansive due process requirements of the Fifth Amendment govern the controversy and the relevant due process inquiry is whether the defendant has had minimum contacts with the United States. Consequently, when a

> congressional statute provides for nationwide service of process, the district court will have personal jurisdiction over a U.S. resident who is personally served in the United States since a resident has sufficient minimum contacts with the U.S. by virtue of his or her residency.

*Warfield v. Arpe,* No. 3-05-CV-1457, 2007 WL 549467, at \*4 (N.D. Tex. Feb. 22, 2007) (internal citations and quotation marks omitted); *see United States Sec. & Exch. Comm'n v. Passos*, 760 F. Supp. 3d 95, 108–09 (S.D.N.Y. 2024) ("[A] federal court applies the forum state's personal jurisdiction rules unless, as in this case, a federal statute specifically provides for national service of process."). In other words, while the analysis is not unlike the typical minimum contacts test in that courts still look for minimum contacts, relatedness, and reasonableness, the Fifth Amendment governs, and the relevant contacts are those the defendant has with the United States. *See In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 642 (S.D.N.Y. 2017).

"When a plaintiff relies on a federal statute providing for nationwide service of process, the court will have personal jurisdiction over a properly served defendant provided that (1) the federal claim is colorable, and (2) the exercise of personal jurisdiction satisfies the Fifth Amendment's Due Process Clause." *Doe 8 v. Varsity Brands, LLC*, No. CV 22-3508, 2023 WL 4209843, at \*7 (D.S.C. June 27, 2023). A federal claim is not colorable "only if the right claimed is so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise devoid of merit as not to involve a federal controversy." *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 941 (11th Cir. 1997) (citations and quotation marks omitted).

Plaintiffs' Complaint asserts four federal statutory claims arising under: (1) Section 10(b) of the Securities Exchange Act ("SEA"), along with Rule 10b-5 promulgated by the Securities Exchange Commission ("SEC"); (2) Section 20(a) of the SEA; (3) the Racketeer Influenced and

Corrupt Organizations Act ("RICO"); and Sections 4o and 22(a) of the Commodity Exchange Act ("CEA"). (Doc. 81 at 104–11). The Court addresses each in turn.

### i.    SEA Section 10(b) and SEC Rule 10b-5

The SEA, in relevant part, provides, "district courts of the United States . . . shall have exclusive jurisdiction of violations of this chapter or the rules and regulations thereunder." 15 U.S.C. § 78aa(a). And "process in such cases may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found." *Id*. "Once process is validly served, jurisdiction is based upon the contacts between the defendant and the United States because it is the United States, and not the particular state that is exercising jurisdiction." *909 Corp. v. Vill. of Bolingbrook Police Pension Fund*, 741 F. Supp. 1290, 1292 (S.D. Tex. 1990).

Here, neither party disputes Defendant Strobel, a Colorado resident, was properly served in Colorado. (*See* Docs. 86-1 at 1; 10 at 2). Rather, the parties disagree as to whether Plaintiffs pled their SEA claims adequately so as to serve as a basis for asserting personal jurisdiction over her. For this claim, Plaintiffs allege,

> Defendants engaged in a plan, scheme, conspiracy and course of conduct that was intended to, and did (i) deceive the investigating public, including Plaintiffs and other Class members, . . . (ii) artificially inflate and maintain the market price of Zoo Tokens and CZ NFTs; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire patently worthless unregistered securities, Zoo Tokens and CZ NFTs, at artificially created, inflated, prices.

> Defendants, by the use of means and instrumentalities of interstate commerce: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon Plaintiffs and the other members of the Class.

(Doc. 81 at 105). Notably, throughout Plaintiffs' federal statutory claims, they attribute violations to "Defendants," rather than any one defendant in particular. That very fact serves as the crux of Defendant Strobel's Motion: "[T]hese claims are based on the alleged conduct of the collective 'Defendants' or 'Founder Defendants,' without Plaintiffs specifying any purported wrongdoing by [Defendant] Strobel." (Doc. 86 at 12). Defendant Strobel further contends, "Section 10(b) and Rule 10b-5 require a plaintiff to allege a materially false or misleading statement *on the part of each defendant*." *Id*. at 14 (quoting *In re UICI Sec. Litig.*, No. 04-CV-1149, 2006 WL 7354417, at *3 (N.D. Tex. Sept. 29, 2006)). In other words, Defendant Strobel must be primarily liable for the conduct alleged to be actionable. *Id*. at 14–15. Defendant Strobel believes Plaintiffs' Section 10b argument is not colorable, as Plaintiffs themselves concede she never made any public statements. *Id*. at 15.

Plaintiffs resist this determination, arguing "Rule 10b-5 of the Exchange Act applies in equal force to individuals who 'employ any device, scheme, or artifice to defraud' or 'engage in any act, practice, or course of business which operates or would operate as fraud or deceit upon any person, in connection with the purchase or sale of a security." (Doc. 91 at 5) (quoting *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 157–58 (2008)). According to Plaintiffs, Defendant Strobel's surreptitious purchase on Zoo Day constitutes participation in a scheme under Rule 10b-5. *Id*. at 6. Defendant Strobel takes issue with the fact that—at least, in her eyes—Plaintiffs improperly raised scheme liability under Rule 10b-5(a) in their Response, when the Complaint only mentions Rule 10b-5(b), pertaining to untrue statements of material fact. (Doc. 99 at 7). Defendant Strobel urges the Court to disregard Plaintiffs' scheme argument based on its untimeliness. *Id*. Even so, Defendant Strobel believes Plaintiffs' argument does not survive for a variety of reasons: Plaintiffs failed to allege Defendant Strobel performed an

inherently deceptive act distinct form the alleged misstatement, they make no showing of intent to manipulate or deceive, and they failed to allege if or how Plaintiffs relied on Defendant Strobel's conduct. *Id*. at 7–8. The Court first addresses whether Plaintiffs' Rule 10b-5(a) scheme liability argument is properly before the Court.

In short, it is. How Defendant Strobel arrived at the conclusion Plaintiffs raised their scheme liability argument for the first time in their Response eludes the Court. Not only do Plaintiffs use the word "scheme" five times in their Complaint's Rule 10b-5 section alone, but they also include the exact same language as Rule 10b-5(a). *Compare* 17 CFR § 240.10b-5(a) ("It shall be unlawful to employ any device, scheme, or artifice to defraud"), *with* (Doc. 81 at 105) ("Defendants, by the use of means and instrumentalities of interstate commerce: (i) employed devices, schemes and artifices to defraud[.]"). The death knell of Plaintiffs' Section 10(b) and Rule 10b-5 claim is not untimeliness, but the ambiguity and collective attribution that runs rampant throughout the Complaint.

Section 10(b) makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate . . . ." 15 U.S.C. § 78j(b). One such rule, Rule 10b-5, provides, "It shall be unlawful for any person . . . (a) [t]o employ any device, scheme, or artifice to defraud[;] (b) [t]o make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading[;] or (c) [t]o engage in any act, practice, or course of business which operates or would operate as

fraud or deceit upon any person, in connection with the purchase or sale of a security." 17 C.F.R. § 240.10b-5.

As discussed ad nauseum, Plaintiff Strobel made no public statements, so no claim can lie under Rule 10b-5(b), outlawing untrue statements of material fact. That leaves only Plaintiffs' allegations under Rule 10b-5(a) and (c), which make it unlawful to employ a scheme to defraud and engage in a deceptive act, respectively. Plaintiffs' only allegation of conduct attributable to Defendant Strobel that verges on participation in a scheme or deceptive act is her purchase of the CryptoZoo products on Zoo Day. And yet, the Court struggles to see how she was involved in a scheme with no allegation she knew of or participated in any conversations regarding the alleged scheme, or how she engaged in a deceptive act for merely purchasing CryptoZoo products for an artificially low value if she never sold them thereafter. *See S.E.C. v. Sharef,* 924 F. Supp. 2d 539, 547 (S.D.N.Y. 2013) (finding jurisdiction where the defendant directly manipulated financial documents knowing they would be relied upon by United States residents). There very well may be a link between Defendant Strobel's purchase and Plaintiffs' harm, but none that is alleged by Plaintiffs. The Court further notes that "whether a federal claim is colorable for jurisdictional purposes is a distinct question from whether the claim is plausible for Rule 12(b)(6) purposes." *Varsity Brands*, 2023 WL 4209843, at *7. The Court also reemphasizes the lynchpin to a federal statutory claim is the defendant's contacts with the United States, not just the forum state. *See 909 Corp.*, 741 F. Supp. at 1292. Neither party disputes—nor does the Court believe—Defendant Strobel, a Colorado resident, lacks contacts with the United States. Rather, the Court simply cannot justify haling Defendant Strobel into this Court based on group-pled allegations of SEA Section 10(b) violations and her dubious participation in the acts that give rise to such claims. In

other words, Defendant Strobel has extensive contacts with the United States but none that give rise to claims under Section 10(b) and Rule 10b-5.

### ii.    SEA Section 20(a)

For their Section 20(a) claim, Plaintiffs aver, "the Founder Defendants were able to, and did, control the contents of the various promotional materials, press releases and public statements which CryptoZoo disseminated in the marketplace . . . ." (Doc. 81 at 108). According to Plaintiffs, "[e]ach of the Founder Defendants exercised control over the general operations of CryptoZoo and possessed power to control the specific activities which comprise the primary violations . . . ." *Id*. Defendant Strobel argues Plaintiffs' Section 20(a) argument necessarily fails because "[t]o adequately plead 'controlling person' liability under Section 20(a), 'a plaintiff must at least show that the defendant had an ability to control the specific transaction or activity upon which the primary violation is based.'" (Doc. 86 at 15) (quoting *Heck v. Triche*, 775 F.3d 265, 283 (5th Cir. 2014)). A defendant's job title, without more, is insufficient to prove power or control, according to Defendant Strobel. *Id*. at 16.

Section 20(a) provides, [e]very person who, directly or indirectly, controls any person liable under any provision of this chapter of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person . . . ." 15 U.S.C.A. § 78t(a). "To establish a prima facie case of control person liability pursuant to Section 20(a), a plaintiff must sufficiently allege (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *In re EHang Holdings Ltd. Sec. Litig.*, 646 F. Supp. 3d 443, 457 (S.D.N.Y. 2022) (citations and quotation marks

omitted). "Further, a plaintiff must demonstrate primary liability under Section 10(b) prior to making out a control person liability claim." *Id*.

Here, Plaintiffs stumble at the second hurdle. Nowhere in the Complaint do Plaintiffs allege Defendant Strobel—as opposed to the "Founder Defendants"—exercised any degree of control over CryptoZoo or her co-defendants. And Defendant Strobel is correct, "[c]ourts have found that pleading job titles alone fails to show actual control." *Mart v. Tactile Sys. Tech., Inc.*, 595 F. Supp. 3d 788, 825 (D. Minn. 2022). Instead, this Court must look to the degree to which Plaintiffs allege Defendant Strobel was involved in the day-to-day affairs of CryptoZoo. *See In re Metawave Commc'ns Corp. Sec. Litig.*, 298 F. Supp. 2d 1056, 1091 (W.D. Wash. 2003). If anything, Plaintiffs' allegation that Defendant Strobel was Defendant Paul's administrative assistant lends more to her subordination than to her control. *See id*. (finding no control, in spite of title, where the defendant reported to his superior). For purposes of this Motion, the Court need not delve into the first requirement under Section 20(a)—whether the controlled person committed a primary violation—because Plaintiffs' Complaint is completely devoid of any indication Defendant Strobel exercised control.

### iii.    RICO

Although it is unclear as to whether the Complaint raises a RICO claim against Defendant Strobel, the Court nevertheless addresses the RICO claim, as the parties do in their other filings. (*See* Docs. 86, 91, 99). Plaintiffs argue, "CryptoZoo Inc. was one of Defendants Paul and Levin's entities for their criminal enterprise . . . ." (Doc. 81 at 108). Purportedly, "Defendants participated in an ongoing fraudulent enterprise led by Defendants Paul and Levin—who were previously engaged in a pattern of cryptocurrency and NFT-related rug-pulls and pump-and-dumps . . . ." *Id*. at 109. Plaintiffs go on to list a host of these fraudulent

enterprises, none of which Defendant Strobel seems to have been involved in. *See id*. Integral to these enterprises were the Defendants' public representations of them. *Id*. It is here that Plaintiffs concede Defendant Strobel, as opposed to her co-defendants, made no public statements. *Id*. Ostensibly, the goal of these endeavors is to publicly tout them as fruitful investment opportunities, thereby garnering interest and investments and then abruptly recoiling and absconding with the funds. *Id*. Defendant Strobel calls attention to two flaws in Plaintiffs' RICO claim. (Doc. 86 at 16–17). First, Plaintiffs' claim lacks evidence of a pattern of racketeering activity (i.e., at least two predicate acts under the RICO statute). *Id*. at 17. Second, Plaintiffs' collective attribution is especially fatal to their RICO claim, as caselaw expressly dictates a plaintiff must specify facts as to each defendant. *Id*. at 18. Once again, Plaintiffs' claim does not pass muster.

Although the Fifth Circuit has yet to explicitly clarify the breadth of RICO's nationwide process provisions, our sister court has noted—and this Court agrees—"[t]he more widely recognized and sound approach is to determine if a plaintiff has raised a 'colorable' RICO claim." *Fernandez-Lopez*, 2020 WL 9396523, at *10. Contrary to Defendant Strobel's contention, this is a less onerous burden than those prescribed by Federal Rules 12(b)(6) and 9. *See id*. Although a surmountable burden, a district court may dismiss RICO claims on jurisdictional grounds if it determines "(1) that the federal claim is immaterial and made solely for the purpose of obtaining jurisdiction, or (2) that the federal claim is wholly insubstantial and frivolous." *Fellows v. Universal Rests.*, *Inc.*, 701 F.2d 447, 449 (5th Cir. 1983). Again, whether Plaintiffs' RICO claim will ultimately prevail on the merits is not at issue. *Id.* at 449. Instead, the Court's narrow goal is to determine whether Plaintiffs have alleged facts sufficient to support a finding of personal jurisdiction over Defendant Strobel as to their RICO claim.

The RICO statute makes it "unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity . . . ." 18 U.S.C. § 1962(a). Generally, "[t]o establish a RICO violation, a plaintiff must prove four elements: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Brown v. Fid. Nat'l Title Grp.*, No. 18-CV-01148, 2020 WL 6106090, at \*17 (M.D. Fla. Aug. 5, 2020), *R. & R. adopted*, 2020 WL 5105435 (M.D. Fla. Aug. 31, 2020). Plaintiffs specifically allege a violation under 18 U.S.C. § 1962(c), which makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." (*See* Doc. 81 at 108). To prevail under this subsection, Plaintiffs must show "(1) the existence of an enterprise that affects interstate or foreign commerce, (2) that the defendant was employed by or associated with the enterprise, (3) that the defendant participated in the conduct of the enterprise's affairs, and (4) that the participation was through a pattern of racketeering activity." *United States v. Delgado*, 401 F.3d 290, 297 (5th Cir. 2005) (citations and quotation marks omitted). "An enterprise is a group of persons or entities associating together for the common purpose of engaging in a course of conduct." *Whelan v. Winchester Prod. Co.*, 319 F.3d 225, 229 (5th Cir. 2003). "To prove a pattern of racketeering activity, a plaintiff must show at least two predicate acts of racketeering that are related and amount to or pose a threat of continued criminal activity." *Tel-Phonic Servs., Inc. v. TBS Int'l, Inc.*, 975 F.2d 1134, 1139–40 (5th Cir. 1992). Alleging only one predicate act— i.e., involvement in only the criminal act at issue—is insufficient to prove a pattern under RICO. *See Fernandez-Lopez*, 2020 WL 9396523, at \*13. It is here Plaintiffs' RICO argument falters.

Although Plaintiffs list various other, presumably similar, enterprises, they do not implicate Defendant Strobel in any other than the one at issue. Plaintiffs simply aver, "Defendants participated in an ongoing fraudulent enterprise led by Defendants Paul and Levin—who were previously engaged in a pattern and practice of cryptocurrency and NFT-related rug-pulls and pump-and-dumps, including: Dink Doink; Liquid Marketplace; F*** Elon; EMAX; OMI; and Elon Gate." (Doc. 81 at 109). At least at this procedural stage, it is not for the Court to decide whether Plaintiffs' RICO claim has merit as to the other defendants. But with no indication whatsoever that Defendant Strobel was involved in any other allegedly criminal acts, the Court is wary of allowing Plaintiffs' RICO claim to serve as the basis for its jurisdiction over her. And as this district has done before, the Court declines to allow Plaintiffs to "couch their claims as falling under RICO simply for the purpose of obtaining jurisdiction over Defendants." *Fernandez-Lopez*, 2020 WL 9396523, at *13. Thus, for the narrow purpose of disposing of the instant Motion and based solely on the allegations pertaining to Defendant Strobel, Plaintiffs are ineligible for RICO's nationwide service provision.

### iv.    CEA Sections 4o and 22(a)

For their final argument, Plaintiffs alternatively allege Defendants violated Sections 4o and 22(a) of the CEA. (Doc. 81 at 110). Plaintiffs point to four acts to support this claim: Defendants (1) received and misappropriated Plaintiffs' funds, (2) misrepresented the development of the CryptoZoo game, (3) failed to provide accurate information to Plaintiffs about the status of the game, and (4) misrepresented the assets invested by the Founder Defendants. *Id.* at 110–11. As with her other federal-statute arguments, Defendant Strobel believes Plaintiffs alleged their CEA claims in a furtive attempt to create jurisdiction. (Doc. 86 at 13). Defendant Strobel also argues Plaintiffs' claim is not colorable. *Id.* at 14. Even if it were,

Plaintiffs once again failed to attribute any actionable conduct to Defendant Strobel. *Id.* at 15.

For reasons outlined below, the Court agrees with Defendant Strobel.

Section 4o of the CEA makes it

> unlawful for a commodity trading advisor, associated person of a commodity trading advisor, commodity pool operator, or associated person of a commodity pool operator, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly--
>> (A) to employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant; or
>> (B) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant.

7 U.S.C. § 6o. Section 22(a) provides a private right to action under the CEA.

*See* 7 U.S.C. § 25(a)(1)(A)–(D).

> To have standing under Section 22, a private plaintiff must fall into one of four categories: a plaintiff must either have (A) received trading advice from Defendants for a fee; (B) traded through Defendants or deposited money with Defendants in connection with a commodities trade; (C) purchased from or sold to Defendants or placed an order for purchase or sale of a commodity through them; or (D) engaged in certain market manipulation activities in connection with the purchase or sale of a commodity contract.

*Starshinova v. Batratchenko*, 931 F. Supp. 2d 478, 487 (S.D.N.Y. 2013). Once again, "[t]he plaintiff need only make 'a colorable showing that the defendant *might* be liable' under that statute." *Cox v. CoinMarketCap OPCO, LLC*, 112 F.4th 822, 836 (9th Cir. 2024) (citations and quotation marks omitted). As before, relevant considerations include "the defendant's purposeful conduct towards the forum, the relation between [her] conduct and the cause of action asserted against [her], and the reasonableness of the exercise of jurisdiction." *Id.* (citation omitted).

The Court can easily dispose of this claim because its elements are nearly indistinguishable from those under subsections (a) and (c) of Rule 10b-5 promulgated by the SEC, as analyzed above. *Compare* 17 C.F.R. § 240.10b-5 (making it unlawful to "employ any device, scheme, or artifice to defraud" and "engage in any act, practice or course of business which operates or would operate as fraud or deceit"), *with* 7 U.S.C. § 6o (making it unlawful to "employ any device, scheme, or artifice to defraud" and "engage in any transaction, practice, or course of business which operates as a fraud or deceit"). As with Plaintiffs' SEA claim, the Court struggles to see how the mere allegation that Defendant Strobel purchased CryptoZoo products at an artificially low value, without more, sufficiently qualifies as purposeful conduct giving rise to Plaintiffs' claim.

The Court nevertheless finds it prudent to distinguish the instant case from *Cox v. CoinMarketCap OPCO, LLC*, 112 F.4th 822 (9th Cir. 2024). In *Cox*, the plaintiff brought a CEA claim against various defendants for allegedly manipulating the price of a certain type of cryptocurrency. *Id*. at 826. There, the Ninth Circuit found jurisdiction proper over two in-state corporations based solely on their places of incorporation and principal places of business. *Id*. at 834. However, the *Cox* court only found it had general jurisdiction over those defendants, not specific. *See id*. Plaintiffs here, contrarily, do not assert this Court has general jurisdiction: "Plaintiffs do not claim to have general jurisdiction over Defendant [Strobel] but do have specific jurisdiction." (Doc. 91 at 1). Therefore, this Court is tasked with determining whether Defendant Strobel's admittedly sufficient contacts with the United States give rise to or are related to Plaintiffs' CEA claim. And as discussed, they do not.

To reiterate, this Court, for purposes of disposing of this Motion, expresses no opinion as to whether Plaintiffs' claims have merit. Instead, the Court merely finds that, based on the

conduct alleged, Defendant Strobel possesses insufficient contacts related to the claims alleged. And, because the Court concluded Defendant Strobel lacks sufficient contacts to support this Court's exercise of specific jurisdiction over her, the burden does not shift to her to establish the third and final prong—fairness and reasonableness. *Hardy v. Scandinavian Airlines Sys.*, 117 F.4th 252, 265 (5th Cir. 2024). In other words, "a court does not need to consider the fairness of exercising personal jurisdiction where a plaintiff fails to establish the existence of the requisite minimum contacts." *Border Steel, Inc. v. Pac. Century Customs Serv., Inc.*, 500 F. Supp. 2d 655, 661 (W.D. Tex. 2006); *Felch v. Transportes Lar-Mex SA DE CV*, 92 F.3d 320, 329 n.20 (5th Cir. 1996); *Galesburg 67, LLC v. Nw. Television, Inc.*, No. 13-CV-384, 2014 WL 10121177, at *6 (W.D. Tex. Aug. 27, 2014).

### 7. Federal Statutory Claims as to International Plaintiffs

Although the Court has already concluded Plaintiffs' federal statutory claims do not support a finding of personal jurisdiction over Defendant Strobel, regardless of each member's residence, it will nevertheless address Defendant Strobel's final ground for dismissal. Of Plaintiffs' class, 3 are Texas residents, 35 are residents of states other than Texas, and 102 are residents of foreign countries. (Doc. 81 at 22–41). Defendant Strobel argues the federal statutory claims are unavailable to the international plaintiffs, as there exists a presumption against extraterritorial application of the federal statutes. (Doc. 86 at 18). Although Plaintiffs failed to respond to this argument, the Court nevertheless agrees with Defendant Strobel—subject to certain caveats.

It is true, "[t]he presumption against extraterritorial application provides that when a statute gives no clear indication of extraterritorial application, it has none." *United States v. Kaluza*, 780 F.3d 647, 669 n.14 (5th Cir. 2015) (alteration in original) (citing *Kiobel v. Royal*

*Dutch Petroleum Co.*, 569 U.S. 108, 108 (2013)). In other words, Defendant Strobel is correct: there is a rebuttable presumption against the extraterritorial application of the federal statutes alleged by Plaintiffs. *See Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 261–266 (2010) ("[T]he focus of the Exchange Act is not upon the place where the deception originated, but upon purchases and sales of securities in the United States. Section 10(b) [and Rule 10b-5] do[] not punish deceptive conduct, but only deceptive conduct in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered."); *Starshinova*, 931 F. Supp. 2d 478  (extending the presumption against extraterritorial application to CEA claims). However, it is only a rebuttable presumption, not an unwavering bar. *See generally Morrison*, 561 U.S. 247. And more relevant to this Motion, what Defendant Strobel fails to recognize is 38 of the 140 plaintiffs are United States residents, all of whom purchased CryptoZoo products domestically and to whom the federal statutes do, in fact, apply. (Doc. 81 at 22–4). The Court simply makes note of this to demonstrate that, although Plaintiffs did not respond to this argument, Defendant Strobel's extraterritorial-application argument, alone, would not warrant dismissal.

### 8. Jurisdictional Discovery

In their Response, Plaintiffs request jurisdictional discovery in the event of an unfavorable ruling. (Doc. 91 at 6–7). Defendant Strobel, unsurprisingly, is opposed. (Doc. 99 at 9–10). She argues Plaintiffs failed to make a preliminary showing of jurisdiction, as is required before a court can grant jurisdictional discovery. The Court agrees.

"If a plaintiff presents factual allegations that suggest with reasonable particularity the possible existence of the requisite contacts[,] the plaintiff's right to conduct jurisdictional discovery should be sustained." *Fielding v. Hubert Burda Media, Inc.*, 415 F.3d 419

(5th Cir. 2005) (quoting *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 456 (3d Cir. 2003)). "The decision to permit such discovery is within the court's discretion." *Bar Grp., LLC v. Bus. Intel. Advisors, Inc.,* 215 F. Supp. 3d 524, 545 (S.D. Tex. 2017). When, as here, the motion to dismiss raises no issues of fact and a lack of jurisdiction is evident, the Court should deny jurisdictional discovery. *Kelly v. Syria Shell Petroleum Dev. B.V.*, 213 F.3d 841, 855 (5th Cir. 2000). Moreover, the Fifth Circuit has authorized denial of jurisdictional discovery when plaintiffs do not "describe the discovery they contend should have been allowed, what facts they hoped to obtain from such discovery, or how it would produce information that would support specific jurisdiction." *Id*.

Here, the issue is not factual accuracy, but sufficiency. Stated differently, the parties do not seem to disagree as to the existence of Defendant Strobel's forum contacts, but rather as to whether they sufficiently confer this Court jurisdiction over her. Moreover, nowhere do Plaintiffs with any semblance of specificity describe what they expect jurisdictional discovery would generate or how those facts might support a finding of jurisdiction. Accordingly, the Court is of the opinion jurisdictional discovery is not warranted.

### 9. Leave to Amend

In addition to jurisdictional discovery, Plaintiffs also request leave to amend their complaint. (Doc. 91 at 6–7). Defendant Strobel believes, given the age of the case and the previous opportunity to amend, further amendments are not justified. (Doc. 99 at 9–10).

Federal Rule of Civil Procedure 15 instructs this Court to "freely give leave when justice so requires." FED. R. CIV. P. 15(a)(2). District courts consider several factors in determining whether to grant leave to amend, such as undue delay, bad faith or dilatory motive, repeated failures to cure deficiencies, undue prejudice to the opposing party, and futility of amendment.

*In re Am. Refinery, Inc.*, 676 F.3d 455, 466–67 (5th Cir. 2012) (internal citations omitted). Ultimately, however, the decision to grant or deny leave to amend is within the sound discretion of the district court. *Pervasive Software Inc. v. Lexware GmbH & Co. KG*, 688 F.3d 214, 232 (5th Cir. 2012) (citing *Wimm v. Jack Eckerd Corp.*, 3 F.3d 137, 139 (5th Cir. 1993)).

Although Plaintiffs have exhibited no undue delay or dilatory motive, all other factors weigh in favor of denying leave to amend. First, Plaintiffs have had an opportunity to amend and cure any deficiencies. Plaintiffs' initial complaint was filed on February 2, 2023, raised eight causes of action, and contained nearly identical facts pertaining to Defendant Strobel as the Complaint at issue. (Docs. 1, 81). Although nineteen claims and eighty-nine pages longer, the instant Complaint no further dispels the Court's concern that it lacks jurisdiction over Defendant Strobel. (Doc. 81). At the time of this ruling, nearly two and a half years have elapsed since Plaintiffs filed suit, and Defendant Strobel has expended resources on various filings, including two motions to dismiss. (Docs. 22, 86). And once again, Plaintiffs do not indicate they have more facts attributable to Defendant Strobel that might support a finding of jurisdiction. On the contrary, they believe the facts as presented are sufficient. In sum, the Court is of the opinion Plaintiffs have had ample opportunity to cure deficiencies, Defendant Strobel would be prejudiced if Plaintiffs were granted leave, and even so, amendment would be futile.

## IV.    RECOMMENDATION

In accordance with the above discussion, the Court **RECOMMENDS** Defendant Strobel's Rule 12(b)(2) Motion to Dismiss be **GRANTED** and Plaintiffs' claims against Defendant Strobel be **DISMISSED WITHOUT PREJUDICE**. (Doc. 86).

SIGNED THIS 7TH DAY OF JULY, 2025.

_____
RONALD C. GRIFFIN
UNITED STATES MAGISTRATE JUDGE

**INSTRUCTIONS FOR SERVICE AND NOTICE OF RIGHT TO APPEAL/OBJECT**

In the event that a party ***has not been served*** by the Clerk with this Report and Recommendation electronically, pursuant to the CM/ECF procedures of this District, the Clerk is **ORDERED** to mail such party a copy of this Report and Recommendation by certified mail. Pursuant to 28 U.S.C. § 636(b)(1), any party who desires to object to this report must serve and file written objections within fourteen (14) days after being served with a copy. A party filing objections must specifically identify those findings, conclusions, or recommendations to which objections are being made; the District Judge need not consider frivolous, conclusive, or general objections. Such party shall file the objections with the Clerk of the Court and serve the objections on all other parties. A party's failure to file such objections to the proposed findings, conclusions, and recommendations contained in this report shall bar the party from a *de novo* determination by the District Judge. Additionally, a party's failure to file written objections to the proposed findings, conclusions, and recommendations contained in this report within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Judge. *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996).