**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **DON HOLLAND, individually and on behalf of all others similarly situated,** *Plaintiff,* | § § § | |
| **v.** | § § | **1:23-CV-00110-ADA-RCG** |
| **CRYPTOZOO INC., a Delaware Corporation; LOGAN PAUL; DANIELLE STROBEL; JEFFREY LEVIN; EDUARDO IBANEZ; JAKE GREENBAUM a/k/a CRYPTO KING; and OPHIR BENTOV a/k/a BEN ROTH;** *Defendants.* | § § § § § § § § § | |

## REPORT AND RECOMMENDATION OF THE U.S. MAGISTRATE JUDGE

BEFORE THE COURT is Defendant Logan Paul's ("Defendant Paul") Rule 12(b)(6) Motion to Dismiss. (Doc. 85).[1] This case is before the undersigned through a Standing Order pursuant to 28 U.S.C. § 636 and Appendix C of the Local Court Rules for the Assignment of Duties to United States Magistrate Judges. After due consideration of the Parties' briefs and case law, the Court **RECOMMENDS** Defendant Paul's Motion to Dismiss be **GRANTED**. (Doc. 85).

### I.    BACKGROUND

This case stems from a dispute surrounding a game called CryptoZoo. (Doc. 81 at 6). It all began when Defendant Paul—an online entertainer with a sizeable following—concocted an idea to launch a "passion project" of his. *Id.* at 7, 41. Around February of 2021, Defendant Paul began meeting with Jeffrey Levin ("Defendant Levin"), Eduardo Ibanez ("Defendant Ibanez"), Jake Greenbaum ("Defendant Greenbaum"), and Danielle Strobel ("Defendant Strobel") (collectively, "Founder Defendants")—the then soon-to-be founders of CryptoZoo Inc.

---

1. All citations are to CM/ECF generated pagination, unless otherwise noted.

("CryptoZoo"). *Id*. at 41–43. CryptoZoo's general scheme—at least, in theory—was this: through the game, purchasers would buy digital assets in the form of Zoo Tokens, which could in turn be used to purchase other CryptoZoo products, such as CryptoZoo Non-Fungible Tokens ("CZ NFTs"). *Id*. at 7. NFTs are unique digital assets that exist on a blockchain, "which acts as a public accounting ledger." *Id*. at 20. In essence, purchasers could buy Zoo Tokens through CryptoZoo and use them to buy CZ NFTs, which appeared on the game in the form of eggs. *Id*. at 8. To the Court's understanding, the CZ NFT eggs would hatch into various different animals, which could then be bred to form hybrid animals, each varying in value. *Id*. And those CZ NFTs in turn could earn holders more Zoo Tokens—the game's form of currency. *Id*. Along with the cryptocurrency components, Defendants contemplated forming a CryptoZoo online community to discuss the game. *Id*. at 7. Having devised their plan for the game, Founder Defendants hired Ophir Bentov ("Defendant Bentov") (collectively, "Defendants") to manage developers and maintain the community. *Id*. And thus the concept of CryptoZoo was born.

Prior to any public promotion, Defendants communicated via group chat to discuss the logistics of how the cryptocurrency facets of the game would function. *Id*. at 44. On April 14, 2024, Defendant Ibanez informed the other defendants, including Defendant Paul, that Zoo Tokens could be traded as securities:

> Eddie Ibanez
>
> There would be close no gas fee's if I did an ERC1155 token as I can bundle actions & transactions into 1 VS having to create a smart contract every time.
>
> It can also transact as a currency (fungible) and as a nonfungible token (animal) -
> It allows for multiple tokens under
> One contract. ==The same token can trade as a security & NFT if we wanted.==

*Id*. In the same chat, Defendants also discussed a presale of Zoo Tokens but ultimately decided against it out of concern for potential consequences with the Securities and Exchange Commission ("SEC"):



*Id*. at 45. Instead, Defendants decided to lock Zoo Tokens in a liquidity pool accessible only to them and those of their choosing, so as to effectuate a presale-adjacent distribution without attracting SEC "eyeballs": [2]

> jake the crypto king
>
> If we can't sell, no presale. We can still trade em in the liquidity pool.

> jake the crypto king
>
> 1. We mint tokens via a wallet address (new phone or just need wallet doesn't matter). 2. We lock tokens in a liquidity pool from that same wallet address. 3. We lock team tokens to be distributed over months to the founders that have token allocations. 4. We begin buying out of the liquidity pool. 5. Once the team has exhausted funds for the liquidity pool buying we send the contract address to friends/family/investors who want to be able to get in that have heard about it. 5. As long as trusted team members have the back up words I can't do anything with locked tokens, and if I perish when they unlock u can access them. Or we just use a different new phone but than same situation, who holds it, who holds back up words.

---

2. "[J]ake the crypto king" refers to Defendant Greenbaum. (Doc. 81 at 42).

*Id*. According to the Complaint, CryptoZoo products were made available for purchase by Defendants on May 27, 2021, and again on June 11, 2021. *Id*. And purchase they did. *Id*. at 50. On June 11, 2021—what Defendants referred to as "Zoo Day"—prior to any public promotion, Defendants surreptitiously released CryptoZoo products on the blockchain and bought them "at an artificially low value" from the liquidity pool. *Id*. Allegedly, "[s]oon after the project was publicly announced, [Defendant] Ibanez, [Defendant] Greenbaum, and potentially other Defendants, sold large amounts of the digital products for an immediate and large profit." *Id*.

Around August of 2021, Defendant Paul began promoting the game. *Id*. at 46. On his YouTube channel, Defendant Paul touted CryptoZoo as "so fun" and "a really fun game that makes you money." *Id*. at 7. He further disclosed CryptoZoo was backed by a "massive team" and was funded by "like a million dollars." *Id*. at 46. Don Holland ("Plaintiff Holland"), Alex Heikali ("Plaintiff Heikali"), Mourad Kechichian ("Plaintiff Kechichian"), and the 137 other plaintiffs in this suit (collectively, "Plaintiffs") were only some of approximately 20,000 people who caught wind of and subsequently purchased CryptoZoo products. *Id*. at 52. According to the Complaint, Plaintiffs Holland and Heikali learned of CryptoZoo from their son and friend, respectively, and decided to purchase CryptoZoo products shortly after its unveiling. *Id*. at 46. Each of the 140 plaintiffs invested, and eventually lost, anywhere from $100 to $350,000. *Id*. at 22–41. Even after the initial surge of purchases following CryptoZoo's launch had subsided, Defendant Paul continued to assure the public of his project's potential:

> I think CryptoZoo is the most important thing we're doing. Kids are going to care about the blockchain because of my project. Imagine if your first experience on the blockchain is with CryptoZoo. We're coming up with really, really fun plans for six months, a year down the line, two years down the line. Like this could be one of the biggest things I do.

*Id*. at 47. At one point Defendants' statements indicated the game was completed and tested in 2021; however, Defendants' public announcements in 2024 revealed the game was functional and finalized in 2023, and that Defendants, themselves, had personally played it.[3] *Id*. at 7. Plaintiffs first waited months, and eventually years, for its arrival. *Id*. All the while, Plaintiffs continued to purchase or possess CryptoZoo products. *Id*. at 13.

Plaintiffs claim there was a falling out between Defendants Paul and Greenbaum, resulting in Defendant Greenbaum's expulsion from the group. *Id*. at 47. Amidst internal company turmoil, the value of CryptoZoo products waxed and waned. *Id*. Allegedly, Defendants never paid the software developer, so they never received the code necessary to get the game off the ground. *Id*. at 48. And yet, Defendant Paul's reassurances streamed in. *Id*. at 48–49. Referring to the logistical hurdles Defendants faced in development, Defendant Paul made the following statements, indicating the game was forthcoming:

> Artists working around the clock.
>
> Retroactively working to make these projects right and just takes time bro. It just takes f***ing time bro. Development takes time.
>
> Working backwards to fix things, which isn't ideal, but also this project will speak for itself.
>
> And now, you know, we're working backwards to try and fix it.

*Id*. At bottom, Plaintiffs contend Defendant Paul promised, in spite of the speedbumps along the way, "he was still going to complete the game—inducing more investors/customers to buy CryptoZoo products . . . ." *Id*. at 13. By way of evidence of the impact of Defendant Paul's assurances, Plaintiffs provide a table with CryptoZoo's trading volume, both pre- and post-

---

3. Discussed in further detail in the fraud section, based on the Complaint, it is not entirely clear which defendants made what statements.

statement, with the figures increasing after Defendant Paul reiterated his continued devotion to the game:



*Id*. Unfortunately for Plaintiffs, Defendant Paul's statements proved less than prophetic, as the long-awaited game never came to be. *Id*. at 7.

Eventually, Defendant Paul admitted—in a since-deleted video—in reality, CryptoZoo would not make users money and was not backed by a massive team. *Id*. at 46. And in 2024, Defendant Paul finally announced the CryptoZoo game would "not be released." *Id*.  As a way "to make whole those who intended to play CryptoZoo[,]" Defendant Paul instituted a buy-back program, whereby he promised to repurchase Plaintiffs' CZ NFTs for their "original purchase price." *Id*. at 8. Plaintiffs take issue with the buy-back program, arguing, much like the game itself, its reality does not mirror Defendant Paul's representations. *Id*. First, Defendant Paul's

offer of 0.1 Ethereum[4] for each CZ NFT returned "omit[s] the economic reality that Ethereum's dollar-value has gone down nearly 50% since the initial sale of CryptoZoo products over two years ago[.]" *Id*. Second, not all CryptoZoo product-holders are eligible. *Id*. Only "base egg and base animal" holders qualify; those who possess Zoo Tokens or hybrid animal NFTs are ineligible. *Id*. And purchasers "spent much more on Zoo Tokens than CZ NFTs by almost a factor of ten." *Id*. at 9. Also ineligible are those who purchased CryptoZoo products, quickly disposed of them when they saw the writing on the wall, and consequently lost money. *Id*. at 14. Finally, Defendant Paul made program participation contingent on participants' waiver and release of all CryptoZoo-related claims. *Id*. at 8.

Outraged at Defendant Paul's purportedly lackluster attempt at recompense, purchasers took to social media to ask Defendant Paul questions and express discontent. *Id*. at 14. One purchaser asked Defendant Paul what remedies exist for those who sold their products in an attempt to salvage what money they could upon hearing the project was abandoned. *Id*. Defendant Paul's reply? Tough luck.[5]

---

4. "One type of cryptocurrency coin is Ether (ETH), created and used in the Ethereum blockchain network." *Van Loon v. Dep't of the Treasury*, 122 F.4th 549, 555 (5th Cir. 2024). Based on the parties' briefing the Court understands the value of this cryptocurrencies, as with other kinds, fluctuates with the market. (Docs. 81 at 8, 85 at 5 n. 5).

5. The Court understands Defendant Paul's use of "^" to express agreement with KingVincent6's comment, "If you sell you lose . . common investing knowledge[.]" (Doc. 81 at 14).



*Id.* With purchasers continuing to buy CryptoZoo products, Defendant Paul finally admonished the public against doing so because he did not want to be liable for anyone's "investment decisions":



*Id*. at 14–15. Plaintiffs are frustrated with Defendant Paul's buy-back program comments, not only as a result of the degree to which he qualifies eligibility, but also because, in direct contradiction to his apparent agreement with the above comments, he persistently points to CryptoZoo's governing documents in claiming Zoo Tokens are not investment vehicles:



*Id*. at 15. All in all, while Defendant Paul paints himself as a hapless bystander to a series of unfortunate events, Plaintiffs believe him to be a "snake-oil salesman," who pulled the wool over their eyes by inducing them to purchase "patently worthless" products in the name of greed and whose buy-back program is nothing more than feigned altruism. *Id*. at 6, 11. And so arose the instant dispute.

Plaintiffs filed their Original Complaint on February 2, 2023. (Doc. 1). Notably, Defendant Paul filed his Answer, containing affirmative defenses and crossclaims on January 4, 2024. (Doc. 55). With leave of court, Plaintiffs filed their First Amended Class Action Complaint (the "Complaint" or "Amended Complaint")—the live pleading before the Court—on August 19, 2024. (Doc. 81). On August 30, 2024, Defendant Paul filed his Rule 12(b)(6) Motion to Dismiss. (Doc. 85). Plaintiffs responded on October 16, 2024 (Doc. 92), and Defendant Paul replied on November 8, 2024 (Doc. 96). Consequently, the instant matter is ripe for disposition.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) allows a party to move for the dismissal of a complaint for "failure to state a claim upon which relief can be granted." To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. A claim for relief must contain: (1) "a short and plain statement of the grounds for the court's jurisdiction"; (2) "a short and plain statement of the claim showing that the pleader is entitled to the relief"; and (3) "a demand for the relief sought." FED. R. CIV. P. 8(a). A plaintiff "must provide enough factual allegations to draw the reasonable inference that the elements exist." *Innova Hosp. San Antonio, L.P. v. Blue Cross & Blue Shield of Ga., Inc.*, 995 F. Supp. 2d 587, 602 (N.D. Tex. 2014) (citing *Patrick v. Wal–Mart, Inc.-Store No. 155*, 681 F.3d 614, 617 (5th Cir. 2012)); *see also Torch Liquidating Tr. ex rel. Bridge Assocs. L.L.C. v. Stockstill*, 561 F.3d 377, 384 (5th Cir. 2009) ("[T]he complaint must contain either direct allegations or permit properly drawn inferences to support every material point necessary to sustain recovery" (internal quotation marks and citations omitted)).

In a court's review of a motion to dismiss under Rule 12(b)(6), all factual allegations from the complaint should be taken as true, and the facts are to be construed in the light most favorable to the nonmoving party. *Fernandez-Montes v. Allied Pilots Assoc.*, 987 F.2d 278, 284 (5th Cir. 1993). Still, a complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

"'[N]aked assertions' devoid of 'further factual enhancement,'" and "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to the presumption of truth. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557); *see R2 Invs. LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005) (finding the Court should neither "strain to find inferences favorable to plaintiffs" nor accept "conclusory allegations, unwarranted deductions, or legal conclusions.").

"Fraud claims are subject to the heightened pleading standard of Rule 9(b), under which 'a party must state with particularity the circumstances constituting fraud.'" *Poe v. Bock*, No. EP-CV-17-00232, 2018 WL 4677901, at *2 (W.D. Tex. June 11, 2018) (quoting FED. R. CIV. P. 9(b)), *R. & R. adopted*, 2018 WL 4275839 (W.D. Tex. Sept. 7, 2018). The Fifth Circuit has interpreted this to mean a plaintiff "must specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 177 (5th Cir. 1997). Stated differently, "[a] claim of fraud must allege the 'who, what, when, and where.'" *Big Thirst, Inc. v. Donoho*, 657 F. Supp. 3d 914, 924 (W.D. Tex. 2023) (quoting *Williams*, 112 F.3d at 178). In the corporate context, "plaintiffs must plead when each defendant or other corporate officer learned that a statement was false, how that defendant learned that the statement was false, and the particular document or other source of information from which the defendant came to know that the statement was false." *Schnurr v. Preston*, No. 5-17-CV-512, 2018 WL 8584292, at *3 (W.D. Tex. May 29, 2018). Courts cannot presume fraud from vague allegations. *Id*.

### III.    DISCUSSION

#### 1.  Pre-Motion Answer

Before analyzing the substantive aspects of this case, the Court addresses a procedural issue. Although neither party addressed it in its briefing, Defendant Paul filed a pre-motion answer to the Original Complaint. (Doc. 55). Generally, "Rule 12(b)(6) requires that motions for failure to state a claim must be made before an answer is submitted." *Barnett v. Forest River, Inc.*, No. 17-CV-99, 2017 WL 7733052, at *4 n.1 (E.D. Tex. Nov. 29, 2017). In other words, a Rule 12(b)(6) motion filed after an answer is technically untimely. *See Dolenz v. Akin*, No. 95-CV-1605, 1997 WL 21388, at *1 (N.D. Tex. Jan. 14, 1997), *aff'd per curiam*, 129 F.3d 612 (5th Cir. 1997). However, the Fifth Circuit has crafted an exception to accommodate such circumstances: untimely Rule 12(b)(6) motions to dismiss are to be treated as Rule 12(c) motions for judgment on the pleadings "based on a failure to state a claim on which relief may be granted." *Jones v. Greninger*, 188 F.3d 322, 324 (5th Cir. 1999). The rationale behind this is the only "difference between a motion to dismiss pursuant to Rule 12(b)(6) and a motion pursuant to Rule 12(c) is a matter of timing." *In re Morrison*, 421 B.R. 381, 388 (Bankr. S.D. Tex. 2009) (citation and quotation marks omitted) (construing a post-answer Rule 12(b)(6) motion as a Rule 12(c) motion even though the pleadings had not yet closed). Thus, "[a] motion under Rule 12(c) for failure to state a claim is subject to the same standards as a motion to dismiss under Rule 12(b)(6)." *In re Great Lakes Dredge & Dock Co. v. Dock Co.*, 624 F.3d 201, 209–10 (5th Cir. 2010) (citing *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008)); *Great Plains Tr. Co. v. Morgan Stanley Dean Witter Co.*, 313 F.3d 305, 312 (5th Cir. 2002). "And legal arguments raised in Rule 12(b)(6) motions are not waived if not raised pre-answer and may be raised in a Rule 12(c) motion or as late as trial." *1901 Gateway Holdings, LLC v. CentiMark*

*Corp.*, No. 21-CV-2607, 2023 WL 5807012, at *2 (N.D. Tex. Sept. 7, 2023). Here, because Defendant Paul answered prior to filing his Rule 12(b)(6) Motion to Dismiss, his Motion should be construed as a Rule 12(c) motion for judgment on the pleadings. (Docs. 55, 85). But because the standard does not differ and the parties consistently refer to his Motion as a motion to dismiss, the Court here does the same for consistency's sake.[6]

### 2. Applicable Substantive Law

Much to the Court's frustration, Plaintiffs provide no briefing on the applicable law in this case. (Docs. 81, 92). While the Court appreciates that Defendant Paul at least pays lip service to the applicable law and ultimately decides to focus on Texas and California law, Plaintiffs neglect the issue entirely. (Docs. 85 at 34; 81; 92). In the absence of guidance, the Court clarifies the applicable law.

The issue here is not a simple one. The Court must decide what law applies in a federal question case, in which a class of 140 plaintiffs—consisting of 3 Texas residents, 34 residents of states other than Texas, and 103 residents of foreign countries—bring federal statutory claims, as well as a variety of supplemental common law claims and state statutory claims of 13 different states. (Doc. 81). Normally, "a federal district court must apply the state law that would be applied by the state court of the state in which it sits. This is true whether the basis for subject matter jurisdiction is diversity of citizenship under 28 U.S.C. § 1332 or federal question under 28 U.S.C. § 1331." *Shannon-Vail Five Inc. v. Bunch*, 270 F.3d 1207, 1210 (9th Cir. 2001). That means this Court should apply Texas' choice-of-law rules. *Gulf Consol. Servs., Inc. v. Corinth*

---

6. The Court finds it important to note, on August 29, 2024, after Plaintiffs filed their Amended Complaint, Defendant Paul sought leave to exceed the page limitations prescribed by the Local Rules as to his Motion to Dismiss. (Doc. 84). This request was unopposed. *Id.* The next day, the Court granted Defendant Paul's extension and docketed his Motion to Dismiss. (Doc. 85). Therefore, to deny Defendant Paul the opportunity to move to dismiss Plaintiffs' claims would not only be against the weight of authority, but it would also be contradictory on the Court's part. As such, the Court assesses Defendant Paul's Motion to Dismiss in its entirety.

*Pipeworks, S.A.*, 898 F.2d 1071, 1075 (5th Cir. 1990) ("A federal court must follow the choice-of-law rules of the state in which it sits."). The Texas choice-of-law rules are claim-specific. *See Melton v. Borg-Warner Corp.*, 467 F. Supp. 983, 985 (W.D. Tex. 1979) ("[I]n tort actions Texas courts apply the traditional tort choice of law rule Lex loci delictus, the law of the place of the tort."); *Quicksilver Res., Inc. v. Eagle Drilling, LLC*, 792 F. Supp. 2d 948, 951 (S.D. Tex. 2011) ("In the absence of an applicable choice of law provision in a contract, this court applies Texas law unless a conflict exists between Texas law and that of the other proposed state."). The analysis becomes particularly sticky when assessing Plaintiffs' common law claims. Take Plaintiffs' fraudulent inducement claim, for example. Where is the site of injury where Plaintiffs were allegedly induced by Defendant Paul's statements in 14 different states and approximately 31 foreign countries? Or, for Plaintiffs' breach-of-contract claim, against which state (or foreign country) should the Court analyze whether a conflict exists? The possibilities are about as endless as selection is tedious. In the name of sanity, many courts have adopted a simpler approach: "[T]he parties appear to assume without argument that Texas law governs, and so, without deciding, shall we." *Access Telecom, Inc. v. MCI Telecomms. Corp.*, 197 F.3d 694, 705 (5th Cir. 1999); *see Thompson & Wallace of Memphis, Inc. v. Falconwood Corp.*, 100 F.3d 429, 436 n.5 (5th Cir. 1996) ("As both sides argue this issue under Texas law, we apply Texas law in our analysis and assume that no one disputes its applicability."); *Broussard v. First Tower Loan, LLC*, 150 F. Supp. 3d 709, 730 n.5 (E.D. La. 2015) ("Yet none of the parties briefed the Court on the choice-of-law issue, and the parties' memoranda apply Louisiana law. Consequently, the Court applies Louisiana law . . . ."); *Marquis v. OmniGuide, Inc.*, No. 3-09-CV-2092, 2011 WL 321112, at *8 (N.D. Tex. Jan. 28, 2011) ("Both parties apply Texas law in their briefing, and in the absence of disagreement, this court does as well."); *Morlock, LLC v.*

*Petteway*, No. 4-21-CV-03202, 2024 WL 4265811, at *8 n.3 (S.D. Tex. Sept. 23, 2024) ("Neither Party disputes that Texas law applies, and both Parties exclusively cite Texas law."). Thus, the consensus seems to be, absent dissent or any indication to the contrary, courts apply the law applied by the parties in their briefing.

Here, as mentioned, Plaintiffs are silent on the issue. (Docs. 81, 92). However, in their Response, Plaintiffs almost exclusively cite to Texas courts and courts in the Fifth Circuit— nearly all applying Texas law—for their common law claims. (Doc. 92). Meanwhile, Defendant Paul briefly addresses the issue's complexity in his Motion, ultimately opting to focus on Texas and California law. (Doc. 85 at 34). The majority of Defendant Paul's cases apply Texas law, but he seems to address California law out of caution, given that two of the three co-lead plaintiffs reside there. *Id*. Likewise, the overwhelming majority of cases in Defendant Paul's Reply apply Texas law. (Doc. 96). Based on the parties' briefing, it is abundantly clear they are not opposed to the application of Texas law to Plaintiffs' common law claims. The Court therefore follows suit and applies Texas law to Counts 1 through 8—Plaintiffs' common law causes of action. As for Counts 9 through 23, the state statutory claims, the Court (predictably) applies the laws of the state to which each respective claim belongs. *See In re Gas Reclamation, Inc. Sec. Litig.*, 659 F. Supp. 493 (S.D.N.Y. 1987) (applying Texas law to an alleged Texas Deceptive Trade Practices Act violation). And for the final four counts, all of which are alleged federal statute violations, the court applies federal law. *Brown v. United States*, 890 F.2d 1329, 1341 (5th Cir. 1989) ("It is axiomatic that federal law controls the interpretation of federal statutes and regulations.").

In the event the parties disagree as to the Court's determination of applicable law (read: the law applied pervasively throughout the parties' papers), they may brief the Court on the appropriate law to be applied to each claim and its implications as to the 34 residents of other

states, as well as the 103 foreign residents. The Court now turns to Defendant Paul's asserted grounds for dismissal.

### 3. Shotgun Pleading and Group Pleading

Defendant Paul raises two overarching qualms with the Complaint. First, he argues Plaintiffs' incorporation of each count into the next—or "shotgun pleading"—is improper and cause for dismissal. (Doc. 85 at 8–10). Second, he takes issue with Plaintiffs' employment of "group pleading," or collective attribution of conduct to "Defendants" or "Founder Defendants." *Id*. For these reasons, according to Defendant Paul, the Complaint does not comply with Rule 8(a)(2). *Id*. The Court addresses each in turn.

Defendant Paul argues, in committing the "sin" of shotgun pleading, the Complaint does not pass Rule 8(a)(2)'s muster. *Id*. Defendant Paul believes the Complaint violates Rule 8(a)(2) by incorporating each count into the next and then, in the final paragraph, adding "[e]very paragraph in this Complaint is hereby incorporated into every other paragraph." (Doc. 85 at 9 (quoting Doc. 81 at 113)). The rule provides, a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). "A shotgun/group pleading is a complaint that violates either Federal Rule of Civil Procedure 8(a)(2) or Rule 10(b), or both." *Hubbard v. Crow*, No. 23-CA-580, 2024 WL 5036668, at *5 (W.D. Tex. Sept. 18, 2024) (internal citations and quotation marks omitted). "A shotgun pleading is one that sets forth an excessive number of facts and then asserts in a conclusory fashion that each of those facts supports a number of legal claims, with the result that 'each count is replete with factual allegations that could not possibly be material to that specific

count, and that any allegations that are material are buried beneath innumerable pages of rambling irrelevancies.'" *Martin v. Tesoro Corp.*, No. 2-11-CV-1413, 2012 WL 1866841, at *2 (W.D. La. May 21, 2012) (quoting *Magluta v. Samples*, 256 F.3d 1282, 1284 (11th Cir. 2001)). "However, '[t]o require Plaintiffs to recount the specific facts upon which each claim rests when stating that claim would require Plaintiffs to repeat [several] pages of facts with respect to each claim[,] . . . [and] would render the pleading unwieldy and would detract from, rather than add to, its clarity.'" *Martinez v. Foster*, No. 4-13-CV-59, 2017 WL 9250304, at *5 (E.D. Tex. Mar. 13, 2017) (first and second alterations and omission in original) (quoting *Martinez v. Nueces County*, No. 2-13-CV-178, 2013 WL 6190519, at *3 (S.D. Tex. Nov. 26, 2013)), *R. & R. adopted*, No. 4-13-CV-59, 2017 WL 1173370 (E.D. Tex. Mar. 30, 2017). Here, although Plaintiffs incorporate some paragraphs into others, they do not include extraneous or excessive facts. (Doc. 81). And the Court is able to gather which facts pertain to which counts. Accordingly, the Complaint does not run afoul of the general bar against shotgun pleading.

Defendant Paul next argues Plaintiffs' engagement in impermissible group pleading calls for the Complaint's dismissal in its entirety. (Doc. 85 at 9–10). Although the Complaint refers to Defendant Paul by name 72 times, many allegations are attributed to Defendants collectively, without specifying which defendant is responsible for the allegedly reprehensible conduct. (Doc. 81). It is true, the Fifth Circuit does not look kindly on group pleading. *Stephens v. Uranium Energy Corp.*, No. H-15-1862, 2016 WL 3855860, at *13 (S.D. Tex. July 15, 2016) ("The Fifth Circuit has repeatedly 'rejected the group pleading doctrine.'") (quoting *Owens v. Jastrow*, 789 F.3d 529, 537 (5th Cir. 2015)). Defendant Paul argues this deficiency, alone, warrants dismissal and cites to *Noble Capital Texas Real Estate Income Fund LP v. Newman*, No. 1-22-CV-652, 2023 WL 3035411 (W.D. Tex. Jan. 13, 2023), *R. & R. adopted*, 2023 WL

3035399 (W.D. Tex. Feb. 22, 2023) in support of his assertion. But *Noble* is distinguishable. In *Noble*, the group pleading was more egregious, and "at least one person named as a defendant [was] not mentioned again after the second page [of the complaint]." 2023 WL 3035411, at *3. Here, as mentioned, Defendant Paul's name appears 72 times throughout the Complaint. (Doc. 81). And "the Fifth Circuit's disdain for group pleading is not absolute." *Genesee Cnty. Emps.' Ret. Sys. v. FirstCash Holdings Inc.*, 667 F. Supp. 3d 295, 327 (N.D. Tex. 2023). Nor does group pleading always call for dismissal. *See Commodity Futures Trading Comm'n v. Cartu*, No. 1-20-CV-908, 2023 WL 5246360, at *9 (W.D. Tex. Aug. 15, 2023) ("Although the amended complaint does not always specify which Defendants performed which actions, it does not engage in impermissible group pleading."); *see also Martinez v. City of N. Richland Hills*, 846 F. App'x 238, 243 (5th Cir. 2021) ("[C]reating a category of multiple defendants into a clearly defined term does not, of itself, warrant dismissal."). The Court finds Plaintiffs attribute conduct to Defendant Paul with sufficient specificity, so dismissal based solely on the Complaint's collective attribution is not warranted.[7]

---

7. In addition to the Complaint, Defendant Paul takes issue with Plaintiffs' Response. In his Reply, Defendant Paul argues Plaintiffs waive each of his Motion's arguments they did not explicitly oppose in their Response. (Doc. 96 at 5, 7, 13, 16–17). As a general rule, "[f]ailure to respond to arguments made in a motion to dismiss results in waiver of opposition." *Morris v. City of Fort Worth*, No. 19-CV-638, 2020 WL 870228, at *5 n.3 (N.D. Tex. Feb. 21, 2020). But the Court does not see what Defendant Paul sees. While Plaintiffs may not have responded in a manner to Defendant Paul's liking or used certain buzz words that match his, the Court believes Plaintiffs responded to the arguments in his Motion. *Compare* (Doc. 85 at 23) ("Plaintiffs fail to plead either [Exchange Act] count with the particularity required under the Private Securities Litigation Reform Act of 1955 . . . .") *with* (Doc. 92 at 16–17) ("Plaintiffs have met the pleading standard to show that the CryptoZoo products they bought were unregistered securities."). The Court is not so harsh as to deem Plaintiffs' opposition to arguments waived simply because they did not use the exact language Defendant Paul prefers. And even if Plaintiffs did in fact fail to respond to certain arguments, many courts nevertheless address such arguments on the merits. *See Banks v. Kottemann L. Firm*, No. 19-375, 2021 WL 1200090, at *20 (M.D. La. Mar. 30, 2021) (addressing a motion's argument on the merits even though the plaintiff did not respond to it); *Elec. Workers Pension Fund, Loc. 103, I.B.E.W. v. Six Flags Ent. Corp.*, 524 F. Supp. 3d 501, 525 (N.D. Tex. 2021) ("[E]ven if Plaintiffs' Response could be construed as addressing whether these statements were inactionable, the challenged statements fail on other grands stated herein."); *United Sates ex rel. Beck v. St. Joseph Health Sys.*, No. 5-17-CV-052, 2021 WL 7084164, at *10 (N.D. Tex. Nov. 30, 2021) ("To the extent the Court construes this allegation as a substantive response that saves Relator from waiver, it is still far from sufficient . . . ."); *Carmona v. Sw. Airlines Co.*, 06-CA-641, 2008 WL 11408430, at *5 (W.D. Tex. Oct. 20, 2008) ("Although the Plaintiff fails to respond to this argument, the Court finds it to be without merit.").

And so, the bell does not toll for Plaintiffs based on these shortcomings, alone. Now, whether the Court is willing to pierce the corporate veil to impute conduct to Defendant Paul or whether the Complaint's fraud allegations meet Rule 9(b)'s heightened pleading requirements are different issues entirely. The Court addresses both below.

### 4. Piercing the Corporate Veil

As broached above, Plaintiffs' Complaint is replete with allegations attributed to "Defendants" (referring to all named defendants) and "Founder Defendants" (referring to all named defendants except Defendant Bentov). (Doc. 81). As a sort of precautionary measure, Plaintiffs include the following in their Complaint:

> In the event any parties are misnamed or are not included here, it is Plaintiffs' contention that such was a "misidentification," "misnomer," and/or such parties are/were "alter egos" of parties named here. Alternatively, Plaintiffs contend that such "corporate veils" should be pierced to hold such parties properly included in the interest of justice.

> All allegations of acts or omissions by Defendants include, but are not limited to, acts and omissions of such Defendants' officers, directors, operators, managers, supervisors, employees, affiliates, subsidiaries, vice-principals, partners, agents, servants, and owners. Plaintiffs allege that such acts and omissions were committed or made with express and/or implied authority of the Defendants, or were ratified or otherwise approved by the same Defendants; or otherwise, that such acts or omissions were made in the routine, normal course of the actor's employment or agency, and within the scope of the agency or employment, as the case may be.

*Id*. at 21. The Court understands these paragraphs to mean Plaintiffs want the Court to attribute the allegedly unlawful conduct to Defendant Paul even in those instances where he is not identified by name. Although Defendant Paul does not—at least, in his Motion—explicitly address the issues of liability based on alter ego, piercing the corporate veil, or a principal-agent

relationship,[8] he does, as mentioned, take issue with the way the Complaint lumps the defendants together. (Doc. 85 at 8–10). In a similar vein as his group pleading objection, Defendant Paul argues some of Plaintiffs' allegations are misdirected, as he, unlike CryptoZoo, is not in privity of contract with Plaintiffs or personally responsible for CryptoZoo's acts. *Id*. at 35. To this, Plaintiffs reiterate that CryptoZoo "was merely a vehicle created to perpetrate a fraud as an alter ego to Defendant Paul[,]" and accordingly, they urge the Court to pierce the corporate veil to impose liability on Defendant Paul. (Doc. 92 at 26). From what the Court can gather, Plaintiffs seem to request that Defendant Paul be held vicariously liable as to six of their eight common law claims: breach of express contract, breach of implied contract, unjust enrichment, negligence, conspiracy to commit fraud, and civil aiding and abetting. *See generally id*. In his Reply, Defendant Paul cautions the Court against wasting its time with Plaintiffs' half-hearted, conclusory mentions of veil-piercing in their Complaint. (Doc. 96 at 17–18). The Court here addresses whether it should pierce CryptoZoo's corporate veil for purposes of imposing liability on Defendant Paul.

"Generally speaking, a corporate officer's acts on a corporation's behalf are deemed to be acts of the corporation." *In re Jamieson*, No. 19-41433, 2021 WL 438868, at *9 (Bankr. E.D. Tex. Feb. 8, 2021) (citing *Leitch v. Hornsby*, 935 S.W.2d 114, 117–18 (Tex. 1996)). However, "Texas[9] has long had two methods for holding individual corporate agents or officers personally

---

8. Plaintiffs' only mention of liability based on a principal-agent relationship is in the portion of the Complaint cited above. (Doc. 81 at 21). Because Plaintiffs provide no indication this argument pertains to Defendant Paul, and because neither Plaintiffs nor Defendant Paul mentions this argument again in their briefing, the Court limits its analysis to liability based on alter ego and veil-piercing theories.

9. "Under Texas's choice-of-law rules, whether a corporation, LLC, or individual may be held liable pursuant to a veil-piercing theory is determined by the law of the state in which the entity is organized." *Ogbonna v. USPLabs, LLC*, No. 13-CV-347, 2014 WL 2592097, at *5 (W.D. Tex. June 10, 2014). CryptoZoo is a Delaware corporation, so the Court would normally apply Delaware law to the veil-piercing analysis. (Doc. 81 at 1). However, as mentioned in a previous section, the parties only briefed the Court on Texas law. (Docs. 85, 92, 96). The court here applies Texas law. But regardless, the outcome would not differ under Delaware law.

liable when they are acting within the course and scope of their employment or role as corporate agents—piercing the corporate veil or direct individual liability." *Bates Energy Oil & Gas v. Complete Oilfield Servs.*, 361 F. Supp. 3d 633, 664 (W.D. Tex. 2019). In other words, it is not necessary to pierce the corporate veil where a plaintiff alleges a defendant is personally liable for *his* tortious conduct, because piercing the corporate veil is a form of vicarious liability called for only when a plaintiff seeks to hold an officer liable for the actions of a corporation. *Id.*; *Arthur Digital Assets, Inc. v. Lumerritt Res. LLC*, No. 4-23-CV-01500, 2023 WL 9184037, at *3 (S.D. Tex. Aug. 1, 2023) ("Generally, piercing the corporate veil is not a separate cause of action, but a method to impose personal liability on shareholders and corporate officers who would otherwise be shielded from liability for corporate debts."); *UnitedHealthcare Ins. v. Murphy*, No. 5-18-CV-347, 2019 WL 12536545, at *9 (W.D. Tex. Aug. 20, 2019) ("Thus, in an[] action seeking to hold an agent individually liable for his tortious or fraudulent acts, the corporate veil is not required to be pierced." (internal citations and quotation marks omitted)). Notably, "[t]he law is well-settled that a corporate agent can be held individually liable for fraudulent statements or knowing misrepresentations even when they are made in the capacity of a representative for the corporation." *Kingston v. Helm*, 82 S.W.3d 755, 759 (Tex. App.—Corpus Christi 2002, pet. denied). Accordingly, insofar as Plaintiffs allege Defendant Paul personally engaged in tortious conduct, the Court need not pierce CryptoZoo's veil in order to hold him liable for his alleged torts.

---

"Delaware public policy disfavors disregarding the separate legal existence of business entities." *Paul Elton, LLC v. Rommel Del., LLC*, No. 2019-0750, 2020 WL 2203708, at *17 (Del. Ch. May 7, 2020). "Specific facts a court may consider when being asked to disregard the corporate form include: (1) whether the company was adequately capitalized for the undertaking; (2) whether the company was solvent; (3) whether corporate formalities were observed; (4) whether the dominant shareholder siphoned company funds; and (5) whether, in general, the company simply functioned as a facade for the dominant shareholder." *Doberstein v. G-P Indus., Inc.*, No. 9995, 2015 WL 6606484, at *4 (Del. Ch. Oct. 30, 2015). Here, Plaintiffs fail to allege a single fact in support of any factor. Accordingly, even if the Court were to apply Delaware law, Plaintiffs' veil-piercing attempt would not carry the day.

"Whether a plaintiff may pierce an entity's veil . . . depends on whether the plaintiff's claims sound in tort or contract." *AHBP LLC v. Lynd Co.*, 649 F. Supp. 3d 371, 386 (W.D. Tex. 2023). "Whereas a tort claimant may freely pierce the veil . . . , a contract claimant may only pierce the veil if the defendant has also committed an actual fraud against the plaintiff for the defendant's direct personal benefit." *Id*. This distinction exists because Texas Business Organizations Code Section 21.223 has been held to preempt the common law in situations wherein a plaintiff seeks to pierce the corporate veil as to their contract and contract-related claims. *Keyes v. Weller*, 692 S.W.3d 274, 279 (Tex. 2024) ("Section 21.224 confirms that liability for an obligation limited by Section 21.223 is exclusive and preempts any other liability imposed for that obligation under common law or otherwise." (quotation marks omitted)). Put simply, in the veil-piercing context, while pure tort claims are creatures of common law, contract claims (and contract-related claims) are governed by statute. *Id*.; *Bates Energy*, 361 F. Supp. 3d at 667; *Sterett Equip. Co. v. PH Steel, Inc.*, No. 22-CV-476, 2024 WL 1179788, at *14 (E.D. Tex. Mar. 19, 2024) (distinguishing between common law veil-piercing and statutory veil-piercing). As mentioned, Plaintiffs seek to pierce CryptoZoo's veil based on claims sounding in both contract and tort. (Doc. 92). As such, the Court categorizes its analysis accordingly, beginning with statutory veil-piercing in the contractual context.

### i.    Veil-Piercing as to Pure Contract Claims

After a series of statutory amendments within the past few decades, Texas courts have collectively agreed upon Section 21.223's predominance in the realm of veil-piercing for contract and contract-related claims. *Bates Energy*, 361 F. Supp. 3d at 664–74 (providing a detailed history of the evolution of corporate veil-piercing under Texas law). The Fifth Circuit's interpretation of Section 21.223 is as follows:

> [Per Section 21.223(a)(2),] Texas law . . . insulates a shareholder from a corporation's contractual or contractually related obligations "on the basis that the holder . . . is or was the alter ego of the corporation or on the basis of actual or constructive fraud, a sham to perpetrate a fraud, or other similar theory." Section 21.223(b), however, creates an exception to this limitation. A shareholder may be held personally liable for a corporation's obligations "if the obligee demonstrates that the . . . beneficial owner . . . caused the corporation to be used for the purpose of perpetrating and did perpetrate an *actual fraud* on the obligee primarily for the *direct personal benefit* of the . . . beneficial owner." Thus, to hold Barco liable for High End's alleged breach of contract, Belliveau must show that Barco (the then-shareholder) used High End (the corporation) to (1) "perpetrate an actual fraud" (2) primarily for Barco's "direct personal benefit."

*Belliveau v. Barco, Inc.*, 987 F.3d 122, 128–29 (5th Cir. 2021) (second, third, fourth, and fifth omissions in original) (first quoting TEX. BUS. ORGS. CODE § 21.223(a)(2), (b); then quoting *In re Ritz*, 832 F.3d 560, 566 (5th Cir. 2016)). Texas courts have understood Section 21.223(a)(2)—the general rule shielding corporate officers from liability—to provide three avenues of veil-piercing: where "(1) the corporation is the alter ego of its owners and/or shareholders; (2) the corporation is used for illegal purposes; and (3) the corporation is used as a sham to perpetrate a fraud." *AHBP*, 649 F. Supp. 3d at 385 (quoting *W. Horizontal Drilling, Inc. v. Jonnet Energy Corp.*, 11 F.3d 65, 67 (5th Cir. 1994)). And so, to except a corporate officer from that general shield—under Section 21.223(b)—regardless of avenue, a plaintiff must demonstrate the corporate officer (1) perpetrated an actual fraud (2) primarily for the officer's personal benefit. *Ritz*, 832 F.3d at 566. In sum, to pierce CryptoZoo's veil to impose liability on Defendant Paul as to Plaintiffs' contract and contract-related claims, Plaintiffs must show Defendant Paul committed an actual fraud for his own personal benefit.

As for the first requirement, it bears mentioning "in the context of piercing the corporate veil, actual fraud is not equivalent to the tort of fraud." *AHBP*, 649 F. Supp. 3d at 387 (quoting

*Latham v. Burgher*, 320 S.W.3d 602, 607 (Tex. App.—Dallas 2010, no pet.)). "Indeed, 'the requirements for showing actual fraud are *less burdensome* than those for establishing fraud.'" *Id*. (quoting *Weston Grp., Inc. v. Sw. Home Health Care, LP*, No. 12-CV-1964, 2014 WL 940329, at *2 (N.D. Tex. Mar. 11, 2014)). The Fifth Circuit defined actual fraud "as involving dishonesty of purpose or intent to deceive." *Ritz*, 832 F.3d at 567 (quotation marks omitted). "Courts may deduce fraudulent intent from all of the facts and circumstances." *Spring St. Partners-IV, L.P. v. Lam,* 730 F.3d 427, 443 (5th Cir. 2013).

Here, in an effort to rebut Plaintiffs' breach of contract claims—both express and implied—Defendant Paul highlights each purchaser of CryptoZoo products agreed to CryptoZoo's Terms and Conditions (the "T&C"). (Doc. 85 at 3). And CryptoZoo, not Defendant Paul, was a party to the T&C. *Id*. at 35. Thus, he cannot be held to have breached contracts to which he was not a party. *Id*. Plaintiffs, on the other hand, believe they have adequately alleged CryptoZoo "was merely a vehicle to perpetrate a fraud as an alter ego to Defendant Paul and the other individual Defendants[,]" so the Court would be justified in piercing CryptoZoo's veil to impose liability on Defendant Paul for CryptoZoo's breaches. (Doc. 92 at 26). The breaches to which Plaintiffs refer stem not from the representations in the T&C,[10] but from verbal contracts created by Defendants' repeated assurances that they would provide a functional game, only to fall short on their end. (Doc. 81 at 57–60). The Complaint points to a variety of statements Defendant Paul personally made, including: the game was completed and tested in 2021, CryptoZoo is a really fun game that makes you money, and the project is backed by a massive team. *Id*. at 7, 46. But then in 2024, Defendant Paul came clean: the game never existed and

---

10. To the extent Plaintiffs request the Court pierce CryptoZoo's veil to impose liability on Defendant Paul for breaches of the T&C, that request is denied. Apart from one offhand quote in the Complaint from the T&C ("CryptoZoo . . . will strive to do the best for the project and the community"), both Plaintiffs' Complaint and Response focus on express *verbal* contracts originating from Defendants' oral misrepresentations. (Docs. 81 at 58; 92 at 25). Accordingly, the analysis is primarily catered towards oral contracts.

would never be released, CryptoZoo would not make consumers money, and the project was not backed by a massive team. *Id.* at 46. The Court believes in making the statements in 2021, knowing they were untrue—as evidenced by his 2024 alleged admission—Defendant Paul's purpose was dishonest, and he acted with the intent to deceive Plaintiffs into purchasing CryptoZoo products. Accordingly, Plaintiffs have adequately pled the first requirement, actual fraud.

As for the second requirement—that the actual fraud be committed primarily for the officer's personal benefit—Plaintiffs provide nothing to support such an inference. The benefit derived from the actual fraud must be one that is *direct and personal* to the fraudfeasor. TEX. BUS. ORGS. CODE § 21.223(b). "This requirement is met where the 'evidence show[s] that funds derived from the corporation's allegedly fraudulent conduct were pocketed by or diverted to the individual defendant.'" *Thomas v. Hughes*, 27 F.4th 995, 1017 (5th Cir. 2022) (alteration in original) (quoting *Hong v. Havey*, 551 S.W.3d 875, 885 (Tex. App.—Houston [14th Dist.] 2018, no pet.)). Here, Plaintiffs argue, after Defendant Paul made various misrepresentations, only "[Defendant] Ibanez, [Defendant] Greenbaum, and *potentially other Defendants*[] sold large amounts of digital products for an immediate and large profit . . . ." (Doc. 81 at 50 (emphasis added)). In other words, while Plaintiffs allege other defendants derived a direct and personal benefit as a result of Defendant Paul's actual fraud, there is no indication he did. Having failed to meet the second requirement, the Court declines to pierce CryptoZoo's corporate veil to impose liability on Defendant Paul as to Plaintiffs' purely contractual claims.

### ii.    Veil-Piercing as to Tort Claims

Having disposed of Plaintiffs' contract claims, only veil-piercing theories as to their tort claims—unjust enrichment, negligence, conspiracy to commit fraud, and civil aiding and

abetting fraud—remain. As mentioned, the protection of Section 21.223(a)(2) applies not only to contract claims, but also "any matter relating to or arising from the [contractual] obligation." This language indicates the statute "applies to claims holding a shareholder or owner liable for a contract-related corporate obligation (both contract and tort) . . . ." *Bates Energy*, 361 F. Supp. 3d at 673 (emphasis omitted); *In re Antone's Recs., Inc.*, 445 B.R. 758, 788 (Bankr. W.D. Tex. 2011) ("Given its broad scope, Section 21.223 applies to both contractual claims and ancillary torts."). As far as the Court can tell, all four of Plaintiffs' tort claims are contract-related: "As a direct and proximate result of Defendants' intentional and unlawful taking of Plaintiffs' assets without providing the promised product/services, Plaintiffs have been deprived of the profits and other benefits of purchasing/investing in Defendants' products" (unjust enrichment); "Defendants had a duty of care to use reasonable means to provide the promised products/services" (negligence); "Plaintiffs, unaware of the falsity of statements made by Defendants, and in reliance on their accuracy, paid money to Defendants based on such fraudulent statements" (civil conspiracy to commit fraud); "Plaintiffs, because of Defendants' aiding and abetting each other's fraud, unaware of the falsity of statements made by Defendants, and relying on their accuracy, paid money to Defendants based on such fraudulent statements" (civil aiding and abetting). (Doc. 81 at 60–61, 63–64). Plaintiffs' torts claims can be boiled down to this: Defendants worked together in misrepresenting material facts about CryptoZoo to induce Plaintiffs into entering into contracts with and buying products from CryptoZoo. *Id*. Thus, if these claims are in fact contract-related tort claims—as the Court believes them to be—they necessarily suffer the same ill-fated outcome as the pure contract veil-piercing theories. *Compare Bates Energy*, 361 F. Supp. 3d at 673 (shielding the defendant from liability under Section 21.223 as to the plaintiff's contract-related tort claims), *with S-Line LLC v. B2B Supply*, No. 14-

CV-2284, 2015 WL 4745069, at *5 (N.D. Tex. Aug. 10, 2015) ("While some courts have held that Section 21.223 extends to ancillary torts that arise from a contractual obligation, torts that do not arise out of any contractual obligation are not subject to Section 21.223.").

To reiterate, the Court finds it imperative to note the above veil-piercing analysis has no bearing on Defendant Paul's personal tortious conduct—that is, if Plaintiffs have properly alleged he personally committed torts. In a recent case, the Supreme Court of Texas put an end to a long-unsettled debate: "[W]e hold that Section 21.223 does not apply to, and thus does not limit liability for, claims against corporate shareholders and officers premised on their alleged tortious conduct as agents of the company." *Keyes*, 692 S.W.3d at 281. In other words, the *Keyes* court "do[es] not understand Section 21.223 to shield a corporate agent who commits tortious conduct from direct liability merely because the officer or agent also possesses an ownership interest in the corporation." *Id*. at 282 (quotation marks omitted). Thus, whether performed in his official capacity or otherwise, Defendant Paul is to be held liable for his personal torts.

But because neither party briefed the Court on veil-piercing under Section 21.223, to summarily dismiss Plaintiffs' attempts to pierce CryptoZoo's veil would be unnecessarily harsh. Accordingly, the Court **RECOMMENDS** Plaintiffs be given **LEAVE TO AMEND** to identify what direct and personal benefit, if any, Defendant Paul derived to justify piercing the corporate veil under Section 21.223.

### 5. Common Law Claims

The Court now turns to Plaintiffs' eight common law claims: (1) fraud, (2) breach of express contract, (3) breach of implied contract, (4) unjust enrichment, (5) negligence, (6) fraudulent misrepresentation, (7) conspiracy to commit fraud, and (8) civil aiding and abetting fraud. (Doc. 81 at 56–64).

###### i.    Counts 1 and 6: Fraud and Fraudulent Misrepresentation[11]

In their Complaint, Plaintiffs argue Defendant Paul made various affirmative misrepresentations to defraud them. As previously mentioned, those representations include: CryptoZoo was completed and tested in 2021; CryptoZoo is "so fun" and "a really fun game that makes you money"; and the project is backed by a "massive team" and funded by "like a million dollars" ("initial promotion statements"). (Doc. 81 at 7, 46). Later, when the public began to doubt his devotion to finalizing the game, in May of 2022, Defendant Paul stated he had "[n]ever given up, working on [CryptoZoo] daily"; and again, in January of 2023, he promised to finish and deliver the game ("continued devotion statements"). *Id*. at 12, 48–49. Defendant Paul's rebuttal reduces to this: (1) his initial promotion statements constitute mere puffery, and (2) Plaintiffs fail to demonstrate reliance and proximate causation.[12] *Id*. at 13–17. "Plaintiffs have not alleged that they—or anyone—relied on misrepresentations by [Defendant] Paul." (Doc. 85 at 14). In essence, Defendant Paul believes, depending on the statement, Plaintiffs' reliance was either non-existent or unreasonable. *Id*. at 15, 38. Defendant Paul also adds, "[t]o the extent that any Plaintiff bases any claim on alleged omissions, they cannot prevail without pleading, and

---

11. For counts 1 and 6, Plaintiffs assert claims for "fraud" and "fraudulent misrepresentation." (Doc. 81 at 56–57, 62–63). Texas law recognizes two forms of common law fraud: fraudulent misrepresentation and fraudulent inducement. *See Bates Energy*, 361 F. Supp. 3d at 660. Although unclear, the Court assumes Plaintiffs intended to raise a fraudulent inducement claim in addition to their fraudulent misrepresentation claim. (Doc. 81 at 9) ("Defendants promised one thing up front, did something completely different behind the scenes for years, and now attempt to walk back their misrepresentations and fraudulent inducements to avoid liability."). With this assumption in mind, the Court analyzes the merits of both claims—fraudulent misrepresentation and fraudulent inducement—in this section.

12. Defendant Paul seems to paint reliance and proximate causation as separate elements of fraud. (Doc. 85 at 13) (arguing Plaintiffs fail to prove "reliance *or* proximate causation" (emphasis added)). It is the Court's view that they are one and the same in the context of this claim, and therefore, are addressed together. *In re Mounce*, 390 B.R. 233, 247 (Bankr. W.D. Tex. 2008) ("In the context of fraud, proof of detrimental reliance may be used to establish proximate cause.").

then proving, that [Defendant] Paul owed them a duty to disclose." [13] *Id*. at 15. Plaintiffs respond, arguing Defendant Paul mischaracterizes their burden to prove reliance. (Doc. 92 at 9–11). Under the fraud-created-the-market doctrine, Plaintiffs are entitled to a presumption of reliance, and even if that were not the case, Plaintiffs believe they adequately alleged specific reliance as well. *Id*. Defendant Paul, however, argues Plaintiffs' dependence on the fraud-created-the-market doctrine is misplaced—at least, as to Plaintiffs' common law fraud claims—because it only applies to federal securities claims. (Doc. 96 at 5). The Court focuses its analysis primarily on the contested elements of Plaintiffs' fraud claims: materiality and reliance.

Fraud claims are subject to heightened pleading requirements. *Burback v. Brock*, No. 22-40609, 2023 WL 4532803, at *3 (5th Cir. July 13, 2023). "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." FED. R. CIV. P. 9(b). "At a minimum, Rule 9(b) requires that a plaintiff set forth the 'who, what, when, where, and how' of the alleged fraud." *U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997). This district categorizes fraud claims into two similar but distinct classes:

> Under Texas law, there are two types of common-law fraud:
> (1) simple fraud, also known as fraudulent misrepresentation, and
> (2) fraudulent inducement, which is when someone
> allegedly induces another to enter into a contract by using false
> representations. These are separate causes of action, but they share
> the same elements, which are: (1) defendant made a material

---

13. Although Plaintiffs' do not explicitly plead fraud-by-nondisclosure as a separate cause of action, their first count certainly reads as a fraud-by-nondisclosure claim. (Doc. 81 at 63) ("Defendants had a duty to tell its consumers, including Plaintiffs, that CryptoZoo would never be functional and that they had no intention of supporting the project or the CryptoZoo community."). Normally, courts do not require that Plaintiffs separately plead fraud-by-nondisclosure as a separate claim. *See SCHST, Inc. v. Certain Underwriters at Lloyd's, Lond.*, No. 21-CV-02935, 2024 WL 2866393, at *1 (S.D. Tex. Feb. 20, 2024) (considering the plaintiff's fraud-by-nondisclosure claim although not separately pled because fraud-by-nondisclosure is a subcategory of fraudulent misrepresentation). However, Plaintiffs attribute no omissions specifically to Defendant Paul (or explain why he owed a duty, for that matter), so the Court focuses its analysis on affirmative misrepresentations, as opposed to concealment.

> misrepresentation that (2) was false, (3) and was either known to
> be false when made or was asserted without knowledge of its truth,
> (4) the defendant intended the representation to be acted upon, (5)
> it was relied upon, and (6) it caused injury.

*Bates Energy*, 361 F. Supp. 3d at 660 (internal citations and quotation marks omitted). The only

distinction between the two claims is that, unlike fraudulent misrepresentation,

"[f]raudulent inducement is a particular species of fraud that arises only in the context of a

contract and requires the existence of a contract as part of its proof." *Bohnsack v. Varco, L.P.*,

668 F.3d 262, 277 (5th Cir. 2012) (quotation marks omitted).

Regardless of this variance, crucial to the survival of any fraud claim is materiality. "A

fact is material if it would likely affect the conduct of a reasonable person concerning the

transaction in question." *Coldwell Banker Whiteside Assocs. v. Ryan Equity Partners, Ltd.*, 181

S.W.3d 879, 888 (Tex. App.—Dallas 2006, no pet.). Generally, common law fraud requires that

the misrepresentation be one of present fact, as opposed to a false promise to perform in the

future. *Hascor USA, Inc. v. N. Am. Höganäs, Inc.*, No. 13-CA-466, 2013 WL 12183224, at *4

(W.D. Tex. Aug. 23, 2013). However, "[a] promise of future performance constitutes an

actionable misrepresentation if the promise was made with no intention of performing at the time

it was made." *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d

41, 48 (Tex. 1998). Puffery, unlike a material misrepresentation, refers to "an expression of

opinion not made as a representation of fact." *Gulf Oil Corp. v. Fed. Trade Comm'n*, 150 F.2d

106, 109 (5th Cir. 1945). "While a seller has some latitude in 'puffing' his goods, he is not

authorized to misrepresent them or to assign to them benefits or virtues they do not possess." *Id*.

With respect to Defendant Paul's statements, the undersigned is of the opinion some are

mere puffery, while others are material misrepresentations. Defendant Paul's statements that

CryptoZoo is "so fun" and "a really fun game that makes you money" are irrefutably puffery.

*Austin's Nat. Frozen Pops, Inc. v. Jonny Pops, LLC*, No. 24-CV-716, 2025 WL 888560, at *4 (W.D. Tex. Mar. 13, 2025) (identifying words like "best," "better," and "favorite" as stereotypical non-actionable puffery). Albeit less obvious, Defendant Paul's depiction of the project as one backed by a "massive team" and funded by "like a million dollars" also constitutes puffery. *Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 497 (5th Cir. 2000) ("[N]on-actionable "puffery" comes in at least two possible forms: (1) an exaggerated, blustering, and boasting statement upon which no reasonable buyer would be justified in relying; or (2) a general claim of superiority over comparable products that is so vague that it can be understood as nothing more than a mere expression of opinion."). What would be material, were it not so vague, would be the statement about the game's completion date. Plaintiffs' exact wording is as follows:

> Ultimately, Defendants never released the game—though allegedly it was completed in "early 2023"—despite Defendants' statements from 2021 that it had already been completed and tested. The first of these public statements was made during the public announcement of CryptoZoo on August 18, 2021, by Defendant [] Paul, the majority owner of CryptoZoo and online celebrity, via his YouTube show Impaulsive, claiming the CrytpoZoo game was "so fun" and "a really fun game that makes you money."

*Id.* at 7. This excerpt leaves the Court with a host of questions. When did Defendants say the game was completed and tested—2021 or 2023? Who said it was completed? Did Defendant Paul say the game was completed during on YouTube episode, or did he merely boast about how fun it is? While the Court can certainly see how an affirmation falsely claiming the game was completed and functional by a certain date could be material, the Court simply cannot draw the inference Defendant Paul made that statement when Plaintiffs provide only fragments of facts accompanied by vague attributions of conduct to "Defendants." *See Herrmann Holdings Ltd. v. Lucent Techs. Inc.*, 302 F.3d 552, 564–65 (5th Cir. 2002) ("This Court interprets Rule 9(b)

strictly, requiring a plaintiff pleading fraud to specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." (internal citations and quotation marks omitted)). Thus, Defendant Paul's initial promotion statements are either non-actionable puffery or impermissibly vague. What are material, on the other hand, are those statements whereby Defendant Paul made assurances in 2022 and 2023 regarding his continued devotion and intent to finalize and deliver the game. (Doc. 81 at 12, 48–49). Assuming Defendant Paul never intended to hold true to his promises, it is plausible that those statements, unlike the others, could induce a reasonable person to rely and act on them, making them material. But even these statements suffer from their own unique deficiencies, as described in greater detail below.

Also vital to a viable fraud claim is reliance. *Montes v. Am. Hosp. Ass'n*, No. 12-CV-1999, 2012 WL 4928872, at *4 (N.D. Tex. Sept. 18, 2012), *R. & R. adopted*, 2012 WL 4929853 (N.D. Tex. Oct. 16, 2012). "A plaintiff establishes reliance by showing the defendant's acts and representations induced him to either act or refrain from acting to his detriment." *Biliouris v. Sundance Res., Inc.*, No. 07-CV-1591, 2010 WL 11515689, at *4 (N.D. Tex. Mar. 12, 2010) (quoting *Van Marcontell v. Jacoby*, 260 S.W.3d 686, 691 (Tex. App.—Dallas 2008, no pet.)). The Court first addresses the only non-puffery initial promotion statement—namely, that the game was completed in 2021 (or 2023?)—then Defendant Paul's continued devotion statements.

"Evidence of reliance 'is often different for each individual, depending on how and what each was told, what each knew of the matter, and how each reacted . . . .'" *Id.* (quoting *Exxon Mobil Corp. v. Gill*, 299 S.W.3d 124, 127 (Tex. 2009)). Proving reliance in a class action suit is undeniably more arduous than in an individual suit; nevertheless, the Supreme Court of Texas has conclusively decided "the burden on plaintiffs to prove reliance in order to recover on any of

these theories [including fraud] is in no way altered by the assertion of claims on behalf of a class." *Henry Schein, Inc. v. Stromboe*, 102 S.W.3d 675, 693 (Tex. 2002). Meaning, in *Stromboe*, "the 20,000 class members . . .  [were] held to the same standards of proof of reliance—and for that matter all the other elements of their claims—that they would be required to meet if each sued individually." *Id*. Consequently, "[p]roof of reliance or lack of reliance necessarily requires an individualized determination because, under all the same facts and circumstances, one person may have relied on the misrepresentation in reaching a decision while another did not rely on it in reaching the same decision." *Biliouris*, 2010 WL 11515689, at *4 (quoting *Grant Thornton LLP v. Suntrust Bank*, 133 S.W.3d 342, 355 (Tex. App.—Dallas 2004, pet. denied)); *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 762 F. Supp. 2d 942, 1021 (S.D. Tex. 2010) (finding the plaintiffs fell short of meeting Rule 9(b)'s requirements by failing to identify "justifiable reliance of each Plaintiff, individually, on one or more misrepresentations, which must also be specified (what, when, by whom, how fraudulent)").

This is ultimately where Plaintiffs' fraud claims fall short. Assuming Plaintiffs adequately attributed this statement, Defendant Paul publicly announced the game was "completed and tested" on his YouTube channel on August 18, 2021. (Doc. 81 at 7). The vast majority of plaintiffs purchased CryptoZoo products on or after that date. *Id*. at 22–41. So presumably, most could have heard Defendant Paul's statement, believed in the availability of a finished product, and purchased accordingly. But Plaintiffs only allege "Defendants misrepresented the status of the CryptoZoo game to entice *Paul's loyal online fans and the public* into investing into CryptoZoo Products and then failed to ever provide a functional CryptoZoo game to use said CryptoZoo Products . . . ." *Id*. at 9–10 (emphasis added). Based on Plaintiffs' vague assertion, alone, it is not clear which plaintiffs, if any, heard Defendant Paul's

initial promotion statement, let alone acted in reliance on it. For this reason, Plaintiffs' indeterminate allegation of reliance on Defendant Paul's initial promotion statement runs afoul of Rule 9(b).

As to Defendant Paul's continued devotion statements, Plaintiffs face even steeper obstacles. Defendant Paul stresses he made these statements on May 14, 2022, and January 13, 2023. (Doc. 85 at 38 & n.11). But 139 out of 140 plaintiffs purchased CryptoZoo products prior to these continued devotion statements. *Id*. Thus, only Jaime Martinez—the sole plaintiff to purchase products after Defendant Paul reiterated his continued devotion—could conceivably rely on them. *Id*. The Court agrees; any allegation of reliance by the 139 other plaintiffs on Defendant Paul's continued devotion statements present a temporal impossibility. And even Jaime Martinez' individual reliance claim suffers the same imprecision issues discussed above. Therefore, Plaintiffs' reliance arguments as to Defendant Paul's continued devotion statements necessarily fail. All in all, Plaintiffs' fraud claims do not meet the heightened pleading requirements of Rule 9(b).

Defendant Paul raises a few other reliance-based arguments the Court finds less availing. He argues, even if Plaintiffs had relied on his statements, their reliance is unreasonable. (Doc. 85 at 36). But "Texas case law does not require a plaintiff to show the reasonableness of its reliance on a misrepresentation to prove fraud. Rather, Texas courts simply demand proof that the 'party acted in reliance upon the [false] representation.'" *Martin v. MBank El Paso, N.A.*, 947 F.2d 1278, 1280 (5th Cir. 1991) (alteration in original) (quoting *Eagle Props., Ltd. v. Scharbauer*, 807 S.W.2d 714, 723 (Tex. 1990)). Instead, the reliance need only be actual and justifiable. *See Ernst & Young, L.L.P. v. Pac. Mut. Life Ins.*, 51 S.W.3d 573, 577 (Tex. 2001). Further, he contends Plaintiffs' reliance, if existent, was unjustifiable given certain plaintiffs'

own admissions that they possessed investment experience. (Doc. 85 at 36 (citing Doc. 81 at 43)). Not so. "To determine justifiability, courts inquire whether—given [the] plaintiff's individual characteristics, abilities, and appreciation of facts and circumstances at or before the time of the alleged fraud—it is extremely unlikely that there is actual reliance on the plaintiff's part." *Roberts v. United N.M. Bank at Roswell*, 14 F.3d 1076, 1078 (5th Cir. 1994) (alteration in original). However, experience alone does not render reliance unjustifiable. *Id*. at 1079–80 ("[T]he mere fact that Roberts was an expert regarding coriander does not preclude a recovery for fraudulent misrepresentations . . . .").

As a final note on the fraud claims, Plaintiffs urge the Court to apply a more lenient standard to their common law fraud claims under the "fraud-on-the-market" theory, which creates a presumption of reliance. *Griffin v. GK Intelligent Sys., Inc.*, 196 F.R.D. 298, 303 (S.D. Tex. 2000). Here too, Defendant Paul is correct—the theory is available only in federal securities claims. *Sec. Inv. Prot. Corp. v. BDO Seidman, LLP*, 222 F.3d 63, 73 (2d Cir.) ("[F]ederal courts repeatedly have refused to apply the fraud on the market theory to state common law cases despite its wide acceptance in the federal securities fraud context."); *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 284 F. Supp. 2d 511, 644 (S.D. Tex. 2003) (referring to common law fraud claims, "Texas law requires actual reliance; the presumption of reliance under the theory of fraud on the market does not apply").

And yet, given the potential strength of Plaintiffs' assertions, if adequately pled, as to their fraud claims, the Court believes they should be afforded the opportunity to amend. If Plaintiffs can plead reliance with more specificity—that is, the who, what, when, where and how—as to Defendant Paul's fraudulent statements, they should be allowed to do so. *See Enron*, 762 F. Supp. 2d at 1020 ("Plaintiffs have constructed a skeletal framework of at least some

35

claims, and the Court is confident that there are numerous sources of information available sufficient to flesh it out with specific details to meet the requirements of Rule 12(b), *Twombly*, *Iqbal*, and Rule 9(b).").  Words matter, and if Plaintiffs did indeed rely on Defendant Paul's statements to their detriment, he should be held accountable for his.

Accordingly, the Court **RECOMMENDS** Defendant Paul's Motion to Dismiss as to Counts 1 and 6—fraud and fraudulent misrepresentation—be **GRANTED**. (Doc. 85). The Court further **RECOMMENDS** Plaintiffs be given **LEAVE TO AMEND** to cure the above-identified deficiencies with these claims. (Doc. 81).

### ii.    Counts 2 and 3: Breach of Express Contract and Implied Contract

Under Texas common law, a valid contract exists if these six elements are present:

> (1) an offer, (2) acceptance in strict compliance with the terms of the offer, (3) meeting of the minds, (4) a communication that each party consented to the terms of the contract, (5) execution and delivery of the contract with intent it become mutual and binding on both parties, and (6) consideration.

*Song v. 4170 & 4231 & 4271 Altoona Drive Holdings Ltd.*, 616 F. App'x 645, 648 (5th Cir. 2015).  "A contract is express when its terms have been explicitly set out by the parties[,]" whereas, "[a] contract is implied when its terms arise from the acts and conduct of the parties." *E-Learning LLC v. AT&T Corp.*, 517 S.W.3d 849, 858 (Tex. App.—San Antonio 2017, no pet.). In other words, the "difference between contracts formed through express promises and those formed through implied promises is the means by which they are formed." *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 850 (Tex. 2009). The elements required to prove both are identical, but where an express contract's assent is expressly stated, an implied contract's assent "must be inferred from the circumstances of the transaction." *Univ. Nat. Bank v. Ernst & Whinney*, 773 S.W.2d 707, 710 (Tex. App.—San Antonio 1989, no pet.). "In Texas, the

essential elements of a breach of contract claim are: (1) the existence of a valid contract; (2) performance or tendered performance by the party bringing the claim; (3) breach of the contract by the party against whom the claim is brought; and (4) damages sustained by the party bringing the claim as a result of the breach." *Cooper Equip. Co. v. Hitachi Constr. Mach. Americas, Inc.*, No. 24-CV-00069, 2024 WL 4467536, at *3 (W.D. Tex. Oct. 9, 2024).

For their breach of express contract claim, Plaintiffs seemingly attempt to cobble together elements of both the T&C, as well as alleged verbal contracts stemming from Defendants' representations to support the existence of a valid contract. (Doc. 81 at 57–59). In essence, Plaintiffs jam together two pieces of different puzzles in the vain hope of producing a final, cohesive product. Unfortunately, the caselaw does not support this tactic. On this topic, the Supreme Court of Texas has authorized limited circumstances in which a plaintiff may combine elements of two contracts to support a finding of one breach of contract claim:

> Where appropriate, "a court may determine, as a matter of law," that multiple contracts, documents, and agreements "were part of a single, unified instrument." In determining whether multiple agreements are part and parcel of a unified instrument, a court may consider whether each written agreement and instrument was "a necessary part of the same transaction." But when construing multiple documents together, courts must do so with caution, bearing in mind that tethering documents to each other is "simply a device for ascertaining and giving effect to the intention of the parties and cannot be applied arbitrarily and without legal regard to the realities of the situation.

*Rieder v. Woods*, 603 S.W.3d 86, 94–95 (Tex. 2020) (first quoting *Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 840 (Tex. 2000); then quoting *Bd. of Ins. Comm'rs v. Great S. Life Ins.*, 150 Tex. 258, 267, 239 S.W.2d 803, 809 (1951); and then quoting *Miles v. Martin*, 159 Tex. 336, 341, 321 S.W.2d 62, 65 (1959)). Even in *Rieder*, where the plaintiffs offered argument in favor of construing the agreements together, the court nevertheless found

"the agreements were executed for separate and distinct purposes[,]" and therefore construed them as such. 603 S.W.3d at 98. Here Plaintiffs have not provided—nor can the Court identify—any reason to construe the T&C and Defendants' verbal contracts as one, and so the Court conducts the analysis for each independently.

Planitiffs' claim for breach of the T&C against Defendant Paul fails as a matter of law because it is well established that a defendant cannot breach a contract to which he is not a party. *Green v. Nationwide Mut. Ins.*, No. 12-CV-600, 2012 WL 5188031, at *4 (W.D. Tex. Oct. 17, 2012), *R. & R. adopted*, 2012 WL 12850260 (W.D. Tex. Nov. 14, 2012). Having left the corporate veil unpierced, Defendant Paul is not a party to the T&C. Nor do Plaintiffs explain how Defendants' conduct constitutes a breach of the sole term of the T&C Plaintiffs invoke: Defendants "will strive to do the best for the project and the community[.]" (Doc. 81 at 57). Regardless, as to Defendant Paul, Plaintiffs' allegation of breach of the T&C is misdirected. And Plaintiffs' argument for breach of express verbal contract does not fare much better. *Id*. This claim appears to be a less-than-inconspicuous attempt at recasting their fraud claims: "The valid and enforceable express contracts that Plaintiffs entered with Defendants include Defendants' representations that they would provide a functional version of CryptoZoo at the time the Zoo Tokens and CZ NFTs were publicly noticed and/or released for sale." *Id*. Generally, this method is also disfavored. *See Century Prods. Co. v. Cosco, Inc.*, No. 00-CV-0800, 2001 WL 282795, at *8 (N.D. Tex. Mar. 15, 2001) (granting the plaintiff's motion for summary judgment as to the defendant's counterclaim for breach of contract, which was in fact, a fraudulent inducement claim recast as a contract claim). Also fatal to Plaintiffs' breach of express verbal contract claim is the absence of proof of a valid contract. What was Defendant Paul's offer? By what terms did he and Plaintiffs have a meeting of the minds? Neither Plaintiffs' Complaint nor their Response

sheds light on these issues. (Docs. 81, 92). These defects prove no less fatal for Plaintiffs' breach of implied contract claim. *See Hous. Auth. of City of El Paso v. Raza Dev. Fund, Inc.*, No. 23-CV-257, 2024 WL 5036563, at *7 (W.D. Tex. July 19, 2024) ("To prevail on a breach of implied-in-fact contract claim, a plaintiff must plead (1) the existence of a valid implied contract . . . ."). Now, whether these elements simply were not pled or facts to support them do not exist, it is impossible to tell. But, having recommended leave to replead their corporate veil-piercing theory—upon which this claim partially relies—the Court does not believe it futile to afford Plaintiffs another bite at the apple.

In short, the Court **RECOMMENDS** Defendant Paul's Motion as to Plaintiffs' breach of contract claims, both express and implied, be **GRANTED**. (Doc. 85). The Court further **RECOMMENDS** Plaintiffs be given **LEAVE TO AMEND** these claims. (Doc. 81).

### iii.    Count 4: Unjust Enrichment

Preliminarily, the Court notes, under Texas law, "it is not clear that unjust enrichment actually functions as an independent cause of action." *Fairchild v. Barot*, 946 F. Supp. 2d 573, 579–80 (N.D. Tex. 2013); *In re Okedokun*, 968 F.3d 378, 391 (5th Cir. 2020) ("Texas courts are divided on whether unjust enrichment is recognized as an independent cause of action or is merely recognized as a quasi-contractual theory of recovery."). What courts do agree on is, "[u]nder Texas law an unjust enrichment claim requires a showing that one party has obtained a benefit from another by fraud, duress, or the taking of an undue advantage." *Digital Drilling Data Sys., L.L.C. v. Petrolink Servs., Inc.*, 965 F.3d 365, 379 (5th Cir. 2020) (internal citations and quotation marks omitted). Importantly, "[a] cause of action for unjust enrichment requires *proof that the defendant received a benefit* and that retention of that benefit would be unjust." *In re S & A Rest. Corp.*, No. 08-41898, 2010 WL 3619779, at *9 (Bankr. E.D. Tex. Sept. 10, 2010).

As the Court already addressed the fraud claims' deficiencies, and Plaintiffs do not allege duress, that leaves them with one available avenue—unjust enrichment by taking of an undue advantage. Here, Plaintiffs argue "Defendants have been unjustly enriched by [their] wrongful receipt and retention of profits and other benefits they deprived Plaintiffs . . . ." (Doc. 81 at 61). Presumably, Plaintiffs refer to the events on Zoo Day, when "[Defendant] Paul, [Defendant] Strobel, [Defendant] Levin, [Defendant] Ibanez, and [Defendant] Greenbaum . . . purchased [CryptoZoo's] digital products at an artificially low value." *Id*. at 50. Thereafter, only once the project was publicly announced, "[Defendant] Ibanez, [Defendant] Greenbaum, and *potentially other Defendants*, sold large amounts of the digital products for an immediate and large profit, effectively stealing the money of consumers who had invested." *Id.* (emphasis added). This is what Plaintiffs refer to as a "rug pull," presumably substantiating their unjust enrichment claim. *Id*. The Court certainly sees how Defendants Ibanez and Greenbaum obtained a benefit, but it struggles to see the same for Defendant Paul. Said differently, if only Defendants Ibanez and Greenbaum participated in the alleged "rug pull" by selling off the assets at a higher value and absconding with the funds, how did the events on Zoo Day confer a benefit to Defendant Paul? Survival of this claim is contingent on Plaintiffs' demonstration "that *the person sought to be charged* had wrongfully secured a benefit or had passively received one which would have been unconscionable to retain." *Matagorda County. v. Tex. Ass'n of Ctys. Cnty. Gov't Risk Mgmt. Pool*, 975 S.W.2d 782, 785 (Tex. App.—Corpus Christi 1998) (emphasis added), *aff'd*, 52 S.W.3d 128 (Tex. 2000). Absent disregard of the corporate form—which the Court already declined to do—Plaintiffs were required to but fell short of alleging individualized benefit obtained by Defendant Paul. Thus, the Court cannot in good faith allow an unjust enrichment claim to proceed with no evidence of enrichment.

In addition, Defendant Paul seeks dismissal of Plaintiffs' unjust enrichment claim based on the Fifth Circuit's observation that certain equitable claims, such as this one, are "inapplicable when the parties have an express contract governing the subject matter of the parties' dispute." (Docs. 85 at 40; 96 at 18 (quoting *King v. Baylor Univ.*, 46 F.4th 344, 368 (5th Cir. 2022)). Defendant Paul is correct—to an extent. True, the Fifth Circuit found an unjust enrichment theory of recovery could not lie "when *the contested issue* was governed by a valid contract." *King v.*, 46 F.4th at 368 (quotation marks omitted). But, as delineated above, the Court cannot ascertain under which contract—the T&C or an oral contract—Plaintiffs seek recovery, let alone whether either of them govern the contested issue. Only once Plaintiffs clarify the ambiguities in their contract claims can the Court determine whether a contract does indeed control, and by extension, whether an unjust enrichment theory of recovery is available.

Accordingly, the Court **RECOMMENDS** Defendant Paul's Motion as to Plaintiffs' unjust enrichment claim be **GRANTED**. (Doc. 85). The Court further **RECOMMENDS** Plaintiffs be given **LEAVE TO AMEND** the above-described deficiencies. (Doc. 81).

### iv.   Count 5: Negligence

Plaintiffs allege various purportedly negligent acts and omissions, some directly attributable to Defendant Paul and others only tangentially—those being, he (1) promoted nonexistent products and services, (2) falsely represented CryptoZoo's functionality, (3) failed to provide promised products and services, (4) manipulated the market for Zoo Tokens and CZ NFTs, and (5) failed to support the CryptoZoo community. (Doc. 81 at 62). By virtue of his misleading statements, Plaintiffs aver, Defendant Paul created a duty of care. (Doc. 92 at 10). Condensed, Defendant Paul's Motion raises two arguments: (1) Plaintiffs fail to plead he owed

Plaintiffs a duty, and (2) the economic loss rule precludes recovery. (Doc. 85 at 43–47). The Court agrees with both.

Common law negligence requires proof "that (1) the defendant owed the plaintiff a duty of care; (2) the defendant breached that duty; (3) the plaintiff suffered damages; and (4) the breach of the duty proximately caused the damages." *Crear v. Omega Protein, Inc.*, 86 F. App'x 688, 690 (5th Cir. 2004). In the corporate context, "[w]ithout piercing the corporate veil, . . . a corporate officer is only liable for the breach of a duty of care owed to third parties independent of the business's duty." *Watkins v. Basurto*, No. 14-10-00299-CV, 2011 WL 1414135, at *9 n.7 (Tex. App.—Houston [14th Dist.] Apr. 14, 2011, no pet.) (mem. op.). It goes without saying, the alleged independent duty must be "apart from the employer's duty." *Mosley v. SF Dallas 88, LLC*, No. 24-CV-2327, 2025 WL 963363, at *2 (N.D. Tex. Mar. 31, 2025) (quoting *Leitch v. Hornsby*, 935 S.W.2d 114, 116 (Tex. 1996)).

At the very least, two of the five above negligent acts—failure to provide promised products/services and failure to support the CryptoZoo community—are not only intimately tied to CryptoZoo's duties, but are arguably CryptoZoo's duties exclusively. Covered at length in the veil-piercing section, the undersigned opines that even Plaintiffs' tort claims are contract-related. But assuming the rest of Plaintiffs' negligence allegations are extra-contractual, they do not survive. The remaining acts and omissions—i.e., promoting nonexistent products/services, manipulating the market for Zoo Tokens and CZ NFTs, and falsely representing CryptoZoo's functionality—are more aptly characterized as negligent misrepresentation claims. The Supreme Court of Texas explained "that, regardless of any independent duty, negligent misrepresentation claims are viable only if a party sustains an injury independent from those stemming from a contractual breach." *Bates Energy*, 361 F. Supp. 3d at 653 (citing *D.S.A., Inc. v. Hillsboro Indep.*

*Sch. Dist.*, 973 S.W.2d 662 (Tex. 1998). The Court strains to see how Plaintiffs' alleged contractual injuries differ from those here: monetary loss as a result of their CryptoZoo purchases.

The economic loss rule is no less damaging to Plaintiffs' negligence claim. This rule is typically one raised by defendants as a "defense that bars negligence and certain other tort claims (such as products liability) for recovery of economic loss when the loss is limited to the subject matter of a contract or to the product itself." *Bates Energy*, 361 F. Supp. 3d at 652. The rule provides, "there is no liability in tort for economic loss caused by negligence in the performance or negotiation of a contract between the parties." *LAN/STV v. Martin K. Eby Const. Co.*, 435 S.W.3d 234, 243 (Tex. 2014) (citation omitted).  Failure to provide products or services under a contract falls squarely within the economic loss rule. *Id*. (applying the economic loss rule to negligent performance of services); *Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407, 418 (Tex. 2011) (applying the rule to defective products or failure to perform a contract). Plaintiffs' negligence claim is exactly the kind of argument the economic loss rule was intended to prevent, as Plaintiffs seek recovery for Defendants' failure to deliver the promised product (the CryptoZoo game) and services (CryptoZoo community support). (Doc. 81 at 61 ("Defendants' duty of care to provide the promised products/services . . . and support Plaintiffs and other members of the CryptoZoo community formed a special relationship that existed between Plaintiffs and defendants"). And Plaintiffs do not seem to challenge that they purchased CryptoZoo products in accordance with the T&C. (Doc. 81 at 57 ("The express contracts also include Defendants' then-current terms of service"); (Doc. 92 at 29 (averring Defendants breached their duty of care by not honoring their promise to strive to do their best for the project, as delineated in the T&C). No amount of additional facts or veil-piercing can alter this reality:

43

Plaintiffs admit they purchased products and services from CryptoZoo, not Defendant Paul, pursuant to the T&C. Put another way, by their own admissions, Plaintiffs have foreclosed for themselves negligence as an available means of recovery, at least is it relates to the assurances made in the T&C. Thus, as a matter of law, Plaintiffs are precluded from recovery for negligence based on the terms of the T&C.

However, Plaintiffs also allege Defendants were negligent in "manipulating the Zoo Token and CZ NFT markets." (Doc. 81 at 62). Although arguably extra-contractual (and therefore exempt from the economic loss rule), this argument dies on the vine. "As a prerequisite to asserting a claim of negligence, there must be a violation of a duty imposed by law independent of any contract." *Gen. Elec. Co. v. M & M X-Press Serv., Ltd.*, No. H-07-02175, 2008 WL 4747211, at *3 (S.D. Tex. Oct. 27, 2008) (citation omitted). "Duty is the threshold inquiry in establishing negligence; a plaintiff must allege and prove the existence and violation of a duty owed to him by the defendant to establish liability in tort." *Peek v. Oshman's Sporting Goods, Inc.*, 768 S.W.2d 841, 846 (Tex. App.—San Antonio 1989, writ denied). "Furthermore, in general, the party claiming that a duty exists has the burden to establish its existence." *State Farm Mut. Auto. Ins. v. Misra*, No. SA-22-CV-806, 2024 WL 289032, at *3 (W.D. Tex. Jan. 25, 2024). Based on Plaintiffs' conclusory allegations alone, the Court is unable to ascertain what duty, if any, Defendant Paul owed to Plaintiffs.

Accordingly, the Court **RECOMMENDS** Defendant Paul's Motion as to Plaintiffs' negligence claim be **GRANTED** (Doc. 85), and Plaintiffs' negligence claim as to Defendant Paul be **DISMISSED** with **LEAVE TO AMEND** only as to any alleged extra-contractual breaches (Doc. 81).

v.    **Counts 7 and 8: Conspiracy to Commit Fraud and Civil Aiding and Abetting Fraud**

Preliminarily, the Court notes, on account of the Court's recommended dismissal of the underlying tort claims, these final two common law claims necessarily fail. The viability of both claims for conspiracy to commit fraud and civil aiding and abetting hinges on the existence of an underlying tort. *Allstate Ins. v. Receivable Fin. Co.*, 501 F.3d 398 (5th Cir. 2007) ("Because A&I cannot be held liable for fraud, the remaining defendants-appellants cannot be held liable for conspiracy to commit fraud."); *Zarzana v. Ashley*, 218 S.W.3d 152, 162 (Tex. App.—Houston [14th Dist.] 2007, no pet.) ("[C]onspiracy is not an independent cause of action but requires an underlying tort, which may include fraud."); *Peatwatuck Enters. v. Truist Bank*, 773 F. Supp. 3d 366, 372 (S.D. Tex. 2025) ("Aiding and abetting itself, without an underlying tort, cannot stand alone as a legal claim in Texas."). Even so, the Court finds it prudent to resolve a contention among the parties: the intracorporate conspiracy doctrine.

Courts in this district have long observed the intracorporate conspiracy doctrine: "It is a long-standing rule in this circuit that a corporation cannot conspire with itself any more than a private individual can, and it is the general rule that the acts of the agent are the acts of the corporation." *Hilliard v. Ferguson*, 30 F.3d 649, 653 (5th Cir. 1994) (citation and quotation marks omitted).

Looking to the Complaint, it is not at all apparent which specific defendants Plaintiffs aim to implicate in the conspiracy or inculpate in the aiding and abetting. (Doc. 81 at 63–64 ("Defendants conspired with one another and potentially others as yet unknown to commit the acts set forth in this Complaint.") ("Each Defendant aided and abetted each other in perpetuating the fraudulent scheme described above against Plaintiffs and other investors/consumers.")). Rather than shed light on these ambiguities, Plaintiffs attack Defendant Paul's assertion of the

intracorporate conspiracy doctrine as a means of precluding their conspiracy claim: "[C]ourts, including the Fifth Circuit, have recognized that the intracorporate conspiracy doctrine does not apply when corporate employees act for their own personal purposes." (Doc. 92 at 29 (quoting *Hilliard*, 30 F.3d at 653)). The Court agrees; "[C]ourts have fashioned an exception to the rule that a corporation cannot conspire with its employees: when the officers of a corporation act for their own personal purposes, they become independent actors, who can conspire with the corporation." *Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 603 (5th Cir. 1981). So, insofar as Plaintiffs allege Defendant Paul acted for his own personal purposes, he can be held to have conspired with CryptoZoo. This, in a somewhat circular fashion, brings the Court back to Plaintiffs' veil-piercing attempt. It seems, to pierce CryptoZoo's veil, and thereby bring a conspiracy claim, Plaintiffs must prove Defendant Paul acted for his personal benefit; likewise, in order to independently prevail on a conspiracy claim against Defendant Paul, a corporate officer, Plaintiffs must also prove he acted for his own personal purposes. Circularity aside, it is abundantly clear Plaintiffs must prove—but have not—Defendant Paul acted in furtherance of his own personal purposes to allege an actionable conspiracy claim. Given the conspiracy claim's dependence on the viability of Plaintiffs' veil-piercing claims, as well as both the conspiracy and aiding and abetting claims' reliance on an underlying fraud claim, for all of which the Court recommended leave to amend, leave as to these claims is also proper.

Accordingly, the Court **RECOMMENDS** Defendant Paul's Motion be **GRANTED** as to Plaintiffs' civil conspiracy and aiding and abetting claims (Doc. 85), and further **RECOMMENDS** Plaintiffs be afforded **LEAVE TO AMEND** these claims (Doc. 81).

### vi.    Counts 9 Through 23: State Law Claims

Plaintiffs raise a total of 15 state statutory violations in their Complaint. (Doc. 81 at 64–101). Every statute listed is some form of consumer protection act prohibiting unfair trade and advertisement practices. *See id.*  Plaintiffs' fifteen statutory violations, along with excerpts relevant to this analysis, are listed below. Notably, each claim requires a showing of reliance or causation:

- Count 9: Arizona Consumer Fraud Act: "The act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact *with intent that others rely on such concealment*, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice." ARIZ. REV. STAT. § 44-1522 (emphasis added).

- Count 10: California False Advertising Law: "It is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services . . . which [are] untrue or misleading, and which [are] known, or which by the exercise of reasonable care should be known, to be untrue or misleading . . . ." CAL. BUS. & PROF. CODE § 17500; *see West v. Rheem Mfg. Co.*, 765 F. Supp. 3d 976, 992 (C.D. Cal. 2025) ("Here, *because plaintiff does not allege that she relied on the warranty* when she purchased the house, it is unclear how the disclosure would have changed her behavior." (emphasis added)).

- Count 11: California Consumer Legal Remedies Act: "The unfair methods of competition and unfair or deceptive acts or practices listed in this subdivision undertaken by any person in a transaction *intended to result or that results* in the sale or lease of goods or services to any consumer are unlawful: . . . Representing that goods or services have . . . characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have. CAL. CIV. CODE § 1770(a) (emphasis added); *see Richter v. CC-Palo Alto, Inc.*, 176 F. Supp. 3d 877, 899 (N.D. Cal. 2016) ("[A] CLRA claim based in fraud requires reliance.").

- Count 12: California Unfair Competition Law: "[U]nfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by . . . the Business and Professions Code." CAL. BUS. & PROF. CODE § 17200; *see Backhaut v. Apple, Inc.*, 74 F. Supp. 3d 1033, 1047 (N.D. Cal. 2014) ("California courts have held that when the 'unfair competition' underlying a plaintiff's UCL claim consists of a defendant's misrepresentation or omission, a plaintiff must have actually relied on the misrepresentation or omission, and suffered economic injury as a result of that reliance . . . .").

- Count 13: Colorado Consumer Protection Act: "A person engages in a deceptive trade practice when, in the course of the person's business, vocation, or occupation, the person: . . . Either knowingly or recklessly makes a false representation as to the characteristics, ingredients, uses, benefits, alterations, or quantities of goods, food, services, or property . . . ." COLO. REV. STAT. § 6-1-105(1); *see May Dep't Stores Co. v. State ex rel. Woodard*, 863 P.2d 967, 973–74 (Colo. 1993) (finding the CCPA requires a showing the plaintiff purchased "subject to misleading information" or "in reliance on the advertisement.").

- Count 14: Florida Deceptive & Unfair Trade Practices Act: "Unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." FLA. STAT. § 501.204(1); *see Burciaga v. Gold Club Tampa, Inc.*, No. 16-CV-790, 2016 WL 9526567, at *5 (M.D. Fla. Dec. 28, 2016) ("The elements of a FDUTPA claim are: (1) a deceptive act or unfair practice; 2) *causation*; and 3) actual damages." (emphasis added)).

- Count 15: Iowa Private Right of Action for Consumer Frauds Act: "A person shall not engage in a practice or act the person knows or reasonably should know is an unfair practice, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact, *with the intent that others rely* upon the unfair practice, deception, fraud, false pretense, false promise, misrepresentation, concealment, suppression, or omission in connection with the advertisement, sale, or lease of consumer merchandise . . . ." IOWA CODE § 714H.3 (emphasis added).

- Count 16: Illinois Consumer Fraud and Deceptive Business Practices Act: "Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, *with intent that others rely* upon the concealment, suppression or omission of such material fact . . . in the conduct of any trade or commerce are hereby declared unlawful . . . ." 815 ILL. COMP. STAT. § 501/2 (emphasis added).

- Count 17: Massachusetts Business Practices for Consumer Protection Law: "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." MASS. GEN. LAWS. ch. 93A, § 2; *see Clark Sch. for Creative Learning, Inc. v. Phila. Indem. Ins.*, No. 12-10475, 2012 WL 6771835, at *9 n.2 (D. Mass. Dec. 26, 2012) ("To prove a violation of Mass. Gen. L. c. 93A based on deception, a plaintiff must show reasonable reliance.").

- Count 18: North Carolina Unfair and Deceptive Trade Practices Act: "Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or

affecting commerce, are declared unlawful." N.C. GEN. STAT. § 75-1.1[14]; *see Bumpers v. Cmty. Bank of N. Va.*, 747 S.E.2d 220, 226 (2013) ("[A] claim under section 75–1.1 stemming from an alleged misrepresentation does indeed require a plaintiff to demonstrate reliance on the misrepresentation in order to show the necessary proximate cause.").

- Count 19: New Jersey Consumer Fraud Act: The act, use or employment by any person of any commercial practice that is unconscionable or abusive, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact *with intent that others rely* upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise . . . is declared to be an unlawful practice . . . ." N.J. STAT. § 56:8-2 (emphasis added).

- Count 20: Nevada Deceptive Trade Practices Act: "A person engages in a 'deceptive trade practice' if, in the course of his or her business or occupation, he or she: . . . Knowingly makes a false representation as to the characteristics, ingredients, uses, benefits, alterations or quantities of goods or services for sale . . . ." NEV. REV. STAT. § 598.0915; *see Axcess Glob. Scis., LLC v. Revolution Lab'ys LLC*, No. 23-CV-01169, 2024 WL 3498294, at *4 (D. Nev. July 22, 2024) ("The elements of a NDTPA violation are as follows: (1) an act of consumer fraud by the defendant (2) *causing plaintiff* (3) damage." (emphasis added)).

- Count 21: New York General Business Law: "Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful." N.Y. GEN. BUS. LAW § 349; *see Lin v. Miracle Curtains, NY, Inc.*, No. 19-CV-5627, 2022 WL 4386834, at * 11 (E.D.N.Y. Sept. 22, 2022) ("To succeed on such a claim, a plaintiff must show that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) the *plaintiff suffered injury as a result of* the allegedly deceptive act or practice.").

- Count 22: Pennsylvania Unfair Trade Practices and Consumer Protection Law: "'Unfair methods of competition' and 'unfair or deceptive acts or practices' mean any one or more of the following: . . . Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have . . . ." 73 PA. STAT. § 201-2(4); *see Tran v. Metro. Life Ins.*, 408 F.3d 130, 140 (3d Cir. 2005) (finding a UTPCPL claim requires proof of ordinary reliance).

- Count 23: Texas Deceptive Trade Practices Act: "False, misleading, or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful and are

---

14. For Count 18, Plaintiffs cite to "North Carolina Code § 714H.1, *et seq*." (Doc. 81 at 88). Presumably, Plaintiffs inadvertently inserted a section of the Iowa Private Right of Action for Consumer Frauds Act—Iowa Code § 714H.1—because, to the Court's knowledge, no such section exists in the North Carolina Code. Based on the substance of the claim, it is clear Plaintiffs intended to cite to North Carolina General Statutes § 75-1.1. *See id*. The Court, therefore, cites to the relevant portion of this section of the North Carolina Code.

subject to action by the consumer protection division . . . ." TEX. BUS. & COM. CODE § 17.46(a); *see Peltier Enters., Inc. v. Hilton*, 51 S.W.3d 616, 624 (Tex. App.—Tyler 2000, no pet.) ("This claim [under § 17.46] requires individualized proof because reliance [as] an essential element of this DTPA claim.").

Taken together, all 15 of Plaintiffs' state statutory claims require a showing of reliance or causation, which in many states, are considered synonymous. Having already concluded Plaintiffs failed to allege either, the Court need not delve into these claims further.

The Court therefore **RECOMMENDS** Defendant Paul's Motion as to these claims be **GRANTED** (Doc. 85), and Plaintiffs be given **LEAVE TO AMEND** their 15 state statutory claims (Doc. 81).

### vii.    Count 24: Violation of Securities Exchange Act Section 10(b) and SEC Rule 10b-5

Plaintiffs' first federal statutory claim asserts a violation of Section 10(b) of the Exchange Act ("SEA"), in conjunction with Rule 10b-5, promulgated by the SEC. (Doc. 81 at 104–07). Their claim seems to be rooted in three of Defendants' fraudulent acts: (1) deceiving Plaintiffs with their false or misleading representations, (2) artificially inflating the price of Zoo Tokens and CZ NFTs prior to Plaintiffs' purchase, and (3) causing Plaintiffs to purchase "worthless, unregistered securities." *Id*. at 105. In rebuttal, Defendant Paul puts forth two arguments: (1) the SEA is inapplicable, as Zoo Tokens and CZ NFTs are not securities because they do not qualify as "investment contracts," and (2) even if the SEA did apply, Plaintiffs failed to plead this claim with the requisite particularity prescribed by the Private Securities Litigation Reform Act of 1995 (the "PSLRA") and Rule 9(b). (Doc. 85 at 23–30). The Court begins with the former.

### i.   Whether CryptoZoo Transactions Qualify as Securities

The general purpose of the SEA is to "regulate a wide variety of financial instruments that are termed 'securities.'" *SEC v. Coinbase, Inc.*, 726 F. Supp. 3d 260, 279 (S.D.N.Y. 2024). Needless to say, the existence of a security is a prerequisite to recovery for an alleged SEA violation. *SEC v. Rubera*, 350 F.3d 1084, 1089 (9th Cir. 2003). Thus, the threshold question here is whether the transactions at issue qualify as securities under the SEA.

Plaintiffs' Complaint consistently refers to Zoo Tokens and CZ NFTs as unregistered securities. (Doc. 81 at 105). In their Response, Plaintiffs clarify the type of security they believe CryptoZoo transactions to be—investment contracts.[15] (Doc. 92 at 16). The statutory definition of a security includes, among other things, investment contracts. 15 U.S.C. § 78c(10). The Court and the parties are in agreement that *SEC v. W.J. Howey Company*, 328 U.S. 293 (1946) controls the determination of whether a transaction qualifies as an investment contract. (Docs. 85 at 23–24; 92 at 16). Under *Howey*, "an investment contract . . . means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or third party . . . ." 328 U.S. at 298–99. Courts interpreting *Howey* understand investment contracts to require three elements: (1) an investment of money (2) in a common enterprise (3) with profits derived solely from the efforts of others. *Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994). Ultimately, this test requires a case-by-case approach. *Williamson v. Tucker*, 645 F.2d 404 (5th Cir. 1981). Defendant Paul does not seem to dispute—nor has the Complaint given the Court reason to doubt—the first two elements are present here.[16] Rather, he takes issue with the third element, so qualification as investment

---

15. Although Plaintiffs' Complaint refers to CryptoZoo products, themselves, as "unregistered securities," they further explain their argument in their Response: "cryptocurrency *itself* is not an investment contract, but may be the subject of an investment contract just like any other commodity." (Doc. 92 at 17).

16. Plaintiffs repeatedly allege they purchased crypto from CryptoZoo, so the first element is satisfied. (Doc. 81 at 7); *Rensel v. Centra Tech, Inc.*, No. 17-CV-24500, 2022 WL 2103051, at *3 (S.D. Fla. May 31, 2022) ("[A]n investment of cryptocurrency constitutes an 'investment of money.'"). The second element is also satisfied. *See SEC*

contracts here hinges on the extent to which profits were derived solely from the efforts of others.

Defendant Paul first argues "no consumer who agreed to the T&C can claim that [Defendant] Paul led them to expect profits solely from [his] efforts." (Doc. 92 at 25). The reason being the T&C expressly disclaims CryptoZoo as an investment vehicle and admonishes against any expectation of profits: "[CryptoZoo products] were created as art pieces intended for people to enjoy collecting, not as [] financial instrument[s]" and "CryptoZoo makes absolutely no guarantees regarding the value of CryptoZoo NFTs aside from one that we will strive to do the best for the project and the community." (Docs. 85 at 25; 1-2 at 2–3).[17] The Court finds this argument unavailing. As Plaintiffs point out, whether a transaction qualifies as a security is not defined by a defendant's label, but by the economic realities of their overall operation. (Doc. 92 at 15 (quoting *Reves v. Ernst & Young*, 494 U.S. 56, 61 (1990))). In essence, Defendant Paul argues in favor of form over substance, despite various courts consistently denying that approach. *SEC v. Balina*, No. 22-CV-00950, 2024 WL 2332965, at *11 (W.D. Tex. May 22, 2024) ("[W]hen a Court analyzes whether something is a security, the Court will look to substance over form. Therefore, the Court will not consider express disclaimers in a contract when determining the character of the security."); *Rodriguez v. Banco Cent. Corp.*, 990 F.2d 7,

---

v. *NAC Found., LLC*, 512 F. Supp. 3d 988, 996 (N.D. Cal. 2021) ("[A] common enterprise exists where the investment scheme involves either 'horizontal commonality' or 'strict vertical commonality.' Horizontal commonality describes the relationship shared by two or more investors who pool their investments together and split the net profits and losses in accordance with their pro rata investments. By contrast, vertical commonality may be established by showing that the fortunes of the investors are linked with those of the promoters." (internal citations and quotation marks omitted)). Plaintiffs allege they each invested in CryptoZoo under the assumption Defendants would "provide a functional version of CryptoZoo, upon which the value of Zoo Tokens and CZ NFTs were at least partially dependent." (Doc. 81 at 57). They also allege Defendants had skin in the game, as they purchased CryptoZoo products. *Id*. at 50.

17. Presumably by mistake, neither Defendant Paul nor Plaintiffs attached the T&C to their live pleading. Plaintiffs did, however, attach the T&C to their Original Complaint. (Doc. 1-2). The Court, therefore, considers the T&C, as it was attached to the Original Complaint, referred to and quoted from consistently throughout both parties' briefing, and is central to Plaintiffs' claims. *Doe v. Univ. of Tex. M.D. Anderson Cancer Ctr.*, 653 F. Supp. 3d 359, 370 (S.D. Tex. 2023).

11 (1st Cir. 1993) ("[T]he interest may be treated as a security, even if not so labeled."); *SEC v. Telegram Grp. Inc.*, 448 F. Supp. 3d 352, 365 (S.D.N.Y. 2020) ("Disclaimers, if contrary to the apparent economic reality of a transaction, may be considered by the court but are not dispositive."). And indeed, Defendant Paul's selective amnesia is convenient at best and self-serving at worst. Perhaps he does not recall publicly endorsing comments such as "If you sell[,] you lose . . . common investing knowledge" and "He's probably saying 'Hey I'm sick of you guys blaming your investment decisions on me . . . .'" (Doc. 81 at 14). That said, the T&C's designation of CryptoZoo products as non-securities is not dispositive; instead, the Court looks to "the economic reality" and "the totality of the circumstances" to determine whether the transactions at issue qualify as investment contracts. *SEC v. Ripple Labs, Inc.*, 682 F. Supp. 3d 308, 321 (S.D.N.Y. 2023).

Next, Defendant Paul argues, because there is a "real likelihood" some plaintiffs "purchased those items through secondary markets rather than directly from CryptoZoo[,]" those purchasers could not have reasonably relied on the managerial efforts of Defendants to reap profits. (Doc. 85 at 26–27). Presumably, Defendant Paul's inspiration for this argument stems from Plaintiffs' division of the class at large into four sub-classes, three of which include the plaintiffs who purchased some form of product directly from Defendants, with the final class being those who purchased CryptoZoo products on the open market. (Doc. 81 at 10). Regardless, this argument, too, has been rejected time and time again:

> Contrary to Defendants' assertion, whether a particular transaction in a crypto-asset amounts to an investment contract does not necessarily turn on whether an investor bought tokens directly from an issuer or, instead, in a secondary market transaction. . . . [T]here is little logic to the distinction Defendants attempt to draw between the reasonable expectations of investors who buy directly from an issuer and those who buy on the secondary market. An investor selecting an investment opportunity

> in either setting is attracted by the promises and offers made by
> issuers to the investing public. Accordingly, the manner of sale
> "has no impact on whether a reasonable individual would
> objectively view the [issuers'] actions and statements as evincing a
> promise of profits based on their efforts.

*Coinbase*, 726 F. Supp. 3d at 293 (second alteration in original) (quoting *SEC v. Terraform Labs Pte. Ltd.*, 684 F. Supp. 3d 170, 197 (S.D.N.Y. 2023)); *see In re Ripple Labs, Inc. Litig.*, No. 18-CV-06753, 2024 WL 3074379, at *7 (N.D. Cal. June 20, 2024) (declining to give credence to the secondary market distinction); *SEC v. Payward, Inc.*, No. 23-CV-06003, 2024 WL 4511499, at *12 (N.D. Cal. Aug. 23, 2024) ("[T]he fact that the transactions in question occurred on a secondary market does not by itself prevent those transactions from involving investment contracts."); *Terraform*, 684 F. Supp. 3d at 197–98 (holding a purchaser need not have a formal contract with the issuer for an investment contract to exist). Although somewhat contradictory to their division of sub-classes, when listing each plaintiff by name and describing their respective purchases, every paragraph says each named plaintiff "purchased CryptoZoo products from Defendants . . . ." (Doc. 81 at 22–41). Thus, even if the issue of secondary market purchases were determinative, Plaintiffs seem to—albeit inconsistently—allege they purchased products directly from Defendants. *Id*. What is abundantly clear is at least three of the four classes of plaintiffs purchased directly from Defendants. *Id*. at 10. All that is to say, whether CryptoZoo purchasers bought products directly from CryptoZoo or secondhand is not itself conclusive of whether those purchasers expected profits from the efforts of CryptoZoo's founders.

Defendant Paul's final—and most promising—argument on this topic concerns the very nature of purchasing cryptocurrency. The volatility of the market, so the argument goes, forecloses any reasonable expectation of profits derived from Defendants' efforts. (Doc. 85 at 26). In other words, Defendants believe they sold Plaintiffs a finished product (as opposed to a

dynamic investment vehicle), whose productivity depended not on their efforts, but rather the unpredictable ebb and flow of the crypto market. *Id*. Plaintiffs, meanwhile, contend Defendants' concerted efforts to market CryptoZoo as a community and their promotion of benefits tied to product ownership are indicative of the heavy hand Defendants had in CryptoZoo's enterprise, and by extension, Plaintiff's profits. (Doc. 92 at 18). While Defendant Paul clings to *Ripple* in support of this argument, Plaintiffs urge the Court to mirror the findings of *Balina*. (Docs. 85 at 25 (citing *Ripple*, 682 F. Supp. 3d 308); 92 at 18–19 (citing *Balina*, 2024 WL 2332965)). But the Court believes *Coinbase* to be far more apposite. 726 F. Supp. 3d 260.

In *Coinbase*, the defendant "provide[d] a platform and other services that allow[ed] customers to transact in hundreds (and in one instance, thousands) of different crypto-assets." *Id*. at 268. In addition to providing a platform for transactions, the "issuers and promoters of the Crypto-Assets—through websites, social media posts, investor materials, town halls, and other fora—repeatedly encouraged investors to purchase tokens by advertising the ways in which their technical and entrepreneurial efforts would be used to improve the value of the asset, and continued to do so long after they were made available for trading on the secondary market." *Id*. at 292. One particular crypto asset, the "CHZ," allowed "[sports] fans to acquire branded Fan Tokens from any team or organization" and accorded "holders of 'Fan Tokens' (purchased with CHZ tokens)" various opportunities and interaction-based benefits. *Id*. at 276. In making its determination as to whether various different crypto assets qualified as investment contracts, the *Coinbase* court looked to a variety of factors, including promotional materials; advertisement statements (including, an issuer's statement that it was "working around the clock" on the platform); the degree to which the issuers touted their expertise; and what benefits, if any, the issuers advertised in connection with crypto asset ownership. *Id*. at 290, 292. In so doing, the

court concluded "purchasers of certain crypto-assets on the Coinbase Platform . . . invested in a common enterprise and were led to expect profits solely from the efforts of others, thereby satisfying the *Howey* test for an investment contract." *Id*. at 290.

The Court believes *Coinbase* and the instant case are remarkably similar. Again, the relevant inquiry here is whether, based on the totality of the circumstances, a reasonable investor could have expected profits stemming from Defendants' efforts.[18] First, the Court returns to the T&C. Per the T&C, "[b]y holding a CryptoZoo NFT in your crypto wallet, [purchasers] gain full and complete ownership of [their] NFT as well as the opportunity to utilize this NFT in minting or receiving *subsequent opportunities available only to CryptoZoo holders*." (Doc. 1-2 at 2 (emphasis added)). Further, under a section titled "Future Projects," the T&C promises, "[b]y holding a CryptoZoo NFT, [purchasers] will have the opportunity to participate in a variety of future opportunities." *Id*. Finally, in the T&C's disclaimer, the issuers vow to "strive to do the best for the project and the *community*." *Id*. at 3 (emphasis added). Next, the Court looks to Defendants' public statements. As mentioned, Defendant Paul touted CryptoZoo, which he claimed was "backed by a massive team" and funded by "like a million dollars," as "so fun" and "a really fun game that makes you money." (Doc. 81 at 7, 46). Later, as public confidence began to dwindle, Defendant Paul assured the community he had "[a]rtists working around the clock" and that the "project will speak for itself." *Id*. at 49. Defendant Levin also chimed in to reassure the public: "Let our actions speak for ourselves [sic]" and "[Defendants] said they are going to do something, they're going to do it." *Id*. at 48. Tellingly, on October 11, 2021, Defendant Paul said, "We're coming up with really, really fun plans for *six months, a year down the line, two*

---

18. The Court finds it important to note this "inquiry is an objective one focusing on the promises and offers made to investors; it is not a search for the precise motivation of each individual participant." *Telegram*, 448 F. Supp. 3d at 371. As such, the Court focuses on whether an objective, reasonable person under these circumstances could have anticipated profits from Defendants' efforts, rather than assess each individual plaintiff's subjective perception.

*years down the line*. Like this could be the biggest thing I do." *Id*. at 47 (emphasis added). Although the Complaint does not mention the credentials of some of the members of the "massive team," it does touch on Defendant Ibanez' apparently inaccurate resume as it appeared on CryptoZoo's website: "The CryptoZoo website described [Defendant] Ibanez [as an] 'American tech entrepreneur, data scientist, and cybersecurity expert' who 'spent most of his teen years hacking websites from his bedroom before he joined the MIT and went on to work to [sic] government agencies in cyber security.'" *Id*. at 42. Allegedly, CryptoZoo's website also falsely claimed Defendant Ibanez "was a visiting professor at the Stern School of Business at New York University, held multiple degrees, and was the recipient of distinguished service medals." *Id*. Apart from that, Defendant Levin publicly stated Defendants are "long-term thinkers[.]" *Id*. at 49. Finally, and perhaps most telling, CryptoZoo community membership came with benefits. The "CryptpoZoo Twitter account posted a riddle announcing a prize of 10 million Zoo Tokens or [] CZ NFT[s] . . . ." *Id*. at 48. All in all, Plaintiffs were led to believe "purchasers would later receive benefits, including, among other things, rewards, exclusive access to other cryptocurrency assets, and the support of an online ecosystem to use and market CZ NFTs." *Id*. at 11. Viewed together—the T&C's vows, Defendants' public statements regarding future opportunities, the credentials of the "massive team," and the promise of future benefits—are more than sufficient to meet the third *Howey* prong.

Returning to Defendant Paul's volatility argument, the Court is not convinced the unpredictability of the market or speculative nature of any return on investment precludes crypto sales from qualifying as investment contracts. If that were the case, virtually no crypto transactions would ever qualify as investment contracts. And Defendant Paul has not demonstrated CryptoZoo's market is any more volatile than the markets in the plethora of other

cases that found crypto transactions to be investment contracts. *See Balina*, 2024 WL 2332965, at *11; *Coinbase*,726 F. Supp. 3d at 293; *SEC v. Wahi*, No. 22-CV-01009, 2024 WL 896148, at *6 (W.D. Wash. Mar. 1, 2024); *Telegram*, 448 F. Supp. 3d at 368; *SEC v. Pacheco*, No. 19-958, 2022 WL 1591711, at *3 (C.D. Cal. Apr. 4, 2022). Even assuming market volatility did play a role in Plaintiffs' profits—and the Court does not doubt that it did—that fact alone would not be determinative. Granted, *Howey'*s language is somewhat misleading, as it requires an investor to be "led to expect profits solely from the efforts of the promoter . . . ." 328 U.S. at 299. However, since *Howey*, courts interpreting this language have adopted a much more flexible approach. In fact, the Fifth Circuit endorsed one such approach: "[W]e adopt a more realistic test, whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *Williamson*, 645 F.2d at 418 (quoting *SEC v. Glenn W. Turner Enters., Inc.*, 474 F.2d 476, 482 (9th Cir. 1973)). As such, a reasonable investor under these circumstances certainly could have been led to believe the value of his investment hinged, at least in part, on Defendants' continued efforts. *See SEC v. Edwards*, 540 U.S. 389, 390 (2004) ("Profits" under *Howey* include "dividends, other periodic payments, or the *increased value of investment*." (emphasis added)).

In sum, the undersigned is of the opinion Plaintiffs have sufficiently alleged—at least, at this procedural stage—the transactions at issue qualify as investment contracts, and therefore, securities. Whether, through later discovery, it comes to light they do not in fact qualify as securities is not the issue here because, based solely on the pleadings, Plaintiffs have met their burden. Thus, the CryptoZoo transactions at issue, if properly alleged, may amount to SEA violations, or—to use Defendants' term—subject them to "SEC eyeballs." That said, the Court turns to the first alleged SEA violation.

### ii. Whether Plaintiffs State a Claim for a Section 10(b) and Rule 10b-5 Violation

As mentioned, Defendant Paul's second proposed ground for dismissing Plaintiffs' Section 10(b) and Rule 10b-5 claim is its failure to meet the pleading requirements set by the PSLRA and Rule 9(b). (Doc. 85 at 27). More specifically, Defendant Paul takes issue with the Complaint's lack of specificity, particularly as it relates to the scienter and causation requirements. *Id*. Plaintiffs, however, advance a different standard: the fraud-created-the-market (aka fraud-on-the-market) doctrine, which requires only a showing of presumptive reliance, a lesser burden. (Doc. 92 at 10). Regardless of the standard, Plaintiffs believe they have sufficiently pled both presumptive and specific reliance. *Id*. In addition, Plaintiffs argue they are permitted to aver scienter generally, particularly based on the fact Defendant Paul knew the game was nonfunctional but nevertheless made assurances to the contrary. *Id*. at 22. The Court first takes up the applicable standard, then whether Plaintiffs fulfilled their burden.

Section 10(b) makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate . . . ." 15 U.S.C. § 78j(b). One such rule, Rule 10b-5, provides, "It shall be unlawful for any person . . . (a) [t]o employ any device, scheme, or artifice to defraud[;] (b) [t]o make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading[;] or

(c) [t]o engage in any act, practice, or course of business which operates or would operate as fraud or deceit upon any person, in connection with the purchase or sale of a security." 17 C.F.R. § 240.10b-5. The Fifth Circuit has held both the PSLRA and Rule 9(b) speak to the pleading requirements to be applied in class action securities law cases. *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 361–62 (5th Cir. 2004).

The PSLRA's pleading specifications are as follows:

(1) Misleading statements and omissions

In any private action arising under this chapter in which the plaintiff alleges the defendant--
    (A) Made an untrue statement of a material fact; or
    (B) omitted to state a material fact necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading;
the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity the facts on which that belief is formed.

 (2) Required state of mind

(A) In general

Except as provided in subparagraph (B), in any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity the facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u-4(b)(1)–(2). And as mentioned in the common law fraud section, Rule 9(b) requires "a plaintiff to specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were

fraudulent. *Williams*, 112 F.3d at 177. Taken together, the Fifth Circuit has made the following

observation about these standards:

> The PSLRA reinforces the particularity requirements of Rule 9(b),
> requiring the plaintiffs to state not only the time, place, the identity
> of the speaker, and the content of the alleged misrepresentation,
> but also to explain why the challenged statement or omission is
> false or misleading. The PSLRA *also* requires that the complaint
> "with respect to *each* act or omission alleged" to be false or
> misleading "state with *particularity  facts* giving  rise  to
> a *strong* inference that *the defendant* acted with the required state
> of mind."

*Southland*, 365 F.3d at 362–63 (quoting 15 U.S.C. § 78u-4(b)(2)(A)). With these standards in

mind, to prevail on a securities-fraud claim under Section 10(b) and Rule 10b-5, "plaintiffs must

plead (1) a misstatement or omission; (2) of a material fact; (3) made with scienter; (4) on which

the plaintiffs relied; and (5) that proximately caused the plaintiffs' injuries." *Id*. at 362 (citing

*Williams*, 112 F.3d 177). *Southland* is especially informative in that it provides a roadmap for

district courts when met with the intersection of the PSLRA and group pleading. *Id*. at 363–65.

In short, they are mutually exclusive. *Id*. at 365. "The 'group pleading' doctrine conflicts with

the scienter requirement of the PSLRA because, even if a corporate officer's position supports a

reasonable inference that he likely would be negligent in [the alleged conduct at issue,] the

PSLRA state of mind requirement is severe recklessness or actual knowledge." *Id*. With this

logical inconsistency in mind, the Fifth Circuit devised a rule: "[C]orporate officers may not be

held responsible for unattributed corporate statements solely on the basis of their titles, even if

their general level of day-to-day involvement in the corporation's affairs is pleaded." *Id*. To

paraphrase, a complaint's attribution of conduct to "defendant" or "defendants" does not

measure up to the PSLRA's scienter standard, regardless of that particular defendant's job title

within the company. *Id*. at 366. Also notable, "[a]n essential element of plaintiffs [sic] claim for

securities fraud and common law fraud is the establishment of reliance." *Griffin v. Box*, 85 F.3d 625 (5th Cir. 1996); *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 159 (2008) ("Reliance by the plaintiff upon the defendant's deceptive acts is an essential element of the § 10(b) private cause of action."); *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011) ("[P]roof of reliance ensures that there is a proper connection between a defendant's misrepresentation and a plaintiff's injury.") internal quotation marks omitted)).

Given the near equivalence of the pleading requirements for Plaintiffs' common law fraud claims and securities fraud claims, the Court need not restate what was already said in great detail above. Just as Plaintiffs' common law fraud claims fail under Rule 9(b), so too does their securities fraud claim under the PSLRA. But Plaintiffs advance a different standard: the fraud-on-the-market doctrine. (Doc. 92 at 10). The Supreme Court originally crafted this theory because "[r]equiring proof of individualized reliance from each member of the proposed plaintiff class effectively would have prevented [plaintiffs] from proceeding with a class action, since individual issues then would have overwhelmed the common ones." *Basic Inc. v. Levinson*, 485 U.S. 224, 242 (1988). To "alleviate those [] concerns" courts "permit[] plaintiffs to invoke a rebuttable presumption of reliance based on what is known as the 'fraud-on-the-market' theory." *Erica P. John Fund*, 563 U.S. at 811. "Because the market transmits information to the investor in the processed form of a market price, we can assume . . . that an investor relies on public misstatements whenever he buys or sells stock at the price set by the market." *Id*. (citation and quotation marks omitted). Still, Plaintiffs have a burden, which even if met, can be rebutted. *Basic*, 485 U.S. at 248. Indeed, "[t]o invoke the *Basic* presumption, a plaintiff must prove: (1) the alleged misrepresentation was publicly known; (2) that it was material; (3) that the stock traded in an efficient market; and (4) that the plaintiff traded the stock between the time the

misrepresentation was made and when the truth was revealed." *Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*, 594 U.S. 113, 118 (2021).

Turning to the case at bar, Plaintiffs have provided no basis to support the Court's application of this lesser standard. Immateriality of certain misrepresentations aside, Plaintiffs' Complaint and Response are devoid of facts to support any of the fraud-on-the-market prerequisite elements. Plaintiffs in essence slap four words on a page ("fraud-on-the-market") and call it a day. (Docs. 81 at 103–04; 92 at 10). This will not do. Thus, the Court has no choice but to defer to the PSLRA standard, which Plaintiffs failed to satisfy.

Accordingly, the Court **RECOMMENDS** Defendant Paul's Motion be **GRANTED** (Doc. 85) and Plaintiffs' Section 10(b) and Rule 10b-5 claim be **DISMISSED** (Doc. 81), not because the Court is convinced CryptoZoo transactions are exempt from the regulations of the SEA, but because the claim falls short of both the PSLRA pleading standard and the fraud-on-the-market doctrine. Nevertheless, as with Plaintiffs' common law fraud claims, the Court **RECCOMMENDS** Plaintiffs be afforded **LEAVE TO AMEND** this claim. (Doc. 81).

### viii.    Count 25: Violation of SEA Section 20(a)

Section 20(a) provides, [e]very person who, directly or indirectly, controls any person liable under any provision of this chapter of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person . . . ." 15 U.S.C.A. § 78t(a). "To establish a prima facie case of control person liability pursuant to Section 20(a), a plaintiff must sufficiently allege (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *In re EHang Holdings Ltd. Sec. Litig.*, 646 F. Supp. 3d 443, 457 (S.D.N.Y. 2022) (citation and quotation marks

omitted). "Further, a plaintiff must demonstrate primary liability under Section 10(b) prior to making out a control person liability claim." *Id*.

Here, Plaintiffs' claim fails on all accounts. First and foremost, Plaintiffs have no underlying Section 10(b) violation upon which to predicate their Section 20(a) claim. That, alone, is disqualifying. Even so, the Court cannot make heads or tails of this claim because nowhere in Plaintiffs' Section 20(a) argument does Defendant Paul's name appear. (Doc. 81 at 107–08). Instead, Plaintiffs merely allege the "Founder Defendants" exercised control by virtue of their positions "as senior officers." *Id*. at 108; *In re Neighbors Legacy Holdings, Inc*., 645 B.R. 864, 893 (Bankr. S.D. Tex. 2022) ("While titles alone do not establish control, a title coupled with an ability to prevent the Securities Act violation can establish control." (citation and quotation marks omitted)). Did Defendant Paul, himself, exercise control? Over whom did he exert control? What ability, if any, did he have to prevent a SEA violation? The Complaint does not say. These obscurities are a far cry from permissible allegations under the PSLRA. *See Genesee Cnty. Emps.' Ret. Sys. v. FirstCash Holdings Inc.*, 667 F. Supp. 3d 295, 306 (N.D. Tex. 2023) ("Because Plaintiff brings claims under §§ 10(b) and 20(A) of the Securities Exchange Act, the PSLRA's heightened standard applies."). But because this claim relies upon a viable underlying Section 10(b) violation—for which the Court recommended leave to amend—opportunity to cure this claim is similarly justified.

Accordingly, the Court **RECOMMENDS** Defendant Paul's Motion to Dismiss be **GRANTED** as to this claim (Doc. 85), and Plaintiffs' SEA Section 20(a) claim be **DISMISSED** (Doc. 81). The Court further **RECOMMENDS** Plaintiffs be afforded **LEAVE TO AMEND** their Section 20(a) claim. (Doc. 81).

### ix.    Count 26: Violation of the Racketeer Influenced and Corrupt Organizations Act

Unlike the preceding claim, Plaintiffs' Racketeer Influenced and Corrupt Organizations Act ("RICO") claim refers to Defendant Paul by name: "Before and during the Class Period, Defendants participated in an ongoing fraudulent enterprise led by Defendants Paul and Levin— who were previously engaged in a pattern and practice of cryptocurrency and NFT-related rug-pulls and pump-and-dumps." (Doc. 81 at 109). According to the Complaint, those allegedly fraudulent enterprises include Dink Doink, Liquid Marketplace, F*** Elon, EMAX, OMI, and Elon Gate. *Id*. It was through these schemes Plaintiffs claim Defendants fraudulently obtained cryptocurrency and funds by misrepresenting material facts to Defendant Paul's fanbase and absconding with the unlawfully obtained funds. *Id*. Defendant Paul argues, not only does Plaintiffs' RICO claim fall short of Rule 9(b), but it also fails to establish the requisite elements of a RICO claim. (Doc. 85 at 17). For example, Plaintiffs' claim contains no mention of an actionable criminal predicate act, as is required by the RICO statute. *Id*. at 18. Contrary to Plaintiffs' contention, common law fraud is not a viable predicate act. *Id*. What is more, Plaintiffs have not satisfied RICO's enterprise requirement because CryptoZoo cannot form an enterprise with its officers and employees. *Id*. at 19–23. Plaintiffs, on the other hand, believe their Complaint satisfies Rule 9(b), the alleged rug-pulls suffice as predicate acts, and Defendant Paul's association with CryptoZoo does, in fact, qualify as an enterprise. (Doc. 92 at 11–15).

"The substantive provisions of RICO, 18 U.S.C. § 1962(a)-(d), outlaw four types of racketeering-related activities." *Morin v. Trupin*, 835 F. Supp. 126, 130 (S.D.N.Y. 1993). Plaintiffs specifically allege a violation under 18 U.S.C. § 1962(c), which makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the

conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." (Doc. 81 at 108). To prevail under this subsection, Plaintiffs must show "(1) the existence of an enterprise that affects interstate or foreign commerce, (2) that the defendant was employed by or associated with the enterprise, (3) that the defendant participated in the conduct of the enterprise's affairs, and (4) that the participation was through a pattern of racketeering activity." *United States v. Delgado*, 401 F.3d 290, 297 (5th Cir. 2005) (citations and quotation marks omitted). "To prove a pattern of racketeering activity, a plaintiff must show at least two predicate acts of racketeering that are related and amount to or pose a threat of continued criminal activity." *Tel-Phonic Servs., Inc. v. TBS Int'l, Inc.*, 975 F.2d 1134, 1139–40 (5th Cir. 1992). Alleging only one predicate act—i.e., involvement in only the criminal act at issue—is insufficient to prove a pattern under RICO. *See Fernandez-Lopez*, 2020 WL 9396523, at *13. "An enterprise is a group of persons or entities associating together for the common purpose of engaging in a course of conduct." *Whelan v. Winchester Prod. Co.*, 319 F.3d 225, 229 (5th Cir. 2003). It is here Plaintiffs' RICO argument falters.

First and foremost, Plaintiffs' Complaint falls short of Rule 9(b)'s pleading requirements, and their RICO claim is no exception. *See Tassio v. Onemain Fin., Inc.*, No. 15-CV-00484, 2016 WL 410024, at *2 (E.D. Tex. Feb. 3, 2016) ("Federal Rule of Civil Procedure 9(b)'s pleading requirements apply to RICO claims resting on allegations of fraud, and a plaintiff must plead his fraud-based RICO claims with particularity."). Second, although Plaintiffs attribute a variety of rug-pulls to Defendant Paul, they point to no criminal predicate act—arising under either state or federal law—to support their pattern of racketeering activity. (Doc. 81 at 109). And "[c]ommon law fraud is not a predicate act under RICO." *Moore v. Town N. Auto., Inc.*, No. 14-CV-1215, 2014 WL 3396100, at *5 (N.D. Tex. July 11, 2014) (citing *Tel-Phonic Servs., Inc.*

*v. TBS Int'l, Inc.*, 975 F.2d 1134, 1139 (5th Cir. 1992)). The Court cannot strain to infer a pattern of racketeering activity where Plaintiffs fail to identify a single state or federal criminal predicate act. And even if they had, Plaintiffs' RICO claim would not survive without proof of an underlying violation. *See Dillard v. Sec. Pac. Corp.*, 85 F.3d 621 (5th Cir. 1996) ("The predicate acts Dillard alleged all depended on violations of antitrust laws. Dillard's failure to establish an antitrust violation requires summary judgement on the RICO claim as well."). Finally, Plaintiffs' enterprise argument is equally flawed. Defendant Paul is correct: "In making a distinction between a RICO 'person' and a RICO 'enterprise,' it is not enough to establish that a defendant corporation through its agents committed the predicate acts in the conduct of its own business." (Doc. 81 at 22 (quoting *ISystems v. Spark Networks, Ltd.*, No. 10-10905, 2012 WL 3101672, at *4 (5th Cir. Mar. 21, 2012)). Plaintiffs attempt to skirt this requirement by arguing "the need for two distinct entities is satisfied . . . when a corporate employee unlawfully conducts the affairs of the corporation of which he is the sole owner—whether he conducts those affairs within the scope, or beyond the scope, of corporate authority." (Doc. 92 at 14–15 (quoting *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 166 (2001)). Plaintiffs' logic here is truly perplexing because nowhere do they contend Defendant Paul is the sole owner of CrytpoZoo. In fact, their Complaint suggests the exact opposite: "The list of CryptoZoo founders is noted in Defendants' internal documents, where Paul, Strobel, Levin, Ibanez, and Greenbaum are listed as founders of CryptoZoo, Inc., with each receiving 51%, 1%, 10%, 30%, and 5% of the founder shares respectively, with 3% leftover for expenses." (Doc. 81 at 43). Defendant Paul may be the majority owner of CrytpoZoo, but not the *sole* owner. To summarize, Plaintiffs' RICO claim is deficient because it does not meet Rule 9(b)'s pleading requirements, fails to properly allege

predicate acts (and therefore, a pattern), and defies logic as to the existence of an enterprise. These defects, if cured, could survive a motion to dismiss.

For these reasons, the Court **RECOMENDS** Defendant Paul's Motion be **GRANTED** (Doc. 85), Plaintiffs' RICO claim be **DISMISSED**, and Plaintiffs be granted **LEAVE TO AMEND** this claim (Doc. 81).

### x.    Count 27: Commodity Exchange Act Sections 4o and 22(a)

For their final argument, Plaintiffs alternatively allege Defendants violated Sections 4o and 22(a) of the Commodity Exchange Act ("CEA"). (Doc. 81 at 110). Plaintiffs point to four acts to support this claim: Defendants (1) received and misappropriated Plaintiffs' funds, (2) misrepresented the development of the CryptoZoo game, (3) failed to provide accurate information to Plaintiffs about the status of the game, and (4) misrepresented the assets invested by the Founder Defendants. *Id*. at 110–11.

Section 4o of the CEA provides:

> It shall be unlawful for a commodity trading advisor, associated person of a commodity trading advisor, commodity pool operator, or associated person of a commodity pool operator, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly--
> (A) to employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant; or
> (B) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant.

7 U.S.C. § 6o. Section 22(a) provides a private right to action under the CEA. *See* 7 U.S.C. § 25(a)(1)(A)–(D). Plaintiffs' Response clarifies their CEA claim arises under the option language in the statute:

> Any person . . . who violates this chapter . . . shall be liable for actual damages resulting from one or more transactions referred to

in subparagraphs (A) through (D) of this paragraph and caused by
such violation to another person--

. . . .

    (B) who made through such person any contract of sale of
    any commodity for future delivery (*or option on such
    contract or any commodity*) or any swap; or who
    deposited with or paid to such person money,
    securities, or property (or incurred debt in lieu thereof)
    in connection with any order to make such contract or
    any swap[.]

7 U.S.C. § 25(a)(1)(B) (emphasis added). According to Plaintiffs, "CZ NFTs operated as options

on a commodity for future delivery." (Doc. 92 at 24).

The Court can easily dispose of this claim because, in regard to Plaintiffs' option

argument—which they raised for the very first time in their Response—the Court, once again,

does not follow Plaintiffs' logic. Plaintiffs seem to argue the uncertain and evolving nature of the

CZ NFTs creates an option contract or a commodity for future delivery. (Doc. 92 at 24). In other

words, because purchasers buy CZ NFTs unaware of their value until they hatch, and because the

CZ NFT animals can be bred with others to create hybrid NFTs, an option contract is thereby

formed. *Id*. The mental gymnastics required to come to this conclusion are truly dizzying. "A

futures contract . . . does not involve a sale *of the commodity* at all. It involves a sale *of the

contract*." *Commodity Futures Trading Comm'n v. Zelener*, 373 F.3d 861, 865 (7th Cir. 2004).

"A futures contract, roughly speaking, is a fungible promise to buy or sell a particular

commodity at a fixed date in the future." *Id*. at 864 (citation and quotation marks omitted). Thus,

"[a] condition precedent § 25(a)(1)(D) is that the plaintiff purchased or sold a contract for future

delivery." *In re Dairy Farmers of Am., Inc., Cheese Antitrust Litig.*, 60 F. Supp. 3d 914, 965

(N.D. Ill. 2014), *aff'd sub nom.*, 801 F.3d 758 (7th Cir. 2015). Plaintiffs do not explain—nor can

the Court understand—how their purchases of CZ NFTs create option contracts or contracts for

future delivery. *See Berk v. Coinbase, Inc.*, No. 18-CV-01364, 2018 WL 5292244, at *2 (N.D.

Cal. Oct. 23, 2018) ("Because Berk used Coinbase to purchase Bitcoin Cash, rather than to make a contract to purchase Bitcoin Cash at a specific date in the future, he cannot maintain a claim under the CEA."). And no addition of facts or refinement of the claim can change that fact.

Accordingly, the Court **RECOMMENDS** Defendant's Motion be **GRANTED** as to this claim (Doc. 85), and Plaintiff's CEA claim be **DISMISSED WITH PREJUDICE** (Doc. 81).

### 6. Notice of Supplemental Authority

The Court finds it prudent to note Defendant Paul filed a Notice of Filing Supplemental Authority ("Notice") on April 3, 2025. (Doc. 101). That filing contains a "Staff Statement" published by the SEC. (Doc. 101-1). Although the parties did not brief the Court on the procedural implications of Defendant Paul's filing, the Court declines to consider the Notice for reasons outlined below.

Although Defendant Paul labels his filing a "Notice of Filing Supplemental Authority," that is a misnomer. "[F]iling notices of supplemental authorities that come to a party's attention after briefing is a well-established practice. . . . Moreover, such practice is helpful to the Court, which of course always endeavors to apply current authority in resolving the issues before it." *Hornor, Townsend & Kent, Inc. v. Hamilton*, No. 01-CV-2979, 2004 WL 2284503, at *11 (N.D. Ga. Sept. 30, 2004). To the Court's knowledge, this practice is reserved for filing particularly relevant *cases and legal authorities* that arise after the close of briefing and which may assist a court in the disposition of the motion before it. *See, e.g.*, *id.* (taking notice of both binding and non-binding caselaw); *Mendoza v. Microsoft, Inc.*, 1 F. Supp. 3d 533, 540–41 (W.D. Tex. 2014) (taking notice of *Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49 (2013)); *Guilbeau v. Schlumberger Tech. Corp.*, 719 F. Supp. 3d 702 (W.D. Tex. 2024) (taking notice of *Wilson v. Schlumberger Tech. Corp.*, 80 F.4th 1170 (10th Cir. 2023)).

Defendant Paul's attachment is not legal authority, but rather an article published by the SEC. (Doc. 101-1). He seems to attach the article to support his proposition that CryptoZoo products are not securities under the SEA. *Id*. Because it seeks to amplify his existing SEA argument, this attempt is more aptly characterized as a notice for supplemental pleadings, not a notice of supplemental authority.

The Federal Rules outline the requirements for supplementing pleadings:

> *On motion and reasonable notice*, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented. The court may permit supplementation even though the original pleading is defective in stating a claim or defense. The court may order that the opposing party plead to the supplemental pleading within a specified time.

FED. R. CIV. P. 15(d) (emphasis added). Setting aside Defendant Paul's failure to move to file his supplemental pleading, such pleadings are generally treated as if they had been included in the original pleading. *Earl v. Estelle*, 503 F. Supp. 406, 409 (N.D. Tex. 1980). But even if Defendant Paul had (or could have) attached the article to his Motion, the Court would not consider it.

"When considering a motion to dismiss under Rule 12(b)(6), the Court's review is limited to the complaint; any documents attached to the complaint; any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint; and matters subject to judicial notice under Federal Rule of Evidence 201." *Doe v. Univ. of Tex. M.D. Anderson Cancer Ctr.*, 653 F. Supp. 3d 359, 370 (S.D. Tex. 2023) (citing *Allen v. Vertafore, Inc.*, 28 F.4th 613, 616 (5th Cir. 2022); *George v. SI Grp., Inc.*, 36 F.4th 611, 619 (5th Cir. 2022)). "[W]hen non-pleading materials are filed with a motion to dismiss, . . . a district court has complete discretion under the Federal Rules of Civil Procedure to either accept the exhibits submitted or not, as it sees fit[.]" *Isquith ex rel. Isquith v. Middle S. Utils., Inc.*, 847 F.2d 186,

196 (5th Cir. 1988). There exist two avenues by which a court may look outside of the pleadings at the motion to dismiss stage: (1) if the attachment is both referenced in the complaint and central to the plaintiff's claim, or (2) if the attachment is subject to judicial notice under Federal Rule of Evidence 201. *See Polnac v. City of Sulphur Springs*, 555 F. Supp. 3d 309, 323 (E.D. Tex. 2021) (distinguishing between the two avenues of consideration). Rule 201 allows courts to "judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction, or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201. Courts are permitted to "take judicial notice of the *undisputed* and publicly available information displayed on government websites." *King v. Cnty. of Los Angeles*, 885 F.3d 548, 555 (9th Cir. 2018) (emphasis added).

Here, the Complaint makes no mention of the article, so the first avenue is unavailable. (Doc. 81). That leaves only the second avenue, whereby a court may take judicial notice of a document pursuant to Federal Rule of Evidence 201. *Polnac*, 555 F. Supp. 3d at 323. But Defendant Paul does not demonstrate how the SEC article is readily determined from sources whose accuracy cannot reasonably be questioned. FED. R. EVID. 201. And because Defendant Paul simply filed the article with no explanation as to the propriety of its inclusion, there is no way for the Court to determine if it is "undisputed" or if it even applies to the crypto assets at issue in this case. *King*, 885 F.3d at 555. Thus, there is no avenue by which the Court can consider the article. For these reasons—Defendant Paul's misclassification of the article as authority, his failure to move to file the article, and because the article does not fall under any recognized method of inclusion under the Federal Rules of Civil Procedure or Evidence—the Court does not factor the article into its analysis. (Doc. 101-1).

### 7.   Leave to Amend

In their Response, Plaintiffs request that the Court give them leave to amend any counts the Court may find deficient. (Doc. 92 at 32). Having found all of Plaintiffs' claims deficient, the Court considers this request.

Federal Rule of Civil Procedure 15 instructs this Court to "freely give leave when justice so requires." FED. R. CIV. P. 15(a)(2). District courts consider several factors in determining whether to grant leave to amend, such as undue delay, bad faith or dilatory motive, repeated failures to cure deficiencies, undue prejudice to the opposing party, and futility of amendment. *In re Am. Refinery, Inc.*, 676 F.3d 455, 466–67 (5th Cir. 2012) (internal citations omitted). "Futility is an important consideration when determining whether to grant leave to amend." *RSUI Indem. Co. v. Am. States Ins.*, No. 12-2820, 2015 WL 1525854, at *6 (E.D. La. Apr. 2, 2015). "[T]he cases make it clear that leave to amend the complaint should be refused only if there is no basis for concluding that the plaintiff can state a claim and thus permitting and amendment would be futile." *Greene v. Nevro Corp.*, No. 23-CV-1648, 2025 WL 369682, at *8 (M.D. La. Jan. 31, 2025) (citation omitted). "Ultimately, however, the decision to grant or deny leave to amend is within the sound discretion of the district court. *Pervasive Software Inc. v. Lexware GmbH & Co. KG*, 688 F.3d 214, 232 (5th Cir. 2012) (citing *Wimm v. Jack Eckerd Corp.*, 3 F.3d 137, 139 (5th Cir. 1993)).

Here, there is no evidence of undue delay or bad faith. Plaintiffs have had one opportunity to cure deficiencies, but Plaintiffs' Amended Complaint added 21 new causes of action and 139 new plaintiffs, raising new issues Plaintiffs have not yet had occasion to cure. (Docs. 1, 81). This case was filed on February 2, 2023, and the Court does not doubt Defendant Paul has expended substantial time and resources to his defense. (Doc. 1). But this alone does not

warrant denial of leave. In fact, the most telling factor—futility—weighs heavily in favor of granting Plaintiffs leave to amend. Many of Plaintiffs' claims are rooted in some form of fraud, and as the Court previously noted, Plaintiffs' fraud claims, if properly pled with more specificity, could survive a motion to dismiss. (Doc. 81). The Court believes this to be the case as to the majority of Plaintiffs' claims. However, no matter how artfully pled or supplemented with facts, one count—the CEA violation—cannot survive.

Accordingly, the Court **RECOMMENDS** Plaintiffs be granted leave to amend their Complaint as to all claims, save Count 27. *Id*.

## IV.    RECOMMENDATION

In accordance with the above discussion, the Court **RECOMMENDS** Defendant Paul's Rule 12(b)(6) Motion to Dismiss be **GRANTED** as to all Counts (Doc. 85) and all 27 of Plaintiffs' claims be **DISMISSED** (Doc. 81). As to Counts 1–26, the Court **RECOMMENDS** Plaintiffs be given **LEAVE TO AMEND**. (Doc. 81). As to Count 27, the Court **RECOMMENDS** Plaintiffs' claim be **DISMISSED WITH PREJUDICE**. *Id*.

SIGNED THIS 14TH DAY OF AUGUST, 2025.

RONALD C. GRIFFIN
UNITED STATES MAGISTRATE JUDGE

**INSTRUCTIONS FOR SERVICE AND NOTICE OF RIGHT TO APPEAL/OBJECT**

In the event that a party ***has not been served*** by the Clerk with this Report and Recommendation electronically, pursuant to the CM/ECF procedures of this District, the Clerk is **ORDERED** to mail such party a copy of this Report and Recommendation by certified mail. Pursuant to 28 U.S.C. § 636(b)(1), any party who desires to object to this report must serve and file written objections within fourteen (14) days after being served with a copy. A party filing objections must specifically identify those findings, conclusions, or recommendations to which objections are being made; the District Judge need not consider frivolous, conclusive, or general objections. Such party shall file the objections with the Clerk of the Court and serve the objections on all other parties. A party's failure to file such objections to the proposed findings, conclusions, and recommendations contained in this report shall bar the party from a *de novo* determination by the District Judge. Additionally, a party's failure to file written objections to the proposed findings, conclusions, and recommendations contained in this report within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Judge. *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996).