**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**

**FILED**

August 28, 2025

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

**AUSTIN DIVISION**

BY: _Christian Rodriguez_
DEPUTY

DON HOLLAND, individually and on behalf of all
others similarly situated,

Plaintiff,

vs.                                                                          Civil Action No. 1:23-cv-110

CRYPTOZOO INC., a Delaware Corporation,
LOGAN PAUL, DANIELLE STROBEL, JEFFREY
LEVIN, EDUARDO IBANEZ, JAKE GREENBAUM
a/k/a CRYPTO KING, and OPHIR BENTOV a/k/a
 BEN ROTH,

Defendants.

_____/

LOGAN PAUL,

Cross-Plaintiff,

vs.

EDUARDO IBANEZ and
JAKE GREENBAUM a/k/a CRYPTO KING,

Cross-Defendants.

_____/

**DEFENDANT/CROSS-PLAINTIFF LOGAN PAUL'S OBJECTION TO THE REPORT**
**AND RECOMMENDATION ON HIS MOTION TO DISMISS PLAINTIFFS'**
**FIRST AMENDED COMPLAINT AND INCORPORATED MEMORANDUM OF LAW**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ..................................................................................................... iii

INTRODUCTION ................................................................................................................... 1

PROCEDURAL BACKGROUND ............................................................................................ 3

LEGAL STANDARD ............................................................................................................... 4

ARGUMENT ........................................................................................................................... 4

    I.    Texas Law Does Not Apply to All Plaintiffs' Claims. ......................................... 4

    II.    CryptoZoo Tokens and NFTs Are Not Securities. .............................................. 6

        A.    The R&R misconstrues the third prong of the *Howey* test. ............................. 7

            1.    An objective consumer would not reasonably expect "profits" from CryptoZoo. ..... 7

            2.    The R&R's reliance on *Coinbase* is misplaced..........................................11

        B.    The R&R erroneously finds a "common enterprise" by applying the wrong legal standard. ......................................................................................................... 15

        C.    The SEC Statement on Meme Coins is properly treated as supplemental authority. ...... 16

    III.    The R&R Erred by Framing an Inference Drawn from Plaintiffs' Allegations as a Finding of Fact. ...................................................................................................... 17

    IV.    The R&R Appropriately Applied Rule 12(b)(6); Rule 12(c) Does Not Govern. .............. 18

CONCLUSION ..................................................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Allstate Ins. Co. v. Hague*,
  449 U.S. 302, 101 S. Ct. 633, 66 L. Ed. 2d 521 (1981) ............................................. 5

*Apache Corp. v. New York City Employees' Ret. Sys.*,
  621 F. Supp. 2d 444 (S.D. Tex. 2008) ...................................................................... 17

*Austin Legal Video, LLC v. Deposition Sols., LLC*,
  2024 WL 5184485 (W.D. Tex. July 19, 2024) ........................................................ 19

*Barnett v. Forest River, Inc.*,
  2017 WL 7733052 (E.D. Tex. Nov. 29, 2017) ......................................................... 18

*Bauer v. AGCO Corp.*,
  770 F. Supp. 3d 957 (W.D. Tex. 2025) ..................................................................... 18

*DeSimone v. Select Portfolio Servicing, Inc.*,
  2023 WL 6450236 (E.D.N.Y. Sept. 30, 2023) ......................................................... 17

*Donovan v. GMO-Z.com Tr. Co., Inc.*,
  779 F. Supp. 3d 372 (S.D.N.Y. 2025) ..................................................................... 8, 9

*Feldkamp v. Long Bay Partners, LLC*,
  2010 WL 3610452 (M.D. Fla. Sept. 14, 2010) ................................................... 18, 19

*Herrera v. Michelin N. Am., Inc.*,
  2009 WL 700645 (S.D. Tex. Mar. 16, 2009) ............................................................. 6

*Johnston v. Prairie View, Inc.*,
  2020 WL 2025499 (D. Kan. Apr. 27, 2020) ............................................................. 19

*King v. Dogan*,
  31 F.3d 344 (5th Cir. 1994) ............................................................................... 18, 19

*Long v. Shultz Cattle Co.*,
  881 F.2d 129 (5th Cir. 1989) ................................................................................... 15

*Long v. Shultz Cattle Co.*,
  896 F.2d 85 (5th Cir. 1990) ..................................................................................... 16

*Louisiana Crawfish Producers Ass'n—W. v. Amerada Hess Corp.*,
  919 F. Supp. 2d 756 (W.D. La. 2013) ...................................................................... 17

*Middaugh v. InterBank*,
  528 F. Supp. 3d 509 (N.D. Tex. 2021) ..................................................................... 19

iii

*Pintando v. Miami-Dade Housing Agency*,
    501 F.3d 1241 (11th Cir. 2007) ............................................................... 19

*S.E.C. v. SG Ltd.*,
    265 F.3d 42 (1st Cir. 2001) ..................................................................... 9

*SEC v. Balina*,
    2024 WL 2332965 (W.D. Tex. May 22, 2024) ........................................ 16

*SEC v. Coinbase, Inc.*,
    726 F. Supp. 3d 260 (S.D.N.Y. 2024) ..........................7, 8, 9, 11, 12, 13, 14

*SEC v. Cont'l Commodities Corp*.,
    497 F.2d 516 (5th Cir. 1974) .............................................................. 15, 16

*SEC v. Edwards*,
    540 U.S. 389 (2004)................................................................................. 8

*SEC v. NAC Foundation, LLC*,
    512 F. Supp. 3d 988 (N.D. Cal. 2021) ................................................... 15

*SEC v. Telegram Grp., Inc.*,
    448 F. Supp. 3d 352 (S.D.N.Y. 2020) .................................................... 13

*SEC v. Teshuater, LLC*,
    2024 WL 1348432 (S.D. Tex. Mar. 29, 2024) ....................................... 15

*SEC v. W.J. Howey Co.*,
    328 U.S. 293 (1946)........................................................................ 1, 6, 7

*Smith v. McMullen*,
    589 F. Supp. 642 (S.D. Tex. 1984).......................................................... 17

*United Hous. Found., Inc. v. Forman*,
    421 U.S. 837 (1975)................................................................... 1, 6, 7, 8

*Westchester Corp. v. Peat, Marwick, Mitchell & Co.*,
    626 F.2d 1212 (5th Cir. 1980) .................................................................. 6

## **Statutes**

28 U.S.C.A. § 636 ..................................................................................... 4

## **Rules**

Fed. R. Civ. P. 12(b)(6) ....................................................................... 3, 4, 20

Fed. R. Civ. P. 12(c) ................................................................................... 3

**<u>Other Authorities</u>**

Lewis Klar, *The Impact of U.S. Tort Law in Canada*, 38 PEPPERDINE L. REV. 362, Iss. 2 (2011) . 5

Kylie Burns, *et al.*, *Australia: a land of plenty (of legislative regimes)*, COMPARING TORT & CRIME, Cambridge Univ. Press (2015)……………………………………………………5

## INTRODUCTION

The Magistrate Judge recommended dismissal of Plaintiffs' First Amended Class Action Complaint against Logan Paul and advised granting Plaintiffs leave to amend twenty-six of their twenty-seven counts.[1] The Report and Recommendation ("R&R") erred in four fundamental respects, none of which should alter the ultimate result.

*First*, the R&R erroneously concluded that the Court may apply Texas law to all Plaintiffs' common law claims. As Mr. Paul argued in his motion to dismiss, Texas courts apply the "most significant relationship" test to choice-of-law questions such that, where a conflict exists, the law of the state with the most significant relationship to each claim applies. Though Plaintiffs had not pled sufficient facts to inform a comprehensive conflicts analysis, Mr. Paul argued in his motion that each Plaintiff's claims should be governed by the law of the place where he or she resides. This is particularly so given that 137 of the 140 Plaintiffs' claims do not have *any* connection to Texas, let alone a "significant" one, such that applying Texas law to these claims would violate due process. Mr. Paul will submit additional briefing on conflict of laws at the appropriate time, as Magistrate Judge Griffin invited.

*Second*, the R&R dismissed Plaintiffs' claims for violations of the Securities Exchange Act as insufficiently pled, but erred in its initial conclusion that CryptoZoo Tokens and NFTs qualify as securities under the three-prong test set forth in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946). The third prong of the *Howey* test considers whether the transaction at issue gave rise to "a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." *United Hous. Found., Inc. v. Forman,* 421 U.S. 837, 852 (1975) (citing *Howey*, 328 U.S. at 299). The inquiry is objective: it asks what a reasonable purchaser would have understood

---

[1] The R&R recommended dismissal with prejudice of Count Twenty-Seven for violations of the Commodity Exchange Act and aspects of Count Five, for negligence. *See* R&R at 41-44, 68-70.

from the promoters' public representations about the asset. CryptoZoo and its co-founders did not promote CryptoZoo as an investment vehicle. They touted the project as a "game" developed by "artists" that would be "fun" and that "kids . . . love to play." Nor did they publicize the project as one that would bring "profits," which the United States Supreme Court has defined narrowly to include investment income or returns. Plaintiffs therefore fail to satisfy *Howey*'s third prong.

The R&R also incorrectly concluded that Plaintiffs had satisfied the second, "common enterprise" element of the *Howey* test by applying the Ninth Circuit's standard rather than the standard applied by the Fifth Circuit. Under the Fifth Circuit's test, a plaintiff satisfies the common enterprise element by alleging that the collective success of all investments in an enterprise is essentially dependent upon the promoter's expertise. But Plaintiffs have not alleged that any Defendant possessed relevant expertise, let alone expertise that could be considered material to the success of a financial investment. They allege that Mr. Paul is an "entertainer," "online celebrity," and media host who promoted CryptoZoo to his online subscribers as a "game" without any mention of investment value. Plaintiffs describe Defendant Eduardo Ibanez vaguely as a former "hacker" with experience in "cybersecurity," but offer no additional information that would engender confidence in his or any other defendant's investment advice.

*Third*, in finding that Plaintiffs cannot pierce the corporate veil, the R&R stated that the "court believe[d]" Mr. Paul's "purpose" to have been "dishonest" and that "he acted with intent to deceive Plaintiffs" in making certain statements. Mr. Paul understands this statement to mean that Plaintiffs have *plausibly alleged* a dishonest purpose. To the extent that R&R was asserting a finding of fact, however, Mr. Paul objects on the ground that the R&R failed to limit its analysis to consideration of the sufficiency of the facts pled, as required on a Rule 12(b)(6) motion to dismiss for failure to state a claim.

*Fourth*, and finally, the R&R reasons that Mr. Paul's motion to dismiss for failure to state a claim could properly be considered a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c), because Mr. Paul answered the complaint before filing his motion to dismiss. But Mr. Paul answered Plaintiff Holland's *original* complaint; he did not answer or otherwise respond to the *amended* complaint—consisting of twenty-seven counts brought by Mr. Holland and 139 other plaintiffs—before filing his motion to dismiss. The R&R ultimately considered Mr. Paul's motion under Rule 12(b)(6), but did not need to carve out an exception based on a "technicality." This result makes sense—amended pleadings render the original pleadings that precede them a legal nullity, and before the pending motion to dismiss, Mr. Paul had not yet had the opportunity to address any plaintiff's claims other than Mr. Holland's original eight.

The Court should decline to adopt those aspects of the R&R addressed by Mr. Paul's objections, adopt the remainder, and dismiss Plaintiffs' First Amended Class Action Complaint ("FAC" or the "Amended Complaint") in its entirety.

## **PROCEDURAL BACKGROUND**

Plaintiff Don Holland filed the original class action complaint in this action on February 2, 2023, against CryptoZoo, Inc., Logan Paul, Eduardo Ibanez, Jake Greenbaum, Jeffrey Levin, Danielle Stroebel, and Ophir Bentov, bringing eight state law causes of action arising from alleged economic losses resulting from Mr. Holland's purchase of CryptoZoo tokens and NFTs. [ECF No. 1.] Mr. Paul answered Plaintiff Holland's original complaint, asserted affirmative defenses, and brought crossclaims against Defendants/Cross-Defendants Eduardo Ibanez and Jake Greenbaum. *See* Answer, Aff. Defenses, and Crossclaim [ECF No. 55].

Plaintiff Holland amended the original complaint on August 19, 2024, to add 139 additional plaintiffs from fourteen U.S. states and thirty-one countries; nineteen causes of action, including claims for violations of the federal RICO statute and securities laws; and new facts. [ECF No. 81.]

Mr. Paul moved to dismiss the Amended Complaint on August 30, 2024 [ECF No. 85]. On August 14, 2025, the Magistrate Judge entered an R&R recommending dismissal of the Amended Complaint in its entirety, and granting Plaintiffs leave to amend twenty-six of the twenty-seven counts. [ECF No. 107.] Mr. Paul now objects to four of the R&R's holdings.

## LEGAL STANDARD

"A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C.A. § 636. The Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *Id.*

## ARGUMENT

The R&R missed the mark in at least four respects: (I) the Court cannot apply Texas law to all Plaintiffs' claims; (II) the CryptoZoo assets at issue are not securities; (III) at this stage, the Court's review is limited to the sufficiency of Plaintiffs' allegations; and (IV) Rule 12(b)(6) governs the Court's analysis because Mr. Paul has not answered the Amended Complaint.

### I.    Texas Law Does Not Apply to All Plaintiffs' Claims.

The R&R applied Texas law to its analysis of Plaintiffs' claims as a default setting, reasoning that neither party had briefed choice of law and both had "assumed without argument that Texas law governs." *See* R&R at 14. But Mr. Paul *did* brief choice of law to the extent possible given the deficient allegations of the Amended Complaint. He argued, correctly, that Texas district courts apply the "most significant relationship" test to choice of law questions in tort and contract cases, requiring analysis of the law of the place where the injury occurred (for torts) or the place where the contract at issue was negotiated and performed (for contract claims). *See* Mot. to Dismiss [ECF No. 85] at 34.

The problem, however, remains that Plaintiffs have not pled the facts required for a fulsome

4

choice-of-law analysis. They do not allege where any Defendant resides or, relatedly, where any Plaintiff's contract with CryptoZoo (or any purported contract with Mr. Paul) was negotiated or performed. *See id.* at 7, 34. Nor does the Amended Complaint identify the countries or states in which some plaintiffs purchased CryptoZoo. *See id.* at 7-8 (noting that some plaintiffs allege only that they reside in "the United Kingdom" or "the United States").[2] Regardless, Mr. Paul took the position in his motion that the laws of the states and countries where the various Plaintiffs reside would (once identified) govern their claims. *See id.*

Mr. Paul did not engage in a thorough analysis of the laws of the fourteen states and thirty-one countries at issue given the Amended Complaint's deficiencies. He opted instead to analyze only the three "co-lead" Plaintiffs' claims under the laws of their home states—Texas and California—and provide authority to the extent possible describing distinctions where state laws differ. *See id.* at 34. This was *not* a concession that Texas law applies to all Plaintiffs' claims. In fact, it cannot. Most Plaintiffs' claims have *no* connection to Texas—only three plaintiffs reside there (FAC ¶¶ 45, 98, 171), no Defendant is at home there (*id.* ¶¶ 185-90), and Plaintiffs do not allege any other material relationship between their claims and Texas. Applying Texas law to the 137 nonresident plaintiffs' claims would, consequently, violate due process. *See Allstate Ins. Co. v. Hague*, 449 U.S. 302, 312–13, 101 S. Ct. 633, 640, 66 L. Ed. 2d 521 (1981) ("[F]or a State's

---

[2] Other Plaintiffs allege only they reside in "Canada" or "Australia" without identifying a specific town or city, *see, e.g.*, FAC ¶¶ 59, 72, 77-81, 93, 94, 100, 101, 107, 119-21, 128, 137-39, 141, 143 148, 151, 157, 176, and variances exist among the tort and contract laws of these countries' regions and territories. *See, e.g.,* Lewis Klar, *The Impact of U.S. Tort Law in Canada*, 38 PEPPERDINE L. REV. 362, Issue 2, at 359, 362 (2011) ("In one sense, it is not possible to speak of 'Canadian' tort law because tort law varies from province to province."); Kylie Burns, *et al.*, *Australia: a land of plenty (of legislative regimes)*, COMPARING TORT & CRIME, Cambridge Univ. Press (2015) ("[M]ost criminal and tort law is state-based, and, hence, varies across Australia."), *available at* https://www.cambridge.org/core/books/abs/comparing-tort-and-crime/australia-a-land-of-plenty-of-legislative-regimes/8DB185E397655A218103ACEA1874AEC8.

substantive law to be selected in a constitutionally permissible manner, that State must have a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair."); *Herrera v. Michelin N. Am., Inc.*, 2009 WL 700645, at *11 (S.D. Tex. Mar. 16, 2009) (applying Texas law to claims with no specific connection to Texas, "would be an unconstitutional exercise of extraterritorial jurisdiction").

Mr. Paul recognizes that, should Plaintiffs appropriately plead facts to support a comprehensive choice of law analysis in a second amended complaint, the Court will require thorough briefing on the issue to resolve Plaintiffs' claims. Mr. Paul will provide such briefing at the appropriate time as invited by Magistrate Judge Griffin.

## II.    CryptoZoo Tokens and NFTs Are Not Securities.

The threshold question of whether a digital asset constitutes a security is governed by the Supreme Court's test for an "investment contract," set forth in *SEC v. W.J. Howey Co.,* 328 U.S. 293 (1946). Often cited for its flexibility, the *Howey* test is not a boundless net; it is a specific, three-part inquiry designed to identify a particular kind of financial relationship. For a transaction to be deemed an investment contract, it must involve (1) an investment of money, (2) in a common enterprise, with (3) a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others. *United Hous. Found., Inc. v. Forman,* 421 U.S. 837, 852 (1975) (citing *Howey*, 328 U.S. at 299).

The *Howey* test is not disjunctive: a plaintiff must plead and prove every element, and failure to establish any one is fatal to a securities claim. *See Westchester Corp. v. Peat, Marwick, Mitchell & Co.,* 626 F.2d 1212, 1215 (5th Cir. 1980) ("This Circuit has required all three *Howey* elements to be present for a land contract to constitute a security."). The Supreme Court did not intend the test to regulate every novel product or asset; it aimed to protect passive investors in "the

countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Howey*, 328 U.S. at 299. Therefore, as the R&R recognizes, courts must look past labels and analyze the "economic reality" of the entire transaction. *See Forman,* 421 U.S. at 849; R&R at 53. Doing so requires a case-by-case inquiry into the "totality of the circumstances" surrounding the transaction, ensuring that courts consider the unique facts of each offering. *See SEC v. Coinbase, Inc.*, 726 F. Supp. 3d 260, 287 (S.D.N.Y. 2024). And, addressing crypto-assets, "courts evaluate whether the crypto-assets and the full set of contracts, expectations, and understandings surrounding [the asset's] sale and distribution . . . amount to an investment contract." *Id.* at 289 (cleaned up).

Contrary to the R&R's conclusions, Plaintiffs' allegations fail to satisfy *Howey*.

**A. The R&R misconstrues the third prong of the *Howey* test.**

The R&R's analysis of *Howey*'s third prong—a reasonable expectation of profits derived from the entrepreneurial or managerial efforts of others, *Forman,* 421 U.S. at 852—is materially flawed because the R&R (1) misapplied the objective "reasonable expectation of profits" standard; and (2) misplaced its reliance on *SEC v. Coinbase, Inc.*, 726 F. Supp. 3d 260, 289 (S.D.N.Y. 2024), which presents facts distinct from Plaintiffs' allegations in the Amended Complaint.

1. An objective consumer would not reasonably expect "profits" from CryptoZoo.

The third prong of the *Howey* test incorporates two distinct, objective components: (1) a reasonable expectation of profits, (2) derived from the entrepreneurial or managerial efforts of others. The inquiry is an objective one, asking what a reasonable purchaser would have understood from the promoters' public representations. *See Forman*, 421 U.S. at 852 ("The touchstone [of the *Howey* test] is the presence of an investment in a common venture premised on a *reasonable expectation of profits* to be derived from the entrepreneurial or managerial efforts of others.")

(emphasis added); *Donovan v. GMO-Z.com Tr. Co., Inc.*, 779 F. Supp. 3d 372, 385 (S.D.N.Y. 2025) ("*Howey*'s third prong reflects an objective standard of reasonableness."); *Coinbase*, 726 F. Supp. 3d at 289 ("[I]n assessing the circumstances surrounding the sale of a crypto-asset, courts should look to what the offeror invites investors to reasonably understand and expect. To do so, courts examine how, and to whom, issuers or promoters market the crypto-asset."). Critically, in this context, "[p]rofits" does not encompass all possible benefits; it means "either capital appreciation resulting from the development of the initial investment, ... or a participation in earnings resulting from the use of investors' funds." *Donovan*, 779 F. Supp. 3d at 385 (citing *Forman*, 421 U.S. at 852, and *SEC v. Edwards*, 540 U.S. 389, 394 (2004) ("profits" means "income or return, to include, for example, dividends, other periodic payments, or the increased value of the investment")).

Applying this objective standard, a consumer purchasing CryptoZoo tokens and NFTs would *not* reasonably have expected "profits." As the R&R recognizes, at all times relevant (and most critically pre-purchase), Mr. Paul touted his passion project to his followers and subscribers as a game. He and his colleagues described CryptoZoo as a "really fun game that makes you money," a "game" that "kids . . . love to play," a project for which Mr. Paul had "really fun plans," and a "project" being "developed" by "artists." FAC ¶¶ 188, 200, 206, 210; R&R at 56. These public statements aligned with CryptoZoo's Whitepaper, which warned that "$ZOO was created to support CryptoZoo, and was not intended to be an investment vehicle," FAC ¶¶ 8, 20, as well as its Terms and Conditions ("T&C"), which advised:

> CryptoZoo are *collectible digital art pieces* that also function as fun, Non-Fungible Tokens *for you to collect*. They were created as art pieces intended for people to enjoy by collecting, *not as a financial instrument*. CryptoZoo makes absolutely no promises or guarantees regarding the value of CryptoZoo NFTs aside from the one that we will strive to do the best for the project and the community.

Compl. [ECF No. 1] at Ex. 1 (emphasis added).[3]

The R&R correctly observes that disclaimers are not dispositive under *Howey*, *see* R&R at 53, but they are not irrelevant. A clear and unequivocal disclaimer is a crucial part of the "economic reality" that informs a reasonable investor's expectations. *See, e.g.*, *S.E.C. v. SG Ltd.*, 265 F.3d 42, 54 (1st Cir. 2001) (defendant's "repeated disclaimers" were not "irrelevant" and defendant had "a plausible argument . . . that no participant in his or her right mind should have expected guaranteed profits from purchases of privileged company shares"). A reasonable consumer reviewing the prominent, explicit disclaimers in the T&C and Whitepaper, coupled with Mr. Paul's and his colleagues' consistent characterizations of the project as a "game," would understand the project's consumptive purpose and not mistake CryptoZoo purchases for investment contracts. *See, e.g.*, *Coinbase*, 726 F. Supp. 3d at 287 (courts "look at the 'totality of the circumstances' surrounding the offer of an investment contract . . . including the intentions and expectations of the parties at the time"). Notably, Plaintiffs do *not* allege that Defendants promised investment returns, dividends, or any form of "capital appreciation resulting from the development of the initial investment." *Donovan*, 779 F. Supp. 3d at 385.

Nor did Mr. Paul and his co-founders target their promotion of CryptoZoo to known individual or institutional investors. *See Coinbase*, 726 F. Supp. 3d at 289 ("[C]ourts should look to what the offeror invites investors to reasonably understand and expect. To do so, courts examine how, *and to whom*, issuers or promoters market the crypto-asset.") (emphasis added). According to Amended Complaint, Mr. Paul—an "entertainer," "online celebrity," and media host—marketed CryptoZoo to his followers on Twitter (now "X") and YouTube. *See* FAC ¶¶ 3, 27, 200, 206, 210.

---

[3] Although Plaintiffs did not attach the T&C to the Amended Complaint, the R&R acknowledged that they had attached it to their original complaint, and considered it in reviewing and analyzing Mr. Paul's motion to dismiss the Amended Complaint. *See* R&R at 52 n.17.

Finally, to the extent that the R&R relies on Mr. Paul's January 2023 indicators ("^^") on social media purportedly characterizing CryptoZoo as an "investment" as the basis for finding a reasonable expectation of profit, its reliance is misplaced for several reasons. *First*, Mr. Paul published these statements *after* 139 of the 140 plaintiffs had purchased CryptoZoo products. *See* FAC ¶¶ 19, 20, 45-184. It is, therefore, a "temporal impossibility" for these plaintiffs to have formed any expectation founded on these statements before the point of purchase. *See* R&R at 34. *Second*, the indicators "^^" do not convey that CryptoZoo would function as anything other than a game. Mr. Paul's apparent adoption of *third-party* opinions by using the indicator "^^" is too vague to be conclusive. Mr. Paul used "^^," for example, in response to a commenter who said:



FAC ¶ 20; R&R at 8.

The use of "^^" does not necessarily indicate Mr. Paul's agreement with the characterization of CryptoZoo purchases as "investments"; it could simply indicate Mr. Paul's adoption of the statement "don't buy anymore" or reflect his feeling that he was "sick" of shouldering blame. And, notably, both the Amended Complaint and the R&R present Mr. Paul's "statements" out of order. Mr. Paul's *first* and immediate public statement after Hunterkayy's

comment came one minute later, at 18:38:



FAC ¶ 20; R&R at 8-9.

It was only *after* explaining the "$ZOO was created to support CryptoZoo," *the game*, that Mr. Paul indicated agreement with an unspecified part of the statement by Hunterkayy. FAC ¶ 20 (showing that Mr. Paul indicated "^^" at 18:39).

Taken together, Plaintiffs' allegations can only compel the conclusion that they have not plausibly alleged that purchasers had "a reasonable expectation of profits" under *Howey.*

2. The R&R's reliance on *Coinbase* is misplaced.

The R&R concludes that *S.E.C. v. Coinbase, Inc.*, 726 F. Supp. 3d 260 (S.D.N.Y. 2024), is "remarkably similar" to this case (R&R at 56), but the comparison collapses under even the slightest scrutiny. *Coinbase* addressed whether a crypto-asset trading platform (Coinbase), had, among other things, engaged in the unregistered offer and sale of securities. *See* 726 F. Supp. 3d at 268. Seeking dismissal of the SEC's complaint, Coinbase argued "that the transactions executed and facilitated through its platform and related services d[id] not qualify as 'securities,' and thus f[e]ll outside the scope of the SEC's delegated authority." *Id.* Resolving this question required the court to apply the *Howey* test. *Id.* at 279.

Addressing the third prong of the *Howey* test, the court reasoned that "in assessing the circumstances surrounding the sale of a crypto-asset, courts should look to what the offeror invites investors to reasonably understand and expect" by "examin[ing] how, and to whom, issuers or promoters market the crypto-asset," including consideration of "websites, social media posts, investor materials, town halls, and other fora." *Id.* at 289, 202. The court then considered two of the thirteen crypto-assets at issue—Solana (SOL) and Chiliz (CHZ)—and found that both satisfied *Howey*'s third prong. *See id.* at 274-77, 291-93.

In both cases, unlike here, the promoters presented the crypto-assets in question as investment contracts intended to provide investors an investment return. The promoter of the first crypto-asset, Solana (SOL), raised capital to fund its endeavor through two initial offerings targeted at institutional investors, a "Dutch auction," private sales, and, ultimately, release on the secondary market. *See id.* at 275. The promoter, Solana Labs, also posted news of SOL's availability to trade on two U.S. exchanges on Twitter, and "stated publicly that it would pool proceeds from its private and public SOL sales to 'fund the development, operations, and marketing efforts with respect to the Solana blockchain in order to attract more users to that blockchain.'" *Id.* (quoting complaint). Solana Labs used a variety of popular platforms to increase participation in its network—and thus demand for SOL—and announced its intention, pre-sale, to exercise control over the supply of SOL by destroying SOL tokens as part of a "deflationary model" to reduce the total supply and thereby maintain a healthy SOL price. *Id.* at 275-76.

The second crypto-asset, Chiliz (CHZ), was developed to raise capital "to help fund new sports and e-sports entities," and granted investors voting rights to "influence team decisions." *Id.* at 276 (cleaned up). Like Solana Labs, the Chiliz team had raised capital to fund CHZ through several private offerings and "stated publicly that it would pool proceeds from CHZ sales to fund

the development, marketing, business operations, and growth of the Chiliz protocol and, consequently, to increase the demand for CHZ in connection with the protocol." *Id.* The Chiliz team also publicized its plans to increase demand for CHZ, as well as its intention to destroy CHZ tokens "to reduce their total supply as a mechanism to support the price of CHZ." *Id.* at 277.

Ultimately, the court in *Coinbase* found that "the SEC ha[d] plausibly alleged that issuers and promoters of the [at-issue] Crypto-Assets . . . repeatedly encouraged investors to purchase tokens by advertising the ways in which their technical and entrepreneurial efforts *would be used to improve the value of the asset*, and continued to do so long after the tokens were made available for trading on the secondary market." *Id.* at 292 (emphasis added). The court also found persuasive the SEC's "allegations of . . . public statements to the effect that token issuers would employ deflationary strategies to reduce the total supply of tokens and thereby affect the token price[,]" because these statements represented affirmations of the promoters' ability to "support the token's market price by reducing the supply of available tokens." *See id.* (citing *SEC v. Telegram Grp., Inc.*, 448 F. Supp. 3d 352, 372 (S.D.N.Y. 2020)). Finally, the court observed that the at-issue assets' promoters had "publicized to investors in the primary and secondary markets that profits from the continued sale of tokens would be fed back into further development of the token's ecosystem, which would, in turn, increase the value of the token." *Id.* This conveyed to investors that the promoters were focused on "profits" and the crypto-assets in question were investment opportunities from which investors could expect to see investment returns. *See id.* at 293.

As detailed above, *see* pp. 8-9, *supra*, Plaintiffs' allegations about CryptoZoo are different. Plaintiffs allege that Mr. Paul and his co-founders promoted CryptoZoo to Mr. Paul's followers as a "game" developed by "artists" and supported by capital *not* from investors, but from Mr. Paul's own pockets. *See* FAC ¶¶ 3, 200, 106, 200, 210. They do not allege that Mr. Paul or his co-founders

told consumers that they would take steps to increase demand or the value of CryptoZoo tokens or NFTs or reinvest profits in the CryptoZoo enterprise. The R&R grasps at superficial similarities between this case and *Coinbase* that lack any legal relevance, such as the T&C's use of the word "community" and Mr. Paul's assurance that the CryptoZoo team was "working around the clock." R&R at 56. The R&R also treats CryptoZoo's vague announcement of "future opportunities" as a promise of future "profits" (*i.e.* investment returns), *see id.*, but it is not. Considered in context, "future opportunities" is more logically construed to reference opportunities *within the game*—to win prizes and gain early access to other projects developed by Mr. Paul, for example. *See, e.g.*, FAC ¶¶ 201, 207; Compl. [ECF No. 1] at Ex. 1.

Finally, the R&R's likening of the *Coinbase* promoters' broad public advertisement of their teams' qualifications to CryptoZoo's publication on its website of the employment history of one of its many team members is misguided. *Compare Coinbase*, 726 F. Supp. 3d at 275-76, 277 *with* R&R at 57. The SOL and CHZ teams promoted the expertise of "350+ cross-industry professionals," touting details of their "past entrepreneurial and technology experiences and successes," and a team "comprised of pioneering technologists from several high-profile technology companies." *Coinbase* 726 F. Supp. 3d at 275-76, 277 (cleaned up). Plaintiffs, by contrast, allege that CryptoZoo's website noted that *one* founder, Eduardo Ibanez, was a former hacker, professor, and, vaguely, "American tech entrepreneur," who had once worked in "cybersecurity." R&R at 57 (citing FAC at 42). These "qualifications" do not speak to managerial capabilities directed at designing and operating a sophisticated investment enterprise; they better describe experience with the code and technology required to develop and protect a computer application, such as a game.

The Court should decline to adopt Section vii(i) of the R&R and hold that Plaintiffs have

not satisfied the third prong of the test set forth in *Howey*.

**B.  The R&R erroneously finds a "common enterprise" by applying the wrong legal standard.**

The R&R incorrectly concludes that Plaintiffs have satisfied the "common enterprise" element of the *Howey* test. *See* R&R at 51-52 n.16 ("The second element is also satisfied."). As support, the R&R relies on *SEC v. NAC Foundation, LLC*, 512 F. Supp. 3d 988 (N.D. Cal. 2021), for the proposition that a common enterprise exists where an investment scheme involves either horizonal or "strict vertical" commonality, with "strict vertical" commonality requiring "a showing that the fortunes of the investors are linked with those of the promoters." *Id.* (quoting *NAC Found.*, 512 F. Supp. 3d at 996). But the Fifth Circuit does not recognize horizontal commonality as a prerequisite to establishing a common enterprise *or* apply a "strict vertical" commonality standard—the controlling "common enterprise" standard in the Fifth Circuit is "broad vertical commonality." *See Long v. Shultz Cattle Co.*, 881 F.2d 129, 140-41 (5th Cir. 1989) (stating "[t]his court . . . has explicitly rejected the view that horizontal commonality is a prerequisite to establishing a common enterprise within the meaning of *Howey* and has focused instead on the 'vertical commonality' between the investors and the promoter[,]" and distinguishing Ninth Circuit vertical commonality standard from standard applied by Fifth Circuit); *SEC v. Teshuater, LLC*, 2024 WL 1348432, at *4 (S.D. Tex. Mar. 29, 2024).

This distinction is crucial: the commonality standard applied by the Ninth Circuit requires a showing that a promoter's fortunes rise and fall with those of investors, whereas the Fifth Circuit's standard focuses on whether investors' collective success is dependent on the promoter's expertise. *See SEC v. Cont'l Commodities Corp.*, 497 F.2d 516, 522 (5th Cir. 1974) ("[T]he critical inquiry is confined to whether the fortuity of the investments collectively is essentially dependent upon promoter expertise."). And, "under the commonality theory adopted [by the Fifth Circuit],

the second and third prongs of the *Howey* test may in some cases overlap to a significant degree." *Long v. Shultz Cattle Co.*, 896 F.2d 85, 86 (5th Cir. 1990).

Applying the correct standard, Plaintiffs fail to allege facts demonstrating a common enterprise. The focus of the Fifth Circuit's commonality test is "promoter expertise," but Plaintiffs fail to plead any facts suggesting Defendants possessed *any* relevant expertise or offered any investment advice. *See, e.g.*, *Cont'l Commodities Corp.*, 497 F.2d at 522 (common enterprise found where investors' collective success depended on promoters' "guidance for the success of their investment"). Unlike the promoters in *SEC v. Balina*, 2024 WL 2332965 (W.D. Tex. May 22, 2024), on which Plaintiffs rely, Defendants are a social media influencer and his associates who did not "highlight" their "expertise to give comfort to the investors about the 'fortuity of the investments' supporting a common enterprise." 2024 WL 2332965, at *9 (noting that promoters had published "eight pages of biographies of executives and other employees, highlighting their educational and professional backgrounds," which, with other facts, "indicated that Sparkster was seeking purchasers of tokens much like a company would seek investors before an I.P.O."). Other than vague assertions about Ibanez's background on the CryptoZoo website, *see* p. 14, *supra*, Plaintiffs identify no public statement by any Defendant touting the team's relevant management capabilities, educational backgrounds, or technical skills in a way that would engender *investor* confidence. Without plausible allegations of promoter expertise, among other things, there can be no common enterprise under Fifth Circuit law. *See, e.g.*, *Long*, *supra*.

**C.  The SEC Statement on Meme Coins is properly treated as supplemental authority.**

The R&R improperly declined to consider the SEC's recent guidance on meme coins by mischaracterizing the statement as matter for a supplemental pleading rather than legal authority. (R&R at 70-72). The SEC Statement is not an assertion of new or additional facts, which would properly be the subject of a motion for supplemental pleading. *See* R&R at 71. Rather, the SEC

Staff Statement is an agency opinion on a matter of law and, as such, is persuasive legal authority that may be considered on a motion to dismiss. *See, e.g.*, *DeSimone v. Select Portfolio Servicing, Inc.*, 2023 WL 6450236, at *4 & n.7 (E.D.N.Y. Sept. 30, 2023) (treating agency opinion as persuasive legal authority submitted via notice of supplemental authority); *see also, e.g.*, *Apache Corp. v. New York City Employees' Ret. Sys.*, 621 F. Supp. 2d 444, 449 (S.D. Tex. 2008) (characterizing SEC no-action letters as "nonbinding, persuasive authority"). The Court should consider the SEC Statement as persuasive legal authority.

Plaintiffs have not plausibly alleged CryptoZoo products are securities.

### III.    The R&R Erred by Framing an Inference Drawn from Plaintiffs' Allegations as a Finding of Fact.

Before concluding that Plaintiffs could not pierce the corporate veil, the R&R repeated statements that the Amended Complaint attributes to Mr. Paul and opined: "The Court believes in making the statements in 2021, knowing they were untrue—as evidenced by his 2024 alleged admission—Defendant Paul's purpose was dishonest, and he acted with the intent to deceive Plaintiffs into purchasing CryptoZoo products." R&R at 25.

Mr. Paul understands this statement to convey that the Magistrate Judge, drawing all reasonable inferences in Plaintiffs' favor, has concluded that Plaintiffs have plausibly alleged a dishonest purpose. To the extent the R&R goes beyond drawing such inferences, and has asserted a finding of fact, its conclusion is impermissible on a Rule 12(b)(6) motion.[4] *See, e.g.*, *La. Crawfish Producers Ass'n—W. v. Amerada Hess Corp.*, 919 F. Supp. 2d 756, 764 (W.D. La. 2013) ("[T]he [c]ourt's inquiry [on a Rule 12(b)(6) motion] is limited to the face of the pleadings, and . . . directed

---

[4] "[W]hen construing a [Rule 12(c)] motion for judgment on the pleadings, the Court is required to assume that the allegations of fact presented by the *opposing* party are true, . . .and must further view the facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable to the *non*moving party." *Smith v. McMullen*, 589 F. Supp. 642, 644 (S.D. Tex. 1984) (emphasis added) (citing Wright & Miller, Fed. Prac. & Procedure: Civ. § 1368 (1973)).

to the *sufficiency* of those facts pled[,]" and district courts should not "make . . . factual findings [or] substantive determinations" on motions to dismiss for failure to state a claim.) (emphasis in original); *see also Bauer v. AGCO Corp.*, 770 F. Supp. 3d 957, 963 (W.D. Tex. 2025) ("[F]actual findings . . . cannot be made at the Rule 12(b)(6) stage.").

Mr. Paul objects to the inclusion of the language quoted above, as phrased, in the Court's forthcoming order on his motion to dismiss.

## IV.    The R&R Appropriately Applied Rule 12(b)(6); Rule 12(c) Does Not Govern.

Before addressing the parties' arguments, the R&R undertook an analysis of a perceived "procedural issue." R&R at 12. The R&R reasoned that because Mr. Paul had answered Plaintiff Holland's *original* complaint, his motion to dismiss the *amended* complaint under Rule 12(b)(6) was "technically untimely." *Id.* As support, the R&R reasoned that "'Rule 12(b)(6) requires that motions for failure to state a claim must be made before an answer is submitted.'" *Id.* (quoting *Barnett v. Forest River, Inc.*, 2017 WL 7733052, at *4 n.1 (E.D. Tex. Nov. 29, 2017)). This is a correct articulation of the rule, but the R&R misapplied it. A motion to dismiss for failure to state a claim must precede an answer *where the motion and answer address the same pleadings*. Answering an original complaint does not preclude a defendant from moving to dismiss a subsequent amendment. *See, e.g.*, *Feldkamp v. Long Bay Partners, LLC*, 2010 WL 3610452, at *6 (M.D. Fla. Sept. 14, 2010) ("Plaintiffs are correct that defendants, while moving to dismiss other counts, previously answered the FUFTA count. . . . This does not, however, preclude them from filing a motion to dismiss when the count is reasserted in an amended complaint.").

This rule makes sense. An amended pleading supersedes an original pleading, rendering the original a nullity. *See, e. g.*, *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994) ("An amended complaint supersedes the original complaint and renders it of no legal effect unless the amended complaint specifically refers to and adopts or incorporates by reference the earlier pleading."); *see*

*also Pintando v. Miami-Dade Housing Agency*, 501 F.3d 1241, 1243 (11th Cir. 2007) ("As a general matter, an amended pleading supersedes the former pleading; the original pleading is abandoned by the amendment, and is no longer a part of the pleader's averments against his adversary.")). An amended complaint is a fresh start, reviving a defendant's right to move for dismissal for failure to state a claim. *See, e.g., Austin Legal Video, LLC v. Deposition Sols., LLC*, 2024 WL 5184485, at *4 n.2 (W.D. Tex. July 19, 2024) (motion to dismiss amended complaint after answering earlier complaint not untimely); *Middaugh v. InterBank*, 528 F. Supp. 3d 509, 533 (N.D. Tex. 2021) (same); *Johnston v. Prairie View, Inc*., 2020 WL 2025499, at *4 (D. Kan. Apr. 27, 2020) ("Because the original complaint no longer was in effect, Defendant Lane's original answer was also moot and without legal effect. . . . Once Plaintiff filed the first amended complaint, Defendant Lane was free to answer, move, or otherwise respond."); *Feldkamp, supra*.

The R&R reached the correct result by applying Rule 12(b)(6) to Mr. Paul's motion to dismiss. It erred, however, in reasoning that the motion was technically a motion for judgment on the pleadings. *See* R&R at 13. Plaintiff Holland abandoned his original complaint by filing an amendment, rendering his first pleading a legal nullity. *See King*, 31 F.3d at 346.

The R&R also failed to acknowledge that the Amended Complaint raises new matter. This case began with one plaintiff—Don Holland—who brought eight causes of action against Mr. Paul and his co-defendants, all arising under Texas state law. *See* Compl. [ECF No. 1]. The original complaint was twenty-six pages long. *See id.* The amended complaint, by contrast, spans 114 pages, adds 139 additional plaintiffs from fourteen states and thirty-one countries; raises twenty-seven causes of action, including federal RICO and securities claims and claims for violations of fifteen state consumer protection statutes; and sets forth new allegations about the alleged CryptoZoo scheme, including fresh allegations about Mr. Paul. *Compare id. with* FAC [ECF No.

81]. Prior to the pending motion, Mr. Paul had not yet had the opportunity to address any of these new claims or factual allegations. Mr. Paul has a right to move to dismiss the Amended Complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).

## **CONCLUSION**

The Court should decline to adopt the R&R as to the issues raised in Mr. Paul's objections and grant his motion to dismiss in its entirety.        .

Date: August 28, 2025                                    Respectfully submitted,

/s/ *Benjamin J. Widlanski*                                /s/ *Jeffrey Neiman*
Benjamin J. Widlanski, Esq.                             Jeffrey Neiman, Esq.
bwidlanski@kttlaw.com                                   jneiman@nmfalawfirm.com
Tal Lifshitz, Esq.                                       Jason L. Mays, Esq.
tjl@kttlaw.com                                          jmays@nmfalawfirm.com
Rachel Sullivan, Esq.                                   **NEIMAN MAYS FLOCH & ALMEIDA PLLC**
rs@kttlaw.com                                           100 SE 3rd Ave., Suite 805
Clayton Schmitt, Esq.                                    Fort Lauderdale, Florida 33394
cschmitt@kttlaw.com                                     Telephone: (954) 462-1200
**KOZYAK TROPIN & THROCKMORTON LLP**
2525 Ponce de Leon Boulevard, 9th Floor                 *Counsel for Defendant Paul*
Miami, Florida 33134                                    (admitted *pro hac vice*)
Telephone: (305) 372-1800
Facsimile: (305) 372-3508

*Counsel for Defendant Logan Paul*
(admitted *pro hac vice*)

/s/ *Shelby O'Brien*
Shelby O'Brien
**BUTLER SNOW LLP**
1400 Lavaca Street, Suite 1000
Austin, Texas 78701
Telephone: (737) 802-1800
Facsimile: (737) 802-1801
shelby.obrien@butlersnow.com

*Counsel for Defendants Paul,*
*Levin, and Bentov*
(admitted to Western District of Texas)

20

## **CERTIFICATE OF SERVICE**

I hereby certify a copy of the above and foregoing has been served upon all counsel of

record by using the Court's electronic filing system on the 28th day of August 2025.

/s/ *Benjamin J. Widlanski*
Benjamin J. Widlanski, Esq.