# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

DON HOLLAND, individually and on behalf of all
others similarly situated,

Plaintiff,

vs.

CRYPTOZOO INC., a Delaware Corporation,
LOGAN PAUL, EDUARDO IBANEZ, and JAKE
GREENBAUM a/k/a CRYPTO KING,

Defendants.

_____/

LOGAN PAUL,
Cross-Plaintiff,
vs.
EDUARDO IBANEZ and
JAKE GREENBAUM a/k/a CRYPTO KING
Cross-Defendants.

_____/

Civil Action No. 1:23-cv-110

**DEFENDANT LOGAN PAUL'S MOTION TO DISMISS PLAINTIFFS' SECOND
AMENDED COMPLAINT AND INCORPORATED MEMORANDUM OF LAW**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................iv

INTRODUCTION ...........................................................................................................1

BACKGROUND .............................................................................................................3

LEGAL STANDARD ......................................................................................................7

ARGUMENT .................................................................................................................8

I.    PLAINTIFFS CANNOT PIERCE THE CORPORATE VEIL TO HOLD MR. PAUL
      LIABLE FOR CRYPTOZOO, INC.'S STATEMENTS OR CONDUCT. ..............................8

II.   PLAINTIFFS HAVE NOT STATED FEDERAL RICO CLAIMS. ....................................13

      A.   Plaintiffs Lack Standing to Pursue RICO Claims Because They Did Not Purchase
           CryptoZoo Products Directly from Any Defendant. ................................................14

      B.   Plaintiffs Have Not Pled a Pattern of Racketeering Activity. ..................................14

      C.   Plaintiffs Cannot Satisfy RICO's Enterprise Requirement. ....................................16

           1.   Plaintiffs have not pled an enterprise with the requisite specificity....................16

           2.   CryptoZoo's officers cannot form an enterprise in the course of their employment.....17

      D.   The Foreign Plaintiffs Have Not Pled a Domestic RICO Injury............................18

III.  PLAINTIFFS HAVE NOT STATED CLAIMS FOR VIOLATIONS OF THE FEDERAL
      SECURITIES LAWS. ................................................................................................19

      A.   CryptoZoo Tokens and NFTs Are Not Securities. ................................................19

           1.   Plaintiffs cannot satisfy the first prong of the *Howey* test...............................20

           2.   Plaintiffs cannot satisfy the second prong of the *Howey* test. ..........................22

           3.   Plaintiffs cannot satisfy the third prong of the *Howey* test. .............................23

      B.   The Foreign Plaintiffs Have Not Pled Domestic Securities Transactions. ..............24

      C.   Plaintiffs Lack Standing to Pursue Claims Based on Post-Purchase Representations. .......26

      D.   Plaintiffs Have Not Pled the Elements of Securities Fraud with Particularity. ..................28

1.    Plaintiffs do not plead all necessary details of their claims. ...............................28

2.    Plaintiffs have not pled scienter with sufficient particularity…...…………………31

E.    Plaintiffs Have Not Identified Actionable Misrepresentations by Mr. Paul. .......................32

F.    Plaintiffs Have Not Pled Loss Causation. ...................................................................36

G.    Mr. Paul Is Not A "Control Person" Under Section 20(a). ........................................38

IV.    THE COURT SHOULD DISMISS THE SECOND AMENDED COMPLAINT FOR LACK OF SUBJECT-MATTER JURISDICTION. .....................................................39

CONCLUSION .......................................................................................................................40

# TABLE OF AUTHORITIES

## Cases

*Abraham v. Singh,*
    480 F.3d 351 (5th Cir. 2007)......................................................................................13

*Abrams v. Baker Hughes Inc.,*
    292 F.3d 424 (5th Cir. 2002)......................................................................................31

*Absolute Activist Value Master Fund Ltd. v. Ficeto,*
    677 F.3d 60 (2d Cir. 2012)........................................................................................25

*Allstate Ins. Co. v. Plambeck,*
    802 F.3d 665 (5th Cir. 2015)......................................................................................16

*ANI Pharms., Inc. v. Method Pharms., LLC,*
    2019 WL 176339 (D. Del. Jan. 11, 2019)........................................................... 10, 12

*Armendariz v. Chowaiki,*
    2016 WL 8856919 (W.D. Tex. Mar. 31, 2016).................................................13, 15, 16

*Apple Inc. v. Pepper,*
    587 U.S. 273 (2019)..................................................................................................14

*Arnold v. X Corp.,*
    2025 WL 2769484 (D. Del. Sept. 29, 2025)................................................................9

*Ashcroft v. Iqbal,*
    556 U.S.662 (2009) ............................................................................................ 11, 35

*Azad v. Jenner,*
    2025 WL 1718273 (C.D. Cal. May 9, 2025)..............................................................26

*Barr v. McGraw-Hill, Inc.,*
    710 F. Supp. 95 (S.D.N.Y. 1989) ..............................................................................28

*Basic v. BProtocol Found.,*
    2024 WL 4113751 (W.D. Tex. July 31, 2024)............................................................25

*Baylor v. Honda Motor Co.,*
    2024 WL 650415 (C.D. Cal. Jan. 19, 2024)..............................................................26

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ........................................................................................... 11, 34

*Blue Chip Stamps v. Manor Drug Stores,*
    421 U.S. 723 (1975).............................................................................................26, 27

*Bonton v. Archer Chrysler Plymouth, Inc.*,
   889 F. Supp. 995 (S.D. Tex. 1995) ................................................................................. 13, 15, 17

*Callinan v. Lexicon Pharms., Inc.*,
   479 F. Supp. 3d 379 (S.D. Tex. 2020) ...................................................................................... 38

*Cedric Kushner Promotions, Ltd. v. King*,
   533 U.S. 158 (2001) .................................................................................................................. 17

*Chyba v. EMC Mortg. Corp.*,
   2011 WL 13205938 (N.D. Tex. Apr. 15, 2011) ........................................................................ 17

*Clark v. Nat'l Equities Holdings, Inc.*,
   561 F. Supp. 2d 632 (E.D. Tex. 2006) ...................................................................................... 17

*Cohen v. Stevanovich*,
   722 F. Supp. 2d 416 (S.D.N.Y. 2010) ................................................................................. 29, 32

*Compagnie des Grands Hotels d'Afrique S.A. v. Starwood Cap. Grp. Glob. I LLC*,
   2024 WL 4249723 (3d Cir. Sept. 20, 2024) ............................................................................... 9

*Crosswell v. Rodriguez*,
   2023 WL 6206911 (S.D. Tex. Sept. 8, 2023) ............................................................................ 15

*Dawes v. Imperial Sugar Co.*,
   975 F. Supp. 2d 666 (S.D. Tex. 2013) .......................................................................... 36, 37, 38

*Dennis v. Gen. Imaging, Inc.*,
   918 F.2d 496 (5th Cir. 1990) .................................................................................................... 15

*Donovan v. GMO-Z.com Tr. Co., Inc.*,
   779 F. Supp. 3d 372 (S.D.N.Y. 2025) ................................................................................. 23, 24

*Dorsey v. Portfolio Equities, Inc.*,
   540 F.3d 333 (5th Cir. 2008) ................................................................................................ 28, 31

*Dorsey v. Portfolio Equities, Inc.*,
   2005 WL 8158181 ..................................................................................................................... 31

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005) .............................................................................................. 29, 30, 36, 37

*Elliott v. Foufas*,
   867 F.2d 877 (5th Cir. 1989) .................................................................................................... 16

*Etheredge v. Senior Care Health & Rehab. Ctr.*,
   2010 WL 1855941 (E.D. Tex. Mar. 2, 2010) ............................................................................ 39

*Exp. Working Cap., LLC v. One World Cuisine Grp., LLC,*
    2018 WL 4214349 n.8 (N.D. Tex. Aug. 16, 2018) ...................................................16

*Fagan v. Nexo Cap. Inc.,*
    2025 WL 2446301 (E.D. Tex. Aug. 25, 2025) ......................................................25

*Fenner v. Gen. Motors, LLC,*
    113 F.4th 585 (6th Cir. 2024) .............................................................................14

*Fin. Acquisition Partners LP v. Blackwell,*
    440 F.3d 278 (5th Cir. 2006) ..............................................................................32

*Garcia v. Lion Mex. Consol. L.P.,*
    2018 WL 6427350 (W.D. Tex. Sept. 14, 2018) ...................................................18

*Gilbert v. Bartel,*
    273 F. App'x 413 (5th Cir. 2008) .......................................................................39

*Gordon v. Neugebauer,*
    57 F. Supp. 3d 766 (N.D. Tex. 2014) .................................................................15

*Harris Cnty., Tex. v. Eli Lilly & Co.,*
    2022 WL 479943 (S.D. Tex. Feb. 16, 2022) ......................................................14

*Holland v. GEXA Corp.,*
    161 F. App'x 364 (5th Cir. 2005) ............................................................28, 29, 38

*Humana, Inc. v. Indivior, Inc.,*
    2022 WL 17718342 (3d Cir. Dec. 15, 2022) ......................................................14

*Illinois Brick Company v. Illinois,*
    431 U.S. 720 (1977) ...........................................................................................14

*In re Enron Corp. Sec., Deriv. & "ERISA" Litig.,*
    238 F. Supp. 3d 799 (S.D. Tex. 2017) ...........................................................9, 13

*In re Franklin Bank Corp. Sec. Litig.,*
    782 F. Supp. 2d 364 (S.D. Tex. 2011) ...............................................................31

*In re Key Energy Servs., Inc. Sec. Litig.,*
    166 F. Supp. 3d 822 (S.D. Tex. 2016) ..........................................................38, 39

*In re Oral Phenylephrine Mktg. & Sales Pracs. Litig.,*
    755 F. Supp. 3d 208 (E.D.N.Y. 2024) ...............................................................14

*Ind. Bell Tel. Co. Inc. v. Lovelady,*
    2006 WL 485305 (W.D. Tex. Jan. 11, 2006) ......................................................8

*ISystems v. Spark Networks, Ltd.*,
    2012 WL 3101672 (5th Cir. Mar. 21, 2012) ................................................................17

*JT Brother Constr., LLC v. Tex. Pride Trailers, LLC*,
    2022 WL 800183 (S.D. Tex. Mar. 16, 2022) ..............................................................34

*Kan v. OneWest Bank, FSB*,
    823 F. Supp. 2d 464 (W.D. Tex. 2011) ................................................................. 7, 8

*Krim v. BancTexas Grp., Inc.*,
    989 F.2d 1435 (5th Cir. 1993) ........................................................................... 27, 34

*Lemmer v. Nu-Kote Holding, Inc.*,
    2001 WL 1112577 (N.D. Tex. Sept. 6, 2001) ...........................................................39

*Lewis v. Messere*,
    2025 WL 3002116 (W.D. Tex. Oct. 1, 2025) .............................................................39

*Linenweber v. Sw. Airlines Co.*,
    693 F. Supp. 3d 661 (N.D. Tex. 2023) .....................................................................35

*Long v. Shultz Cattle Co.*,
    881 F.2d 129 (5th Cir. 1989) ...................................................................................22

*Long v. Shultz Cattle Co.*,
    896 F.2d 85 (5th Cir. 1990) ............................................................................... 22, 23

*Lormand v. US Unwired, Inc.*,
    565 F.3d 228 (2009) ................................................................................................37

*Lott v. Cougar Drilling Sols. USA, Inc.*,
    2022 WL 17672627 (S.D. Tex. Dec. 14, 2022) .................................................. 11, 12

*Manax v. McNamara*,
    842 F.2d 808 (5th Cir. 1988) ...................................................................................16

*Mauer v. Heritage Auctions, Inc.*,
    2010 WL 11575504 (N.D. Tex. July 16, 2010) ........................................................17

*Mobil Oil Corp. v. Linear Films, Inc.*,
    718 F. Supp. 260 (D. Del. 1989) ...............................................................................9

*Morrison v. Nat'l Austl. Bank Ltd.*,
    561 U.S. 247 (2010) .......................................................................................... 18, 25

*N. Port Firefighters' Pension--Loc. Option Plan v. Temple-Inland, Inc.*,
    936 F. Supp. 2d 722 (N.D. Tex. 2013) ............................................................... 33, 37

*Ogbonna v. USPLabs, LLC,*
  2014 WL 2592097 (W.D. Tex. June 10, 2014) ................................................................. 9

*Pan Am. Mar., Inc. v. Esco Marine, Inc.,*
  2005 WL 1155149 (S.D. Tex. May 10, 2005) ................................................................. 15

*Percival Partners Ltd. v. Nduom,*
  99 F.4th 696 (4th Cir. 2024) ........................................................................................... 19

*Real v. Yuga Labs, Inc.,*
  2025 WL 3437389 (C.D. Cal. Sept. 30, 2025) ................................................... 20, 21, 24

*RJR Nabisco v. Eur. Cmty.,*
  579 U.S. 325 (2016) ......................................................................................................... 18

*Rosenzweig v. Azurix Corp.,*
  332 F.3d 854 (5th Cir. 2003) ..................................................................................... 32, 34

*Rubenstetn v. Ishizuka,*
  2025 WL 1489375 (S.D.N.Y. May 23, 2025) ................................................................. 26

*S.E.C. v. Balina,*
  2024 WL 2332965 (W.D. Tex. May 22, 2024) ............................................................... 22

*S.E.C. v. Binance Holdings Ltd.,*
  738 F. Supp. 3d 20 (D.D.C. 2024) ........................................................................... 20, 24

*S.E.C. v. Coinbase, Inc.,*
  726 F. Supp. 3d 260 (S.D.N.Y. 2024) ........................................................... 20, 23, 24

*S.E.C. v. Cont'l Commodities Corp.,*
  497 F.2d 516 (5th Cir. 1974) ......................................................................................... 22

*S.E.C. v. Edwards,*
  540 U.S. 390 (2004) ......................................................................................................... 23

*S.E.C. v. SG Ltd.,*
  265 F.3d 42 (1st Cir. 2001) ............................................................................................. 24

*S.E.C. v. Teshuater, LLC,*
  2024 WL 1348432 (S.D. Tex. Mar. 29, 2024) ............................................................... 22

*S.E.C. v. W.J. Howey Co.,*
  328 U.S. 293 (1946) ............................................................................................... 2, 19, 20

*Sec. & Exch. Comm'n v. Mapp,*
  240 F. Supp. 3d 569 (E.D. Tex. 2017) ..................................................................... 33, 35

*Sedima, S.P.R.L. v. Imrex Co., Inc.,*
  473 U.S. 479 (1985) ................................................................................................15

*Senthilnathan v. AT&T, Inc.,*
  2018 WL 472925 (N.D. Tex. Jan. 3, 2018) ............................................................17

*Shtaif v. Shoss,*
  2007 WL 9752787 (S.D. Tex. Feb. 12, 2007) ........................................................26

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.,*
  365 F.3d 353 (5th Cir. 2004) ............................................................................ 8, 28

*St. Germain v. Howard,*
  556 F.3d 261 (5th Cir. 2009) .......................................................................... 13, 14

*Stromfeld v. Great Atl. & Pac. Tea Co.,*
  484 F. Supp. 1264 (S.D.N.Y.) ...............................................................................29

*Talarico v. Johnson,*
  2023 WL 2618255 (S.D. Tex. Feb. 7, 2023) ..................................................... 27, 28

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
  551 U.S. 308 (2007) ..................................................................................... 3, 31, 32

*Tel–Phonic Servs., Inc. v. TBS Int'l, Inc.,*
  975 F.2d 1134 (5th Cir. 1992) ...............................................................................13

*Trevino v. Merscorp, Inc.,*
  583 F. Supp. 2d 521 (D. Del. 2008) ................................................................... 9, 10

*Tuchman v. DSC Commc'ns Corp.,*
  14 F.3d 1061 (5th Cir. 1994) ...................................................................................8

*U.S. ex rel. King v. Alcon Lab'ys, Inc.,*
  232 F.R.D. 568 (N.D. Tex. 2005) ............................................................................8

*U.S. ex rel. Williams v. Bell Helicopter Textron, Inc.,*
  2004 WL 579505 (N.D. Tex. Mar. 18, 2004) .............................................11, 12, 36

*United Hous. Found., Inc. v. Forman,*
  421 U.S. 837 (1975) .................................................................................20, 22, 23

*Walker v. Beaumont Indep. Sch. Dist.,*
  938 F.3d 724 (5th Cir. 2019) .................................................................................16

*Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood,*
  752 A.2d 1175 (Del. Ch. 1999) .................................................................. 9, 10, 12

*Warfield v. Alaniz,*
    569 F.3d 1015 (9th Cir. 2009) ..................................................................................... 20

*Westchester Corp. v. Peat, Marwick, Mitchell & Co.,*
    626 F.2d 1212 (5th Cir. 1980) ..................................................................................... 20

*Whelan v. Winchester Prod. Co.,*
    319 F.3d 225 (5th Cir. 2003) ................................................................................... 17, 18

*Yadav v. Frost Bank,*
    2020 WL 7385842 (W.D. Tex. Dec. 16, 2020) .......................................................... 17

*Yegiazaryan v. Smagin,*
    599 U.S. 533 (2023) .............................................................................................. 18, 19

**Statutes**

15 U.S.C. § 78u–4 ................................................................................ 8, 28, 30, 21, 37

18 U.S.C. § 1961 ........................................................................................... 15, 16

18 U.S.C. § 1962 ..................................................................................... 13, 16, 17

28 U.S.C. § 1331 .................................................................................................. 39

28 U.S.C. § 1332 .................................................................................................. 39

## **INTRODUCTION**

Plaintiffs' Second Amended Complaint marks their third attempt to state claims against Defendant Logan Paul by mischaracterizing his CryptoZoo project as an illegal "rug pull"—a fraudulent scheme to solicit interest in a new digital asset, collect consumer funds, and then abscond with the money leaving investors empty-handed. In the new pleading, 140 plaintiffs from forty-five U.S. States and foreign nations now bring twenty-six counts for relief against Mr. Paul and other defendants in a pleading that spans 209 pages and includes 702 paragraphs. Despite their complaint's length, Plaintiffs have yet to plead a comprehensible—let alone plausible—claim for relief. The Second Amended Complaint sets forth a jumble of conclusory and contradictory allegations, incorporating each paragraph and count into every other and leaving the reader to wonder which claims Plaintiffs assert against which Defendants and by whom. More remarkably, perhaps, Plaintiffs do not allege *anywhere* in the Second Amended Complaint that Defendant Paul ever "pulled the rug" on consumers. For these reasons, and as set forth below, Plaintiffs have again failed to state a plausible claim against Mr. Paul, demonstrating conclusively that they simply cannot. Enough is enough.

Plaintiffs' pleading deficiencies plague their claims for violations of the federal RICO statute and Securities Exchange Act (addressed here), which Plaintiffs set forth in Counts Twenty-Four to Twenty-Six of the Second Amended Complaint. Preliminarily, Plaintiffs again fail to pierce the corporate veil, which, under Delaware law (which applies here), requires nonconclusory allegations that a majority shareholder and the corporation operated as a single economic entity. Plaintiffs plead facts throughout the complaint indicating that CryptoZoo, Inc. was distinct from Mr. Paul, describing CryptoZoo, Inc. as an entity that hired employees, maintained records reflecting its ownership structure, and kept notes of internal meetings. They further allege that Mr. Paul expressed dissatisfaction with the progress of actual CryptoZoo projects and intended to release NFTs and complete the CryptoZoo game. These allegations suggest that CryptoZoo, Inc. was neither a sham

1

entity nor Mr. Paul's alter ego. Without piercing the corporate veil, Plaintiffs cannot hold Mr. Paul responsible for representations authored or conduct undertaken by CryptoZoo, Inc.

Plaintiffs' RICO claims otherwise fall far short of applicable pleading standards. The Court dismissed Plaintiffs' attempted RICO claims in the First Amended Complaint, and Plaintiffs have done nothing to remedy the claims' shortcomings this time around. Once again, Plaintiffs have not alleged a single predicate act, defined a viable enterprise, or pled their RICO claims with the specificity required by Federal Rule of Civil Procedure 9(b). The indirect purchaser rule also bars Plaintiffs' RICO claims against Mr. Paul because no Plaintiff purchased CryptoZoo products directly from him. Finally, the 103 foreign plaintiffs' claims are barred because they have not identified a domestic RICO injury.

Plaintiffs' federal securities claims are equally deficient. Most importantly, Plaintiffs' claims fail because CryptoZoo products are not securities according to the test set forth by the United States Supreme Court in *SEC v. W.J. Howey Co.,* 328 U.S. 293 (1946). This is due, in large part, to the fact that neither Mr. Paul nor his colleagues promoted CryptoZoo products as investments vehicles. In fact, they expressly and repeatedly disclaimed any such status. Mr. Paul consistently promoted CryptoZoo as a game, touting only its consumptive purpose and never promising investment returns.

Even if CryptoZoo products were securities, at least twenty-one plaintiffs lack standing to sue under Rule 10b-5 (or, derivatively, Section 20(a)) because they allegedly relied on statements made *after* they purchased CryptoZoo products and never sold their tokens or NFTs. As such, these Plaintiffs are holders of securities and cannot state claims based on CryptoZoo products' "purchase or sale." Forty-four plaintiffs do not identify specific statements on which they relied. In fact, *no* plaintiff pleads his claim with the specificity required by Rule 9(b) or the PSLRA. Plaintiffs do not allege which "CryptoZoo Products" they purchased, the price at which they bought or sold the products, from whom or on what platform they purchased the products, or the dates of all purchases. Their allegations of scienter as to Mr. Paul are conclusory at best and contradicted throughout the Second Amended

Complaint, falling far short of the PSLRA standard requiring a strong inference of scienter that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007)). Nor have Plaintiffs identified an actionable misrepresentation or omission by Mr. Paul. The "misrepresentations" alleged are various combinations of puffery, true (*i.e.* not misrepresentations), and irrelevant to Plaintiffs' claims. At least two were not authored by Mr. Paul.

Nor have Plaintiffs adequately pled loss causation: Plaintiffs do not even attempt to describe the circumstances giving rise to CryptoZoo products' alleged losses in value, let alone tie those losses to representations by Mr. Paul *or* corrective statements leaked to the market.

Finally, as with their RICO claims, the 103 foreign plaintiffs have not pled domestic injuries—they have not alleged a purchase or sale made in the United States or a transaction involving a security listed on a domestic exchange.

The Court need not proceed any further. Because no plaintiff has stated a federal claim, the Court lacks subject-matter jurisdiction over Plaintiffs' state (and foreign) law causes of action. Plaintiffs have pled neither a basis for federal question jurisdiction nor the citizenship of any defendant, rendering them unable to establish diversity as an alternate jurisdictional foundation.

The Court should dismiss the Second Amended Complaint in its entirety and with prejudice.

## **BACKGROUND**

Plaintiffs are three "Co-Lead" and 137 "Individual" litigants who purchased "CryptoZoo Products" and allege that the CryptoZoo project was a "rug pull" investment scam orchestrated by Defendants Logan Paul, Jake Greenbaum, Eduardo Ibanez, and others, all employees of CryptoZoo, Inc. *See* SAC ¶¶ 1-27, 30-49, 63-395. Plaintiffs bring claims for fraud, fraudulent misrepresentation, negligence, unjust enrichment, civil conspiracy to defraud, aiding and abetting fraud, breach of express and implied contract, and violations of the federal RICO statute, Rules 10b-5 and Section 20(a) of the

Securities Exchange Act, and the Texas, New York, Iowa, North Carolina, California, Pennsylvania, New Jersey, Arizona, Florida, Colorado, Massachusetts, Illinois, and Nevada consumer protection statutes. *See id.* ¶¶ 409-691. Mr. Paul addresses only the federal claims with this motion. [D.E. 125.]

Plaintiffs hail from thirty-one countries and at least fourteen U.S. states,[1] with most residing abroad. *See id.* ¶¶ 63-342. Each Plaintiff alleges where he resides and purchased "CryptoZoo Products," when he first purchased CryptoZoo products, how much he spent, and how much he lost. *See id.* All seek to recover the investment losses they allegedly incurred from purchasing CryptoZoo. *Id.* ¶¶ 63-342. No Plaintiff specifies which CryptoZoo product or products he purchased, discloses whether he sold any product he purchased, or explains where he purchased "CryptoZoo Products" (*e.g.*, on what exchange or on a primary or secondary market).

Every CryptoZoo consumer agreed to CryptoZoo, Inc.'s Terms and Conditions ("T&C"), which provide in part:

> CryptoZoo are NOT Investment Vehicles
>
> CryptoZoo are collectible digital art pieces that also function as fun, Non-Fungible Tokens for you to collect. They were created as art pieces intended for people to enjoy by collecting, *not as a financial instrument*. CryptoZoo makes *absolutely no promises or guarantees regarding the value of CryptoZoo NFTs* aside from the one that we will strive to do the best for the project and the community.

CryptoZoo T&C [D.E. 1-2] at 2-3 (emphasis added).

Plaintiffs allege that Mr. Paul co-founded CryptoZoo, Inc. with Jeffrey Levin, Danielle Strobel, and Defendants Eduardo Ibanez and Jake Greenbaum. *See* SAC ¶¶ 343-47. They allege that Defendants conceived CryptoZoo as a "rug pull"—a fraudulent scheme through which an NFT developer solicits funds from prospective purchasers and then "abruptly abandon[s] the project and fail[s] to deliver . . . while fraudulently retaining the purchasers' funds." *Id.* ¶¶ 3-8, 32. But Plaintiffs never allege that Mr. Paul "pulled the rug." They describe abrupt exits from the project by Ibanez and

---

[1] Two Plaintiffs are identified as residing in only "the United States." *See* SAC ¶¶ 87, 241.

Greenbaum, each of whom absconded with "millions of dollars in profit" behind Mr. Paul's back, *see id.* ¶¶ 8, 9, 353; characterize Mr. Paul as "enraged" when he "discovered" that Greenbaum had "begun selling," *see id.* ¶ 364; and note the steps Mr. Paul took to exclude Ibanez and Greenbaum from the project after they had fled, *see id.* ¶¶ 9, 365. Plaintiffs conclude that Mr. Paul caused Ibanez and Greebaum's "rug pull," but offer no plausible facts to support that conclusion. *See id.* ¶¶ 364, 365.

Plaintiffs never allege that Mr. Paul "pulled the rug," but do allege "on information and belief" that he withdrew approximately $1.2 million from CryptoZoo's accounts on September 5 and 6, 2021. *See id.* ¶ 10. Plaintiffs allege that the $1.2 million constituted about half of the revenues from one day's sales of "egg" NFTs, earned by CryptoZoo on September 3rd. *See id.* ¶¶ 10, 374. Plaintiffs contend that Mr. Paul stole these funds from CryptoZoo, and asked CryptoZoo's manager, Jeffrey Levin, in an undated text message if he could disclose to his followers that he had withdrawn the funds to cover his out-of-pocket expenses and further develop CryptoZoo. *See id.* Plaintiffs conclude without basis that Mr. Paul "pocketed" the money. *See id.* ¶ 20. They allege elsewhere in their complaint that Mr. Paul was a 51% shareholder in CryptoZoo, Inc., that 3% of CryptoZoo's shares were designated for "expenses," and that Mr. Paul was out of pocket at least $220,000 by early September 2021. *See id.* ¶¶ 11, 347. Plaintiffs do not allege that Mr. Paul took any other funds from CryptoZoo or "abruptly abandon[ed] the project." *Id.* ¶ 32.

Plaintiffs attribute several categories of "misrepresentations" to Mr. Paul. They allege that on August 18, 2021, *inter alia*, Mr. Paul characterized CryptoZoo as "so fun," backed by a "massive team," and "a really fun game that makes you money and that "kids are addicted to," and asserted that "we . . . are probably out of pocket like a million." *See id.* ¶¶ 354, 355, 357. They also allege that Mr. Paul represented that CryptoZoo "hand made art for the past 6 months," and had "10 different artists making art for our project." *Id.* ¶ 361. Plaintiffs raised most of these allegations in their First Amended Complaint and the Court held (correctly) that they were "irrefutably puffery." Report &

Recommendation [D.E. 107] at 30-31.

Plaintiffs also allege that Mr. Paul made statements in a *Medium* article on September 1, 2021, and a revised Whitepaper the following day about a Zoo Token "conversion" and "migration," representing the conversion as "a technical upgrade designed to enhance accessibility and interoperability across chains" when, in fact, the actual goal of the conversion was "specifically to 'blacklist' wallets traceable to Greenbaum." *Id.* ¶¶ 366-72. Both the *Medium* article (entitled "CryptoZoo: Genesis Smart Contract Update") and the revised Whitepaper are attributed to CryptoZoo, Inc., not Mr. Paul. *See id.* ¶ 367 (reflecting that "CryptoZoo.co" authored the *Medium* article), ¶ 369 (CryptoZoo.co releases CryptoZoo Whitepaper).

The remaining representations attributed to Mr. Paul are about CryptoZoo, the game. *See id.* ¶¶ 361, 378-80, 383 (stating, for example: "I created the game"; "[i]t is so much fun"; "I am addicted to it"; "we love playing it"). Plaintiffs do not attribute any representation to Mr. Paul (or anyone else) characterizing CryptoZoo as an investment or promising investment returns.

Plaintiff Don Holland filed his original class action complaint on February 2, 2023, against CryptoZoo, Inc., Logan Paul, and other individual defendants, including Ibanez and Greenbaum. *See* Compl. [D.E. 1]. After other Defendants moved to dismiss the original complaint [D.E. 22, 23], on January 4, 2024, Defendant Paul filed an answer, affirmative defenses, and a cross-claim denying the core allegations of the original complaint and bringing claims for fraudulent inducement and fraudulent misrepresentation against Ibanez and Greenbaum for hijacking and looting the CryptoZoo project. *See* Answer, Affirmative Defenses, & Crossclaim [D.E. 55]. The Clerk entered defaults against Ibanez and Greenbaum on April 17 and May 16, 2024, respectively. [D.E. 70, 74.]

The Court granted Plaintiffs leave to amend their complaint on August 19, 2024, and the Clerk separately filed the First Amended Complaint brought by Plaintiff Holland, now with two new co-lead plaintiffs and 137 "individual" plaintiffs. [D.E. 80, 81.] Plaintiffs asserted the same claims they

assert in this action in the now-operative complaint in their First Amended Complaint, as well as one count for violations of the federal Commodity Exchange Act. [D.E. 81.] Defendants Strobel, Levin, and Bentov moved to dismiss the First Amended Complaint for lack of personal jurisdiction, and those motions were fully briefed. [D.E. 86, 87.] Defendant Paul moved to dismiss the First Amended Complaint for failure to state a claim. [D.E. 85.] In mid-August 2025, the Magistrate Judge recommended dismissal of all Defendants' motions to dismiss and in October the Court adopted the reports and recommendations. [D.E. 104, 107, 109, 113, 114, 115, 117.] In a Report and Recommendation dismissing all claims against Mr. Paul, the Magistrate Judge generally recommended dismissal without prejudice, but dismissed the Commodity Exchange Act claim with prejudice. *See* Report & Recommendation [D.E. 107] at 74.

Plaintiffs filed the operative Second Amended Complaint (alternately, the "SAC") on November 12, 2025. [D.E. 118.] Not much has changed. The same Plaintiffs bring the same claims, barring the Commodity Exchange Act Claim, adding mostly conclusory allegations to fill the gaps the Court identified in the First Amended Complaint. At the parties' request, the Court held a status conference on January 15, 2026, to address how best to proceed with motion to dismiss briefing given the complex choice of law issues arising from the Second Amended Complaint. On January 26, 2026, the parties submitted a joint proposed order, at the Court's request, requiring Mr. Paul to move for dismissal first of Counts Twenty-Four through Twenty-Six of the SAC—the federal RICO and securities claims—and staying the remaining claims pending resolution of this motion. [D.E. 125.]

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief may be granted "tests the sufficiency of the complaint under Federal Rule of Civil Procedure 8." *Kan v. OneWest Bank, FSB*, 823 F. Supp. 2d 464, 468 (W.D. Tex. 2011). "For a complaint to meet the pleading requirements of Rule 8(a)(2) and to survive a Rule 12(b)(6) motion to dismiss, . . . (1) every element

7

of each cause of action must be supported by specific factual allegations; and (2) the complaint must state a plausible claim for relief." *Id.* While courts generally accept "as true all factual allegations contained within the complaint," they are "not bound to accept legal conclusions couched as factual allegations." *Id.* Finally, the "Plaintiffs must plead specific facts, not mere conclusory allegations." *Id.* (quoting *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1067 (5th Cir. 1994)).

Federal Rule of Civil Procedure 9(b) "requires that complaints pleading fraud state their claims with particularity." *Ind. Bell Tel. Co. Inc. v. Lovelady*, 2006 WL 485305, at *1 (W.D. Tex. Jan. 11, 2006). "To comply with [Rule] 9(b), a plaintiff must allege the particulars of time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what that person obtained thereby, otherwise referred to as the who, what, when, where, and how of the alleged fraud." *U.S. ex rel. King v. Alcon Lab'ys, Inc.*, 232 F.R.D. 568, 570 (N.D. Tex. 2005) (cleaned up).

The Private Securities Litigation Reform Act ("PSLRA") "reinforces the particularity requirements of Rule 9(b), requiring the plaintiffs to state not only the time, place, the identity of the speaker, and the content of the alleged misrepresentation, but also to explain why the challenged statement or omission is false or misleading." *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 362–63 (5th Cir. 2004). "The PSLRA *also* requires that the complaint with respect to *each* act or omission alleged to be false or misleading state with *particularity facts* giving rise to a *strong* inference that *the defendant* acted with the required state of mind." *Id.* (cleaned up; emphasis in original) (citing 15 U.S.C. § 78u–4(b)(2)).

## ARGUMENT

### I.    PLAINTIFFS CANNOT PIERCE THE CORPORATE VEIL TO HOLD MR. PAUL LIABLE FOR CRYPTOZOO, INC.'S STATEMENTS OR CONDUCT.

The Court dismissed at least four of Plaintiffs' claims in the First Amended Complaint on the ground, among others, that Plaintiffs had not pled facts to support piercing the corporate veil to hold Mr. Paul responsible for CryptoZoo Inc.'s alleged statements or malfeasance. *See* Report &

Recommendation [D.E. 107] at 19-27, 38-39, 43-44, 46. Specifically, the Court found that Plaintiffs had failed to allege that CryptoZoo was founded and functioned "primarily for [Mr. Paul's] personal benefit," as required by Texas law. *See id.* at 25. The Court also observed, however, that "[u]nder Texas's choice-of-law rules, whether a corporation, LLC, or individual may be held liable pursuant to a veil-piercing theory is determined by the law of the state in which the entity is organized." *Id.* at 20 n.9 (quoting *Ogbonna v. USPLabs, LLC*, 2014 WL 2592097, at *5 (W.D. Tex. June 10, 2014)); *see also, e.g., In re Enron Corp. Sec., Deriv. & "ERISA" Litig.*, 238 F. Supp. 3d 799, 839 (S.D. Tex. 2017) ("When an entity's corporate form is at issue, courts standardly hold that the law of the state of incorporation of that entity applies to determine whether its corporate form should be disregarded, i.e., whether one can pierce the corporate veil."). Because CryptoZoo, Inc. is a Delaware corporation, Delaware law applies to Court's veil-piercing analysis. *See* Report & Recommendation [D.E. 107] at 20 n.9.

"Under Delaware law, veil piercing is an uncommon remedy reserved for the exceptional case where a corporation is shown to be 'a sham' that exists *for no other purpose* than as a vehicle for fraud." *Compagnie des Grands Hotels d'Afrique S.A. v. Starwood Cap. Grp. Glob. I LLC*, 2024 WL 4249723, at *3 (3d Cir. Sept. 20, 2024) (cleaned up; emphasis added). "Persuading a Delaware court to disregard the corporate entity is a difficult task." *Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood*, 752 A.2d 1175, 1183–84 (Del. Ch. 1999). Accordingly, "the party who wishes the court to disregard that form 'bears the burden of proving that there are substantial reasons for doing so.'" *Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 270 (D. Del. 1989).

"[I]n order to state a claim for piercing the corporate veil under an alter ego theory, [a litigant] must show (1) that the corporation and its [owner] operated as a single economic entity, and (2) that an overall element of injustice or unfairness is present." *Trevino v. Merscorp, Inc.*, 583 F. Supp. 2d 521, 528 (D. Del. 2008). "Conclusory allegations of 'alter ego' status are insufficient to state a claim. Rather, a plaintiff must allege specific facts supporting both of the necessary elements." *Arnold v. X Corp.,*

2025 WL 2769484, at *5 (D. Del. Sept. 29, 2025).

To satisfy the first element of Delaware's test and show that a corporation and its owner functioned as "a single economic entity," a plaintiff "must allege facts that, if taken as true, demonstrate the [controlling member's] and/or [parent's] complete domination and control . . . to the point that [the corporation] no longer ha[s] legal or independent significance of [its] own." *Wallace*, 752 A.2d at 1183–84. The Third Circuit has developed a seven-factor test for this analysis, requiring courts to consider allegations of "(1) undercapitalization; (2) failure to observe corporate formalities; (3) nonpayment of dividends; (4) the insolvency of the debtor corporation at the time; (5) siphoning of the corporation's funds by the dominant stockholder; (6) absence of corporate records; and (7) the fact that the corporation is merely a facade for the operations of the dominant stockholder or stockholders." *ANI Pharms., Inc. v. Method Pharms., LLC*, 2019 WL 176339, at *6 n.4 (D. Del. Jan. 11, 2019). "While no single factor justifies a decision to disregard the corporate entity, some combination of the above is required[.]" *Trevino*, 583 F. Supp. 2d at 529.

Plaintiffs attempt to plead, at most, two of the seven factors, but their efforts fall short. *First*, in a transparent attempt to remedy the deficiency identified by the Court in their First Amended Complaint (failure to allege that Mr. Paul founded CryptoZoo primarily for his own personal benefit), Plaintiffs now allege, on information and belief, that Mr. Paul "paid himself" approximately $1.2 million from September 3, 2021 "CZ NFT egg sales" that garnered CryptoZoo $2.6 million in revenues. *See* SAC ¶¶ 10, 374. Plaintiffs contend that Mr. Paul withdrew the funds and later "tried to rationalize his conduct as reimbursement," but cite as support only undated text messages that do not compel that conclusion. *See id.* ¶¶ 10, 375. In the quoted text exchange, Mr. Paul asks CryptoZoo's manager whether he should tell subscribers that he had "recouped expenses and the remainder was used for development." *Id.* Plaintiffs claim that these messages constitute an admission that Mr. Paul *stole* $1.2 million and used CryptoZoo, Inc. as a front for his personal enrichment. *See id.* ¶¶ 10, 35.

They plainly do not.

Setting aside Plaintiffs' failure to establish that the undated text messages reference the September 3rd egg sale at all, on their face, the communications reflect only a founder asking his company's "community manager" for advice; specifically, whether he should issue a public statement that he had recouped expenses and allocated funds to "development" while investors suffered losses. *See id.* (Bentov: "In summary it looks like this: Logan recouped his investment and is unscathed."). Plaintiffs plead no plausible basis for the inference that Mr. Paul "pocketed" the funds. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("Factual allegations must be enough to raise a right to relief above the speculative level[.]"). Plaintiffs cannot rely on pleading "on information and belief" to bridge the gap between the facts alleged and their manufactured conclusion. *See, e.g., Lott v. Cougar Drilling Sols. USA, Inc.*, 2022 WL 17672627, at *1 (S.D. Tex. Dec. 14, 2022) ("Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'") (quoting *Iqbal*, 556 U.S. at 678); *U.S. ex rel. Williams v. Bell Helicopter Textron, Inc.*, 2004 WL 579505, at *4 (N.D. Tex. Mar. 18, 2004), *aff'd*, 417 F.3d 450 (5th Cir. 2005) (pleading on information and belief "must not be taken for license to base claims of fraud on speculation and conclusory allegations.") (cleaned up).

Plaintiffs attempt to justify skipping this critical step by pointing to allegations in Mr. Paul's Crossclaim that he was out-of-pocket only $220,000 to fund CryptoZoo as of early September 2021, which Plaintiffs conclude renders his withdrawal of $1.2 million "indefensible." *See* SAC ¶ 11. This is not the "gotcha" Plaintiffs hope for—the fact that the amount Mr. Paul's alleged withdrawal does not match his asserted expenses does not compel the conclusion that Mr. Paul *stole* from CryptoZoo. This is particularly so given Plaintiffs' allegation that Mr. Paul was a founder of and 51% shareholder in CryptoZoo and that 3% of CryptoZoo's holdings were earmarked for "expenses." *See* SAC ¶ 347. Given this context (and assuming for the sake of argument that the cited text messages refer to the September 3rd "egg sale" at all)—and Mr. Paul's statement that he wanted to disclose to his followers

11

that he had applied the funds to cover his costs *and* fund further development, *see* SAC ¶ 10, 375—the only plausible inference to be derived from the text exchange is that Mr. Paul did *not* "pocket" CryptoZoo profits. Plaintiffs' allegations do not support the conclusion that Mr. Paul misappropriated the allegedly withdrawn funds. *See, e.g.*, *Lott*, 2022 WL 17672627, at *1 ("'naked assertion[s]' devoid of 'further factual enhancement'" do not suffice).

Even if they had, identifying one instance of misdirected funds—in an amount totaling less than half of the revenues from a single day's sales of one product—does not compel the conclusion that CryptoZoo was a sham corporation founded *only* to enrich Mr. Paul. *See Wallace*, 752 A.2d at 1183–84 (plaintiff must show defendant's "complete domination and control" of corporation to pierce corporate veil).[2] Mr. Paul's text messages do not support Plaintiffs' baseless conclusions. *See, e.g.*, *Williams*, 2004 WL 579505, at *4 (pleading on information and belief "must not be taken for license to base claims of fraud on speculation and conclusory allegations.").

*Second*, though Plaintiffs allege that CryptoZoo was "merely a facade for the operations of the dominant stockholder," *ANI Pharms.*, 2019 WL 176339, at *6 n.4, allegations elsewhere in the Second Amended Complaint belie that conclusion. Plaintiffs allege, for example, on the one hand that CryptoZoo functioned as Mr. Paul's "alter ego and personal piggy bank" and that "CryptoZoo, in substance, was never a company," SAC ¶¶ 10, 374, but admit on the other that CryptoZoo hired vendors, including "developers[who] created projects related to CryptoZoo"; created a prototype of the "the project's . . . 'virtual marketplace,'" which Mr. Paul reviewed and rejected as inadequate; hired employees; maintained "internal documents" reflecting the ownership structure of the company and allocating a percentage of the company's assets to "expenses"; and kept notes of internal meetings.

---

[2] Plaintiffs also ignore that the quoted text exchange accounts for the delta between Mr. Paul's claimed out of pocket expenses and the alleged amount withdrawn: Mr. Paul's text messages reflect that he wanted to disclose that he had used the $1.2 million not *only* to recoup his expenses, but also to fund further development. *See* SAC ¶ 10, 375.

*See, e.g., id.* ¶¶ 347, 348, 377, 389. Plaintiffs also allege that in private conversations (*i.e.* conversations that Mr. Paul could not have intended to mislead the public), Mr. Paul "acknowledged confusion and dissatisfaction with the state of [the game's] development" and expressed his expectation that CryptoZoo would "successfully launch our eggs." *Id.* ¶¶ 362, 365. These allegations cannot be reconciled with Plaintiffs' conclusory assertions that CryptoZoo "was never a company" and that Mr. Paul never intended the venture to succeed. *See, e.g., id.* ¶¶ 10, 374; *Enron Corp. Sec., Deriv. & "ERISA" Litig.*, 238 F. Supp. 3d at 839 ("A conclusory statement that three entities are one is not sufficient without specific facts supporting such an allegation."). Plaintiffs cannot pierce the corporate veil.

## II.    PLAINTIFFS HAVE NOT STATED FEDERAL RICO CLAIMS.

"Claims under RICO, 18 U.S.C. § 1962, have three common elements: (1) a person who engages in (2) a pattern of racketeering activity, (3) connected to the acquisition, establishment, conduct, or control of an enterprise." *St. Germain v. Howard*, 556 F.3d 261, 263 (5th Cir. 2009) (quoting *Abraham v. Singh*, 480 F.3d 351, 355 (5th Cir. 2007)) (cleaned up). "Each concept is a term of art which carries its own inherent requirements of particularity." *Armendariz v. Chowaiki*, 2016 WL 8856919, at *6 (W.D. Tex. Mar. 31, 2016), *aff'd*, 683 F. App'x 338 (5th Cir. 2017) (cleaned up). Beyond the "inherent" particularity required to support a RICO claim, Rule 9(b) applies to RICO claims where the alleged predicate acts sound in fraud. *See Bonton v. Archer Chrysler Plymouth, Inc.*, 889 F. Supp. 995, 1004 (S.D. Tex. 1995) (citing *Tel–Phonic Servs., Inc. v. TBS Int'l, Inc.*, 975 F.2d 1134, 1138 (5th Cir. 1992)).

Plaintiffs have made no attempt to correct the pleading deficiencies that plagued their first RICO claim. Once again, they have not detailed (A) a pattern of racketeering activity or (B) a RICO enterprise. Beyond these failings, the 103 plaintiffs who reside and purchased CryptoZoo products abroad have not pled domestic injuries to business or property, and no plaintiff has alleged that he purchased CryptoZoo products directly from Mr. Paul or CryptoZoo, Inc. The Court should dismiss Plaintiffs' RICO claims with prejudice.

**A. Plaintiffs Lack Standing to Pursue RICO Claims Because They Did Not Purchase CryptoZoo Products Directly from Any Defendant.**

"Antitrust standing principles apply equally to allegations of RICO violations." *Harris Cnty., Tex. v. Eli Lilly & Co.*, 2022 WL 479943, at *6 (S.D. Tex. Feb. 16, 2022). In *Illinois Brick Co. v. Illinois*, the United States Supreme Court held that plaintiffs who purchase a product or service indirectly from an antitrust violator—*e.g.*, through a middleman or intermediary—lack standing to sue under the federal antitrust laws. *See* 431 U.S. 720, 736 (1977). The Court reaffirmed its conclusion in *Apple Inc. v. Pepper*, asserting that the "bright-line rule" articulated in *Illinois Brick* "means that indirect purchasers who are two or more steps removed from the antitrust violator in a distribution chain may not sue. By contrast, direct purchasers—that is, those who are 'the immediate buyers from the alleged antitrust violators'—may sue." 587 U.S. 273, 280 (2019). Courts routinely extend this "indirect purchaser rule" to RICO claims. *See, e.g.*, *Harris Cnty.*, 2022 WL 479943, at *6; *see also, e.g.*, *Fenner v. Gen. Motors, LLC*, 113 F.4th 585, 604 (6th Cir. 2024) ("The indirect-purchaser rule was initially developed in the antitrust realm but applies to civil RICO claims with equal force."); *Humana, Inc. v. Indivior, Inc.*, 2022 WL 17718342, at *3 (3d Cir. Dec. 15, 2022) (indirect purchaser rule applies to RICO claims); *In re Oral Phenylephrine Mktg. & Sales Pracs. Litig.*, 755 F. Supp. 3d 208, 218 (E.D.N.Y. 2024) (same).

Setting aside that no Plaintiff has alleged where or from whom he purchased CryptoZoo products, *see* SAC ¶¶ 63-342, as well as Plaintiffs' concession that some among them purchased "on the open market," *see id.* ¶ 397, no Plaintiff claims to have purchased anything directly from Mr. Paul. In fact, as far as Mr. Paul can discern, no Plaintiff claims to have purchased CryptoZoo products from any Defendant or any member of Plaintiffs' ill-defined RICO enterprise. *See id.* ¶¶ 63-342. Consequently, Plaintiffs lack standing to pursue RICO claims against Mr. Paul.

**B. Plaintiffs Have Not Pled a Pattern of Racketeering Activity.**

"A pattern of racketeering activity consists of two or more predicate criminal acts that are (1) related and (2) amount to or pose a threat of continued criminal activity." *St. Germain*, 556 F.3d at 263.

"Although two predicate acts are the minimum number of acts required. . ., two acts may not be sufficient." *Pan Am. Mar., Inc. v. Esco Marine, Inc.*, 2005 WL 1155149, at *6 (S.D. Tex. May 10, 2005) (citing *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 n.14 (1985)).

Predicate criminal acts supporting a RICO claim may arise under state or federal law, but in either event are limited to the acts enumerated in 18 U.S.C. § 1961(1). *See, e.g., Armendariz*, 2016 WL 8856919, at *10–11 ("'Racketeering activity' is defined in RICO as 'any act or threat involving' certain enumerated state law crimes or any 'act' indictable under specified federal statutes and certain federal 'offenses.'") (quoting *Dennis v. Gen. Imaging, Inc.*, 918 F.2d 496, 511 (5th Cir. 1990)). "For state law predicate acts, 'only crimes prohibited in state statutes *and* listed in section 1961(1) can serve as predicate offenses for the purpose of a RICO claim.'" *Gordon v. Neugebauer*, 57 F. Supp. 3d 766, 777 (N.D. Tex. 2014) (quoting *Pan Am. Mar.*, 2005 WL 1155149, at *4) (emphasis in original). "Such state law crimes include murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance." *Id.* (cleaned up). "For federal predicate acts, only those federal statutes specifically listed in section 1961(1) qualify as predicate acts[.]" *Id.* (citing, *e.g.*, *Bonton*, 889 F. Supp. at 1002 ("Any act that does not fall within the purview of RICO's definition of predicate offenses is not an act of 'racketeering activity.'") (cleaned up)).

Plaintiffs have yet to plead *even one* criminal predicate act listed in Section 1961(1). *See* SAC ¶¶ 684-91. Their entire RICO claim comprises seven paragraphs of the complaint, which, at best, suggest a simple—though poorly pled—fraudulent scheme. *See id.* Common law fraud does not qualify as a RICO predicate act and the courts have made clear that the RICO statute is not a "'surrogate for garden-variety fraud actions properly brought under state law.'" *Crosswell v. Rodriguez*, 2023 WL 6206911, at *4 (S.D. Tex. Sept. 8, 2023). This failure alone warrants dismissal of Plaintiffs' RICO claims. *See, e.g.*, Report & Recommendation [D.E. 107] at 67 ("The Court cannot strain to infer a pattern of racketeering activity where Plaintiffs fail to identify a single state or federal criminal

predicate act.").

**C. Plaintiffs Cannot Satisfy RICO's Enterprise Requirement.**

The federal RICO statute defines "enterprise" to include "any individual, partnership, corporation, association, or other alleged legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). An association-in-fact enterprise also "(1) must have an existence separate and apart from the pattern of racketeering, (2) must be an ongoing organization and (3) its members must function as a continuing unit as shown by a hierarchical or consensual decision making structure." *Allstate Ins. Co. v. Plambeck*, 802 F.3d 665, 673 (5th Cir. 2015).

1. Plaintiffs have not pled an enterprise with the requisite specificity.

Plaintiffs asserting RICO claims must "plead specific facts, not mere conclusory allegations[,] which establish the enterprise." *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 738 (5th Cir. 2019) (citing *Manax v. McNamara*, 842 F.2d 808, 811 (5th Cir. 1988)). Where, as here, a plaintiff does no more than describe a fraudulent scheme and conclude that the defendants comprise a RICO enterprise, he has not met the requirement. *See, e.g., Armendariz*, 2016 WL 8856919, at *9 ("The mere fact that individuals might have joined together to defraud Plaintiffs is insufficient to establish a RICO enterprise.") (quoting *Elliott v. Foufas*, 867 F.2d 877, 881 (5th Cir. 1989)) (cleaned up).

Plaintiffs allege that Defendants participated in an "ongoing fraudulent enterprise" consisting of at least seven purported "pump and dump" schemes, including the CryptoZoo project. *See* SAC ¶ 686. Plaintiffs do not plead a single detail of the other purported schemes—they simply list them, presumably for the purpose of pleading enterprise activity beyond the alleged CryptoZoo fraud.[3] *Cf.*

---

[3] Because Plaintiffs' allegations of other schemes fail to satisfy basic pleading requirements, the Court must discount them as part of the alleged enterprise's activity. Plaintiffs have accordingly failed to plead an enterprise distinct from its alleged pattern of racketeering activity. At best, they describe an enterprise of CryptoZoo's members formed to execute the alleged CryptoZoo scheme. These allegations cannot support a RICO claim. *See, e.g., Exp. Working Cap., LLC v. One World Cuisine Grp., LLC*, 2018 WL 4214349, at *11 n.8 (N.D. Tex. Aug. 16, 2018) ("For purposes of § 1962(c), . . . the enterprise must be distinct from the series of predicate acts constituting racketeering activity.").

*Clark v. Nat'l Equities Holdings, Inc.*, 561 F. Supp. 2d 632, 639 (E.D. Tex. 2006) (plaintiff must "show[] that the association exists for purposes other than simply to commit the predicate acts"). These conclusory allegations do not meet RICO's stringent pleading standard, let alone Rule 9(b). *See, e.g., Chyba v. EMC Mortg. Corp.*, 2011 WL 13205938, at *1 (N.D. Tex. Apr. 15, 2011), *aff'd*, 450 F. App'x 404 (5th Cir. 2011) (plaintiff must "plead specific facts, not mere conclusory allegations, to avoid dismissal"); *Bonton*, 889 F. Supp. at 1004 (Rule 9(b) applies to RICO claims).

2. CryptoZoo's officers cannot form an enterprise in the course of their employment.

"[T]o establish liability under § 1962(c) one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *ISystems v. Spark Networks, Ltd.*, 2012 WL 3101672, at *4 (5th Cir. Mar. 21, 2012) (quoting *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001)):

> In making a distinction between a RICO 'person' and a RICO 'enterprise,' it is not enough to establish that a defendant corporation through its agents committed the predicate acts in the conduct of its own business. That officers or employees of a corporation, in the course of their employment, associate to commit predicate acts does not establish an association-in-fact enterprise distinct from the corporation.

*Id.* (quoting *Whelan v. Winchester Prod. Co.*, 319 F.3d 225, 229 (5th Cir. 2003)) (cleaned up).

Accordingly, "[a] corporation whose corporate officers and employees are engaged in a corporation's activities cannot constitute a RICO enterprise based upon the activities of its employees," *Mauer v. Heritage Auctions, Inc.*, 2010 WL 11575504, at *1 (N.D. Tex. July 16, 2010), and "[w]here a plaintiff alleges that a RICO enterprise consists merely of a corporation associating with its own employees, the claim fails," *Yadav v. Frost Bank*, 2020 WL 7385842, at *5 (W.D. Tex. Dec. 16, 2020), *aff'd* 851 F. App'x 509 (5th Cir. 2021). *See also, e.g., Senthilnathan v. AT&T, Inc.*, 2018 WL 472925, at *1 (N.D. Tex. Jan. 3, 2018) (employees who associate to commit predicate acts in course of employment do not form distinct RICO enterprise).

Regardless of whether CryptoZoo remains a defendant to this action (which is not entirely

clear), Plaintiffs once again fail to plead the existence of a RICO "enterprise." Plaintiffs appear to allege that Defendants Paul, Greenbaum, and Ibanez, with former defendant Jeffrey Levin, schemed, as CryptoZoo employees, to deceive Plaintiffs. *See, e.g.*, SAC ¶¶ 684-91. The purported enterprise consists only "officers or employees of a corporation, in the course of their employment, [who allegedly] associated to commit predicate acts." *Whelan*, 319 F.3d at 225. As such, these allegations "do[] not establish an association-in-fact enterprise distinct from the corporation." *Id.* at 229.

### D. The Foreign Plaintiffs Have Not Pled a Domestic RICO Injury.

There is a presumption against the extraterritorial application of United States federal statutes. *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255 (2010) ("When a statute gives no clear indication of an extraterritorial application, it has none."). To overcome this presumption, courts ask whether the statute in question "gives a clear, affirmative indication that it applies extraterritorially." *Yegiazaryan v. Smagin*, 599 U.S. 533, 541–42 (2023). "If the answer is 'yes,' then the presumption is rebutted." *Id.* If the answer is "no," then "step two asks whether the case involves a domestic application of the statute, which is assessed 'by looking to the statute's 'focus.'" *Id.*

"Nothing in § 1964(c) provides a clear indication that Congress intended to create a private right of action for injuries suffered outside of the United States." *RJR Nabisco v. Eur. Cmty.*, 579 U.S. 325, 349 (2016). Thus, because Section 1964(c) focuses on "injur[ies] to 'business or property,'" *Yegiazaryan*, 599 U.S. at 542, "a civil RICO plaintiff [must] allege and prove a domestic injury to business or property and [Section 1964(c)] does not allow recovery for foreign injuries," *RJR Nabisco*, 579 U.S. at 354. "Essentially, injury to tangible property located in the United States is domestic, while injury to intangible assets owned by one residing abroad is not." *Garcia v. Lion Mex. Consol. L.P.*, 2018 WL 6427350, at *7 (W.D. Tex. Sept. 14, 2018). So, "injury to intangible assets owned by one residing abroad" does not constitute a domestic RICO injury. *See id.*

The 103 plaintiffs who reside abroad (the "Foreign Plaintiffs")[4] have not pled domestic injuries. Though "determining whether a plaintiff has alleged a domestic injury [for purposes of RICO] is a context-specific inquiry," *Yegiazaryan*, 599 U.S. at 543–44, nothing in the Second Amended Complaint suggests a different outcome. The Foreign Plaintiffs allege that they reside, purchased CryptoZoo products, and relied on various statements outside of the United States. *See* SAC ¶¶ 63-342. They do not allege where CryptoZoo was located or operated, where any Defendant resides, or where the alleged conduct described in their pleading took place. *See* SAC. Regardless, "racketeering alleged to have occurred in the United States . . . is [not] enough to turn what otherwise would be a foreign injury into a domestic one." *Percival Partners Ltd. v. Nduom*, 99 F.4th 696, 703 (4th Cir. 2024). Plaintiffs have not pled facts to "sufficiently ground the [Foreign Plaintiffs'] injur[ies] in the United States, such that it is clear the injury arose domestically.'" *Yegiazaryan*, 599 U.S. at 545.

The Court should dismiss Plaintiffs' RICO claims with prejudice.

## III.    PLAINTIFFS HAVE NOT STATED CLAIMS FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS.

### A.    CryptoZoo Tokens and NFTs Are Not Securities.

The threshold question of whether a digital asset constitutes a security is governed by the Supreme Court's test for an "investment contract," set forth in *SEC v. W.J. Howey Co.,* 328 U.S. 293 (1946). For a transaction to be deemed an investment contract, it must involve (1) an investment of

---

[4] The Foreign Plaintiffs reside and purchased "CryptoZoo Products" in England (SAC ¶¶ 93, 95, 121, 191, 231, 237, 271, 321, 335); Scotland (*id.* ¶¶ 267, 331); Northern Ireland (*id.* ¶ 185); Wales (*id.* ¶ 243); Russia (*id.* ¶¶ 113, 333); Canada (*id.* ¶¶ 117, 133, 211, 215, 249, 255, 269, 301, 337); Australia (*id.* ¶¶ 75, 79, 81, 91, 127, 129, 131, 135, 159, 161, 173, 175, 187, 213, 229, 247, 251, 259, 275, 287, 297, 325); Spain (*id.* ¶¶ 101, 119, 219, 235, 279, 285, 289, 327, 341); Romania (*id.* ¶ 181); Kuwait (*id.* ¶ 305); Singapore (*id.* ¶ 69); New Zealand (*id.* ¶¶ 109, 125, 143, 277, 303); Norway (*id.* ¶¶ 97, 265, 293); Croatia (*id.* ¶ 291); Philippines (*id.* ¶¶ 145, 197, 263, 283, 309); Brazil (*id.* ¶ 103); Denmark (*id.* ¶¶ 89, 227); Germany (*id.* ¶¶ 203, 253, 311); France (*id.* ¶¶ 99, 165); Slovenia (*id.* ¶ 177); Dominican Republic (*id.* ¶ 147); Italy (*id.* ¶ 115); Lebanon (*id.* ¶ 217); Macedonia (*id.* ¶ 105); India (*id.* ¶ 179); Switzerland (*id.* ¶ 107); Portugal (*id.* ¶¶ 209, 225, 239); Netherlands (*id.* ¶¶ 195, 261, 313, 319); Colombia (*id.* ¶¶ 141, 155, 163); Argentina (*id.* ¶¶ 83, 157); Belgium (*id.* ¶¶ 71, 207, 281); and "the United Kingdom" (*id.* ¶ 323).

money, (2) in a common enterprise, with (3) a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others. *United Hous. Found., Inc. v. Forman,* 421 U.S. 837, 852 (1975) (citing *Howey,* 328 U.S. at 299).

The Fifth Circuit "has required all three *Howey* elements to be present for a land contract to constitute a security." *Westchester Corp. v. Peat, Marwick, Mitchell & Co.*, 626 F.2d 1212, 1215 (5th Cir. 1980). The Supreme Court did not intend the test to regulate every novel product or asset. *Howey,* 328 U.S. at 299. Courts must look past labels and analyze the "economic reality" of the entire transaction. *See Forman,* 421 U.S. at 849. Doing so requires a "case-by-case inquiry into the totality of the circumstances surrounding the transaction," ensuring that courts consider the unique facts of each offering. *See SEC v. Binance Holdings Ltd.,* 738 F. Supp. 3d 20, 40–41 (D.D.C. 2024). Addressing crypto-assets, "courts evaluate whether the crypto-assets and the full set of contracts, expectations, and understandings surrounding [the asset's] sale and distribution . . . amount to an investment contract." *SEC v. Coinbase, Inc.*, 726 F. Supp. 3d 260, 289 (S.D.N.Y. 2024) (cleaned up).

1. Plaintiffs cannot satisfy the first prong of the *Howey* test.

Plaintiffs cannot satisfy *Howey*'s first prong—an "investment of money"—because they have not alleged that Defendants compelled them to "invest" money in CryptoZoo products. "Under *Howey*, courts conduct an objective inquiry into the character of the instrument or transaction offered based on what the purchasers were led to expect." *Real v. Yuga Labs, Inc.*, 2025 WL 3437389, at *7 (C.D. Cal. Sept. 30, 2025). "While a purchaser's subjective intent may have 'some bearing' in determining whether a plaintiff made an 'investment of money,' the 'focus [of the] inquiry [is] on what the purchasers were offered or promised.'" *Id.* at *5 (quoting *Warfield v. Alaniz,* 569 F.3d 1015, 1021 (9th Cir. 2009)). "Courts therefore often look to the promotional materials associated with a sale." *Id.* The ultimate question is whether the plaintiff "invested money" on promises of a financial return or "purchase[d] a commodity for personal consumption." *Forman,* 421 U.S. at 858.

The SAC makes clear that Defendants did not offer CryptoZoo products as "investments" or promise consumers investment returns. In fact, Mr. Paul and CryptoZoo *disclaimed* its products' investment status at every turn. *See* p. 4, *supra*; p. 21, *infra*. Beyond these express disclaimers, Mr. Paul and CryptoZoo, Inc. consistently promoted CryptoZoo exclusively as a game. *See, e.g.*, SAC ¶¶ 367, 378, 379. The "Egg NFTs," according to Mr. Paul and CryptoZoo, were "digital products" that Mr. "Paul had repeatedly promised would 'hatch' into a CZ Base Animal NFT and form the basis of the CryptoZoo game." *Id.* ¶ 374; T&C [D.E. 1-2] at 3 (NFTs "were created as art pieces intended for people to enjoy by collecting, not as a financial instrument"). The tokens, according to the T&C signed by every consumer, were issued for use in "the ecosystem in which all of the NFTs may be bought, sold, exchanged, or utilized," T&C at l, and were the currency for "transactions taking place *in our game*," *id.* ¶ 362 (emphasis added). *See also* T&C at 2 ("CryptoZoo NFTs may offer the ability to change the Name and Description *on-chain in exchange for $ZOO token*") (emphasis added). These statements aligned with CryptoZoo's Whitepaper, which warned that "$ZOO was created to support CryptoZoo, and was not intended to be an investment vehicle." SAC ¶ 25; *Tokenomics*, CryptoZoo Whitepaper, *available at* https://whitepaper.cryptozoo.co/tokenomics. Defendants marketed "CryptoZoo Products" exclusively for personal consumption: as tokens to buy goods and services, provide access to consumptive benefits, and empower the products' consumers to participate in community activities. *See, e.g.*, T&C at 3 (describing CryptoZoo NFTs as "collectible digital art pieces").

Under *Howey*'s objective test, Plaintiffs' allegations do not support the proposition that consumers made an "investment of money" in CryptoZoo. *See, e.g.*, *Real*, 2025 WL 3437389, at *7 (plaintiffs had not adequately alleged that digital assets were offered as investments where the alleged "promotional statements b[ore] little resemblance to the explicit discussions of rates of return" in other cases); *cf.* U.S. Sec. & Exch. Comm'n Div. of Corp. Fin., *Staff Statement on Meme Coins*, Feb. 25, 2025, *available at* https://www.sec.gov/newsroom/speeches-statements/staff-statement-meme-coins

(meme coins "typically are purchased for entertainment, social interaction, and cultural purposes" and "are akin to collectibles" such that in the Division's view, "transactions in the types of meme coins described in this statement, do not involve the offer and sale of securities[.]").

2. <u>Plaintiffs cannot satisfy the second prong of the *Howey* test.</u>

The second prong of the *Howey* test asks whether a transaction involving "an investment of money" involved an investment in "a common enterprise." *Forman,* 421 U.S. at 852. The controlling "common enterprise" standard in the Fifth Circuit is "broad vertical commonality." *See Long v. Shultz Cattle Co.*, 881 F.2d 129, 140-41 (5th Cir. 1989) ("This court . . . has explicitly rejected the view that horizontal commonality is a prerequisite to establishing a common enterprise within the meaning of *Howey* and has focused instead on the 'vertical commonality' between the investors and the promoter."); *SEC v. Teshuater, LLC*, 2024 WL 1348432, at *4 (S.D. Tex. Mar. 29, 2024). This standard focuses on whether investors' collective success is dependent on the promoter's expertise. *See SEC v. Cont'l Commodities Corp.*, 497 F.2d 516, 522 (5th Cir. 1974) ("[T]he critical inquiry is confined to whether the fortuity of the investments collectively is essentially dependent upon promoter expertise."). "Under th[is] commonality theory . . ., the second and third prongs of the *Howey* test may in some cases overlap to a significant degree." *Long v. Shultz Cattle Co.*, 896 F.2d 85, 86 (5th Cir. 1990).

Plaintiffs fail to plead a common enterprise. The focus of the Fifth Circuit's test is "promoter expertise," but Plaintiffs fail to plead any facts suggesting Defendants possessed *any* relevant expertise or offered any investment advice. *See, e.g., Cont'l Commodities Corp.,* 497 F.2d at 522 (common enterprise found where investors' collective success depended on promoters' "guidance for the success of their investment"). Defendants are a social media influencer and his colleagues; they did not "highlight" their "expertise to give comfort to the investors about the 'fortuity of the investments' supporting a common enterprise." *SEC v. Balina*, 2024 WL 2332965, at *9 (W.D. Tex. May 22, 2024) (noting that promoters had published "eight pages of biographies of executives and other employees, highlighting

their educational and professional backgrounds," which, with other facts, "indicated that Sparkster was seeking purchasers of tokens much like a company would seek investors before an I.P.O."). Other than vague assertions about Ibanez's background on CryptoZoo's website, *see* SAC ¶ 345, Plaintiffs identify no public statement by any Defendant touting the team's relevant management capabilities, investment expertise, educational backgrounds, or technical skills in a way that would engender *investor* confidence. Without plausible allegations of promoter expertise, Plaintiffs cannot satisfy *Howey*'s second prong. *See, e.g., Long, supra.*

3.    Plaintiffs cannot satisfy the third prong of the *Howey* test.

*Howey*'s third prong asks whether plaintiffs had a reasonable expectation of profits derived from the entrepreneurial or managerial efforts of others. *See Forman*, 421 U.S. at 852. The inquiry is objective, asking what a reasonable purchaser would have understood from the promoters' public representations. *See id.* ("The touchstone [of the *Howey* test] is the presence of an investment in a common venture premised on a *reasonable expectation of profits. . . .*") (emphasis added); *Coinbase*, 726 F. Supp. 3d at 289 ("[I]n assessing the circumstances surrounding the sale of a crypto-asset, courts should look to what the offeror invites investors to reasonably understand and expect. To do so, courts examine how, and to whom, issuers or promoters market the crypto-asset."). Critically, in this context, "[p]rofits" does not encompass all possible benefits; it means "either capital appreciation resulting from the development of the initial investment, ... or a participation in earnings resulting from the use of investors' funds." *Donovan v. GMO-Z.com Tr. Co., Inc.*, 779 F. Supp. 3d 372, 385 (S.D.N.Y. 2025) (citing *Forman*, 421 U.S. at 852, and *Edwards*, 540 U.S. at 394 ("profits" means "income or return, to include, for example, dividends, other periodic payments, or the increased value of the investment")).

A consumer purchasing CryptoZoo tokens and NFTs would not reasonably expect investment profits. At all times relevant (and, most critically, pre-purchase), Mr. Paul touted his passion project to his followers and subscribers *as a game* and expressly disclaimed the products as

investment vehicles. *See* p. 4, *supra*; p. 21, *infra*. Though disclaimers are not dispositive under *Howey*, they are not irrelevant. A clear and unequivocal disclaimer is a crucial part of the "economic reality" that informs a reasonable investor's expectations. *See, e.g.*, *S.E.C. v. SG Ltd.*, 265 F.3d 42, 54 (1st Cir. 2001) (defendant's "repeated disclaimers" were not "irrelevant"; defendant had "a plausible argument . . . that no participant in his or her right mind should have expected guaranteed profits from purchases of privileged company shares"). A reasonable consumer reviewing the explicit disclaimers in the T&Cs and Whitepaper, coupled with Mr. Paul's and his colleagues' consistent and exclusive characterizations of the project as a "game," would understand the project's consumptive purpose and not mistake CryptoZoo products for investment contracts. *See, e.g.*, *Binance Holdings*, 738 F. Supp. 3d at 40–41 (requiring a "case-by-case inquiry into the totality of the circumstances surrounding the transaction").

Notably, Plaintiffs do *not* allege that Defendants promised investment returns, dividends, or any form of "capital appreciation resulting from the development of the initial investment." *Donovan*, 779 F. Supp. 3d at 385. Nor did Mr. Paul and his co-founders target their promotion of CryptoZoo to known individual or institutional investors. *See Coinbase*, 726 F. Supp. 3d at 289 ("[C]ourts should look to what the offeror invites investors to reasonably understand and expect. To do so, courts examine how, *and to whom*, issuers or promoters market the crypto-asset.") (emphasis added). Plaintiffs allege that Mr. Paul—an "entertainer"—marketed CryptoZoo to his followers and subscribers on Twitter (now "X") and YouTube. *See, e.g.*, SAC ¶¶ 343, 354, 369, 378-80.

Plaintiffs have not plausibly alleged that they had "a reasonable expectation of profits." *See, e.g.*, *Real*, 2025 WL 3437389, at *10 (no reasonable expectation of profits where "profit-focused elements" were "missing" from alleged "run-of-the-mill promotional statements" such that "it was not objectively reasonable for plaintiffs to base expectations of speculative profit" on them).

**B. The Foreign Plaintiffs Have Not Pled Domestic Securities Transactions.**

As with their RICO claims, *see* Section II.D, *supra*, the Foreign Plaintiffs cannot overcome the

presumption against the extraterritorial application of the Securities Exchange Act. "[T]he focus of the Exchange Act is not upon the place where the deception originated, but upon purchases and sales of securities in the United States." *Morrison*, 561 U.S. at 266. There is a domestic application of Section 10(b) of the Exchange Act when (1) "the purchase or sale is made in the United States" or (2) the transaction "involves a security listed on a domestic exchange." *Id.* ("[I]t is . . . only transactions in securities listed on domestic exchanges, and domestic transactions in other securities, to which § 10(b) [of the Exchange Act] applies.").

"[T]he Fifth Circuit has not yet established a particular extraterritoriality test" for securities claims, but Texas district courts have found the Second Circuit test persuasive. *Fagan v. Nexo Cap. Inc.*, 2025 WL 2446301, at *22 (E.D. Tex. Aug. 25, 2025); *see also, e.g.*, *Basic v. BProtocol Found.*, 2024 WL 4113751, at *8 (W.D. Tex. July 31, 2024*)* (applying Second Circuit test). Under that test, "in order to adequately allege the existence of a domestic transaction," a plaintiff must plead facts giving rise to the plausible inference "that the purchaser incurred irrevocable liability within the United States to take and pay for a security, or that the seller incurred irrevocable liability within the United States to deliver a security." *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 68 (2d Cir. 2012).

The Foreign Plaintiffs have not alleged how or from whom they purchased "CryptoZoo Products" or where they or any defendant "incurred irrevocable liability." *See* SAC ¶¶ 63-342. Plaintiffs do not allege whether they purchased CryptoZoo tokens or CZ NFTs, whether they purchased from a third party (and if so, where that third party was located),[5] or on what platform or exchange they purchased CryptoZoo products.[6] *See* SAC ¶¶ 63-342. Nor have Plaintiffs alleged where any defendant

---

[5] Plaintiffs do concede, however, that some among them purchased CryptoZoo products on the "open market." *Id.* ¶ 397.

[6] CryptoZoo tokens, for example, are available on PancakeSwap, a secondary exchange with corporate offices in Japan and the Terms and Conditions of which dictate that all disputes with the company are to be resolved by the laws of Hong Kong. *See* PancakeSwap Terms of Service, available at

resided during the relevant period or where any of Defendants' alleged conduct took place. *See, e.g., id.* ¶¶ 343-46. All told, the Foreign Plaintiffs have not plausibly alleged a domestic sale or purchase of a security or that any CryptoZoo product was listed on a domestic exchange.[7] *See, e.g., Rubenstetn v. Ishizuka*, 2025 WL 1489375, at *6 (S.D.N.Y. May 23, 2025) (plaintiff had not pled domestic transaction where he had "not alleged *any* facts . . . supporting a plausible inference that Defendants incurred irrevocable liability in the United States" or "any facts regarding the location of the transfer of title") (emphasis in original); *Azad v. Jenner*, 2025 WL 1718273, at *4 (C.D. Cal. May 9, 2025) (plaintiff failed to plead a domestic securities transaction where he had not alleged where, *inter alia*, he purchased tokens, "whether any of the potential methods for purchasing the tokens would have subjected [him] to irrevocable liability within the United States," or "which method [he] actually used"); *Baylor v. Honda Motor Co.*, 2024 WL 650415, at *4 (C.D. Cal. Jan. 19, 2024) (dismissing claims where "[n]othing in the FAC . . . explains where Plaintiffs 'acquired'" securities listed on both U.S. and foreign exchanges). No Foreign Plaintiff has standing to pursue federal securities claims.

**C. Plaintiffs Lack Standing to Pursue Claims Based on Post-Purchase Representations.**

"[I]n an action for private damages pursuant to Section 10(b) and Rule 10b-5, standing is restricted to plaintiffs who are defrauded in connection with the purchase or sale of securities." *Shtaif v. Shoss*, 2007 WL 9752787, at *3 (S.D. Tex. Feb. 12, 2007) (citing, *inter alia, Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 732 (1975)). A plaintiff raising a securities fraud claim under these provisions

---

https://pancakeswap.finance/terms-of-service;          PancakeSwap,          Crunchbase, https://www.crunchbase.com/organization/pancakeswap.

[7] The court in *Baylor v. Honda Motor Co.*, 2024 WL 650415, at *4 (C.D. Cal. Jan. 19, 2024), noted that "while *Morrison* did not squarely address the issue, a number of lower courts have rejected the argument that a transaction qualifies as a domestic transaction under *Morrison* whenever the purchaser or seller resides in the United States, even if the transaction itself takes place entirely over a foreign exchange." *Id.* (citing cases). Following those cases, even the U.S. Plaintiffs here have not pled a "domestic transaction" because they have not alleged *where* (on what exchange or from whom) they purchased CryptoZoo products. *See id.*

"must affirmatively plead and prove that the plaintiff has standing." *Talarico v. Johnson*, 2023 WL 2618255, at *5 (S.D. Tex. Feb. 7, 2023). Because the Exchange Act restricts standing to purchasers and sellers, "a plaintiff does not have standing as a mere holder of securities." *Id.*; *see also, e.g.*, *Blue Chip Stamps*, 421 U.S. at 737–38, 749 (standing does not extend to purchasers "who allege that they decided not to sell their shares because of an unduly rosy representation or a failure to disclose unfavorable material"). "[A]n investor who held a security and, in reliance on the alleged misstatement, did not sell it, cannot bring suit." *Talarico*, 2023 WL 2618255, at *5; *see also, e.g.*, *Krim v. BancTexas Grp., Inc.*, 989 F.2d 1435, 1443 n.7 (5th Cir. 1993) ("[T]h[e] mere retention of securities in reliance on material misrepresentations or omissions does not form the basis for a § 10(b) or Rule 10b–5 claim.").

Most Plaintiffs base their securities claims, at least in part, on their retention of "CryptoZoo Products" in alleged reliance on post-purchase representations by Mr. Paul. *See* SAC ¶¶ 63-342. Plaintiffs lack standing to pursue claims to the extent they relied on post-purchase statements. *See, e.g.*, *Krim*, *supra*; *Talarico*, 2023 WL 2618255, at *7 ("A holder of securities, as opposed to a purchaser or seller of securities, does not have standing to sue for securities fraud.") Consequently, at least twenty-one Plaintiffs have no securities claims at all. These Plaintiffs allege that they purchased CryptoZoo products before they relied on *any* alleged misrepresentation attributed to Mr. Paul.[8] Because these

---

[8] *See id.* ¶ 99  (purchased on August 15, 2021; first relied on August 18, 2021); ¶ 119 (purchased on May 8, 2021; first relied on August 18, 2021); ¶ 133 (purchased on August 15, 2021; first relied on August 18, 2021); ¶ 155 (purchased on August 20, 2021; first relied on September 3, 2021); ¶ 163 (purchased on August 17, 2021; first relied on August 18, 2021); ¶ 169 (same); ¶ 178 (purchased on July 28, 2021; first relied on August 18, 2021[8]); ¶ 189 (purchased on August 16, 2021; first relied on August 18, 2021); ¶ 199 (purchased on June 1, 2021; first relied on August 18, 2021); ¶ 205 (purchased on August 1, 2021; first relied on August 18, 2021); ¶ 239 (purchased on July 31, 2021; first relied on August 18, 2021); ¶ 245 (purchased on July 29, 2021; first relied on August 18, 2021); ¶ 251 (purchased on August 1, 2021; first relied on August 18, 2021); ¶ 261 (purchased on July 21, 2021; first relied on August 18, 2021); ¶ 281 (purchased on August 17, 2021; first relied on August 18, 2021); ¶ 287 (purchased on August 3, 2021; first relied on August 18, 2021); ¶ 293 (purchased on September 1, 2021; first relied on September 2, 2021); ¶ 299 (purchased on August 1, 2021; first relied on August 18, 2021); ¶ 311 (purchased on August 13, 2021; first relied on August 18, 2021); ¶ 317 (purchased on August 4, 2021; first relied on August 18, 2021); ¶ 341 (purchased in 2022; first relied in January 2023).

Plaintiffs allegedly relied exclusively on post-purchase statements by "acting on these representations to preserve [their] investment[s] in CryptoZoo," *id.* ¶¶ 100, 120, 134, 156, 164, 170, 178, 190, 200, 206, 240, 246, 252, 262, 282, 288, 294, 300, 312, 318, 342, the Court must dismiss their securities fraud claims with prejudice. *See, e.g.*, *Krim*, *Talarico*, *supra*.

### D.  Plaintiffs Have Not Pled the Elements of Securities Fraud with Particularity.

To satisfy the PSLRA's pleading standard, plaintiffs must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 339 (5th Cir. 2008) (quoting 15 U.S.C. § 78u–4(b)). "The PSLRA *also* requires that the complaint "with respect to *each* act or omission alleged" to be false or misleading "state with *particularity facts* giving rise to a *strong* inference that *the defendant* acted with the required state of mind." *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 363 (5th Cir. 2004) (emphasis in original) (quoting 15 U.S.C. § 78u–4(b)(2)). "A complaint can be long-winded, even prolix, without pleading with particularity. Indeed, such a garrulous style is not an uncommon mask for an absence of detail." *Id.* at 362. Plaintiffs have not satisfied the requirements of the PSLRA or Rule 9(b) for two at least reasons.

1.  Plaintiffs do not plead all necessary details of their claims.

The operative complaint is deficient "because it fails, in several ways, to specify the material circumstances of *each* plaintiff's claim." *Barr v. McGraw-Hill, Inc.*, 710 F. Supp. 95, 97 (S.D.N.Y. 1989) (emphasis in original). "To satisfy Rule 9(b), plaintiffs must plead the amount and price of the securities purchased by each plaintiff, the date and place of each purchase, and the losses suffered." *Id.*; *Holland v. GEXA Corp.*, 161 F. App'x 364, 365 (5th Cir. 2005) ("Holland's failure specifically to plead the purchase price he paid for his stock, and that the alleged violations of Section 10(b) and Rule 10b–5 caused the stock to lose value, further evince both Holland's lack of standing and insufficient

pleading as to those claims."); *Stromfeld v. Great Atl. & Pac. Tea Co.*, 484 F. Supp. 1264, 1270 (S.D.N.Y.), *aff'd*, 646 F.2d 563 (2d Cir. 1980) ("The complaint does not allege the dates on which the plaintiffs bought and sold their stock, nor does it specify the price of the stock at the time in question.").

Plaintiffs fail to allege the prices at which they purchased "CryptoZoo Products" and when, if ever, they sold them. *See* SAC ¶¶ 63-342. As discussed above, these details are relevant to the question Plaintiffs' standing. *See* Section III.C, *supra.* They also bear on Plaintiffs' losses. *See, e.g., Cohen v. Stevanovich*, 722 F. Supp. 2d 416, 431 (S.D.N.Y. 2010) ("To the extent any Plaintiff held his, her, or its shares throughout the relevant time period, their claim that . . . Defendants somehow depressed the market price of [the] stock is too speculative to measure and does not constitute a legally cognizable loss."). As the Second Amended Complaint reflects, the price of CryptoZoo tokens fluctuated wildly and frequently over time. *See* SAC ¶ 36. The timing and value of Plaintiffs' purchases (and sales, if any) are critical elements of their securities claims. *See Stromfeld*, 484 F. Supp. at 1270. Plaintiffs also fail to tie the various representations attributed to Mr. Paul (and on which they allegedly relied) or any disclosure of the "truth" to surges or drops in CryptoZoo products' value.[9] *See, e.g., Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 337 (2005) (pleading securities fraud requires providing notice of causal connection between loss and alleged misrepresentation); *see* Section III.F, *infra.*

Relatedly, on the complaint's face, it appears that Plaintiffs have not identified the dates of all purchases. Plaintiffs allege, without explanation, that they "initially purchased" CryptoZoo Products "beginning on" a given date or "purchased CryptoZoo Products for the first time" on a given date. *See id.* ¶¶ 65-342. In keeping with Plaintiffs' scattershot manner of pleading, these allegations suggest that Plaintiffs made additional CryptoZoo purchases on unspecified dates. *See id.* Plaintiffs' dates of purchase are crucial to pleading causation, as well as standing and injury. *See, e.g., GEXA Corp.*, 161 F.

---

[9] Plaintiffs attribute one surge in January 2023 to statements by Mr. Paul, see SAC ¶ 36, but do not allege that any Plaintiff relied on those statements, *see id.* ¶¶ 63-342.

App'x at 365 (pleading "purchase price paid" and that alleged violations caused the stock to lose value went to plaintiff's "lack of standing and insufficient pleading as to those claims").

Perhaps most glaringly, Plaintiffs fail to allege which "CryptoZoo Products" they purchased. *See* SAC ¶¶ 63-342. This omission matters. Plaintiffs who purchased only tokens, as speculators, would have an interest only in investment losses, responsibility for which CryptoZoo and Mr. Paul expressly disclaimed. *See, e.g., id.* ¶ 38; T&C [D.E. 1-2] at 2 ("CryptoZoo Are NOT Investment Vehicles."). Representations about the *game*, by contrast, might not be material to "investors." *See, e.g., Dura Pharms.*, 544 U.S. at 337 (pleading securities fraud requires providing "notice of . . . the causal connection might be between that loss and the misrepresentation"). Similarly, Plaintiffs who heeded CryptoZoo's disclaimers and purchased CryptoZoo products for consumptive purposes would lack a causal connection between promotions of CryptoZoo as an investment and their alleged losses. *See id.*

Finally, at least forty-four Plaintiffs allege that they relied on generic, undated statements by Mr. Paul that the CryptoZoo game would make them money, was fully funded, and was backed by a professional team. *See* SAC ¶¶ 72, 92, 96, 114, 126, 128, 132, 146, 160, 178, 182, 192, 198, 204, 216, 228, 230, 232, 236, 240, 242, 254, 256, 264, 272, 280, 282, 286, 288, 292, 302, 306, 308, 310, 312, 314, 316, 318, 322, 326, 330, 332, 334, 336. Though Plaintiffs allege that Mr. Paul made statements *like* these on specific dates elsewhere in the complaint, their imprecision here suggests that forty-four Plaintiffs do not know when or on what they relied. *See id.* The omitted detail is critical to scienter, causation, and damages. *See, e.g., Dura Pharms.*, 544 U.S. at 337 (securities fraud plaintiff must provide notice of relevant loss and causal connection between loss and misrepresentation)

The PSLRA's certification requirement reflects the importance of these pleading deficiencies. The PSLRA is clear that "each plaintiff seeking to serve as a representative party on behalf of a class shall provide a sworn certification . . . personally signed by such plaintiff and filed with the complaint." 15 U.S.C.A. § 78u-4(2)(a). The certification must detail, among other things, *all* of the plaintiffs'

transactions in the relevant security during the class period. *Id.* Plaintiffs have neither filed a single certification nor detailed the relevant transactions in their operative complaint. Plaintiffs' allegations fall far short of the specificity required by the PSLRA. *See, e.g.*, *Dorsey*, 540 F.3d at 339 (describing PSLRA standard).

     1.   <u>Plaintiffs have not pled scienter with sufficient particularity.</u>

Plaintiffs do not "plead specific facts giving rise to a 'strong inference' of scienter." *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 430 (5th Cir. 2002). "To qualify as 'strong'. . . an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. "The inference . . . need not be irrefutable, but it must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." *Id.* at 310.

The Second Amended Complaint is littered with conclusory allegations of Mr. Paul's intent, which cannot support claims for violations of Section 10(b) and Rule 10b-5. *See, e.g.*, *In re Franklin Bank Corp. Sec. Litig.*, 782 F. Supp. 2d 364, 377 (S.D. Tex. 2011), *aff'd sub nom. Harold Roucher Tr. U/A DTD 9/21/72 v. Nocella*, 464 F. App'x 334 (5th Cir. 2012) ("Conclusory allegations . . . will not suffice to plead scienter."); *Dorsey*, 2005 WL 8158181, at *6 ("rote conclusory allegations" of scienter fail to satisfy Rule 9(b)). Plaintiffs conclude throughout the Second Amended Complaint that Mr. Paul and his co-Defendants founded CryptoZoo as a scam, and specifically a "rug-pulling" scheme, never intending to create a game or a platform, but only to defraud consumers. *See, e.g.*, SAC ¶¶ 10, 32, 376, 388, 392. They allege, for example, "on information and belief" that "Defendants" decided to forego "creat[ing] a functional CryptoZoo game or support it, and instead deliberately undertook a scheme to defraud Plaintiffs and other consumers," SAC ¶ 392, without pleading specific facts to support their conclusions. Plaintiffs also allege without basis that Mr. Paul's withdrawal of a portion of the revenues from one day's sales of egg NFTs "demonstrates that [taking money for his personal use]

was the intent behind CryptoZoo all along." *Id.* ¶ 376; *see* pp. 11-12, *infra*.

 Elsewhere in their pleading, however, Plaintiffs allege that CryptoZoo developers had worked on the platform for the CryptoZoo game, "creat[ing] projects related to CryptoZoo" as well as a prototype of the "the project's . . . 'virtual marketplace,'" which Mr. Paul reviewed and rejected as inadequate. SAC ¶¶ 12, 377. They also allege that CryptoZoo hired employees, maintained "internal documents" reflecting the ownership structure of the company and allocating a percentage of the company's assets to "expenses," and kept notes of internal meetings. *See, e.g.*, *id.* ¶¶ 347, 348, 377, 389. Plaintiffs allege further that in private conversations, Mr. Paul "acknowledged confusion and dissatisfaction with the state of [the game's] development," *id.* ¶ 362, and expressed his expectation that CryptoZoo would "successfully launch our eggs," *id.* ¶ 365. And critically, Plaintiffs do *not* allege that Mr. Paul *ever* sold his CryptoZoo holdings ("pulled the rug"), which "call[s] into question [his] alleged motive to artificially inflate the [tokens'] price." *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 867 (5th Cir. 2003); *see, e.g.*, *Cohen*, 722 F. Supp. 2d at 429 ("To plead motive and opportunity to commit fraud, Plaintiffs must allege . . . that the defendant would realize 'concrete benefits' from the fraud. . . . Generalized motives that could be attributed to any 'for-profit endeavor' will not suffice.").

 Plaintiffs' conclusory allegations, weighed in light of their complaint's internal contradictions, do not support an inference of scienter that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent" or "strong in light of other explanations," *Tellabs*, 551 U.S. at 314, 324, particularly those set forth in Mr. Paul's Crossclaim [D.E. 55].

### E.  Plaintiffs Have Not Identified Actionable Misrepresentations by Mr. Paul.

 To state a claim under Section 10(b) and Rule 10b–5, to begin, a plaintiff must plead knowing misstatements of material fact made in connection with the purchase or sale of securities. *See Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 286 (5th Cir. 2006) (setting forth elements of rule 10b-5 claim). Plaintiffs allege that they relied on various combinations of eight inactionable

representations (or sets of representations) by Mr. Paul, which fall into four categories.

    <u>Statements Not Authored by Mr. Paul.</u> Plaintiffs misattribute two documents and their incorporated statements to Mr. Paul: the September 1, 2021, *Medium* "article" and the CryptoZoo Whitepaper. Plaintiffs allege that the September 1, 2021, *Medium* article claimed that CryptoZoo had initiated the first token conversion to address "functionality" and "interoperability" issues with the platform to conceal Greenbaum's liquidation of his holdings. *See* SAC ¶¶ 364, 366. They further allege "[o]n information and belief" that Mr. Paul "either personally authored the article or provided direct, hands-on instruction regarding its content and messaging." *Id.* ¶ 366. Plaintiffs embed a link to the "article,"[10] which reveals its author to be "CryptoZooCo." *Id.* ¶ 367 (citing https://medium.com/@CryptoZooCo/CryptoZoo-genesis-smart-contract-update-c7dfc029b25). They also attribute revisions to CryptoZoo's Whitepaper—also authored by CryptoZoo—to Mr. Paul without basis. *See id.* ¶ 369.

    Plaintiffs cannot plausibly tie any statement in the *Medium* "article" or the CryptoZoo Whitepaper to Mr. Paul, nor can these documents provide a basis to attach to him a duty to disclose additional or corrective information. *See, e.g.*, *Sec. & Exch. Comm'n v. Mapp*, 240 F. Supp. 3d 569, 584 (E.D. Tex. 2017) ("[A] duty to speak the full truth *on a particular subject* arises when a defendant undertakes to say anything *on that particular subject*.") (emphasis in original); *N. Port Firefighters' Pension-Loc. Option Plan v. Temple-Inland, Inc.*, 936 F. Supp. 2d 722, 737 (N.D. Tex. 2013) ("[A]llegations that each defendant controlled the contents of and participated in writing a company's SEC filings, reports, and releases, without more, are insufficient to meet the requirements of the PSLRA.").[11] Plaintiffs

---

[10] The document is entitled "Genesis Smart Contract Update."

[11] Even were that not the case, Plaintiffs have not plausibly alleged that CryptoZoo's "inoperability" claim was false. The text of the *Medium* "article" (which Plaintiffs have incorporated into the SAC) reflects that the transition was launched in response to community concerns about challenges with the Binance Smart Chain ("We have heard the community and understand that the barrier to entry on the Binance Smart Chain (BSC) has been prohibitive for some…"). *See* SAC ¶ 367 (incorporating

cannot base their allegations "on information and belief" without *any* "facts to raise a right to relief above the speculative level[.]" *Twombly*, 550 U.S. at 555.

Underline: Statements That Are Mere Puffery. Most Plaintiffs claim to have relied on Mr. Paul's "August 18, 2021 statements" without explaining on *which* of the numerous "statements" issued on that date they based their purchase decisions. *See id.* ¶¶ 63-342. Lack of specificity aside, this court has already held that several of the August 18, 2021, statements are inactionable puffery. *See* Report & Recommendation [D.E. 107] at 30-31 (statements that CryptoZoo was "so fun" and "a really fun game that makes you money" were "irrefutably puffery," and depiction of project as backed by "massive team" and funded by "like a million dollars" also constituted puffery). The Court was correct. Representations that CryptoZoo was "so fun," had "a massive team" behind it, and was funded by "like a million dollars," SAC ¶ 356, are puffery because they are too vague to be actionable. *See, e.g.*, *Rosenzweig*, 332 F.3d at 869 (statements that company's fundamentals "remain[ed] strong" and company was "making steady progress" were "precisely the sort of generalized positive characterization that is not actionable under the securities laws"); *JT Brother Constr., LLC v. Tex. Pride Trailers, LLC*, 2022 WL 800183, at *5 (S.D. Tex. Mar. 16, 2022) ("general positive descriptions" of product and its capabilities amounted to puffery). The same holds true for Mr. Paul's representations on September 3, 2021, that CryptoZoo eggs were "selling instantly" such that he "[could]n't even get one," SAC ¶ 378, on September 5, 2021, that "the best is yet to come," *id.* ¶ 379; on October 11, 2021: Let's make a fun game where people can live out their wildest dreams," *id.* ¶ 383; and in May 2022 that "this project will speak for itself," *id.* ¶ 390. *See, e.g.*, *Krim*, 989 F.2d at 1446 ("[P]rojections of future performance not worded as guarantees are generally not actionable under the federal securities

---

*Medium* article). And Mr. Paul's allegations in his Crossclaim that his co-founders conceived a plan to blacklist Mr. Greenbaum's wallets with the conversion does not "contradict" CryptoZoo's representations about inoperability. *See id.* ¶ 371. Both things can be true.

laws."); *Linenweber v. Sw. Airlines Co.*, 693 F. Supp. 3d 661, 675 (N.D. Tex. 2023); ("[G]eneralized expressions of optimism that are short on factual content" are puffery and "[i]nvestors do not rely on such 'puffery[]'"). The Court should dismiss claims based exclusively or in part on these statements.

    <u>Statements That Are Not Misrepresentations.</u> Incorporated into several representations attributed to Mr. Paul are assertions that are true or, at the very least, not demonstrably false. Such statements cannot support a viable securities fraud claim. *See, e.g.*, *Sec. & Exch. Comm'n v. Mapp*, 240 F. Supp. 3d 569, 579-80 (E.D. Tex. 2017) (dismissing claim where SEC "d[id] not allege facts to show that this truthful statement was misleading"). Plaintiffs allege, for example, that Mr. Paul represented "it's going to be on the [B]inance smartchain," Ethereum network "gas fees don't make sense," and the eggs are "selling instantly," *see* SAC ¶¶ 361, 378. Plaintiffs do not dispute these representations.

    Plaintiffs characterize other statements as false but fail to support their conclusions with "further factual enhancement." *Iqbal*, 556 U.S. at 678. Plaintiffs allege, for example, that Mr. Paul stated "we … are probably out of pocket like a million." *See id.* SAC ¶ 356. Plaintiffs plead no facts to support the conclusion that Mr. Paul and his co-founders (and whoever else comprises "we")[12] had not directed "like a million" dollars toward developing and promoting CryptoZoo.

    Similarly, Plaintiffs' assertion that CryptoZoo had not "hand made art for the past 6 months, . . . 10 different artists making art for our project" s conclusory at best. *See id.* ¶ 357. Plaintiffs offer as support an image of a purported CryptoZoo hybrid animal and contend that the piece is "edited and combined stock images," but "not original works of art." *See id.* The text accompanying the embedded image reflects the problem with Plaintiffs' assertion. In that text—an undated online message from

---

[12] Plaintiffs attempt to demonstrate that Mr. Paul's statement was false by pointing out that Mr. Paul alleged in his Cross claims that *he* was out-of-pocket "only around $200,000 of his own money[.]" SAC ¶ 356. Mr. Paul asserted, however that "*we*" were out-of-pocket "like a million." *Id.* "We" could have referred to any number of people who, *together*, contributed "like a million" to CryptoZoo's development. Regardless, Mr. Paul's allegations in his Crossclaim do not undermine the credibility of or in any way disprove his August 18, 2021, statement.

someone named Patrick Muntwyler to CryptoZoo manager, Ben Roth—*Muntwyler* attaches the image and *proposes* a model for the CryptoZoo hybrids, saying "@benroth why not just show a 1:1 animal hybrid[?]" *Id.* The image was not, that is, according to Plaintiffs' allegations, a final or approved CryptoZoo NFT created in-house.[13] The embedded image does not support Plaintiffs' conclusion that CryptoZoo's NFTs were not "original." *See, e.g., Williams*, 2004 WL 579505, at *4 ("Although fraud may be pleaded on information and belief . . . that exception must not be taken for license to base claims of fraud on speculation and conclusory allegations.") (cleaned up).

        Statements About the "Game."  Plaintiffs assert that Mr. Paul lied about the development of the CryptoZoo game without tying his assertions about the game to the value of the *token* or explaining how the game's success or failure affected the value of their alleged investments. Setting aside the question of whether Mr. Paul's statements that the game was "so fun" and that kids were "addicted to it," were hyperbolic, inactionable puffery, *see* pp. 34-35, *supra*, Plaintiffs have not tied these statements to their losses or alleged that any plaintiff purchased CryptoZoo Products with the intention of playing the game (rather than as a cryptocurrency speculator). They cannot, therefore, draw a causal connection between these statements and their losses. *See, e.g., Dura Pharms.*, 544 U.S. at 337 (pleading securities fraud requires providing "notice of . . . what the causal connection might be between that loss and the misrepresentation").

        Plaintiffs have not identified actionable misrepresentations by Mr. Paul.

**F.  Plaintiffs Have Not Pled Loss Causation.**

        "Under the PSLRA, a plaintiff must prove that a defendant's act or omission alleged to have violated the Exchange Act 'caused the loss for which the plaintiff seeks to recover damages.'" *Dawes*

---

[13] Later, as reflected in the October 11, 2021, video Plaintiffs link to the Second Amended Complaint, Mr. Paul shows a different to viewers on YouTube. *See id.* ¶ 14 (linking interview available at https://www.youtube.com/watch?v=ZNQG93EkWiI (at 37:58-38:16)). This "hybrid (a duck and a panda) looks different—it does *not* appear to be a mash up of "crudely edited and combined . . . stock images." *Id.* ¶ 357.

*v. Imperial Sugar Co.*, 975 F. Supp. 2d 666, 707 (S.D. Tex. 2013) (quoting 15 U.S.C. § 78u–4(b)(4)). "To

establish loss causation under § 10(b), it is not enough for a plaintiff to show that it bought stock at

inflated prices and that the stock price declined after negative news was reported." *Id.* at 708. This is

because, as the Supreme Court has recognized, conditions other than disclosure of the "truth" shielded

by a misrepresentation may also affect an asset's value. As the Court explained:

> If the purchaser sells later after the truth makes its way into the marketplace, an initially
> inflated purchase price *might* mean a later loss. But that is far from inevitably so. When
> the purchaser subsequently resells such shares, even at a lower price, that lower price
> may reflect, not the earlier misrepresentation, but changed economic circumstances,
> changed investor expectations, new industry-specific or firm-specific facts, conditions,
> or other events, which taken separately or together account for some or all of that lower
> price. . . . Other things being equal, the longer the time between purchase and sale, the
> more likely that this is so, *i.e.,* the more likely that other factors caused the loss.

*Dura Pharms.*, 544 U.S. at 342–43.

    Thus, to plead loss causation, "plaintiffs must allege a facially plausible causal relationship

between the fraudulent statements or omissions and plaintiff's economic loss, including allegations of

a material misrepresentation or omission, followed by the leaking out of relevant or related truth about

the fraud that caused a significant part of the depreciation of the stock and plaintiff's economic loss."

*N. Port Firefighters*, 936 F. Supp. 2d at 761 (quoting *Lormand,* 565 F.3d at 258). "The loss must result

from this truth having "'ma[de] its way into the marketplace,' not as a result of 'changed economic

circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions,'

or other factors independent of the fraud." *Dawes*, 975 F. Supp. 2d at 708 (quoting *Dura Pharms.*, 544

U.S. at 342–43).

    Plaintiffs do not describe the circumstances giving rise to CryptoZoo products' alleged losses

in value at all, let alone tie those losses to representations by Mr. Paul *or* corrective statements leaked

to the market. Plaintiffs allege "on information and belief" that "Defendants manipulated the Zoo

Token market" and "artificially inflated" the prices of CryptoZoo tokens and NFTs, *see, e.g.,* SAC ¶¶

394, 658, 669, and conclude without explanation that as a result, "the market price of Zoo Tokens

and CZ NFTs plummeted upon materialization of undisclosed risks and/or public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members," *id.* ¶ 675. Nowhere in the Second Amended Complaint do Plaintiffs explain when the market price for Zoo Tokens or CryptoZoo NFTs took a sharp downturn, what events or announcements precipitated that turn, or how any purported disclosure or revelation caused CryptoZoo products' prices to fall.[14] Plaintiffs' vague allegations do not suffice to plead loss causation. *See, e.g., N. Port Firefighters, Dawes, supra; Callinan v. Lexicon Pharms., Inc.*, 479 F. Supp. 3d 379, 440 (S.D. Tex. 2020), *aff'd*, 858 F. App'x 162 (5th Cir. 2021) ("Simply alleging that plaintiffs purchased Lexicon's common stock at inflated prices and that the stock price fell after negative news of the company's operations came out is not sufficient to plead loss causation.").

Plaintiffs never allege, in fact, that the representations on which they supposedly relied had *any* effect on their holdings' value. *See* SAC ¶¶ 354-62, 367-71, 377-81, 383, 390. Plaintiffs allege that Mr. Paul's statements in a video released on January 23, 2023, caused a surge in trading activity on that date,[15] *see id.* ¶ 36, but do not allege that any among them relied on those statements, *see id.* ¶¶ 63-342. Plaintiffs cannot tie their purported losses to Mr. Paul. *See, e.g., GEXA Corp.*, 161 F. App'x at 365 (plaintiff's failure to specifically plead, *inter alia*, "that the alleged violations of Section 10(b) and Rule 10b–5 caused the stock to lose value" rendered 10b-5 claim deficient).

## G. Mr. Paul Is Not A "Control Person" Under Section 20(a).

"Control person liability is derivative: if a plaintiff fails to state a claim for a primary violation of section 10(b) or Rule 10b-5, any claim for control person liability fails." *In re Key Energy Servs., Inc.*

---

[14] In fact, the *only* mention Plaintiffs offer of the products prices or effective value comes from a graphic in paragraph 36 of the complaint that reflects (without explanation) the volatility and inherent instability of Zoo tokens over a two-month period a full year before its purported demise. *See id.* ¶ 36.

[15] The graphic in paragraph 36 is not as compelling as Plaintiffs wish. It shows a surge in trading volume on January 13, 2023, but also reflects wild swings over the course of two months, including intermittent surges larger than the surge on January 23rd. *See* SAC ¶ 36. And although Plaintiffs allege generally that "the market price of Zoo Tokens and CZ NFTs plummeted upon [the] materialization of undisclosed risks," *see, e.g., id.* ¶ 675, they do not plead specific facts to support any loss in value.

*Sec. Litig.*, 166 F. Supp. 3d 822, 842 (S.D. Tex. 2016). Because Plaintiffs fail to state claims under Section 10(b) and Rule 10b-5, they necessarily fail to state Section 20(a) claims. *Id.*

Plaintiffs' Section 20(a) claim against Mr. Paul also fails because they raise a Section 10(b) claim against him. "[S]econdary liability under § 20(a) is an alternative, not a supplement, to primary liability under § 10(b) and Rule 10b-5." *Lemmer v. Nu-Kote Holding, Inc.*, 2001 WL 1112577, at *12 (N.D. Tex. Sept. 6, 2001), *aff'd*, 71 F. App'x 356 (5th Cir. 2003).

The Court should dismiss Plaintiffs' federal securities claims with prejudice.

## IV.    THE COURT SHOULD DISMISS THE SECOND AMENDED COMPLAINT FOR LACK OF SUBJECT-MATTER JURISDICTION.

Plaintiffs' only asserted ground for subject-matter jurisdiction is the federal questions that would arise from their federal securities claims. *See* SAC ¶ 50. Plaintiffs, however, have failed to state federal securities claims, as well as RICO claims. *See* Sections II, III, *supra.* Accordingly, they have not asserted a federal question to support jurisdiction under 28 U.S.C. § 1331.

 Plaintiffs base their claims for state statutory and common law violations on pendent jurisdiction alone. *See* SAC ¶ 50-52. They have not alleged any basis for diversity jurisdiction. To be sure, Plaintiffs have not pled the citizenship of any defendant. *See* SAC ¶¶ 343-46; 28 U.S.C. § 1332(a) (diversity jurisdiction attaches based on diverse citizenship of opposing parties); *Lewis v. Messere*, 2025 WL 3002116, at *2 (W.D. Tex. Oct. 1, 2025) ("As [Plaintiff] has not adequately pleaded [Defendants'] citizenship, his allegations do not sufficiently support diversity jurisdiction."). Accordingly, the Court must dismiss Plaintiffs' common law and state statutory claims for lack of subject-matter jurisdiction. *See, e.g.*, *Gilbert v. Bartel*, 273 F. App'x 413 (5th Cir. 2008) ("A case that does not present either federal question jurisdiction or diversity jurisdiction is subject to dismissal for lack of subject matter jurisdiction."); *Etheredge v. Senior Care Health & Rehab. Ctr.*, 2010 WL 1855941, at *4 (E.D. Tex. Mar. 2, 2010) ("Unless the parties are diverse . . . the Court has no independent jurisdiction over Plaintiff's negligence claims. Plaintiff has not alleged diversity jurisdiction here.").

## CONCLUSION

The Court should dismiss Plaintiffs' Second Amended Complaint in its entirety and with prejudice.

Dated: January 30, 2026

Respectfully submitted,

| | |
|---|---|
| */s/ Benjamin J. Widlanski* <br> Benjamin J. Widlanski, Esq. <br> Email: bwidlanski@kttlaw.com <br> Tal Lifshitz, Esq. <br> Email: tjl@kttlaw.com <br> Rachel Sullivan, Esq. <br> Email: rs@kttlaw.com <br> Clayton J. Schmitt, Esq. <br> Email: cschmitt@kttlaw.com <br> **KOZYAK TROPIN & THROCKMORTON LLP** <br> 2525 Ponce de Leon Blvd., 9th Floor <br> Miami, Florida 33134 <br> Telephone: (305) 372-1800 <br> Facsimile: (305) 372-3508 <br><br> *Counsel for Defendant Logan Paul* <br> (admitted *pro hac vice*) | */s/ Jeffrey Neiman* <br> Jeffrey Neiman, Esq. <br> jneiman@nmfalawfirm.com <br> Jason L. Mays, Esq. <br> jmays@nmfalawfirm.com <br> **NEIMAN MAYS FLOCH & ALMEIDA PLLC** <br> 100 SE 3rd Ave., Suite 805 <br> Fort Lauderdale, Florida 33394 <br> Telephone: (954) 462-1200 <br><br> *Counsel for Defendant Logan Paul* <br> (admitted *pro hac vice*) |
| */s/ Shelby O'Brien* <br> Shelby O'Brien <br> **BUTLER SNOW LLP** <br> 1400 Lavaca St., Suite 1000 <br> Austin, Texas 78701 <br> Telephone: (737) 802-1800 <br> Facsimile: (737) 802-1801 <br> shelby.obrien@butlersnow.com <br><br> *Counsel for Defendant Logan Paul* <br> (admitted to Western District of Texas) | |

## CERTIFICATE OF SERVICE

I hereby certify a copy of the above and foregoing has been served upon all counsel of record by using the Court's electronic filing system on January 30, 2026.

*/s/ Benjamin J. Widlanski*