## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| DON HOLLAND, individually and on behalf of all others similarly situated, | § § § | |
| *Plaintiff,* | § § § | Civil Action No. 1:23-cv-00110-ADA-RCG |
| vs. | § § | |
| CRYPTOZOO INC., a Delaware Corporation, LOGAN PAUL, EDUARDO IBANEZ, and JAKE GREENBAUM a/k/a CRYPTO KING, | § § § § § | |
| *Defendants.* | § § § § | |

## PLAINTIFFS' RESPONSE TO DEFENDANT LOGAN PAUL'S
## MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT

### I.    INTRODUCTION

Plaintiffs' Second Amended Complaint ("Complaint") cures every defect noted in the Court's Report and Recommendation dismissing Plaintiffs' First Amended Complaint with leave to amend. In his Motion to Dismiss Plaintiffs' Second Amended Complaint ("Motion to Dismiss"), ECF No. 126, Defendant Logan Paul fails to provide the Court with a proper basis on which to dismiss. Defendant Paul again relies on mischaracterization of facts and improper legal standards. As detailed below, Plaintiffs' Complaint sufficiently alleges all remaining federal claims and should not be dismissed.

Plaintiffs have sufficiently pled each element of each claim asserted in the Second Amended Complaint.[1] The Court should therefore find that Defendant Paul engaged in conduct

---

[1] Except for Plaintiffs' RICO claim: Plaintiffs concede that they have not properly pled RICO claims and therefore do not oppose their dismissal.

satisfying all elements of Plaintiffs' claims, particularly their securities claims. As expanded upon below, Defendant Paul's conduct is not only egregious, but so well documented that Plaintiffs are forced to request relief in the alternative for leave to amend their Second Amended Complaint. Documents recently obtained by Plaintiffs are in short, so detrimental to Defendant Paul's position that they negate, corrode, and undermine arguments made by Paul in his Motion to Dismiss. These documents contain voluminous plain language statements from internal CryptoZoo communications that show the depth and contemplation of Defendant's acts and bring to light additional parties that aided in the scheme at large.

## II.    LEGAL STANDARD

In reviewing a complaint on a Federal Rule of Civil Procedure 12(b)(6) motion, the Court must consider all facts alleged in the complaint as true and construe the pleadings in a light most favorable to the plaintiff. *Paselk v. Texas*, No. 4:12cv754, 2013 U.S. Dist. LEXIS 127420, at *14 (E.D. Tex. June 6, 2013) (citing *Truman v. United States*, 26 F.3d 592, 594 (5th Cir. 1994)). Federal Rule of Civil Procedure 8(a)(2) requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Although Rule 8(a)(2) requires more than labels and conclusions or "a formulaic recitation of the elements of a cause of action," it does not require detailed factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). *Twombly* and *Iqbal* did not abrogate the notice standard pleading of Rule 8(a)(2) but confirmed that Rule 8(a)(2) is satisfied "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

A claim should not be dismissed so long as there are "enough facts to state a claim to relief that is plausible on its face." *Bunch v. Mollabashy*, No. 3:13-CV-1075-G (BH), 2015 U.S. Dist. LEXIS 38717, at *13 (N.D. Tex. Mar. 26, 2015) (quoting *Twombly*, 550 U.S. at 570). "A claim

has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. Determining whether a claim is plausible is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Paselk*, 2013 U.S. Dist. LEXIS 127420 at *14.

### III.    ARGUMENT

In his Motion to Dismiss, Defendant Paul's position exceeds the bounds of advocacy and veers into a wholly biased if not unfounded interpretation of the events detailed in the Complaint. Defendant insists the Court consider this self-serving description of his well-meaning intentions as fact. But this Court must look at the actions taken by Defendant Paul as described in the Complaint, assume they are true according to proper the legal standard, and infer his intent from those actions. Accordingly, this Court must determine that Defendant Paul intentionally engaged in the conduct of offering and selling multiple series of assets through materially false statements, misleading representations, and deliberate omissions of material fact, which induced Plaintiffs to purchase CryptoZoo assets with reasonable expectation of profits derived from the efforts of others.

### A.    PLAINTIFFS PLEAD FACTS SUFFICIENT TO PIERCE THE CORPORATE VEIL.

In the Court's Report and Recommendation dismissing Plaintiffs' First Amended Complaint without prejudice, ECF No. 107, the Court examined Plaintiffs' allegations that the corporate veil should be pierced such that the actions of corporate Defendant CryptoZoo, Inc., could be attributed to individual Defendant Paul. Because neither party provided applicable law, the Court acknowledged that Delaware law could be applied because CryptoZoo, is a Delaware corporation, but applied Texas law because the result was the same.

In their Second Amended Complaint, Plaintiffs provided the specific facts the Court determined were lacking in order to pierce the corporate veil. Defendant Paul now demands the Court apply Delaware law, likely because Delaware law provides a neat framework of discrete factors by which Defendant Paul may continue his practice of pointing to the way individual trees do not signal a forest. But ultimately it is irrelevant which law the Court applies: CryptoZoo, Inc., was nothing more than a pass-through by which Defendant Paul personally enriched himself and regardless of which law is applied, the Court may pierce the corporate veil and hold Defendant Paul personally liable for the actions of CryptoZoo.

1.  **Plaintiffs' Complaint pleads facts adequate to pierce the corporate veil under Texas law.**

Under Texas law, previously applied by this Court, the Court noted that "insofar as Plaintiffs allege Defendant Paul personally engaged in tortious conduct, the Court need not pierce CryptoZoo's veil in order to hold him liable for his alleged torts." Report and Recommendation, ECF No. 107, p. 21. Because Plaintiffs seek to pierce CryptoZoo's veil for both contract and tort claims, the Court examined veil-piercing in each context but ultimately determined that both claims failed for the same reason: Plaintiffs failed to demonstrate that Defendant Paul used CryptoZoo for his own personal benefit. *Id*. at p. 21, 27. Accordingly, by curing this single defect, which Plaintiffs have done, Plaintiffs properly pled piercing the corporate veil under Texas law.

In examining Plaintiffs' claims under Texas law, Plaintiffs must show "(1) the corporation is the alter ego of its owners and/or shareholders; (2) the corporation is used for illegal purposes; and (3) the corporation is used as a sham to perpetuate a fraud." *Id*. (quoting *AHBP LLC v. Lynd Co.*, 649 F. Supp. 3d 371, 385 (W.D. Tex. 2023)). Accordingly, to pierce the corporate veil as to Defendant Paul under Texas Business Organization Code § 21.223(b), Plaintiffs must demonstrate

that he "(1) perpetuated an actual fraud (2) primarily for [Defendant Paul's] personal benefit." *Id.* (citing *In re Ritz*, 832 F.3d 560, 566 (5th Cir. 2016)). In examining the purported contract and contract-based torts between Defendant Paul and Plaintiffs, the Court concluded that the Complaint properly alleges that Defendant Paul knowingly made untrue statements, evidencing his dishonest motive and intent to deceive Plaintiffs into purchasing CryptoZoo assets and accordingly meeting the first requirement. *Id.* at p. 25. The Court held, however, that Plaintiffs' Complaint did not adequately allege the second requirement that the fraud be committed for Defendant Paul's personal benefit. *Id.* Plaintiffs' Second Amended Complaint cures this defect.

The second requirement is met "where the 'evidence show[s] that funds derived from the corporation's allegedly fraudulent conduct were pocketed by or diverted to the individual defendant." *Id.* (quoting *Thomas v. Hughes*, 27 F.4th 995, 1017 (5th Cir. 2022) (alteration in original)). Plaintiffs' Second Amended Complaint satisfies this requirement by definitively alleging that even though "Paul was not personally conducting the CZ NFT Egg sales, CryptoZoo functioned as his alter ego and personal piggy bank, allowing him to unilaterally withdraw investor funds under the guise of legitimate project operations." Second Amended Complaint, ¶ 374. Specifically, Plaintiffs allege that Paul pocketed a total of approximately $1.3 million in CryptoZoo money via transactions occurring on two separate occasions. *Id.* Plaintiffs further support this allegation with evidence showing that Defendant Paul was aware that this removal of funds would garner suspicion, and that he extracted significantly more money than he had spent. *Id.* at ¶ 375–76.

As has been typical in Defendant Paul's defense, he directs the Court's attention to his own self-serving interpretation of these events and provides a scenario in which his removal of corporate funds to his own personal wallet was simply recouping losses, and then improperly

pushes a heightened burden onto Plaintiffs to definitively prove that the approximately $1 million in unaccounted-for funds were *not* a mere reimbursement to Paul. *See* Motion to Dismiss, p. 11 ("the fact that the amount Mr. Paul's alleged withdrawal does not match his asserted expenses does not compel the conclusion that Mr. Paul *stole* from CryptoZoo.").

At the pleading stage, Plaintiffs do not need to present a scenario that the Court is *compelled* to believe; they must simply provide facts that are plausible on their face, which they have done. "If there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). "Plaintiff's complaint may be dismissed only when defendant's plausible alternative explanation is so convincing that plaintiff's explanation is *im*plausible." *Id*.

Regardless, Defendant Paul's spin on his actions is implausible on its face. The text messages supporting Plaintiffs' allegations state that Defendant Paul "recouped expenses" and then extracted significantly more money to be "used for development" of a game that, critically, was never developed. Second Amended Complaint ¶ 375. Internal CryptoZoo meeting notes from August 13, 2021, already referenced in the Second Amended Complaint, confirm Paul claimed $300,000 in startup expenses and that revenue from egg sales would "clear expenses first then payouts." See SAC ¶331. Thus, even under Defendants' own internal accounting, only $600,000 in total expenses existed yet approximately $1.3 million was withdrawn from project funds at Paul's direction shortly after launch. Defendants' own internal records therefore confirm what the text messages already suggest: Paul extracted project funds to line his pockets.

Defendant Paul's argument that the Court should simply ignore this gross breach of corporate responsibility because the "amount total[ed] less than half of the revenues from a single

day of sales of one product" is likewise spurious. Motion to Dismiss, p. 12. The amount siphoned off for personal use is hardly relevant, and Defendant Paul's characterization of $1.3 million as mere chump change is more indicative of his own disconnect from the reality of those whom he defrauded than it is of any defect in Plaintiffs' Complaint.

Because this Court must "accept[] all well-pleaded facts as true and view[] those facts in the light most favorable to the plaintiffs," Plaintiffs have definitively shown that Defendant Paul perpetuated fraud in the use of CryptoZoo funds for his own personal benefit and this Court may pierce the corporate veil. *Meador v. Apple, Inc.*, 911 F.3d 260, 264 (5th Cir. 2018) (quoting *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008)).

2. **Plaintiffs' Complaint pleads facts adequate to pierce the corporate veil under Delaware law.**

Based on the Court's Report and Recommendation, Plaintiffs need only show that Defendant Paul siphoned off CryptoZoo funds for his own personal benefit in order to pierce to corporate veil as to Defendant Paul. Likely because of the ease with which Plaintiffs were able to provide this evidence, Defendant Paul now claims that the Court must apply Delaware law based on the Court's footnote stating that it could have applied Delaware law previously, had it so chosen. But the application of Delaware law yields the same result: CryptoZoo operated as Defendant Paul's personal wallet and the Court may pierce the corporate veil.

Under Delaware law, courts examine several factors when considering whether to pierce the corporate veil. These factors include: "(1) whether the company was adequately capitalized for the undertaking; (2) whether the company was solvent; (3) whether corporate formalities were observed; (4) whether the dominant shareholder siphoned company funds; and (5) whether, in

general, the company simply functioned as a facade for the dominant shareholder."[2] *Doberstein v. G-P Industries, Inc.*, No. CV 9995-VCP, 2015 WL 6606484, at *4 (Del. Ch. Oct. 30, 2015) (quoting *MicroStrategy Inc. v. Acacia Research Corp.*, No. CIV.A. 5735-VCP, 2010 WL 5550455, at *11 (Del. Ch. Dec. 30, 2010)). These factors are not a rigid test, but Plaintiffs must demonstrate "an overall element of injustice or unfairness" before the Court may pierce the corporate veil. *Id.* at *4.

Plaintiffs' Second Amended Complaint easily makes this showing. CryptoZoo was not properly capitalized, as shown by the allegation that Defendant Paul lied about the project's funding. SAC ¶ 356 (stating that Paul claimed the project was backed by a "massive team" and that he had personally spent "like a million" despite records showing he only spent around $200,000). The company was obviously not solvent; it barely survived long enough for its founders to siphon off its funding before collapsing entirely. *Id.* at ¶ 386–87. Thus, the first and second factors are clearly met. As stated in Section a above, Plaintiffs have clearly alleged specifics regarding Defendant Paul's siphoning of company funds, thus meeting the fourth factor, and Plaintiffs have thoroughly alleged that CryptoZoo functioned as a façade for Defendant Paul, meeting the fifth factor. *Id.* at ¶ 374, 378, 381, 384 (detailing Paul's siphoning of CryptoZoo funds for his personal use and his manipulation of the sale of CryptoZoo assets).

The third factor is likewise met. Plaintiffs allege that Defendant Paul gave lip service to corporate formalities by providing a whitepaper for the business and keeping some meeting notes, but these formalities were vehicles by which Defendant Paul could profit rather than actual

---

[2]      Likely in an effort to make Plaintiffs' Second Amended Complaint *appear* more inadequate, Defendant Paul cites to a case stating there are seven factors to consider. *See ANI Pharm., Inc. v. Method Pharm., LLC*, No. CV 17-1097, 2019 WL 176339, at *6 (D. Del. Jan. 11, 2019). The factors are largely duplicative, with the two extra factors in *ANI Pharmaceuticals* ("nonpayment of dividends" and "absence of corporate records") easily folded into one of the five factors delineated in *Doberstein* (both can be examined under "whether corporate formalities were observed").

business functions that would result in an ongoing operation for the benefit of investors.[3] Defendant Paul altered the CryptoZoo whitepaper and Zoo token code at will to mete out punishment on other CryptoZoo founders who fell into disfavor, signaling those documents served as Paul's tool for further profit rather than any actual business purpose.[4] SAC ¶ 364–73, 381–82. Likewise, the internal business meeting notes were conducted largely via informal digital forums rather than traditional corporation meeting minutes, which Defendants can now hold up as "corporate formalities" but were obviously not intended to be such. *Id.* at ¶ 348–52; *see KT4 Partners LLC v. Palantir Techs. Inc.*, 203 A.3d 738, 757 (Del. 2019) (holding that a defendant cannot claim not to have any corporate records when those records are all informal electronic communications). The "formal" meeting minutes kept lacked any specificity or detail and were instead decontextualized notes with no specification as to who was present, what was discussed, or if any critical decisions were made. *See* Ex. 2.  Moreover, the more typical corporate formalities, such as issuing dividends, holding formal meetings with shareholders and directors, and maintaining documents memorializing those meetings, were not followed by CryptoZoo.

Taken together, these factors clearly demonstrate the overall element of unfairness and injustice that would result should Defendant Paul be permitted to hide behind the sham corporation he ran as a profit machine at the expense of Plaintiffs. Defendant Paul conceived of an idea he knew would generate public interest and buy-in (SAC, ¶ 348); used his social media platform and large following to promote and sell a nonexistent product (*id.* at ¶ 354); repeatedly promised that

---

[3] Several times in his Motion to Dismiss, Defendant Paul attempts to mischaracterize these allegations as inconsistently pleading that CryptoZoo was somehow both a formal business and a mere vehicle for Paul's profit simultaneously. The actual allegations in the Complaint demonstrate that Paul and the other CryptoZoo founders abided by just enough corporate formalities to lend legitimacy to their fraud but were actually using the business as a front to defraud investors who bought into the game that was never delivered.

[4] Defendant Paul's ability unilaterally blacklists Defendant Greenbaum's cryptocurrency wallet, only to reinstate him later, and change the Whitepaper demonstrate his fraudulent motive to extract profit for himself at all costs.

the nonexistent product existed to generate more investment profit (*id*. at ¶ 362–63, 377–80); never took genuine or necessary steps to actually produce the promised product (*id*. at ¶ 382, 388–89); then absconded with investor money when those investors started demanding the promised product (*id*. at ¶ 386, 391). This is a textbook case of using a corporation for personal profit. The Court should pierce the corporate veil and hold Defendant Paul personally liable.

**B.    PLAINTIFFS ALLEGE FACTS SUFFICIENT TO SUPPORT THEIR SECURITIES EXCHANGE ACT CLAIMS.**

In its Report and Recommendation, this Court determined that CryptoZoo assets were unquestionably securities but found that Plaintiffs' securities fraud claims were deficient for the same reasons as their common law fraud claims: Plaintiffs' allegations did not meet the heightened pleading requirement for fraud pursuant to Federal Rule of Civil Procedure 9(b). Report and Recommendation, p. 62. Specifically, the Court found that Plaintiffs failed to provide a material misrepresentation made by Defendant Paul on which Plaintiffs relied in purchasing CryptoZoo assets. *Id*. at 32–35. Plaintiffs' Complaint cures these defects.

**1.    <u>Legal Standard: Plaintiffs' Complaint sufficiently pleads an Exchange Act Claim.</u>**

Defendant makes a jurisdictional argument that is legally misguided and circular at best. Defendants argue that because Plaintiffs allegedly failed to state federal claims that no federal question jurisdiction exists. And so, "This analysis confuses two separate inquiries: (1) the merits, whether Payne sufficiently stated a claim; and (2) jurisdiction, whether the court has the power to reach the merits of Payne's claim. As the Supreme Court has made clear, these are distinct analyses. Jurisdiction ... is not defeated ... by the possibility that the averments might fail to state a cause of action on which [the plaintiff] could actually recover. For it is well settled that the failure to state

a proper cause of action calls for a judgment on the merits and not for dismissal for want of jurisdiction." *Payne v. Progressive Fin. Servs., Inc.*, 748 F.3d 605, 608 (5th Cir. 2014)

Plaintiffs' Second Amended Complaint expressly pleads violations of Sections 10(b) and 20(a) of the Exchange Act and Sections 12(a)(1) and 15(a) of the Securities Act, these claims are the heart of this case.

In its Report and Recommendation, this Court provided a robust definition of securities and the legal standard that courts apply in assessing whether crypto assets are subject to the Securities Exchange Act. *See* Report and Recommendation, p. 51–58. Plaintiffs allege that the CryptoZoo assets they purchased are "investment contracts," which the Supreme Court defined as "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." *SEC v. W.J. Howey Company*, 328 U.S. 293, 298–99 (1946). Courts in the Fifth Circuit examine three factors in assessing whether a product is an investment contract: Plaintiffs must show "(1) an investment of money; (2) in a common enterprise; and (3) on an expectation of profits to be derived solely from the efforts of the individuals other than the investor." *Masel v. Villarreal*, 924 F.3d 734, 743 (5th Cir. 2019) (quoting *Williamson v. Tucker*, 645 F.2d 404, 417 (5th Cir. May 1981)).

As this Court noted, if these factors are met, the product sold is a security regardless of the seller's subjective intent or definitional semantics because a security is determined by the economic reality of its operation. *Reves v. Ernst & Young*, 494 U.S. 56, 61 (1990) (citing *Tcherepnin* v. *Knight*, 389 U.S. 332, 336 (1967)). *See also Masel*, 924 F.3d at 743 ("The label given by parties to a certain transaction will not be determinative of whether the parties have engaged in the purchase or sale of a security."); *United States SEC v. Balina*, No. 1:22-CV-00950-

DAE, 2024 U.S. Dist. LEXIS 91557, at *31 (W.D. Tex. May 22, 2024) ("the Court will not consider express disclaimers in a contract when determining the character of the security").

The economic reality here is unquestionable. Paul himself repeatedly touts the CryptoZoo ecosystem as "a really fun game that makes you money." SAC ¶ 361.

Within hours of being made publicly available, Crypto Zoo token demand skyrocketed leading to its $600 Million market capitalization as Paul's millions of followers rushed to buy in, believing they were purchasing access to a valuable game economy. SAC ¶ 8. During that same timeframe, Paul and his co-founders made millions from purchasing CryptoZoo tokens at sub-floor pricing during their covert "stealth launch."

The economic reality of the operation can be illustrated simply by the stealth launch itself. The stealth launch acted as a mechanism to allow Paul and his co-founders to accumulate tokens at artificially low prices before public launch and without disclosure. Efforts to orchestrate the stealth launch would be economically meaningless unless the tokens were expected to increase in value - *i.e.,* unless they were, by mere existence, investment vehicles.

## 2. **As this Court has already determined, CryptoZoo assets operated as securities.**

In assessing Plaintiffs' First Amended Complaint, this Court examined Plaintiffs' pleadings extensively and determined that "Plaintiffs have sufficiently alleged—at least, at this procedural stage—the transactions at issue qualify as investment contracts." Report and Recommendation, p. 58. Despite this clear holding, Defendant Paul raises arguments identical in essentials to those the Court has already decided on the merits. Plaintiffs' Second Amended Complaint more than cures any theoretical defect Defendant Paul may have divined under a new reading.

###### a. *Plaintiffs' purchase of CryptoZoo assets was an investment of money.*

This Court has already examined and dispensed with Defendant Paul's arguments regarding whether Plaintiffs' purchase of CryptoZoo assets was an "investment of money" and unequivocally determined that they were. Report and Recommendation, p. 51 Now, Defendant Paul reasserts that his promotional statements regarding the purchase of CryptoZoo assets were merely calculated to induce entry into a game rather than promise any financial return on the purchase.

Relying on the CryptoZoo whitepaper and Defendant Paul's "selective amnesia" the Court described in its Report and Recommendation, Defendant Paul argues that the purchase of CryptoZoo assets was for consumptive rather than investment purposes. This argument again places "form over substance, despite various courts consistently denying that approach." Report and Recommendation, p. 52 (citing *SEC v. Balina*, No. 22-CV-00950, 2024 WL 2332965, at *11 (W.D. Tex. May 22, 2024); *Rodriguez v. Banco Cent. Corp.*, 990 F.2d 7, 11 (1st Cir. 1993); *Telegram Grp. Inc.*, 448 F. Supp. 3d 352, 365 (S.D.N.Y. 2020)). While Defendant Paul argues that the intent of seller and the promises made regarding the product should carry more weight in the Court's analysis than each purchaser's subjective intent in making the purchase, the formulaic definitions found in CryptoZoo's terms and conditions are not dispositive. Rather, as stated by the Court itself, the Court must primarily look to "'the economic reality' and 'the totality of the circumstances' to determine whether the transactions at issue qualify as investment contracts." Report and Recommendation, p. 53 (quoting *SEC v. Ripple Labs, Inc.*, 682 F. Supp. 3d 308, 321 (S.D.N.Y. 2023)).

As noted by the Court, even Defendant Paul's promotional statements describe the investment nature of CryptoZoo assets. The CryptoZoo team's internal communications describe CryptoZoo assets in terms of an "investment," and even note the likelihood that they were dealing in securities. Second Amended Complaint ¶ 350. In his Motion to Dismiss, Paul claims he "promoted CryptoZoo *exclusively* as a game," conveniently ignoring that he promoted CryptoZoo as a game that "provides a yield with a token, it can earn you money." *Compare* Mot. to Dismiss, p. 21 (emphasis added) *with* SAC ¶ 354.

The basis for Paul's contention, that Crypto Zoo was just a gaming ecosystem, is akin to the arguments considered to be the genesis of securities regulation. While history may not repeat itself, it quite often rhythms. As interchangeable as Crypto Zoo and orange groves might be in this instance,  "Much as the orange groves in *Howey* would not be considered securities if they were sold apart from the cultivator's promise to share any profits derived by their cultivation, the term "security" also cannot be used to describe any crypto-assets that were not somehow intermingled with one of the investment "protocols," did not confer a "right to ... purchase" another security, or were otherwise not tied to the growth of the Terraform blockchain ecosystem. *See Telegram* , 448 F. Supp. 3d at 379 (describing a crypto- asset as "little more than alphanumeric cryptographic sequence") ; 15 U.S.C. § 77b(a)(1) (including in the definition of security any instrument that confers a "right to subscribe to or purchase another security").", *Securities and Exchange Commission v. Terraform Labs Pte Ltd.*, No. 1:23-cv-01346 (S.D.N.Y. Jul 30, 2023).

Defendant Paul seems to ignore that the nexus between Plaintiffs' disposition of capital in exchange for Crypto Zoo tokens was exogenous of the (non-existent) game, and even so, that "A product that at one time is not a security may, as circumstances change, become an investment

contract that is subject to SEC regulation. *See Edwards*, 540 U.S. at 390.", *Securities and Exchange Commission v. Terraform Labs Pte Ltd.*, 1:23-cv-01346 (S.D.N.Y. 2023)

As noted by the Court, Paul also made comments describing the "common investing knowledge" regarding financial loss when selling CryptoZoo assets and calling the purchase and sale of CryptoZoo assets "investment decisions." Report and Recommendation, p. 53. Defendant Paul clearly and unquestionably marketed CryptoZoo assets as investments for money.

### b. *Plaintiffs have established a common enterprise.*

In arguing that Plaintiffs have not met the second prong of the *Howey* test, Defendant Paul once again misconstrues relevant law to provide the Court with a wholly imaginary standard. Defendant Paul claims the key element of establishing a common enterprise is "promoter expertise," and argues that Plaintiffs cannot meet this standard because they failed to allege any specific facts regarding Defendant Paul's investment knowledge. *See* Mot. to Dismiss, p. 22–23. But this argument wholly misses the mark.

While Defendant Paul is correct that the Fifth Circuit imposes a "vertical commonality" test that rests on "promoter expertise" for establishing common enterprise, the key element is not the actual and literal experience or knowledge of the promoter, but rather that each investor's success or failure is subject to the whims of the promoter. "[T]he requisite commonality is evidenced by the fact that the fortunes of all investors are inextricably tied to the efficacy of the [promoters'] meetings and guidelines on recruiting prospects and consummating a sale." *S.E.C. v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 479 (5th Cir. 1974). *See also Securities and Exch. Comm'n v. Teshuater, LLC*, No. 4:20-CV-01187, 2024 WL 1348432, at *4 (S.D. Tex. Mar. 29, 2024) (finding the second prong met where "the investors' returns depended solely on his successful use of their funds"). The courts to which Defendant Paul cites are comparing and

delineating vertical commonality from horizontal commonality, which requires a common investment pool resulting in a common pro rata impact on each investor rather than common impact resulting from the actions of the promoter. *See Long v. Shultz Cattle Co., Inc.*, 881 F.2d 129, 140 (5th Cir. 1989); *Securities and Exch. Comm'n v. Contl. Commodities Corp.*, 497 F.2d 516, 522 (5th Cir. 1974). In each of these cases, "the critical factor is not the similitude or coincidence of investor input, but rather the uniformity of impact of the promoter's efforts." *Long*, 881 F.2d at 140; *Contl. Commodities Corp.*, 497 F.2d at 522 (both quoting *Koscot*, 497 F.2d at 478) (emphasis added).

The second prong of *Howey* is met because Plaintiffs' investments succeeded or failed based solely on Defendant Paul's use of those investments, regardless of whether Paul expertly or wisely used the funds. Even in cases in which courts examine the literal expertise of the promoter, the examination was performed in the context of whether the parties "engag[ed] in a common enterprise that correlated with the success of the promoter." *U.S. Securities and Exch. Comm'n v. Balina*, No. 1:22-CV-00950-DAE, 2024 WL 2332965, at *9 (W.D. Tex. May 22, 2024). In *Balina*, the Court found a common enterprise where "the investors relied on [the promoter's] expertise and technical skill to develop the underlying software and blockchain technology;" which is the exact allegation found in Plaintiffs' Complaint. *Id.*; SAC, ¶ 354–62. *See also Teshuater*, 2024 WL 1348432, at *2 (finding a common enterprise because the investments were "passive," whose success or failure was entirely dependent on the efforts of the promoter, who was a pastor and did not claim any investing expertise).

Paul's "expertise" was particularly derived from his unique ability to broadcast and capture the attention of millions of followers instantaneously and inflict immediate volatility on the token. While Paul and his co-defendants are not expert financial analysts, the expertise described above

is the standard that the Fifth Circuit's promoter standard contemplates (*i.e.,* the ability of the promoter's continuous efforts to determine success or failure of the investment.) Holders of Zoo Tokens were entirely dependent on whether Paul continued to promote CryptoZoo to his millions of followers (gained by his prior endeavors) and to the public at large; a prime example of the vertical commonality at play.

Even if the actual investing knowledge and experience of the promoter were as critical as Defendant Paul argues, Plaintiffs' allegations demonstrate a reasonable reliance on Defendant Paul's credentials in investing. CryptoZoo is Defendant Paul's eighth crypto scheme. Second Amended Complaint, ¶ 34. Notably, at the time that Defendant Paul was promoting CryptoZoo, the previous seven schemes were still afloat and for all appearances earning their investors' money. *Id*. Defendant Paul would have this Court believe he, like Plaintiffs, was simply a hapless victim of the volatility of the crypto market. But the evidence shows otherwise. While Plaintiffs relied on outside opportunities for investment, Defendant Paul created his own, then used his carefully cultivated social media presence to entice others into investing in the opportunities he created. Because of his "expertise," Defendant Paul, unlike Plaintiffs, was able to orchestrate the crypto schemes to protect his own investments at the expense of the other investors. Even if Defendant Paul's reading of the law is correct, Plaintiffs have demonstrated that they relied on Defendant Paul's self-touted "expertise" when buying CryptoZoo assets.

### c. *Plaintiffs had a reasonable expectation of profit.*

Defendant Paul's arguments regarding the third prong of the *Howey* test are equally spurious. This Court has already determined that both CryptoZoo's terms and conditions and the express statements of the founders, including Defendant Paul, "are more than sufficient to meet the third *Howey* prong." Report and Recommendation, p. 57.

Once again relying on selective amnesia, Defendant Paul asserts that no reasonable purchaser of CryptoZoo assets could expect to earn a profit because CryptoZoo was marketed exclusively "*as a game*." Mot. to Dismiss, p. 23 (emphasis in original). Again, critically, Defendant Paul marketed CryptoZoo "as a game that *makes you money*." SAC, ¶ 361 (emphasis added).

Regardless, Defendant Paul's imposition of such a narrow and literal reading of the term "profit" once again does not align with relevant law. Courts examining whether the purchase of crypto assets have noted the Supreme Court's broad definition of "profit," which includes not only income, return, or dividends, but also "*the increased value of the investment*." *Securities and Exch. Comm'n v. Coinbase, Inc.*, 726 F. Supp. 3d 260, 291 (S.D.N.Y. 2024) (quoting *S.E.C. v. Edwards*, 540 U.S. 389, 394 (2004) (emphasis in original)). In *Coinbase*, the court noted that the plaintiffs met the *Howey* test by alleging that "investors reaped their profits in the form of the increased market value of their tokens." *Id.*; *see also Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340, 356 (S.D.N.Y. 2019) (finding that the plaintiffs had properly alleged their crypto purchases were investment contracts when the defendant failed to deliver the promised blockchain that would have given the crypto assets value).

Here, as the Court noted in its Report and Recommendation, the CryptoZoo founders, including Defendant Paul, explicitly promised a functioning crypto community in the form of a "game" in which CryptoZoo assets could be used and traded to produce an increase in value in those assets. SAC, ¶ 354–55, 361, 379, 383. Defendant Paul draws a distinction between Zoo Tokens and CZ NFTs, but the economic reality of both assets is that they both functioned as securities. CryptoZoo assets, both Zoo Tokens and NFTs, were marketed as intertwined assets that functioned interchangeably to generate value. SAC ¶ 354-55. At multiple junctures during the

CryptoZoo chaos, Paul proffers that both the CryptoZoo Tokens and CZ NFTs each contain features that provide additional monetary yield to holders.

Even assuming, *arguendo*, Plaintiffs could not reasonably expect to receive an actual monetary payout from purchasing CryptoZoo assets, Plaintiffs had a reasonable expectation that they would receive "profit" in the form of the increased value of their purchases.

The game was never delivered, and accordingly the CryptoZoo assets sold to Plaintiffs never received the value promised. Accordingly, in keeping with its earlier ruling, this Court should find that CryptoZoo assets meet the *Howey* test and operated as securities.

### 3. <u>Plaintiffs alleged facts adequate to support their securities fraud claims.</u>

As stated above, in examining Plaintiffs' First Amended Complaint, this Court determined that Plaintiffs' pleadings as to securities fraud were defective only in that they failed to adequately plead a material misrepresentation by Defendant Paul on which Plaintiffs relied to their detriment. *See* Report and Recommendation, p. 35–36 (evaluating Plaintiffs' common law fraud claims), 62–63 (incorporating that analysis into the Court's evaluation of Plaintiffs' securities fraud claims). Plaintiffs' Second Amended Complaint cures both defects.

#### a. *Plaintiffs have alleged a material misrepresentation.*

In the Second Amended Complaint, Plaintiffs provide the Court with a host of statements made by Defendant Paul on which Plaintiffs relied when purchasing CryptoZoo assets, with four specific statements detailed as material misrepresentations beyond sheer puffery.

The puffery doctrine shields "vague and optimistic" statements not containing "concrete factual or material misrepresentation." *Southland Securities Corporation v. Inspire Insurance Solutions Inc.,* 365 F.3d 353 (5th Cir. 2004). Courts consistently hold that present-tense statements referring to current product functionality and capability are actionable. *Leone v. ASP Isotopes Inc.*,

No. 24-CV-9253 (CM), 2025 WL 3484821 (S.D.N.Y. Dec. 4, 2025). Defendant Paul's statements are actionable and contain concrete factual representations about product functionality, existing and upcoming product features going beyond vague and optimism.

The Second Amended Complaint identifies several statements that go far beyond vague optimism:

First, Defendant Paul claimed that CryptoZoo is a fun game that "provides a yield with a token, it can earn you money." SAC, ¶ 354. Defendant Paul doubled down on this statement later in claiming CryptoZoo "is a really fun game that makes you money." SAC, ¶ 361. These statements were material misrepresentations not only because the game did not exist when they were made and it was therefore impossible for any CryptoZoo assets to be used within the game at all, the CryptoZoo assets were functionally unable to earn money as promised because they were not properly imbedded with the yield mechanism. *Id*. at ¶ 355. Even if the game existed, which it did not, the CryptoZoo assets could not generate a yield as Defendant Paul explicitly and repeatedly claimed because the assets were defectively created. *Id*. The yield function of the assets was a key component in Plaintiffs' purchase of CryptoZoo assets, and Defendant Paul's claim regarding the faulty yield mechanism is a material misrepresentation.

Next, Defendant Paul stated the game was fully funded and supported. SAC, ¶ 355. In relying on this statement, Plaintiffs assumed the CryptoZoo game was a well-capitalized, fully developed business venture when the reality was that CryptoZoo was the crypto equivalent of a garage band that had landed a few paying gigs at the local bar. *Id*. at ¶ 356. Defendant Paul continued this act in claiming that the art made for the nonexistent game was "hand made" by "10 different artists," when, in fact, the art was made by amateurish photoshopping of stock images. *Id*. at ¶ 356–60. Then, to cap off the deception, Defendant Paul claimed the "development team"

(which did not exist), "has to be wizards" due to the complexity of transacting assets on the blockchain. *Id*. at ¶ 361. These statements demonstrate that Defendant Paul knew that he was dealing in complex coding and development, but the assets he sold were not only clumsy and unprofessional, they did not function as promised on the blockchain. *Id*. at ¶ 355. The "wizard" team hired to create "hand made" art that could be used in a "fun" and "addicting" yet nonexistent game to "earn you money" failed to give the assets their most foundational promised function— that of generating a yield. Defendant Paul's statements regarding the funding and hiring of a professional development team were material because a reasonable person would assume that such a team would produce functional assets.

While the above are the material misrepresentations the Complaint specifically attributes to Defendant Paul, Paul continued to perpetuate fraud against Plaintiffs even after this initial promotion of CryptoZoo by perpetuating the lie that a) the game was functional, and b) the CryptoZoo assets already sold had either maintained or increased in value while simultaneously manipulating the market such that the value had significantly decreased. Twice during the perpetuation of the CryptoZoo fraud, Defendant Paul personally manipulated the CryptoZoo assets market to prevent disfavored founders from selling their assets to their advantage.[5] SAC, ¶ 364, 371, 381. Following these market manipulations, Defendant Paul issued statements to "explain" the shifts: social media posts stated the changes were to improve "interoperability and functionality," but the actual result was a tainted liquidity pool that decreased the value of

---

[5]       These manipulations are particularly notable because they display Paul's fraudulent intent. Defendant Paul first manipulated the market to blacklist Defendant Greenbaum, claiming that he was a "snake in the grass" who had been robbing the CryptoZoo wallet to enrich himself (which is particularly ironic given that Defendant Paul himself robbed the CryptoZoo wallet to enrich himself a mere four days later). Second Amended Complaint ¶ 365, 374. Rather than reveal Greenbaum's alleged fraud, Defendant Paul couched the manipulation as technical upgrade. *Id*. at ¶ 366–73. Then, mere weeks after blacklisting Greenbaum as a "snake in the grass," Paul reinstated him and paid him 25 billion in tokens while simultaneously blacklisting Ibanez. *Id*. at ¶ 381. Paul's manipulation of the market to blacklist his co-founders demonstrates not only that his intent in marketing the CryptoZoo game and assets was fraudulent, but also that he damaged the value of Plaintiffs' CryptoZoo assets.

Plaintiffs' assets. *Id*. at ¶ 367, 371. Defendant Paul claims these social media posts cannot be considered material misrepresentations because they cannot be attributed to him personally, but the PSLRA does not require an affirmative statement; Defendant Paul's *omission* of information regarding the tainted liquidity pool and subsequent loss in CryptoZoo assets value satisfies the requirement.[6] 15 U.S.C. § 78u-4(b)(1)–(2). Moreover, Paul personally affirmed and promoted the shift and resulting whitepaper edit, and, immediately following the shift, repeatedly marketed CryptoZoo assets as maintaining value rather than significantly depleting as a result of his manipulation. Second Amended Complaint, ¶ 366–69, 378–80.

Defendant Paul's attempts to individually explain away the multitude of false statements he made in the promotion of CryptoZoo can be dismissed out of hand. *See* Mot. to Dismiss, p. 32–36. Defendant Paul cherry-picks eight representations he made as alleged in the Second Amended Complaint, then explains how these eight specific representations are either not false, not made by Defendant Paul, or are not material. Defendant Paul is once again explaining away each individual tree in hopes that the Court misses the obvious forest. Notably, however, Defendant Paul does not address his promises regarding CryptoZoo assets' yield or money-earning potential, nor his representations regarding the continued value of CryptoZoo assets following his market manipulation. The Complaint is shatteringly clear: Defendant Paul promised assets that would earn money in a game, but delivered assets that were functionally unable to do so, which was compounded by the fact that he never delivered the game by which the assets could be used to earn money or increase in value.

---

[6]    Defendant Paul likewise asserts that the claim regarding "inoperability" may have been true, but while Defendant Paul is correct that Paul's blacklist of Greenbaum does not necessarily mean the shift was not to improver interoperability because "[b]oth things can be true," the Court must take Plaintiffs' version of events as true and favor any resolution of competing facts in their favor. Defendant Paul's self-serving explanation of events does not render Plaintiffs' version implausible, and so Plaintiffs' facts pass pleading muster.

### b. *Plaintiffs have alleged reliance.*

Plaintiffs' Second Amended Complaint likewise cures the defect regarding reliance noted by the Court. Specifically, each Plaintiff alleges that he or she relied on Defendant Paul's statements regarding the completion and function of the CryptoZoo game. SAC, ¶ 63–342. This is sufficient to establish specific reliance.

Moreover, the Second Amended Complaint cures the defects the Court found in Plaintiffs' fraud-on-the-market allegations multiple times. To properly allege fraud-on-the-market, Plaintiffs must demonstrate the following: "(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed." *Erica P. John Fund, Inc. v. Halliburton Co.*, 309 F.R.D. 251, 257 (N.D. Tex. 2015) (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 268 (2014)).

First, Plaintiffs allege that Defendant Paul's misrepresentations were publicly known because he broadcast them on his widely watched YouTube channel. SAC, ¶ 354. As described above, the misrepresentations were material because they promised a function of the CryptoZoo assets that was improperly developed: the CryptoZoo assets sold by Defendants were incapable of generating a yield or earning money as promised by Paul. *Id*. at ¶ 355. Likewise, Defendant Paul promised that CryptoZoo assets were created by properly funded and highly-trained professionals, when the assets actually created were preproduction quality, technologically dysfunctional,    and the antithesis of what was promised.    *Id*. at ¶ 354–61. Defendants traded CryptoZoo assets on the Binance blockchain and other efficient markets. *Id*. at ¶ 2, 353, 361. And finally, Plaintiffs alleged that they bought CryptoZoo assets after Paul's false promises when prices were high, but before the lack of game development or functionality was revealed. *Id*. at ¶ 363.

Additionally, however, Plaintiffs allege that Defendant Paul orchestrated multiple Zoo Token migrations to prevent CryptoZoo co-founders (and fellow Defendants) from profiting too early. *Id*. at ¶ 364, 381. As stated above, Defendant Paul publicly stated that the purpose of these moves was to improve "accessibility" and "interoperability" between blockchains, but in reality, tainted the liquidity pool and significantly reduced the value of Plaintiffs' CryptoZoo assets. *Id*. at ¶ 366–67. Thus, Defendant Paul led Plaintiffs to believe that the value of CryptoZoo assets was unchanged or improved (at least in function) when, in fact, he was orchestrating a move that significantly reduced the value of the assets. *Id*. These false statements and material omissions demonstrate a second wave of fraud resulting in additional CryptoZoo purchases, as shown by the price increase of CryptoZoo assets following Paul's misrepresentations. *Id*. at ¶ 377.

Defendant Paul's pattern of making false statements to generate interest and inflate the price of CryptoZoo assets continued ad nauseum until the public became suspicious of the lack of progress in game development. *Id*. at ¶ 378–80 (describing Paul's social media posts promoting the CryptoZoo assets and game that did not exist), ¶ 385 (describing Plaintiffs' reliance on this stream of false information); ¶ 386 (describing the revelation of the non-functioning game and commensurate loss in CryptoZoo assets value). This pattern of fraud is sufficient to demonstrate fraud-on-the-market and presumptive reliance.

### c. *Plaintiffs have pled securities fraud with particularity.*

Plaintiffs have alleged a) when they purchased CryptoZoo assets, b) how much they spent on their purchases, c) how much loss they suffered, and d) which of Defendant Paul's statements they relied on in making those purchases. *See* SAC, ¶ 62–342. This fully meets the pleading standard at this stage of litigation.

In his Motion to Dismiss, Defendant Paul imposes a pleading requirement on Plaintiffs not found in authoritative law. Specifically, Defendant Paul demands Plaintiffs affirmatively plead the amount, type, and price of the CryptoZoo assets they purchased, the date they purchased them, and the losses they suffered. This standard is appropriate in circumstances in which "the failure to plead the details of purchases or sales of securities made it impossible for the courts to figure out what conduct was alleged to be fraudulent or whether the injury alleged was suffered 'in connection with the purchase or sale of securities', as required by Section 10(b) and Rule 10b-5." *Maverick Fund, L.D.C. v. Comverse Tech., Inc.*, 801 F. Supp. 2d 41, 53–54 (E.D.N.Y. 2011). Here, like the plaintiffs in *Maverick*, Plaintiffs "provide ample details concerning which statements are alleged to be fraudulent and why" and "allege that they bought and sold shares of the [defendant's] stock on a public exchange over the entire period of the alleged fraud." *Id*.

Defendant Paul asserts that the "most glaring[]" failure of Plaintiffs' pleadings is that they do not specify whether they purchased CryptoZoo tokens or NFTs. Mot. to Dismiss, p. 30. Defendant Paul claims tokens purchasers would only have interest in investment losses while those who purchased assets "for consumptive purposes" cannot establish causation between the promotion of a game and their losses, but this reductive reasoning falls apart on closer examination. This argument rests on a false premise that Zoo Tokens and CryptoZoo NFTs were distinct products serving different economic functions. In reality, the two operated as components of a single, closed economic system and were designed to be interchangeable in use, value, and liquidity. Zoo Tokens were marketed as the currency required to acquire NFTs within the game ecosystem, while NFTs themselves were represented as yield-generating assets that would produce Zoo Tokens over time. Thus, tokens purchased NFTs, NFTs generated tokens, and both could be exchanged on secondary markets for cryptocurrency or fiat currency. Neither asset had

independent consumptive value outside the promised game; each derived value from the same expectation of profit based on Defendants' development and promotion of CryptoZoo. Accordingly, both assets functioned as investment vehicles tied to the success of the same enterprise, and both carried a built-in expectation of appreciation. Because Zoo Tokens and NFTs were economically interdependent, mutually convertible, and equally liquid for cash or cryptocurrency, the precise asset purchased by any given Plaintiff is immaterial. Under these circumstances, both assets qualify as securities, and losses stemming from either arise from the same alleged misconduct.

By stripping each claim to its essentials, Defendant Paul hopes to divert the Court's attention from the entire picture: Defendant Paul promised a functioning game in which Plaintiffs could use both their CryptoZoo tokens and their NFTs to generate yield and earn money. SAC ¶ 354. Paul delivered neither the game nor tokens and NFTs that could generate yield. *Id*. at ¶ 355. Plaintiffs have properly alleged the total value of the assets they purchased, which is sufficient at this stage.

Defendant Paul also takes aim at Plaintiff's allegation regarding the authoring and content of the Medium article outlined in the Second Amended Complaint. Plaintiffs allege that Paul "either personally authored the article or provided direct, hands-on instruction regarding its content,". SAC ¶ 366. At the pleading stage, the above allegation is taken as true and pleaded sufficiently.

Finally, Plaintiffs acknowledge that they have been remiss in filing the sworn certification required by the PSLRA for plaintiffs seeking to represent a class and have attached the sworn statement of named Plaintiff Don Holland as Exhibit A.

### d. *Plaintiffs adequately pled scienter.*

Defendant Paul's arguments regarding lack of scienter again misapply the legal standard. The Rule 9(b) pleading requirement ""relaxes the particularity requirement for conditions of mind, such as scienter: 'Malice, intent, knowledge, and other condition of mind of a person may be averred generally.'" *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994) (quoting Fed. R. Civ. P. 9(b)). To adequately plead scienter, Plaintiffs must "set forth specific facts in the complaint that support an inference of fraud." *SEC v. Stack*, No. 1:21-CV-00051-LY, 2021 U.S. Dist. LEXIS 196878, at *11 (W.D. Tex. Oct. 13, 2021) (quoting *Sec. & Exch. Comm'n v. Blackburn*, 156 F. Supp. 3d 778, 790 (E.D. La. 2015)). "Alleged facts are sufficient to support such an inference if they either (1) show a defendant's motive to commit securities fraud or (2) identify circumstances that indicate conscious behavior on the part of the defendant." *Id*. (quoting *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 339 (5th Cir. 2008)).

Plaintiffs have clearly met this burden. Aside from Defendant Paul's actions described in detail above, Plaintiffs allege that Defendant Paul promoted CryptoZoo assets as items that would generate money in a game, fully knowing that the game had not been developed. SAC ¶ 354–62. Specifically, on August 18, 2021, Defendant Paul described the CryptoZoo game as "really fun" and "addicting," and explicitly stated that the game had been played by the developers' children. *Id*. at ¶ 361. Three weeks *after* this promotion, on September 8, 2021, Paul acknowledged that no playable game had been built. *Id*. at ¶ 362. In the ensuing weeks, Defendant Paul continued to promote the game as playable, despite being fully aware no game existed. *Id*. at ¶ 379–80. Accordingly, Defendant Paul promoted a product he had neither seen nor used as fully functional. Evidence of Defendant Paul's knowledge is compounded by the fact that he was responsible for retaining and paying the developers that had not built the game. *Id*. at ¶ 387–89.

Defendant Paul attempts to cultivate an appearance of inconsistency in Plaintiffs' Complaint by stating that Plaintiffs at times construe CryptoZoo as a fully realized enterprise while at others claiming it was nothing more than a pass-through to Defendant Paul's personal wallet. Mot. to Dismiss, p. 31–32. As explained above, when the Complaint is read as a whole rather than piecemeal, the true characterization of Paul's relationship with CryptoZoo is such that he used the trappings of corporate formality only so far as it could benefit Defendant Paul. Defendant Paul drafted founding documents to ensure he received the greatest portion of founder shares (SAC ¶ 347); Defendant Paul forced an illegal presale of Zoo Tokens, despite warnings regarding potential securities violations (*id*. at ¶ 350); Defendant Paul orchestrated blockchain blacklists, using corporate formalities to punish co-founders at the expense of the value of the assets he sold (*id*. at ¶ 364–73, 381); Defendant Paul paid himself "reimbursements" out of corporate coffers in amounts vastly exceeding his actual expenditures (*id*. at ¶ 37–76); and    , while Defendant Paul hired various developers to deliver on his promises, he fired them every time the developers asked to be paid to the complete the project (*id*. at ¶ 382, 387–89).

Defendant Paul publicly stated the first token conversion was a "technical upgrade" for "accessibility and interoperability." Aside from those claims being nothing more than misrepresentations, as no functional interoperability features ever came to fruition, Defendant Paul's private communications point to the real reason for the conversion - to "surgically" remove a "snake from the grass" - i.e., to blacklist Greenbaum's wallets.

A contemporaneous private motive directly contradicting the public explanation shows Defendant Paul's stated reasons for the decision are systematically false and point to a pattern of acts by Defendant Paul that render his continuous misrepresentations about token versions, technical upgrades, and interoperability implausible. Throughout the token conversion fiasco,

Greenbaum was denounced as a fraud and had his tokens frozen, he was then privately transferred billions of tokens by the CryptoZoo team. None of the token versions resulted in technological upgrades. The only concrete effect of the token version initiatives was mitigating an internal founder fraud, nothing more.

Additionally, the establishment of explicit insider trading rules, which Paul himself labeled "Rules for Selling", demonstrates that Paul was aware of the need to prevent insiders from extracting excessive profits from the Token abruptly, to avoid public scrutiny, suspicion, and volatility. These insider rules further reflect Paul's understanding that CryptoZoo Token's value was susceptible to his widely followed public statements, and that the sale of founder-accumulated tokens required internal regulation to mitigate legal exposure. SAC¶ 7. Plaintiffs find such behavior perplexing as it does not comport with the acts of someone who simply believed he was selling a game nor a gaming collectible. Under the absolute most generous interpretation of these events, Defendant Paul was simply inept and ignorant in the coordination of and delivering on his promises, and accordingly irredeemably negligent in his promotion of assets he could neither produce nor understand. As pled in the Complaint,[7] however, Defendant Paul maintained proximal control over every facet of CryptoZoo's corporate business in order to extract profit and protect himself. Undoubtedly, Defendant Paul would have gladly delivered a fully functional CryptoZoo game and assets if he did not have to undercut his own profit margin to do so. But Defendant Paul bit off more than he could stomach and used his own popularity and fame to dig the hole in which he now stands: Defendant Paul cannot disclaim any knowledge of CryptoZoo's inner workings and color himself as a hapless victim of circumstance when evidence of his control and

---

[7]    Which, again, the Court must construe as true unless Defendant Paul provides facts showing Plaintiffs' version of events is *im*plausible.

manipulation is in every aspect of CryptoZoo's existence and marketing. Plaintiffs have fully and adequately pled scienter with respect to Defendant Paul's fraudulent actions.

### 4.      Plaintiffs adequately pled loss causation.

In their Complaint, Plaintiffs affirmatively allege that the loss in value their purchased CryptoZoo assets suffered was directly tied to the material misrepresentations and omissions made by Defendant Paul. Defendant Paul's arguments otherwise again rely on selective amnesia.

Under the Fifth Circuit standard, a plaintiff need only allege a "facially plausible causal relationship" between the fraudulent statements or omissions and the economic loss, "including allegations of a material misrepresentation or omission, followed by the leaking out of relevant or related truth about the fraud." *Lormand v. US Unwired, Inc.*, 565 F.3d 228 (5th Cir. 2009). "Truth about the alleged fraud [may be] disclosed to the market by persons other than the defendants", including third-party analysts or investigators. *Id.* The Second Amended Complaint alleges the CoffeeZilla YouTube investigation exposing the fraud, Paul's January 2023 video response (which itself caused a trading surge, SAC ¶ 36), and the gradual revelation that the game never existed.

These partial disclosures, taken together, constitute the "leaking out of truth" that *Lormand* contemplates. The pleading stage does not require a precise corrective disclosure timeline, it requires only enough facts to give rise to a "reasonable hope or expectation that discovery will reveal evidence" of loss causation. *Lormand*, 565 F.3d at 258.

A corrective disclosure can come from any source and "take any form from which the market can absorb [the information] and react," so long as it "reveal[s] to the market the falsity" of the prior misstatements. *Public Employees' Retirement System v. Amedisys, Inc*., 769 F.3d 313 (5th Cir. 2014). Corrective disclosures need not be a single event; rather, " through a series of partial disclosures." *Lormand*, Inc., 565 F.3d 228 (5th Cir. 2009). Critically, corrective disclosures "need

not squarely and directly contradict the earlier misrepresentations." *In re: BP p.l.c. Sec. Litig.*, No. 4:10-MD-2185, 2016 WL 3090779, at *26 (S.D. Tex. May 31, 2016).

A disclosure satisfies the loss causation standard so long as it "make[s] the existence of the actionable fraud more probable than it would be without that alleged fact (taken as true)". *Spitzberg v. Houston American Energy Corp.*, 758 F.3d 676 (5th Cir. 2014).

At the outset, Defendant Paul promoted and sold assets that were functionally inoperable as advertised because the assets were incapable of generating a yield. SAC¶ 355. Thus, the assets were inherently worth less than what Plaintiffs paid because they were improperly created. *Id*. at ¶ 363 (describing the CryptoZoo market surge resulting from Paul's promotion campaign). Moreover, Defendant Paul deliberately manipulated the CryptoZoo market to both punish his business partners and boost his personal profit, which resulted in an undisclosed loss of CryptoZoo value. *Id*. at ¶ 367, 377–78 (describing the market manipulation and subsequent tainting of the liquidity pool). Defendant Paul further depleted the value of CryptoZoo assets by withdrawing $1.3 million from CryptoZoo accounts for his own personal use. *Id*. at ¶ 374. All the while, Defendant Paul continued to promote both the CryptoZoo game and CryptoZoo assets as fully funded and functional.

In fact, over 10 paragraphs of Plaintiffs' Complaint describe in detail the promises and promotions from Defendant Paul that resulted in a subsequent rise in CryptoZoo demand and value, all while Defendant Paul was fully aware that a) the promised game was not developed, and b) the assets designed for use in the game did not work. SAC¶ 377–86. Plaintiffs have fully pled loss causation.

Likewise, the chart below reflects CryptoZoo token price data from inception to February 2, 2023. The chart contains key timeframe number references which are explained by information derived from the Second Amended Complaint in the attached Exhibit B incorporated herein.



Finally, because Plaintiffs have fully and adequately pled Securities Exchange Act claims against Defendant Paul, they have fully and adequately pled Section 20(a) control person liability claims against Defendant Paul. Plaintiffs' securities claims should be permitted to proceed on the merits. Paul was a 51% majority owner who unilaterally drove nearly every material decision about CryptoZoo's finances, promotional strategy, token architecture.

Likewise, "Pleading standards for claims for control person liability are relaxed: the heightened pleading standards of Rule 9(b) do not apply, as neither fraud nor scienter is an element of such a claim. *In re Key Energy Servs., Inc. Sec. Litig.*, 166 F. Supp. 3d 822, 841 (S.D. Tex. 2016).

5. __All Plaintiffs have standing to pursue their claims against Defendant Paul.__

*a. Foreign Plaintiffs have adequately alleged a domestic transaction.*

Defendant Paul argues that Plaintiffs in this case who reside outside the U.S. do not have standing to pursue securities claims against Defendant Paul without specifically alleging that their transactions were U.S.-based such that irrevocable liability attached within the U.S. While Defendant Paul's argument is couched in proper legal terms, it again improperly applies those standards to the case at hand.

Defendant Paul's argument is premised on the idea that not every Plaintiff in this case purchased their CryptoZoo assets directly from Defendants and therefore may have made their purchases on a foreign exchange. This argument works for pure securities claims because the location of transaction may be determinative of where irrevocable liability attaches. *See Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60 (2d Cir. 2012). In this case, however, Plaintiffs have alleged that the basis of their claim is firmly rooted in the United States. Plaintiffs allege that Defendant Paul sold CryptoZoo assets as investment contracts intended to increase in value within the CryptoZoo game that Paul promised but never developed or delivered. SAC, ¶ 354–55, 361, 379, 383. Critically, not only did Paul fail to deliver the game, which rendered the CryptoZoo assets purchased by Plaintiffs worthless because there was no forum in which those assets could increase in value, *even if Paul had delivered the game*, the CryptoZoo assets would have been worthless because they were minted without the built-in mechanism that allows the assets to generate a yield, or income, for the holder. SAC ¶ 355. Thus, Defendant Paul, who resides in the United States, contracted with developers in the United States, who developed a faulty product on computers within the United States, then flung that faulty product into the ether to be purchased by Plaintiffs. *Id*. at ¶ 343–46, 355–56, 388–89.

Regardless, even under Defendant Paul's reading of the law, Plaintiffs have properly alleged a domestic transaction on behalf of all Plaintiffs. The cases on which Defendant Paul relies are centered around the problems courts face, particularly in crypto cases, wherein the defendant on the hook for allegedly selling securities either has no physical location or expressly exists in a foreign country. *See Basic v. BProtocol Found.*, No. A-23-CV-533-RP, 2024 WL 4113751, at *9 (W.D. Tex. July 31, 2024), *adopted at* No. 1:23-CV-533-RP, 2024 WL 4113024 (W.D. Tex. Sept. 6, 2024) ("The Individual Defendants are Israeli citizens, LocalCoin is an Israeli corporation, and the Foundation is a Swiss entity. . . . Unlike *Binance*, there is no indication that Israel has disavowed itself of any legal authority over Defendants."); *Fagan v. Nexo Capital Inc.*, No. 4:24-CV-466, 2025 WL 2446301, at *22 (E.D. Tex. Aug. 25, 2025) (finding a Cayman Island-based crypto company "domestic" when all the plaintiff's transactions, "including, *inter alia*, signing up for the Nexo platform, purchasing the EIP, and making deposits and withdrawals—occurred domestically in Texas.").

These cases do not stand for the premise that a U.S. business or individual need not face repercussions for selling unregistered securities by simply hosting the transactions on a foreign server. Rather, there are multiple methods by which courts may determine where irrevocable liability attaches, including "the location in which title is transferred," or where "there was a meeting of the minds of the parties." *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 68 (2d Cir. 2012).[8]

Plaintiffs have properly alleged a domestic transaction, even on behalf of the foreign Plaintiffs. As noted by the Court in its Report and Recommendation, all Plaintiffs alleged that they

---

[8]    Importantly, Plaintiffs repeatedly allege that Defendants made CryptoZoo assets available for purchase on the Binance blockchain, which the Second Circuit has already determined can be held to host domestic transactions due to its matching servers located in the United States. *Williams v. Binance*, 96 F.4th 129, 138 (2d Cir. 2024).

purchased CryptoZoo assets "from Defendants," and that three out of the four classes purchased their assets directly from Defendants. Report and Recommendation, p. 54; SAC, ¶ 397. While Plaintiffs are not yet privy to the location of the server on which Defendants hosted their sales of faulty CryptoZoo assets, they have sufficiently alleged that those transactions were domestic based on the information available to them: Defendants, including Defendant Paul, are United States entities and individuals, residing in and operating from the United States, and contracted with United States companies in the development of the tokens and NFTs that would be used in the game that was never developed. *Id*. at ¶ 343–46, 388–89. Because Defendants reside in and operated from within the United States, "it more plausible that the trades at issue were matched over . . . servers located in the United States." *Binance*, 96 F.4th at 138. These allegations are sufficient to establish a domestic transaction at this stage of the litigation.[9] *See Securities and Exch. Comm'n v. Traffic Monsoon, LLC*, 245 F. Supp. 3d 1275, 1295 (D. Utah 2017) ("Either a domestic purchaser or a domestic seller of a security may bring a transaction within the purview of Section 10(b)."). Plaintiffs have put forth specific details related to investments made by foreign plaintiffs in the Second Amended Complaint and that any additional further fact development beyond pleading stage warrants mutual discovery by each party.

### b. All domestic Plaintiffs have standing.

As Defendant Paul points out, Plaintiffs have pled that they "initially" purchased CryptoZoo assets on a certain date. Plaintiffs have pled the date on which they made their first purchase but made additional purchases following Defendant Paul's promises and promotions. *See* Mot. to Dismiss, p. 29. But, as Plaintiffs allege, Logan Paul's very first act in the series of misdeeds

---

[9] Should the Court disagree, Plaintiffs should be given leave to amend their Complaint. *See Absolute Activist*, 677 F.3d at 71 (giving leave to amend when the information demonstrating whether a transaction was domestic was available).

was to rig the market by purchasing Zoo Token at an artificially low price. This meant any consumer, regardless of the purchase date, who paid for Zoo Token was participating in a market Defendant Paul had rigged for his benefit. Therefore, anyone who purchased Zoo Token during the relevant period suffered a traceable, concrete injury from participating in a manipulated market and has standing to sue for redress.

## C.    IN THE ALTERNATIVE, PLAINTIFFS HAVE OBTAINED SUPPLEMENTAL EVIDENCE OF PAUL'S SCIENTER AND SHOULD BE GIVEN LEAVE TO AMEND.

Defendant Paul's Motion to Dismiss inappropriately decontextualizes and compartmentalizes Plaintiffs' Complaint. Plaintiffs contend that the Complaint stands on its own merit: it presents a well-supported, cogent and logical sequence of facts demonstrating a plausible inference that Defendant Paul is liable for the claims presented. Should the Court disagree, however, Plaintiffs respectfully request leave to amend to address any deficiencies. Plaintiffs acquired additional information regarding Defendant Paul's intent to defraud Plaintiffs since the filing of the Second Amended Complaint.

The attached Exhibit C, incorporated herein, contains a sampling of internal communications between Defendant Paul and between the CryptoZoo team. Exhibit C provides a trailer to the voluminous plain language statements Defendant Paul and CryptoZoo made internally showing the depth and contemplation of Defendant's acts as well as additional parties that aided in the scheme at large.

Outside of Exhibit C, a recent filing in *Paul v. Findeisen*[10] produced an exchange between Paul and Defendant Greenbaum predating the launch of CryptoZoo, Paul asks whether observers

---

[10] *Paul v. Findeisen*, No. SA-24-CV-717-OLG (HJB), 2025 WL 1490768 (W.D. Tex. Mar. 26, 2025).

can see a "NEW address," reflecting his awareness that cryptocurrency wallet activity can be monitored on the blockchain. Greenbaum responds that individuals are "serious snoops" and explains that when Paul buys something "100 idiots will jump in after u," referring to investors monitoring and copying Paul's wallet transactions. Paul replies, "fuck yeah lol will just take their money," before asking: "Well how do I get into a wallet they can't track."



In a related exchange, Paul states that he "can't sell right now" because there are "too many eyes," that he needs to "remain anonymous," and asks whether he can "dump" a token "privately." *See* Exhibit C. Although these messages predate the CryptoZoo project, they demonstrate Paul's contemporaneous understanding that investors monitor his cryptocurrency activity and his interest in concealing wallet transactions while extracting value from followers who mirror his trades.

Even if the Court were not already persuaded by the extensive allegations in the Second Amended Complaint, Paul's own words independently establish the requisite state of mind. Long before CryptoZoo launched, Paul openly acknowledged that followers tracked his wallet activity and discussed methods to extract value while avoiding that scrutiny. Those admissions foreclose any plausible claim that Paul lacked knowledge of, or intent behind, the conduct alleged in this case.

"If it appears that given an opportunity to amend the pleading, the plaintiff would be able to state a claim upon which relief could be granted, the court should grant leave to amend." *In re Key Energy Servs. Sec. Litig.*, 166 F. Supp. 3d at 830 (citing *People's Choice Home Loan, Inc. v. Mora*, No. 3:06-CV-1709-G, 2007 U.S. Dist. LEXIS 16624 (N.D. Tex. Mar. 7, 2007)).

## IV.     CONCLUSION

Plaintiffs have met their burden at the pleading stage by presenting a factual basis supporting a plausible inference that Defendant Paul has committed the illegal acts outlined in the Complaint. Defendant Paul's arguments otherwise are based on a dispute of the truth of the claims rather than on a legally supportable basis for dismissal. Accordingly, Defendant Paul's Motion to Dismiss should be denied.

Respectfully submitted,

*/s/ Jarrett L. Ellzey*
**ELLZEY & ASSOCIATES, PLLC**
Jarrett L. Ellzey
Texas Bar No. 24040864
jarrett@ellzeylaw.com
Leigh S. Montgomery
Texas Bar No. 24052214
leigh@ellzeylaw.com
4200 Montrose Blvd., Ste. 200
Houston, Texas 77006
Phone: (888) 350-3931
Fax: (888) 276-3455

**ATTORNEY TOM & ASSOCIATES**
Tom Kherkher
Texas Bar No. 24113389
tom@attorneytom.com
4200 Montrose Blvd., Ste. 200
Houston, Texas 77006
Phone: (855) 866-9467

**ATTORNEYS FOR PLAINTIFFS**

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to Federal Rules of Civil Procedure 5(d).  I hereby certify that on March 16, 2026, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system, which will provide notice to all counsel of record.  I further certify that the foregoing has been served the foregoing document on all counsel of record in a manner authorized by Federal Rule of Civil Procedure 5(b)(2).

*/s/Jarrett L. Ellzey*
Jarrett L. Ellzey
