**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

DON HOLLAND, *et al.*, individually and on behalf of all
others similarly situated,

Plaintiff,

vs.

CRYPTOZOO INC., a Delaware Corporation,
LOGAN PAUL, EDUARDO IBANEZ, and JAKE
GREENBAUM a/k/a CRYPTO KING,

Defendants.

_____/

LOGAN PAUL,
Cross-Plaintiff,
vs.
EDUARDO IBANEZ and
JAKE GREENBAUM a/k/a CRYPTO KING
Cross-Defendants.

_____/

Civil Action No. 1:23-cv-110

**DEFENDANT LOGAN PAUL'S REPLY IN SUPPORT OF HIS
MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................................iii

INTRODUCTION ..................................................................................................................1

ARGUMENT..........................................................................................................................2

    I.      PLAINTIFFS CANNOT PIERCE THE CORPORATE VEIL. ...............................2

    II.     CRYPTOZOO PRODUCTS ARE NOT SECURITIES. ..........................................5

        A.    Plaintiffs Have Not Pled Facts to Suggest That They Made an "Investment of Money."...5

        B.    Plaintiffs' CryptoZoo Purchases Were Not Investments in a "Common Enterprise."........7

        C.    Plaintiffs Have Not Pled a Reasonable Expectation of Profits. ................................9

    III.    PLAINTIFFS LACK STANDING TO PURSUE SECURITIES CLAIMS.......................9

        A.    The Foreign Plaintiffs Lack Standing to Pursue Securities Claims. .........................9

        B.    Other Plaintiffs Similarly Lack Standing. ...................................................11

    IV.    PLAINTIFFS HAVE NOT PLED FRAUD ON THE MARKET..................................12

    V.     PLAINTIFFS HAVE NOT PLED LOSS CAUSATION......................................14

    VI.    PLAINTIFFS HAVE NOT PLED SCIENTER.................................................15

    VII.    PLAINTIFFS HAVE NOT PLED MATERIAL MISREPRESENTATIONS.................17

    VIII.  PLAINTIFFS' ALLEGATIONS ARE NOT SUFFICIENTLY PARTICULAR. ............19

    IX.    THE COURT SHOULD NOT GRANT PLAINTIFFS LEAVE TO AMEND. ............19

CONCLUSION......................................................................................................................20

## TABLE OF AUTHORITIES

Cases

*Abrams v. Baker Hughes Inc.*,
292 F.3d 424 (5th Cir. 2002) ................................................................................................ 15, 17

*Azad v. Jenner*,
2025 WL 1718273 (C.D. Cal. May 9, 2025) ...............................................................................10

*Balestra v. ATBCOIN LLC*,
380 F. Supp. 3d 340 (S.D.N.Y. 2019) ..........................................................................................9

*Baylor v. Honda Motor Co.*,
2024 WL 650415 (C.D. Cal. Jan. 19, 2024) ...............................................................................10

*Black v. Panola Sch. Dist.*,
461 F.3d 584 (5th Cir. 2006) .......................................................................................................11

*Catogas v. Cyberonics, Inc.*,
292 F. App'x 311 (5th Cir. 2008) ................................................................................................14

*Compagnie des Grands Hotels d'Afrique S.A. v. Starwood Cap. Grp. Glob. I LLC*,
2024 WL 4249723 (3d Cir. Sept. 20, 2024) .................................................................................4

*Donovan v. GMO-Z.com Tr. Co., Inc.*,
779 F. Supp. 3d 372 (S.D.N.Y. 2025) ...................................................................................... 6, 9

*Dorsey v. Portfolio Equities, Inc.*,
540 F.3d 333 (5th Cir. 2008) ................................................................................................ 15, 19

*Finkel v. Docutel/Olivetti Corp.*,
817 F.2d 356 (5th Cir. 1987) .......................................................................................................12

*Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*,
594 U.S. 113 (2021) .....................................................................................................................12

*Holland v. GEXA Corp.*,
161 F. App'x 364 (5th Cir. 2005) ................................................................................................19

*Hong v. Havey*,
551 S.W.3d 875 (Tex. App.—Houston [14th Dist.] 2018, no pet.) ..........................................4

*I Am Athlete, LLC v. IM EnMotive, LLC*,
2023 WL 8933592 (Del. Ch. Dec. 27, 2023) ..............................................................................3

*In re Anadarko Petrol. Corp. Class Action Litig.*,
957 F. Supp. 2d 806 (S.D. Tex. 2013) ........................................................................................18

*In re Cornerstone Propane Partners, L.P. Sec. Litig.*,
2006 WL 1180267 (N.D. Cal. May 3, 2006) ........................................................13

*In re DVI, Inc. Sec. Litig.*,
639 F.3d 623 (3d Cir. 2011) ...............................................................................13

*In re Key Energy Servs., Inc. Sec. Litig.*,
166 F. Supp. 3d 822 (S.D. Tex. 2016) .................................................................13

*In re Mack Indus. Ltd.*,
2024 WL 989406 (N.D. Ill. Mar. 7, 2024)............................................................3

*In re Opus E., L.L.C.*,
480 B.R. 561 (Bankr. D. Del. 2012).....................................................................4

*In re Xcelera.com Sec. Litig.*,
430 F.3d 503 (1st Cir. 2005)..............................................................................12

*Krogman v. Sterritt*,
202 F.R.D. 467 (N.D. Tex. 2001) ......................................................................12

*KT4 Partners LLC v. Palantir Techs. Inc.*,
203 A.3d 738 (Del. 2019) ...................................................................................4

*Lemmer v. Nu-Kote Holding, Inc.*,
2001 WL 1112577 (N.D. Tex. Sept. 6, 2001)......................................................19

*Lormand v. US Unwired, Inc.*,
565 F.3d 228 (5th Cir. 2009)..............................................................................14

*Long v. Shultz Cattle Co.*,
881 F.2d 129 (5th Cir. 1989)............................................................................ 8, 9

*Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*,
751 F.3d 368 (5th Cir. 2014)..............................................................................20

*Mason v. Network of Wilmington, Inc.*,
2005 WL 1653954 (Del. Ch. July 1, 2005) ...........................................................3

*Maverick Fund, L.D.C. v. Comverse Tech., Inc.*,
801 F. Supp. 2d 41 (E.D.N.Y. 2011) ..................................................................19

*Messieh v. HDR Glob. Trading Ltd.*,
2024 WL 1436755 (S.D.N.Y. Apr. 3, 2024) ........................................................10

*Morrison v. Nat'l Austl. Bank Ltd.*,
561 U.S. 247 (2010)..........................................................................................10

*Murphy v. Edgefield Holdings, L.L.C.*,
2023 WL 4763331 (5th Cir. July 26, 2023) ................................................................................11

*Nathenson v. Zonagen Inc.*,
267 F.3d 400 (5th Cir. 2001) .......................................................................................................13

*Palmer v. Harris Cnty.*,
2025 WL 2605406 (S.D. Tex. Sept. 5, 2025) ...........................................................................15

*Real v. Yuga Labs, Inc.*,
2025 WL 3437389 (C.D. Cal. Sept. 30, 2025) .................................................................. 6, 7, 8

*Reves v. Ernst & Young*,
494 U.S. 56 (1990) ..........................................................................................................................8

*Rubenstetn v. Ishizuka*,
2025 WL 1489375 (S.D.N.Y. May 23, 2025)............................................................................10

*S.E.C. v. Balina*,
2024 WL 2332965 (W.D. Tex. May 22, 2024) ................................................................. 7, 8, 9

*S.E.C. v. Barton*,
135 F.4th 206 (5th Cir. 2025)........................................................................................................8

*S.E.C. v. Coinbase, Inc.*,
726 F. Supp. 3d 260 (S.D.N.Y. 2024)..........................................................................................9

*S.E.C. v. Cont'l Commodities Corp.*,
497 F.2d 516 (5th Cir. 1974).........................................................................................................8

*S.E.C. v. Koscot Interplanetary, Inc.*,
497 F.2d 473 (5th Cir. 1974).........................................................................................................8

*S.E.C. v. Mapp*,
240 F. Supp. 3d 569 (E.D. Tex. 2017)......................................................................................18

*S.E.C. v. Telegram Grp. Inc.*,
448 F. Supp. 3d 352 (S.D.N.Y. 2020).........................................................................................7

*S.E.C. v. Teshuater, LLC*,
2024 WL 1348432 (S.D. Tex. Mar. 29, 2024)............................................................................8

*Schiller v. Phys. Res. Grp., Inc.*,
2002 WL 318441 (N.D. Tex. Feb. 26, 2002)............................................................................19

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007) ........................................................................................................2, 15, 16, 17

*Trevino v. Merscorp, Inc.,*
 583 F. Supp. 2d 521 (D. Del. 2008) ..........................................................................................4

*Unger v. Amedisys Inc.,*
 401 F.3d 316 (5th Cir. 2005) ...................................................................................................12

*United Hous. Found., Inc. v. Forman,*
 421 U.S. 837 (1975) .......................................................................................................... 5, 6, 7

*United States v. Reagan,*
 596 F.3d 251 (5th Cir. 2010) ...................................................................................................12

*Willcot v. S.E.C.,*
 2025 WL 4656790 (W.D. Tex. Dec. 19, 2025) ......................................................................13

*Williams v. Binance,*
 96 F.4th 129 (2d Cir. 2024) ............................................................................................. 10, 11

*Wilmington Tr. Nat'l Ass'n,*
 2020 WL 1249570 (N.D. Tex. Mar. 16, 2020) .......................................................................11

Other Authorities

33-11412, Exch. Act Release No. 34-105020 (Mar. 17, 2026) .......................................................5

## **INTRODUCTION**

Plaintiffs' response to Logan Paul's motion to dismiss confirms that their pleading is inadequate. Having attempted three times to state claims against Mr. Paul, Plaintiffs rest their arguments against dismissal of their securities claims on unsupported conclusions, facts and documents beyond the complaint's four corners, and—in at least one instance—hallucinated facts with no source at all. Plaintiffs have demonstrated once and for all that they cannot state viable claims.

Plaintiffs' legal arguments lack merit. Plaintiffs argue first, for example, that the Court should apply Texas law to its veil-piercing analysis even though the Court determined in its last dismissal order that Delaware law applies. Regardless, Plaintiffs cannot pierce the veil under any standard—they have not plausibly alleged that Mr. Paul founded CryptoZoo, Inc. to serve as his alter ego. This is not the "exceptional case" that calls for the Court to disregard the corporate form.

Nor have Plaintiffs established that CryptoZoo products are securities. As they concede:

> [Zoo Tokens and CryptoZoo NFTs] operated as components of *a single, closed economic system* and were designed to be interchangeable in use, value, and liquidity. Zoo Tokens *were marketed as* the currency required to acquire NFTs *within the game ecosystem*, while NFTs themselves were represented as yield-generating assets that would produce Zoo Tokens over time. Thus, tokens purchased NFTs, NFTs generated tokens, and both could be exchanged on secondary markets for cryptocurrency or fiat currency. *Neither asset had independent consumptive value outside the promised game*[.]

Resp. at 25-26 (emphasis added).

CryptoZoo did not market its products as investments or promise investment returns. It advertised a consumer product that it was unable to deliver. New guidance from the SEC confirms that CryptoZoo Tokens and NFTs are, consequently, "digital tools" and "digital collectibles," not securities, warranting reconsideration of this Court's prior holding to the contrary.

Even if CryptoZoo products were securities, Plaintiffs' claims would fall short. The 103 Foreign Plaintiffs have not pled domestic securities transactions because do not allege that anything relevant to their purchases happened in the United States. Plaintiffs cannot establish reliance through

fraud-on-the-market because they have not pled an efficient market and admit that not all Plaintiffs relied on all alleged misrepresentations. They have not pled loss causation because they do not persuasively tie leaked, corrective information to decreases in CryptoZoo's prices. Plaintiffs promote the wrong standard for pleading scienter but, in any event, cannot satisfy even the more lenient one they apply. Their allegations addressing Mr. Paul's state of mind are conclusory, contradicted, and not "as compelling as any opposing inference of nonfraudulent intent" or "strong in light of other explanations." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 310, 314 (2007). The misrepresentations on which they base their claims are similarly based on unsupported conclusions.

Plaintiffs urge the Court to grant them a third amendment by citing documents produced in other litigation, but Plaintiffs had access to these documents before they filed their last complaint and none of them would make their claims viable. The Court should dismiss with prejudice.

## ARGUMENT

### I.   PLAINTIFFS CANNOT PIERCE THE CORPORATE VEIL.

Mr. Paul analyzes piercing the corporate veil under Delaware law because—as this Court has acknowledged—Texas choice-of-law rules require it. *See* Report and Recommendation [D.E. 107] ("R&R") at 20 n.9. Plaintiffs cannot pierce the corporate veil under Delaware law. *See* Mot. at 9-13.

Plaintiffs argue that they have alleged facts sufficient to do so, but rely on unsupported conclusions and documents beyond the SAC's four corners to make their case. Plaintiffs argue, for example, that CryptoZoo was underfunded; in support, however, they rely on a statement that this Court has already categorized as puffery—Mr. Paul's boast that "CryptoZoo was backed by a 'massive team' and that he was 'out of pocket like a million.'" R&R at 30-31. Plaintiffs next suggest that CryptoZoo was undercapitalized because Mr. Paul claimed to have invested "only" $200,000 in the venture by August 18, 2021, Resp. at 8—the day on which CryptoZoo was announced, *see* SAC ¶ 5—but provide no context to support their dual assumptions that Mr. Paul's initial investment was the

2

*only* investment in the venture and that Mr. Paul's investment was insufficient to launch CryptoZoo.

Plaintiffs similarly claim that CryptoZoo was "obviously not solvent," and "barely survived long enough" before "ultimately collapsing," Resp. at 8, but plead no facts in support. Regardless, the test of insolvency in the alter ego context is not whether the company failed, but whether its liabilities exceeded its assets such that it was "unable to pay its debts as they bec[a]me due." *Mason v. Network of Wilmington, Inc.*, 2005 WL 1653954, at \*3 (Del. Ch. July 1, 2005). "[W]hat matters is whether [the defendant] abused the corporate form" by rendering the company "insolvent in a way that 'unjustly shield[ed] its assets from its creditors.'" *In re Mack Indus. Ltd.*, 2024 WL 989406, at \*7 (N.D. Ill. Mar. 7, 2024) (applying Delaware law). These allegations are absent from the SAC.[1]

Nor have Plaintiffs plausibly alleged that CryptoZoo failed to observe corporate formalities. They acknowledge that CryptoZoo maintained "internal documents" reflecting ownership structure and kept notes of internal meetings, *see, e.g.*, SAC ¶¶ 347, 348, but make no mention of CryptoZoo's corporate structure, financial accounting, corporate registration, or any other indicium of a formal corporate identity. *See, e.g.*, *Mack Indus.*, 2024 WL 989406, at \*8 (company not alter ego where trustee made "no mention of other circumstances that would support [disregard of corporate formalities]," including that the purported alter egos failed to maintain accurate records, did not properly file tax returns, shared bank accounts, or lacked articles of organization); *I Am Athlete, LLC v. IM EnMotive, LLC*, 2023 WL 8933592, at \*5 (Del. Ch. Dec. 27, 2023) (allegations that company disregarded corporate formalities insufficient where pled on information and belief and conclusory).

Plaintiffs argue that the Court should disregard CryptoZoo's Whitepaper and meeting notes because the Whitepaper was revised for an untoward purpose and CryptoZoo's meeting notes were not "traditional." Resp. at 9. But they offer no basis for their conclusions about the Whitepaper and

---

[1] Plaintiffs allege that CryptoZoo did not pay certain vendors, but not that it was *unable* to—they allege without basis that Defendants "expected labor without cost." SAC ¶¶ 5, 382, 388.

cite no requirement that corporate meeting notes take a particular form. *Compare In re Opus E., L.L.C.*, 480 B.R. 561, 571 (Bankr. D. Del. 2012) (fact that "Secretary was told to keep 'bare-bones' minutes d[id] not create a facially plausible allegation . . . that the Debtor lacked proper corporate records").[2]

Plaintiffs also contend that they have plausibly alleged that Mr. Paul pocketed CryptoZoo funds, but their allegations are pled on information and belief, SAC ¶¶ 10, 374, and speculative at best, *see* Mot. at 10-12. To make matters worse, Plaintiffs now rely on hallucinated allegations—citing paragraph 331 of the SAC for the proposition that "[i]nternal CryptoZoo meeting notes from August 13, 2021, *already referenced in the Second Amended Complaint*, confirm Paul claimed $300,000 in startup expenses and that revenue from egg sales would 'clear expenses first then payouts.'" Resp. at 6 (emphasis added). These allegations appear nowhere in Plaintiffs' operative pleading.[3] In any event, allegations of misappropriation alone do not support the conclusion that a defendant abused the corporate form. *See, e.g.*, *Trevino v. Merscorp, Inc.*, 583 F. Supp. 2d 521, 531 (D. Del. 2008) (allegations that defendant misappropriated funds by charging for costs not incurred did not supply necessary "fraud or injustice"). This is not the "exceptional case" justifying veil-piercing. *See Compagnie des Grands Hotels d'Afrique S.A. v. Starwood Cap. Grp. Glob. I LLC*, 2024 WL 4249723, at *3 (3d Cir. Sept. 20, 2024).

The same holds true under Texas law. Texas courts pierce the veil where a defendant used the corporate form to "perpetrate[] a fraud *primarily* for [his] personal benefit." Resp. at 4 (emphasis added). Plaintiffs allege that Mr. Paul took half of one day's profits from one product. *See* Mot. at 12. These allegations do not support an inference that Mr. Paul used CryptoZoo primarily for his own benefit. *See, e.g.*, *Hong v. Havey*, 551 S.W.3d 875, 887 (Tex. App.—Houston [14th Dist.] 2018, no pet.)

---

[2] *KT4 Partners LLC v. Palantir Techs. Inc.* changes nothing. The court there held that "'books and records[]' . . . has long been understood to cover both official corporate records and less formal written communications," including emails. 203 A.3d 738, 750 (Del. 2019).

[3] Notably, the suggestion that internal meeting notes exist beyond the four corners undermines Plaintiffs' argument that CryptoZoo did not observe corporate formalities. *See* p. 3, *supra*.

(evidence did not show "alleged fraud was perpetrated primarily to benefit [defendant].").

## II.    CRYPTOZOO PRODUCTS ARE NOT SECURITIES.

Plaintiffs contend that CryptoZoo tokens and NFTs are securities, but the SEC says otherwise. In recent guidance, issued after the Court's last dismissal order, the SEC advised that three categories of digital assets are *not* securities: digital commodities, digital tools, and digital collectibles.[4] CryptoZoo NFTs are "digital collectibles": "crypto asset[s] that [are] designed to be collected and/or used and may represent or convey rights to artwork, music, videos, trading cards, [or] in-game items," among other things. *Id.* at 16. Zoo Tokens are "digital tools": crypto assets that are "commonly issued for use in connection with crypto systems and are designed to perform practical functions within such systems."[5] *Id.* at 20. These definitions match Plaintiffs' descriptions of Zoo Tokens as "the currency required to acquire NFTs within the game ecosystem," and NFTs as "high-effort digital collectibles that generated a yield" (more tokens). *See, e.g.*, SAC ¶¶ 2, 357; Resp. at 25-26. The SEC's conclusion that these assets are not securities accords with the *Howey* analysis set forth in the Motion and below.

### A.   Plaintiffs Have Not Pled Facts to Suggest That They Made an "Investment of Money."

Plaintiffs offer no support for their claim that they "invested money" in CryptoZoo "on promises of a financial return." *United Hous. Found., Inc. v. Forman,* 421 U.S. 837, 858 (1975). In fact, Plaintiffs *concede* that Defendants created Zoo Tokens as currency for use in a game and that Zoo NFTs generated more tokens (the "yield") for use only within the game ecosystem. *See* p. 1 *supra*; *see also* SAC ¶ 2 (alleging that Defendants "created the company . . .. to sell digital assets ostensibly *for use in the digital CryptoZoo game*: first, in the form of a digital currency called Zoo Tokens, which could then

---

[4] *See* Application of the Fed. Sec. Laws to Certain Types of Crypto Assets and Certain Transactions Involving Crypto Assets, Sec. Act Release No. 33-11412, Exch. Act Release No. 34-105020 (Mar. 17, 2026), *at* https://www.sec.gov/files/rules/interp/2026/33-11412.pdf ("SEC Interpretation").

[5] This definition matches the description of Zoo Tokens in CryptoZoo's Whitepaper, which advised "$ZOO was *created to support CryptoZoo*, and was not intended to be an investment vehicle." SAC ¶ 25; Tokenomics, CryptoZoo Whitepaper, available at https://whitepaper.cryptozoo.co/tokenomics.

be used to purchase Defendants' other products, CryptoZoo Non-Fungible Tokens"). As Mr. Paul has established, he and CryptoZoo marketed the products as game components—never as investments—and, though the game could "make you money," *i.e.* earn players a yield *within the game*, *see* Resp. at 25-26, consumers were never promised *investment returns*, *see* Mot. at 20-22. According to *Forman*, this is precisely what distinguishes an asset meant for consumptive use from a security. *See Forman,* 421 U.S. at 858 ("What distinguishes a security transaction . . . is an investment where one parts with his money in the hope of receiving profits from the efforts of others, and not where he purchases a commodity for personal consumption.").

Plaintiffs contend that "the CryptoZoo team's internal communications describe CryptoZoo assets as an 'investment,'" Resp. at 14, but internal communications are not the touchstone of *Howey*'s first prong. The *Howey* test requires "an objective inquiry into the character of the instrument or transaction offered based on *what the purchasers were led to expect*." *Real v. Yuga Labs, Inc.*, 2025 WL 3437389, at *7 (C.D. Cal. Sept. 30, 2025) (emphasis added). That aside, the allegations Plaintiffs cite do not show that the founders understood CryptoZoo Products to be investments. Instead, the cited internal communications reflect an understanding that Zoo Tokens *could* "trade as a security *if we wanted*,"[6] and ultimate determination that the founders would not follow that path. *See* SAC ¶¶ 349-51 (emphasis added) ("definitely don't want to do anything that brings SEC eyeballs," so "no presale"). Plaintiffs' purported reliance on Mr. Paul's statements (all puffery) that CryptoZoo *the game* "can earn" or "make" the consumer "money" similarly fall short—that a game can make players money (*e.g.* a slot machine) does not automatically qualify its components as securities. It is promises of *investment returns* that bear on the *Howey* analysis.[7] *See, e.g.*, *Donovan v. GMO-Z.com Tr. Co., Inc.*, 779 F. Supp. 3d 372, 385

---

[6] Of course, no Defendant's understanding of the meaning of "security" bears on the Court's analysis.

[7] Mr. Paul's alleged *post*-project adoption of others' statements describing CryptoZoo products as "investments" (SAC ¶¶ 37-38) are not relevant. They are vague—it is not clear what portion of the prior third-party statements he approved; they played no role in fostering consumers' expectations;

6

(S.D.N.Y. 2025) ("Profits" in this context means "either capital appreciation resulting from the development of the initial investment, ... or a participation in earnings resulting from the use of investors' funds.") (quoting *Forman*, 421 U.S. at 852); *Yuga Labs*, 2025 WL 3437389, at *5 (payment for assets might constitute an "investment" where "promotional materials refer[] to 'lifetime income,' 'Attractive Returns,' and rates of return relative to returns from the stock market").

In *Telegram*, for example (cited by Plaintiffs), where the plaintiffs purchased a crypto-assert having been led to expect "profit in [its] resale," the court found that "a reasonable investor . . . would have purchased Grams with investment intent." *S.E.C. v. Telegram Grp. Inc.*, 448 F. Supp. 3d 352, 371–72 (S.D.N.Y. 2020) ("The Court also finds that, without the expected ability to resell Grams into the secondary market, the $1.7 billion paid to Telegram would not have been raised."). In *Yuga Labs,* by contrast, as here, the defendants promoted NFTs and a related token to be used in a fictional "metaverse," announced on social media that the NFTs had sold out in one night, and described products as "million-dollar" NFTs. 2025 WL 3437389, at *2. The court, looking to these statements, concluded that the plaintiffs' purchases were not "investments of money." *See id.* at *5-7.

## B.  Plaintiffs' CryptoZoo Purchases Were Not Investments in a "Common Enterprise."

Plaintiffs contend that *Howey*'s second prong focuses on "whether the parties 'engaged in a common enterprise that correlated with the success of the promoter,'" and not on the promoter's expertise. Resp. at 16 (cleaned up; quoting *S.E.C. v. Balina*, 2024 WL 2332965, at *9 (W.D. Tex. May 22, 2024)). Even accepting this premise, Plaintiffs' allegations fall short.

Plaintiffs do not allege that they engaged in a common enterprise that tied their fortunes to Mr. Paul's. They allege that they purchased "digital assets ostensibly for use in the digital CryptoZoo game," SAC ¶ 2, which they believed Mr. Paul and his co-founders had already funded and completed.

---

and Mr. Paul stated clearly in the same exchange that CryptoZoo products are *not* investments. *See id.*

All told, Plaintiffs allege that they paid for a product that Defendants were unable to deliver.[8] *Id.* ¶ 1 ("Defendants sold digital assets that did not have characteristics, uses, or benefits they advertised and . . . never released the CryptoZoo game."). "Congress did not … intend to provide a broad federal remedy for all fraud when enacting the Securities Act and Exchange Act." *Yuga Labs*, 2025 WL 3437389, at *4 (quoting *Reves v. Ernst & Young*, 494 U.S. 56, 61 (1990)) (cleaned up).

Plaintiffs' authority illustrates the difference. In *Teshuater*, the court found "broad vertical commonality" because the defendant had used investors' funds "to support the operations of TeshuaCoin and the Bitcoin-mining program, and the investors' returns depended solely on his successful use of their funds." *S.E.C. v. Teshuater, LLC*, 2024 WL 1348432, at *4 (S.D. Tex. Mar. 29, 2024). Similarly, in *Balina*, "Sparkster promised to use the funds from the sale of the SPRK Tokens to develop and promote the digital ecosystem it created, establishing a common enterprise," and "stated in its Whitepaper that the development and launch of the Sparkster Platform . . . w[oiuld] be funded . . . using the proceeds of the sale of the Tokens." 2024 WL 2332965, at *9 (emphasis added).[9] Ultimately, "Sparkster was asking the purchasers of its tokens to make a bet on the success of Sparkster by soliciting investments through token purchases, *key features of a common enterprise*" and "much like a company would seek investors before an I.P.O." *Id.* (emphasis added); *see also, e.g.*, *Long v. Shultz Cattle Co.*, 881 F.2d 129, 141 (5th Cir. 1989) (quoting *Howey* for proposition that its test was designed to address "schemes devised by those who seek the *use of the money of others on the promise of profits*.") (emphasis added). Defendants did not solicit funds from consumers to develop CryptoZoo. *See* pp.

---

[8] This is further reflected in the terms of CryptoZoo's "buyback" offer. Because CryptoZoo had advertised a *game*, it offered consumers the price they had paid (or, according to Plaintiffs, a percentage of that price) for CryptoZoo NFTs. *See* SAC ¶¶ 22-23.

[9] *See also, e,g.*, *S.E.C. v. Barton*, 135 F.4th 206, 213, 216 (5th Cir. 2025) (broad vertical commonality found where defendant solicited funding for purchase and development of land); *S.E.C. v. Cont'l Commodities Corp.*, 497 F.2d 516, 522–23 (5th Cir. 1974) (addressing investments in commodity futures trading options, *i.e.* interests in contracts); *S.E.C. v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 475 (5th Cir. 1974) (involving plaintiffs who bought into pyramid scheme).

7-8, *supra.* They advertised a game that they had already funded for consumptive use.[10] *See id.*

As for Plaintiffs' contention that expertise plays no role, their authority says otherwise. *See, e.g.,* *Long,* 881 F.2d at 141, 142 ("[A]ll of SCCI's clients were dependent on SCCI's expertise" including its "business acumen."); *Balina,* 2024 WL 2332965, at *10 ("[T]he investors relied on Sparkster's expertise and technical skill to develop the underlying software and blockchain technology.").

## C. Plaintiffs Have Not Pled a Reasonable Expectation of Profits.

Plaintiffs' failure as to *Howey*'s third prong is tied to their failure to satisfy its first: Plaintiffs did not "invest money," so they cannot claim an expectation of "profits," *i.e.* "capital appreciation resulting from the development of the initial investment, ... or a participation in earnings resulting from the use of investors' funds." *Donovan,* 779 F. Supp. 3d at 385. Plaintiffs' reliance on the statement that CryptoZoo was a game that makes you money does not turn CryptoZoo products into securities.

Plaintiffs rely on *S.E.C. v. Coinbase, Inc.* to posit that "profit," includes "the increased value of the investment," Resp. at 18, but this presupposes an "investment of money" in a "common enterprise." *See* 726 F. Supp. 3d 260, 290 (S.D.N.Y. 2024); *Balestra v. ATBCOIN LLC,* 380 F. Supp. 3d 340, 353 (S.D.N.Y. 2019). Finally, vague statements "contain[ing] no semblance of an actionable business plan . . . likely would not create reasonable expectations of profit." SEC Interpretation at 27.

## III.    PLAINTIFFS LACK STANDING TO PURSUE SECURITIES CLAIMS.

### A. The Foreign Plaintiffs Lack Standing to Pursue Securities Claims.

The Foreign Plaintiffs contend that they have standing because they "allege[] that the basis of their claim is firmly rooted in the United States." Resp. at 33. They do not. In fact, they do not allege that *any* conduct material to their claims occurred or any Defendant resided in the United States.

---

[10] This analysis confirms that CryptoZoo NFTs are "digital collectibles" and Zoo Tokens "digital tools." As the SEC advises, "[t]he purchase of a digital collectible is not an investment in any business enterprise or other entity, promisor, or obligor associated with the creator of the digital collectible," and "[p]ersons acquire digital tools for their functional utility and do not have any rights or interest in or with respect to a business enterprise." SEC Interpretation at 19, 21.

9

Plaintiffs assert for the first time *in their response* that Defendant Paul "resides in the United States, [and] contracted with developers in the United States, who developed a faulty product on computers within the United States[.]" Resp. at 33. In support, they cite seven paragraphs of the SAC, *none of which* supports these assertions. *See id.* (citing SAC ¶¶ 343–46, 355–56, 388–89). The closest they come is an allegation that the CryptoZoo "team" retained and fired a developer in Texas at some point *after June 2022*—more than eight months after CryptoZoo launched and after most Plaintiffs' purchases. *See id.* ¶ 388. Beyond Plaintiffs' places of purchase, this is the *only* mention of *any* U.S. state in the SAC.

Even if Plaintiffs had pled Rule 10b-5 violations in the United States, "the focus of the Exchange Act is not upon the place where the deception originated." *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 266 (2010). The test rests on "irrevocable liability" based on "'when the parties to the transaction are committed to one another.'" *Williams v. Binance*, 96 F.4th 129, 136 (2d Cir. 2024). Irrevocable liability is plausibly pled when securities "were matched in the United States," parties entered "Terms of Use . . . in the United States," or United States residents "placed . . . orders from the United States." *Messieh v. HDR Glob. Trading Ltd.*, 2024 WL 1436755, at *3 (S.D.N.Y. Apr. 3, 2024).

The Foreign Plaintiffs have not pled any fact that would allow the Court to infer that irrevocable liability for their transactions attached in the United States. Each resides, placed orders, and executed CryptoZoo's terms of service abroad. *See* Mot. at 19 n.4. And none specifies on what exchange he purchased CryptoZoo products or where the servers for that exchange were based. *See, e.g.*, *Rubenstetn v. Ishizuka*, 2025 WL 1489375, at *6 (S.D.N.Y. May 23, 2025) (no domestic transaction where complaint omitted facts "regarding the location of the transfer of title"); *Azad v. Jenner*, 2025 WL 1718273, at *4 (C.D. Cal. May 9, 2025) ( "no basis to conclude" that transactions were domestic where complaint "fail[ed] to clarify" whether any method for purchasing tokens "would have subjected [plaintiff] to irrevocable liability within the United States," and "fail[ed] to specify which method [plaintiff] actually used."); *Baylor v. Honda Motor Co.*, 2024 WL 650415, at *4 (C.D. Cal. Jan. 19,

10

2024) ("Though . . . Honda's [securities] are traded on the [NYSE] . . . Plaintiffs fail to allege that that is where they purchased" the securities, which were "likely" also available on foreign exchanges).

Defendants look to *Williams v. Binance* to establish that the Binance blockchain has servers in the United States, but *Williams* was not so broad. There, irrevocable liability attached to purchases on the Binance blockchain because the plaintiffs had alleged that "the transactions at issue were matched . . . on servers located in the United States." 96 F.4th at 137. The *Williams* plaintiffs, however, also *initiated* their transactions in the United States. *See id.* at 134. This "render[ed] it more plausible" that their trades "were matched over Binance's servers . . . in the United States, *as opposed to Binance's servers located elsewhere." Id.* at 138 (emphasis added). Here, the Foreign Plaintiffs purchased CryptoZoo abroad and do not allege where, or on what server, their transactions were "matched."

## B. Other Plaintiffs Similarly Lack Standing.

Mr. Paul established in his Motion that Plaintiffs who purchased CryptoZoo products before relying on alleged misrepresentations lack standing because they are "holders" of securities. *See* Mot. at 26-28. Plaintiffs do not dispute this argument in their response. They have, accordingly, waived the issue. *See Ark. v. Wilmington Tr. Nat'l Ass'n*, 2020 WL 1249570, at *5 (N.D. Tex. Mar. 16, 2020) ("Failure of a party to respond to arguments raised in a motion to dismiss constitutes waiver or abandonment of that issue….") (citing *Black v. Panola Sch. Dist.*, 461 F.3d 584, 588 n.1 (5th Cir. 2006)).

Plaintiffs argue without any authority that all domestic plaintiffs have standing because they purchased CryptoZoo products in a "rigged market." Resp. at 35-36. "[P]arties that fail to provide citations or authorities in support of an issue waive their arguments." *Murphy v. Edgefield Holdings, L.L.C.*, 2023 WL 4763331, at *3 (5th Cir. July 26, 2023). To the extent Plaintiffs intend to suggest that they need not plead reliance on specific statements with specific dates, their argument falls short. Without specificity, the Court cannot determine whether particular purchases pre- or post-dated each plaintiff's reliance (to the extent they even occurred. *See* Mot. at 26-28. Such allegations also fail to

11

state claims because they do not satisfy the PSLRA and Rule 9(b). *See id.* at 28-29.

## IV.    PLAINTIFFS HAVE NOT PLED FRAUD ON THE MARKET.

A plaintiff seeking to invoke a presumption of reliance based on fraud on the market must plead that (1) alleged misrepresentations were publicly known and material; (2) the stock traded in an efficient market; and (3) the plaintiff traded the stock between the time the misrepresentation was made and when the truth was revealed. R&R at 62-63 (citing *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 594 U.S. 113, 118 (2021)). Plaintiffs have not even attempted to satisfy this basic test.[11]

"An efficient capital market is one in which the price of the stock at a given time is the best estimate of what the price will be in the future." *Krogman v. Sterritt*, 202 F.R.D. 467, 477 (N.D. Tex. 2001) (quoting *Finkel v. Docutel/Olivetti Corp.*, 817 F.2d 356, 360 n.8 (5th Cir. 1987)). "Hence, in an efficient market, a stock's price remains relatively stable in the absence of news, and changes very rapidly as the market receives new and unexpected information." *Id.* Plaintiffs plead nothing about CryptoZoo prices or their stability over time.[12] This alone warrants rejection of Plaintiffs' argument.

Plaintiffs contend that they have pled an efficient market because they allege that CryptoZoo traded on the Binance blockchain.[13] *See* Resp. at 23. Not only have they not alleged that the Binance blockchain is efficient, but the Binance blockchain is also not "market" in question—Plaintiffs must allege that the market *for CryptoZoo products* was efficient. *See, e.g., Unger*, 401 F.3d at 324-25 (weighing market efficiency by reference to stock-specific attributes, not efficiency of exchange); *Krogman*, 202 F.R.D. at 474 (citing average trade volume as "one of the most important [factors] in gauging the efficiency of *the market for a particular stock*") (emphasis added); *see also, e.g., In re Xcelera.com Sec. Litig.*,

---

[11] Plaintiffs have waived their right to rely on any other presumption-of-reliance theory by not raising any in their response. *See, e.g., United States v. Reagan*, 596 F.3d 251, 254 (5th Cir. 2010).

[12] Nor do they address the factors courts consider when addressing market efficiency. *See Unger v. Amedisys Inc.*, 401 F.3d 316, 323 (5th Cir. 2005) (listing factors).

[13] The Binance blockchain was one of numerous exchanges on which consumers could purchase CryptoZoo products. *See* SAC ¶¶ 2, 367, 397.

430 F.3d 503, 511 (1st Cir. 2005) (applying *Cammer* factors to "evaluat[e] whether the Xcelera market was efficient"). Nor have Plaintiffs alleged that they "relied on an assumption of an efficient market free of manipulation." *Willcot v. S.E.C.*, 2025 WL 4656790, at *5 (W.D. Tex. Dec. 19, 2025).

Plaintiffs also fail to allege that any representation attributed to Mr. Paul was "publicly known." Plaintiffs argue that Mr. Paul "broadcast" certain representations "on his widely watched YouTube channel," Resp. at 23, but their argument, once again, rests on allegations absent from their pleading. Plaintiffs describe four alleged misstatements by Mr. Paul on his YouTube channel, three of which this Court has already categorized as mere puffery.[14] *see* R&R at 30-31. Other statements attributed to Mr. Paul were released on Twitter, another person's personal YouTube channel, medium.com, and a livestream aired on an unidentified platform. *See, e.g.*, SAC ¶¶ 367, 378-80, 383. Regardless, Plaintiffs plead no facts from which the Court can infer that any of Mr. Paul's statements were "widely watched." *See id.* More importantly, some Plaintiffs do not plead reliance on the YouTube broadcast (or, variously, Mr. Paul's other statements) at all, *see, e.g.*, SAC ¶¶ 116, 156, 244, 294, 342, which rebuts any presumption of market-wide reliance. *See, e.g.*, *In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 637 (3d Cir. 2011) (citing "non-exhaustive list of ways" defendants can rebut presumption or reliance, "including by showing[] : . . .a plaintiff did not actually rely on the misrepresentations"), *abrogated on other grounds by Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455 (2013); *In re Cornerstone Propane Partners, L.P. Sec. Litig.*, 2006 WL 1180267, at *4 (N.D. Cal. May 3, 2006) (fraud-on-the-market presumption "may be rebutted by a showing that a particular plaintiff did not actually rely on the alleged misstatement[.]").

Finally, where reliance turns on fraud-on-the-market, the alleged misrepresentation must have, in fact, affected the market price. *In re Key Energy Servs., Inc. Sec. Litig.*, 166 F. Supp. 3d 822, 836 (S.D. Tex. 2016) (quoting *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 415 (5th Cir. 2001). Plaintiffs have not tied

---

[14] Plaintiffs have not plausibly alleged that Zoo NFTs were not "hand made." *See* Mot. at 35-36.

any representation by Mr. Paul to the market price for CryptoZoo products. *See* pp. 14-15, *infra.*

## V.    PLAINTIFFS HAVE NOT PLED LOSS CAUSATION.

Plaintiffs miss the point of Mr. Paul's loss causation argument. They focus on allegations describing the "leaking of the truth" about CryptoZoo to the market; specifically, allegations about CoffeeZilla's December 2022, YouTube broadcast purportedly "exposing the fraud" and the subsequent "gradual revelation that the game never existed," Mot. at 30, which Plaintiffs do not describe, let alone plead with particularity, *see, e.g.*, *Catogas v. Cyberonics, Inc.*, 292 F. App'x 311, 312 (5th Cir. 2008) ("[P]laintiffs failed to plead loss causation with the requisite particularity."). As in the SAC, however, Plaintiffs never tie these "leaks" to their alleged losses. Plaintiffs fail, that is, to cast Coffeezilla's broadcast—or any event—as the cause of the ultimate decline in CryptoZoo prices.

Even under *Lormand v. US Unwired, Inc.*, plaintiffs must do more than plead misrepresentations and subsequent disclosures that *might* have contributed to a security's loss in value; they must connect these events to changes in price to demonstrate that the "leaking of the truth"—*and not other events*, *e.g.* a larger crypto market collapse[15]—was plausibly "a significant cause of the decline." 565 F.3d 228, 260 (5th Cir. 2009). Loss causation also assumes an efficient market, *see id.* at 259, in which prices respond reliably to new information, *see id.*; p. 12, *supra*. Plaintiffs have not pled one here. *See* pp. 12-13, *supra*.

Plaintiffs attempt to correct these deficiencies with a graphic not included in their pleading, *see* Resp. at 32, but the graphic does not establish an efficient market or loss causation. It shows, for example, early peaks and dips (Nos. 1-3), with no explanation offered for the dips; dips attributed to a mix of positive and negative information (*e.g.*, No. 5); positive representations to the market that had no effect (No. 7); and a purported "leaking of the truth" (No. 8, the December 2022 Coffeezilla expose), that had no effect. *See* Resp. at 32 & Ex. B). Regardless, the Court cannot consider the graphic

---

[15] *See, e.g.*, A. Levy *et al.*, *Crypto peaked a year ago—investors have lost more than $2 trillion since*, CNBC (Nov. 11, 2022), *available at* https://www.cnbc.com/2022/11/11/crypto-peaked-in-nov-2021-investors-lost-more-than-2-trillion-since.html.

(specifically the price data) at this stage. *See, e.g., Palmer v. Harris Cnty.*, 2025 WL 2605406, at \*6 (S.D. Tex. Sept. 5, 2025) (court cannot consider new facts pled for the first time in a motion to dismiss response) (citing *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008)).

## VI.    PLAINTIFFS HAVE NOT PLED SCIENTER.

Plaintiffs accuse Mr. Paul of applying the wrong pleading standard for scienter, but themselves disregard the PSLRA. *See* Resp. at 27. Though Rule 9(b) permits plaintiffs with fraud claims to "aver generally" facts supporting "malice, intent, knowledge, and other condition of mind," *id.*, a plaintiff pleading *securities* fraud "shall, with respect to act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 430 (5th Cir. 2002). "To qualify as 'strong'. . . an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent" and "strong in light of other explanations." *Tellabs*, 551 U.S. at 310. Plaintiffs have not met this standard. *See* Mot. at 31-32.

Plaintiffs base their argument that they have pled scienter on a list of unsupported and inactionable conclusions set forth in the SAC. They first attempt to attribute malice to Mr. Paul based on statements this Court has already classified as "puffery"—promotional statements that CryptoZoo was "really fun" and "addicting." *See* Resp. at 27. They then contend Mr. Paul "drafted founding documents to ensure he received the greatest portion of founder shares," *id.* at 28, but do not identify allegations that Mr. Paul drafted CryptoZoo's founding documents (there are none), let alone provide any basis to conclude that the allocation of CryptoZoo's shares was in any way fraudulent. *See* SAC ¶ 347. Plaintiffs' conclusions that Mr. Paul stole from CryptoZoo and "us[ed] corporate formalities to punish co-founders" are similarly unsubstantiated by expounding facts. *See* Mot. at 10-11, 33 n.11.

Plaintiffs also argue that CryptoZoo's "Rules for Selling" reflect Mr. Paul's awareness that CryptoZoo products were securities. *See* Resp. at 29-30. Not so. First, Plaintiffs plead nothing to tie

15

CryptoZoo's "Rules for Selling" to Mr. Paul. *See* SAC ¶ 7. In fact, allegations elsewhere in the SAC suggest that he played no role; Plaintiffs plausibly allege that only Mr. Greenbaum and Mr. Ibanez exhibited an understanding of the mechanics and dynamics of cryptocurrency markets. *See id.* ¶¶ 348-52. Second, Plaintiffs' allegations do not support the conclusion that internal governance rules about when founders can liquidate their holdings are inconsistent with legitimate business management in a non-securities context. The existence of these rules, standing alone, does not establish that Mr. Paul knew that CryptoZoo products were securities or had fraudulent intent.

Finally, Plaintiffs argue that Mr. Paul "forced an illegal presale of Zoo Tokens" and promoted a game that would never exist, but these accusations are not "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. The former contention depends on CryptoZoo products' status as securities—they are not. *See* Section II, *supra*. Regardless, Plaintiffs' allegations indicate, at best, that Mr. Paul depended on his co-founders' belief that CryptoZoo tokens *could* be considered securities *if* CryptoZoo launched a presale before the tokens went public, and advice, instead, to "lock" the tokens in a "liquidity pool." *See* SAC ¶¶ 350-51. These allegations do not support the conclusion that Mr. Paul "forced an illegal presale of tokens."[16] Mot. at 28.

Nor is Plaintiffs' contention that Mr. Paul promoted a nonexistent game borne out by their allegations. Plaintiffs base their argument on page 34 of Mr. Paul's Crossclaim, which they cite to establish that three weeks after his promotion of CryptoZoo as a "really fun" and "addicting" game, "on September 8, 2021, Paul acknowledged that no playable game had been built." Resp. at 27 (citing SAC ¶ 362). The allegations Plaintiffs cite, however, say no such thing. In paragraph 362 of the SAC, Plaintiffs allege that on September 8, Mr. Paul "saw that no functional game existed, no playable build had been delivered, and . . . privately acknowledged confusion and dissatisfaction with the state of

---

[16] Plaintiffs allege that Defendants did "a presale through illegal liquidity pool trading" before releasing their products. SAC ¶ 351. A presale and liquidity pool trading are not the same. *See* SAC ¶¶ 350-51.

development." SAC ¶ 362. As authority, the complaint cites page 34 of the Crossclaim, which alleges that on September 8, "Mr. Paul was shown a test of CryptoZoo's *virtual marketplace*[,]" which seemed to Mr. Paul "confusing" and "incomplete." Crossclaim [D.E. 55] at ¶ 91 (emphasis added). The virtual marketplace is not the game. In fact, the next paragraph of the Crossclaim reveals that just three weeks later, on September 29, 2021, Mr. Paul learned *for the first time* that Mr. Ibanez's lead developer had "stolen the code to the Game." *Id.* ¶ 92. This indicates not only that the game *existed* before September 29, but also that Mr. Paul had *believed that it existed* on September 8, when he was shown a test of the virtual marketplace; on August 18, 2021, when he described the game as "really fun"; *and* on September 15, when he described the game as "addict[ing]" and "so much fun." *See* Resp. at 27; SAC ¶¶ 12, 380.

Mr. Paul is an entertainer who relied on his co-founders to build his passion project. *See* SAC ¶¶ 35, 343, 344, 348. After they defrauded him, Mr. Paul still expected a "successful[] launch," and when the project failed, he instituted a buyback program. *See id.* ¶¶ 22, 365. This narrative—pled in Mr. Paul's Crossclaim—is "at least as compelling as" Plaintiffs' conclusory allegations.[17] *Tellabs*, 551 U.S. at 310; *see Abrams*, 292 F.3d at 430 (one must "state with particularity" facts to support scienter).

## VII.    PLAINTIFFS HAVE NOT PLED MATERIAL MISREPRESENTATIONS.

Plaintiffs do not respond directly to Mr. Paul's arguments addressing their failure to plead actionable misrepresentations—they recite select allegations and proclaim them sufficient without significant authority. *See* Resp. at 19-22. Only a few points warrant attention.

*First*, Plaintiffs contend that Mr. Paul's August 18, 2021 statements about CryptoZoo making players money are not puffery because the game did not yet exist. *See* Resp. at 20. Setting aside this Court's prior holding, *see* pp. 2, 13, *supra*, Plaintiffs' allegations do not support the conclusion that Mr. Paul believed the game existed, *see* p. 17, *supra*. Plaintiffs allege that Mr. Paul retained Mr. Ibanez and

---

[17] Critically, Plaintiffs concede that a reasonable, alternate interpretation exists: that Mr. Paul was "inept and ignorant in the coordination of and delivering on his promises," and "negligent in his promotion of assets he could neither produce nor understand." Resp. at 29.

17

others to "develop[] what would become CryptoZoo."[18] SAC ¶¶ 35, 343, 344, 348. Messages among the founders show that Mr. Paul relied on others to handle the project's technical aspects and knew little about cryptocurrency, SEC regulations, or building the game. *See, e.g., id.* ¶¶ 348-51. Plaintiffs also allege that *after* August 18, Mr. Paul was surprised to discover that elements of the project were off-track and still expected a successful launch. *See id.* ¶¶ 365, 377. Taken together with Plaintiffs' averment that only Ibanez and Greenbaum "pulled the rug," *see id.* ¶¶ 8, 353, these allegations do not suggest that Mr. Paul made *knowing mis*representations. *See, e.g., In re Anadarko Petrol. Corp. Class Action Litig.,* 957 F. Supp. 2d 806, 818 (S.D. Tex. 2013) (securities fraud requires intent or "severe recklessness").

*Second,* Plaintiffs argue that even if affirmative statements in the *Medium* article and Whitepaper belong to CryptoZoo, Mr. Paul remains liable for omissions related to those statements. *See* Resp. at 22. Not so. Liability for material omissions depends on a duty to disclose, which attaches to the speaker of the associated affirmative misrepresentation. *See, e.g., S.E.C. v. Mapp,* 240 F. Supp. 3d 569, 584 (E.D. Tex. 2017) (plaintiff with omission-based claim must identify affirmative statement by same defendant "on that particular subject"). Because Mr. Paul did not author the Whitepaper or *Medium* article, *see* Mot. at 33-34, he owed no duty to disclose clarifying information, *see, e.g., Mapp, supra.*

*Third,* and finally, without citing the SAC, Plaintiffs contend that Mr. Paul's motion fails to address his representations regarding "CryptoZoo assets' yield or money-earning potential" and "the continued value of CryptoZoo assets following his market manipulation." Resp. at 22. To the extent that Plaintiffs contend that Mr. Paul promised investment returns, they have not alleged so. *See* p. 6, *supra.* As for the "yield mechanism" purportedly missing from the CryptoZoo game, these allegations describe an in-game feature designed to generate in-game tokens for consumptive use, regardless of whether the technical implementation failed. *See* p. 6, *supra*; SEC Interpretation at 16. Under *Forman,*

---

[18] In an seeming typographical error, Plaintiffs allege that Mr. Paul "recruited the other Defendant Paul" to develop CryptoZoo. *See* SAC ¶ 348. This appears to refer to Ibanez or Greenbaum.

a defective game component cannot provide the basis for a securities fraud claim. *See* p. 6, *supra.*

## VIII.    PLAINTIFFS' ALLEGATIONS ARE NOT SUFFICIENTLY PARTICULAR.

Plaintiffs rest their particularity argument on one opinion in which a New York court determined—based on case-specific facts—that under Rule 9(b) "specific details regarding all purchases and sales" were not required. *See Maverick Fund, L.D.C. v. Comverse Tech., Inc.*, 801 F. Supp. 2d 41, 53 (E.D.N.Y. 2011) ("*In the context of this case*, I conclude that the plaintiffs are not required to plead the specific details of each purchase and sale …") (emphasis added). The Fifth Circuit sees things differently. *See, e.g.*, *Holland v. GEXA Corp.*, 161 F. App'x 364, 365 (5th Cir. 2005) (affirming dismissal for failure to plead price of shares or that 10b–5 violations caused loss in value).

Plaintiffs offer no defense for their failure to plead forty-four Plaintiffs' reliance on *any* specific representation. *See Lemmer v. Nu-Kote Holding, Inc.*, 2001 WL 1112577, at *4 (N.D. Tex. Sept. 6, 2001), *aff'd*, 71 F. App'x 356 (5th Cir. 2003). Nor do they attempt to justify omitting some dates of purchases of "CryptoZoo Products." *See Dorsey*, 540 F.3d at 340 ("Even assuming [plaintiff] made additional purchases. . . he failed to allege specifically when those purchases were made.").

As to the attribution of CryptoZoo's *Medium* "article," Plaintiffs contend that allegations that Mr. Paul "either personally authored" it "or provided direct, hands-on instruction" are enough. *See* Resp. at 26. Citing nothing, they claim that "[a]t the pleading stage, the above allegation is taken as true and pleaded sufficiently." *Id.* Plaintiffs fail to mention, conveniently, that they pled as much on information and belief. *See* SAC ¶ 366. This does not satisfy Rule 9(b) or the PSLRA. *See Schiller v. Phys. Res. Grp., Inc.*, 2002 WL 318441, at *4 (N.D. Tex. Feb. 26, 2002), *aff'd*, 342 F.3d 563 (5th Cir. 2003).

Finally, Plaintiffs contend without support that they need not disclose *what* they purchased. *See* Resp. at 25-26. The court must disregard their unsupported argument. *See* p. 11, *supra.*

## IX.    THE COURT SHOULD NOT GRANT PLAINTIFFS LEAVE TO AMEND.

Plaintiffs have failed three times to state claims against Mr. Paul. Now, more than three years

19

into this case, they seek leave to file a *fourth pleading*, citing documents excerpted in Exhibit C to their response. All documents cited in Exhibit C were produced in other litigation by February 2025 and were available to Plaintiffs' counsel long before they filed the SAC in November 2025.[19] In any event, Plaintiffs mischaracterize the substance of those messages, which would not help Plaintiffs overcome the SAC's many pleading deficiencies. Substantively, the first three messages are not about CryptoZoo—they refer to another project developed before CryptoZoo launched. *See* Ex. C. at 1-2. The fourth, about CryptoZoo's Whitepaper, demonstrates that Mr. Paul did *not* author the Whitepaper (or grasp its contents). *See id.* at 2-3. The fifth is consistent with the promotion of CryptoZoo as a game—it reflects two founders talking about the profits from a new company. *See id.* at 3-4. The statements in the fifth through tenth are by anonymous speakers and do not go to Mr. Paul's state of mind. *See id.* at 3-8. Finally, the eleventh through fourteenth are from 2023, after Plaintiffs' purchases and Coffeezilla's purported exposé. *See id.* at 9-10. They do not reflect Mr. Paul's pre-purchase intent or suggest that CryptoZoo products are securities. *See id.* Granting Plaintiffs a fourth bite at the apple would be futile. *See, e.g.*, *Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 379 (5th Cir. 2014) (affirming district court's denial of leave to file a fourth complaint).

## CONCLUSION

The Court should dismiss the Second Amended Complaint in its entirety and with prejudice.[20]

Dated: April 15, 2026

---

[19] The excerpts in Exhibit C come from five documents produced to Mr. Findeisen, who is an "unpaid consulting expert" in this litigation. *See Paul v Findeisen*, No. 5:24-cv-00717 (W.D. Tex.); *see also id.* at D.E. 62-1 at ¶ 11(h). One document remains subject to a protective order prohibiting its disclosure beyond *Findeisen* and should not have been shared. Regardless, all were available to Plaintiffs by February 2025, and none justifies granting further opportunities to amend.

[20] Because Plaintiffs cannot state federal claims, the Court lacks jurisdiction over the rest. Mot. at 39.

Respectfully submitted,

| | |
|---|---|
| /s/ *Benjamin J. Widlanski*<br>Benjamin J. Widlanski, Esq.<br>Email: bwidlanski@kttlaw.com<br>Tal Lifshitz, Esq.<br>Email: tjl@kttlaw.com<br>Rachel Sullivan, Esq.<br>Email: rs@kttlaw.com<br>Clayton J. Schmitt, Esq.<br>Email: cschmitt@kttlaw.com<br>**KOZYAK TROPIN & THROCKMORTON LLP**<br>2525 Ponce de Leon Blvd., 9th Floor<br>Miami, Florida 33134<br>Telephone: (305) 372-1800<br>Facsimile: (305) 372-3508<br><br>*Counsel for Defendant Logan Paul*<br>(admitted *pro hac vice*) | /s/ *Jeffrey Neiman*<br>Jeffrey Neiman, Esq.<br>jneiman@nmfalawfirm.com<br>Jason L. Mays, Esq.<br>jmays@nmfalawfirm.com<br>**NEIMAN MAYS FLOCH & ALMEIDA PLLC**<br>100 SE 3rd Ave., Suite 805<br>Fort Lauderdale, Florida 33394<br>Telephone: (954) 462-1200<br><br>*Counsel for Defendant Logan Paul*<br>(admitted *pro hac vice*) |
| /s/ *Shelby O'Brien*<br>Shelby O'Brien<br>**BUTLER SNOW LLP**<br>1400 Lavaca St., Suite 1000<br>Austin, Texas 78701<br>Telephone: (737) 802-1800<br>Facsimile: (737) 802-1801<br>shelby.obrien@butlersnow.com<br><br>*Counsel for Defendant Logan Paul*<br>(admitted to Western District of Texas) | |

## CERTIFICATE OF SERVICE

I hereby certify a copy of the above and foregoing has been served upon all counsel of record by using the Court's electronic filing system on April 15, 2026.

/s/ *Benjamin J. Widlanski*